

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 2, 2022**

*Mark X. Mullin*
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 22-90000 (MXM) |
| | § | |
| ROCKALL ENERGY HOLDINGS, LLC, | § | (Chapter 11) |
| *et al.*, | § | |
| | § | (Jointly Administered) |
| | § | |
| Debtors.[1] | § | Re:  Dkt. Nos. 14, 15, 92, 411, 412, 548 |

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND ORDER
(I) APPROVING (A) THE DISCLOSURE STATEMENT
AND (B) THE DISCLOSURE STATEMENT SUPPLEMENT;
(II) CONFIRMING THE DEBTORS' AMENDED JOINT CHAPTER
11 PLAN; AND (III) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS**

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Arrow Rock Energy, LLC (7549), Petro Harvester Operating Company, LLC (2136), Rockall Agent Corp. (1653), Rockall Energy Holdings, LLC (5784), Rockall Energy, LLC (6340), Rockall EOR, LLC (4136), Rockall Exploration Company, LLC (0547), Rockall Intermediate, Inc. (9759), Rockall LA, LLC (4270), Rockall Laurel, LLC (1178), Rockall Midstream, LLC (0917), Rockall MS, LLC (0740), Rockall ND, LLC (9311), Rockall Pine Prairie, LLC (5799), White Marlin Investment Company, LLC (9987), and White Marlin Midstream, LLC (1466).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  5005 LBJ Freeway, Suite 700, Dallas, TX 75244.

US 8836385

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***")

having:

a. distributed, through Stretto Inc. (the "***Voting Agent***"), on or about March 9, 2022 (i) the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan* [Dkt. No. 15] (as may be amended, supplemented, or modified from time to time, the "***Disclosure Statement***"); (ii) the *Debtors' Joint Prepackaged Chapter 11 Plan* [Dkt. No. 14] (the "***Initial Plan***"); and (iii) a ballot (the "***Prepetition Ballot***") for voting on the Plan to each Holder of a Class 3 Secured Parties Claim in accordance with title 11 of the United States Code (the "***Bankruptcy Code***"), the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "***N.D. Tex. L.B.R.***"), and applicable nonbankruptcy law, as evidenced by the *Declaration of Alexa Westmoreland on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting or Rejecting the Debtors' Joint Prepackaged Chapter 11 Plan* [Dkt. No. 19] (the "***Prepetition Voting Report***");

b. commenced these chapter 11 cases by filing voluntary petitions for relief under the chapter 11 of the Bankruptcy Code on March 9, 2022 (the "***Petition Date***") in the United States Bankruptcy Court for the Northern District of Texas (the "***Bankruptcy Court***");

c. continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

d. filed, on the Petition Date, the prepetition solicitation version of the Initial Plan;

e. filed, on March 10, 2022, the prepetition solicitation version of the Disclosure Statement;

f. filed, on March 10, 2022, the *Emergency Motion for Entry of an Order (I) Scheduling a Combined Hearing to Consider (A) Approval of the Disclosure Statement and (B) Confirmation of the Plan; (II) Approving the Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots and Notices; and (IV) Granting Related Relief* [Dkt. No. 18] (the "***Scheduling Motion***");

g. filed, on March 10, 2022, the Prepetition Voting Report, which detailed the results of the prepetition Plan solicitation and voting process;

h. filed, on March 10, 2022, the *Emergency Motion for Entry of Orders (A)(I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment*

US 8836385

*of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Dkt. No. 16] (the "***Sale Motion***");

i.       filed, on March 18, 2022, the notice, setting forth, among other things, the date and time set for the confirmation hearing to consider the adequacy of the Disclosure Statement (including the Disclosure Statement Supplement) and the Confirmation of the Plan (the "***Combined Hearing***"),[2] and the deadlines for filing objections to the Plan and the Disclosure Statement (the "***First Combined Hearing Notice***") on Stretto's public website for these chapter 11 cases [Dkt. No. 129];

j.       caused notice of the Combined Hearing to be published on April 6, 2022, in *The Wall Street Journal* [Dkt. No. 259], *The Clarion-Ledger* [Dkt. No. 257], the *Bismarck Tribune* [Dkt. No. 255], and *The Advocate* [Dkt. No. 253] (collectively, the "***Combined Hearing Publication Notice***");

k.       caused, on April 14, 2022, the *Notice of Deadlines for Filing Proof of Claim* (the "***Bar Date Notice***") to be distributed through Stretto, as evidenced by the *Certificate of Service* [Dkt. No. 267] (the "***Bar Date Notice Affidavit***"); and (i) on April 19, 2022, caused the publication of the Bar Date Notice in *The New York Times*, as evidenced by the *Certificate of Publication for Edgar Noblesala of The New York Times* [Dkt. No. 292] (the "***New York Times Publication Notice Affidavit***"); (ii) on April 20, 2022 caused the publication of the Bar Date Notice in *The Clarion-Ledger*, as evidenced by the *Certificate of Publication for the Authorized Clerk of The Clarion-Ledger* [Dkt. No. 291] (the "***Clarion-Ledger Publication Notice Affidavit***"); (iii) on April 20, 2022 caused the publication of the Bar Date Notice in *The Advocate*, as evidenced by the *Certificate of Publication for Joy Newman of The Advocate* [Dkt. No. 294] (the "***Advocate Publication Notice Affidavit***"); and (iv) on April 21, 2022 caused the publication of the Bar Date Notice in the *Bismarck Tribune*, as evidenced by the *Certificate of Publication for Jill Lindsay of the Bismarck Tribune* [Dkt. No. 293] (the "***Tribune Publication Notice Affidavit***," together, with the Bar Date Notice Affidavit, the New York Times Publication Notice Affidavit, the Clarion-Ledger Publication Notice Affidavit, and the Advocate Publication Notice Affidavit, the "***Bar Date Affidavits***");

l.       filed, on April 29, 2022, (i) the *Notice of Filing of Global Settlement Term Sheet* [Dkt. No. 367]; and (ii) the *Notice of Filing Supplement to the Debtors' Joint Prepackaged Chapter 11 Plan* [Dkt. No. 368] (the "***First Plan Supplement***");

m.       filed, on May 3, 2022, the *Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 399];

n.       filed, on May 3, 2022, the *Emergency Motion for Entry of an Order (I) Conditionally Approving the Disclosure Statement Supplement; (II) Approving*

---

[2]       For the avoidance of doubt, the Combined Hearing also means the hearing to consider approval of the Sale and PSA (each as defined in the Sale Approval Order (as defined below)) (in such context, the "***Sale Hearing***").

US 8836385

*the Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots; and (IV) Granting Related Relief* [Dkt. No. 401] (the "***Disclosure Statement Supplement Motion***");

o.      filed, on May 3, 2022, the solicitation versions of (i) the *Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 411] (the "***Solicited Plan***"); (ii) the *Supplement to the Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 412] (the "***Disclosure Statement Supplement***"); (iii) the Committee letter supporting the Plan [Dkt. No. 401, Ex. C] (the "***Committee Letter***"); and (iv) instructions for Holders of Class 4 General Unsecured Claims to access the ballot (the "***Postpetition Ballot***," and together with the Prepetition Ballot, the "***Ballots***") to vote to accept or reject the Plan [Dkt. No. 401, Ex. D] (the "***Ballot Instructions***");

p.      filed, on May 4, 2022, the notice adjourning the Combined Hearing and setting deadlines for filing objections to the Plan, Disclosure Statement, and for postpetition voting to accept or reject the Plan by Holders of Class 4 General Unsecured Claims [Dkt. No. 414] (the "***Second Combined Hearing Notice***," and together with the First Combined Hearing Notice, the "***Combined Hearing Notices***");

q.      filed, on May 19, 2022, the *Declaration of Alexa Westmoreland on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting or Rejecting the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 482] (the "***First Postpetition Voting Report***"), which detailed the solicitation of Holders of Class 4 General Unsecured Claims and the results of such Class's voting to accept or reject the Plan;

r.      filed, on May 20, 2022, the *Notice of (I) Successful Bidder With Respect to the Sale of Substantially All of the Debtors' Assets; (II) Cancellation of Auction; and (III) Adjournment and Rescheduling of (A) Sale Hearing and (B) Combined Hearing* [Dkt. No. 513] (the "***Notice of Winning Bidder***");

s.      filed, on May 20, 2022, that certain *Purchase and Sale Agreement* [Dkt. No. 513, Ex. A] (together with all ancillary documents, as may be amended, modified, or supplemented, the "***PSA***");

t.      filed, on May 20, 2022, the *Sale Approval Supplement to Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving (A) the Disclosure Statement, and (B) the Disclosure Statement Supplement, and (II) Confirming the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 513, Ex. B] (the "***Sale Approval Order***");

u.      filed, on May 23, 2022, the *Notice of Filing Second Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 529] (the "***Second Plan Supplement***");

v.      filed, on May 24, 2022, the *Debtors' Memorandum of Law in Support of (I) Approval of the Disclosure Statement and the Disclosure Statement Supplement;*

US 8836385

*(II) Confirmation of the Debtors' Amended Joint Chapter 11 Plan; (III) Authorization for the Sale of the Debtors' Assets; and (IV) Reply to Confirmation Objections* [Dkt. No. 531] (the "**Confirmation Brief**");

w.    filed, on May 24, 2022, the *Declaration of William L. Transier in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 532] (the "**Transier Confirmation Declaration**");

x.    filed, on May 24, 2022, the *Declaration of Christian Tempke in Support of the Debtors' Proposed Sale of Substantially All of Their Assets to Formentera Partners Fund I, LP* [Dkt. No. 533] (the "**Tempke Confirmation and Sale Declaration**");

y.    filed, on May 24, 2022, the *Declaration of Scott M. Pinsonnault in Support of Confirmation of the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 538] (the "**Pinsonnault Confirmation Declaration**," and together with the Transier Confirmation Declaration and the Tempke Confirmation and Sale Declaration, the "**Confirmation Declarations**");

z.    filed, on May 24, 2022, the *Notice of Filing Third Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 545] (the "**Third Plan Supplement**");

aa.    filed, on May 25, 2022, the *Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 548] (as may be further modified, amended, or supplemented from time to time, the "**Plan**"), a copy of which is attached hereto as **Exhibit A**;[3]

bb.    filed, on May 25, 2022, the *Notice of Filing Fourth Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 559] (the "**Fourth Plan Supplement**");

cc.    filed, on May 26, 2022, the *Amended Declaration of Alexa Westmoreland on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting or Rejecting the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 568] (the "**Postpetition Voting Report**," and together with the Prepetition Voting Report and the First Postpetition Voting Report, the "**Voting Reports**"); and

dd.    filed, on May 30, 2022, the *Notice of Filing Fifth Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 581] (the "**Fifth Plan Supplement**" and, together with the First Plan Supplement, Second Plan Supplement, Third Plan Supplement, and Fourth Plan Supplement, the "**Plan Supplement**").

The Bankruptcy Court having:

a.    entered, on March 14, 2022, the *Order (I) Scheduling a Combined Hearing to Consider (A) Approval of the Disclosure Statement and (B) Confirmation of the Plan; (II) Approving the Solicitation and Tabulation Procedures; (III) Approving*

---

[3]    Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Plan. The rules of interpretation set forth in Article I.B of the Plan apply.

the *Form of Ballots and Notices; and (IV) Granting Related Relief* [Dkt. No. 88] (the "***Disclosure Statement Order***"), which, among other things, approved the Debtors' prepetition solicitation and tabulation procedures (the "***Prepetition Solicitation and Tabulation Procedures***");

b. entered, on March 14, 2022, the *Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadline and the Auction, (III) Scheduling the Hearing and Objection Deadlines With Respect to the Sale, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Dkt. No. 92] (the "***Bidding Procedures Order***");

c. entered, on April 5, 2022, the *Order (I) Establishing Bar Dates and Procedures and (II) Approving the Form and Manner of Notice Thereof* [Dkt. No. 202] (the "***Bar Date Order***");

d. set May 3, 2022, as the postpetition voting record date (the "***Postpetition Voting Record Date***") for Holders of Class 4 General Unsecured Claims;[4]

e. entered, on May 4, 2022, the *Order (I) Conditionally Approving the Disclosure Statement Supplement; (II) Approving the Solicitation and Tabulation Procedures; (III) Approving the Form of Ballots; and (IV) Granting Related Relief* [Dkt. No. 413] (the "***Disclosure Statement Supplement Order***," and together with the Disclosure Statement Order, the "***Disclosure Statement Orders***"), which, among other things, approved the Debtors' solicitation and tabulation procedures to solicit Holders of Class 4 General Unsecured Claims to vote to accept or reject the Plan (the "***Postpetition Solicitation and Tabulation Procedures***," and together with the Prepetition Solicitation and Tabulation Procedures, the "***Solicitation and Tabulation Procedures***");

f. set May 7, 2022 (or as soon as reasonably practicable), as the date by which the Debtors must complete solicitation;

g. set May 11, 2022, at 5:00 p.m. (prevailing Central Time) as the deadline by which objections to the Plan and the Disclosure Statement must be filed (the "***Confirmation Objection Deadline***");

h. set May 18, 2022, at 5:00 p.m. (prevailing Central Time) as the deadline by which Ballots must be received by the Debtors' Voting Agent (the "***Postpetition Voting Deadline***");

---

[4] The Voting Record Date was extended through May 6, 2022, for any Holders of Class 4 General Unsecured Claims who were not listed in the Debtors' schedules or who were listed in the Debtors' schedules as having a contingent, unliquidated, or disputed claim, and who filed proofs of claim prior to the Claims Bar Date.

US 8836385

i.     set May 19, 2022, as the deadline (the "***Voting Certification Filing Deadline***") by which the Debtors shall file the Postpetition Voting Report;

j.     set May 20, 2022, at 5:00 p.m. (prevailing Central Time) as the deadline by which objections to the Sale must be filed (the "***Sale Objection Deadline***");

k.     set May 20, 2022, as the date by which the Debtors must file a reply to objections to the Plan and the Disclosure Statement (including the Disclosure Statement Supplement);

l.     set May 24, 2022, at 1:30 p.m. (prevailing Central Time) as the date and time for the Combined Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code, subject to adjournment;

m.     continued the Combined Hearing to May 31, 2022, at 1:30 p.m. (prevailing Central Time);

n.     reviewed the Plan, the Confirmation Brief, the Plan Supplement, the Voting Reports, the Confirmation Declarations, the Disclosure Statement, the Disclosure Statement Supplement, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including any and all objections, statements, and reservations of rights filed by parties in interest on the docket of these chapter 11 cases;

o.     held the Combined Hearing;

p.     heard the statements, arguments, and objections, if any, made by counsel in respect of Confirmation of the Plan and approval of the Disclosure Statement (including the Disclosure Statement Supplement);

q.     considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation of the Plan and approval of the Disclosure Statement (including the Disclosure Statement Supplement);

r.     taken judicial notice of all pleadings and other documents filed, all orders entered, and all evidence and arguments presented in these chapter 11 cases; and

s.     overruled any and all objections to the Plan, Confirmation, the adequacy of the Disclosure Statement (including the Disclosure Statement Supplement), and all statements and reservations of right not consensually resolved or withdrawn unless otherwise indicated herein.

**NOW**, **THEREFORE**, the Bankruptcy Court having found that notice of the Combined Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions

7

contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and all evidence proffered, admitted, or adduced by counsel at the Combined Hearing and the entire record of these chapter 11 cases establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following Findings of Fact and Conclusions of Law, and Orders:

<u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:**

**A.      Findings and Conclusions.**

1.      The findings and conclusions set forth herein and on the record of the Combined Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Bankruptcy Rules 7052 and 9014.  To the extent any of the following findings of fact constitute conclusions of law, or vice versa, they are adopted as such.

**B.      Jurisdiction, Venue, and Core Proceeding.**

2.      The Bankruptcy Court has jurisdiction over these chapter 11 cases pursuant to section 1334 of title 28 of the United States Code.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.  Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code.  Confirmation of the Plan is a core proceeding within the meaning of section 157(b)(2) of title 28 of the United States Code, and the Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.

**C.      Eligibility for Relief.**

3.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

US 8836385

**D.** **Commencement and Joint Administration of These Chapter 11 Cases.**

4.      On the Petition Date, each Debtor commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  By prior order of the Bankruptcy Court, these chapter 11 cases were consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Dkt. No. 64].  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  On March 18, 2022, the U.S. Trustee appointed the Official Committee of Unsecured Creditors [Dkt. No. 130] (the "*Committee*") in these chapter 11 cases.

**E.** **Pre- and Post-Petition Marketing and Good Faith.**

5.      In the events leading up to and during the course of these chapter 11 cases, the Debtors explored a variety of alternatives with the goal of maximizing the value of the Debtors' Estates.  The Debtors' officers, directors, financial advisors, attorneys, investment bankers, and other professionals that were involved with the formulation, negotiation, documentation, and approval of the filing of these chapter 11 cases, the Plan, the Global Settlement, and the PSA, and who pursued, analyzed, negotiated, and documented the transactions contemplated thereunder, acted in good faith and made informed decisions in connection therewith, including the decision to enter the PSA.  The Secured Parties, the Intercreditor Agent, the Term Loan Agent, the DIP Lenders, the DIP Agent and each of their respective partners, officers, directors, employees, advisors and professionals acted in good faith in negotiating, formulating and proposing, where applicable, the Plan, the PSA, the Global Settlement (as defined below) and the agreements, compromises, settlements, transactions and transfers contemplated thereby.

US 8836385

**F.      Judicial Notice.**

6.       The Bankruptcy Court takes judicial notice of the docket of these chapter 11 cases maintained by the Clerk of the Bankruptcy Court, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of these chapter 11 cases.

**G.      Notice.**

7.       Due, timely, proper, and adequate notice of the Plan, the Claims Bar Date, and the Combined Hearing, together with the deadlines for voting to accept or reject the Plan as well as objecting to the Plan, has been provided substantially in accordance with the Disclosure Statement Orders and the Bar Date Order, as set forth in the Voting Reports and the Bar Date Notice Affidavit, respectively.

8.       Such notice was appropriate and satisfactory based upon the facts and circumstances of these chapter 11 cases and pursuant to sections 1125 and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3017, 3018, and 3020, and other applicable law and rules. Because such transmittal and service were adequate and sufficient, no other or further notice is necessary or shall be required, and due, proper, timely, and adequate notice of the Combined Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and applicable non-bankruptcy law.

**H.      Solicitation.**

9.       Prior to the Petition Date, the Initial Plan, the Disclosure Statement, and the Prepetition Ballot (collectively the "***Prepetition Solicitation Package***") were transmitted and served in compliance with the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., the Prepetition Solicitation and Tabulation Procedures approved by the Bankruptcy Court via the

US 8836385

Disclosure Statement Order, and all other applicable rules, laws, and regulations applicable to such solicitation. Transmission and service of the Prepetition Solicitation Package was timely, adequate and sufficient. No further notice is required.

10. As set forth in the Prepetition Voting Report, on March 9, 2022, prior to the Petition Date, the Prepetition Solicitation Package was transmitted to and served on the eligible Holders of Class 3 Secured Parties Claims, which was the only Class of Claims entitled to vote to accept or reject the Initial Plan (the "***Prepetition Voting Class***").[5]

11. Following the Global Settlement, the Disclosure Statement Supplement, the Ballot Instructions, and the Committee Letter (collectively, the "***Postpetition Solicitation Package***," together with the Prepetition Solicitation Package, the "***Solicitation Packages***") were transmitted and served in compliance with the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., the Postpetition Solicitation and Tabulation Procedures approved by the Bankruptcy Court via the Disclosure Statement Supplement Order, and all other applicable rules, laws, and regulations applicable to such solicitation. Transmission and service of the Postpetition Solicitation Package was timely, adequate and sufficient. No further notice is required.

12. As set forth in the Postpetition Voting Report, on May 4 and May 7, 2022, the Postpetition Solicitation Package was transmitted to and served on the eligible Holders of Class 4 General Unsecured Claims, which was the only Class of Claims whose votes to accept or reject the Solicited Plan (the "***Postpetition Voting Class***," and together with the Prepetition Voting Class, the "***Voting Classes***") were solicited.[6] As part of the negotiations of the Global Settlement, the Holders of Claims in the Prepetition Voting Class consented to the amendments to the Initial Plan

---

[5] *See* the Prepetition Voting Report [Dkt. No. 19].

[6] *See* the Postpetition Voting Report [Dkt. No. 568].

11

reflected in the Solicited Plan, agreed to waive the right to be re-solicited with respect to the Solicited Plan, and agreed to be deemed to have voted to accept the Solicited Plan.

13. Each eligible Holder of a Claim in the Voting Classes received a Ballot. The form of the Ballots adequately addressed the particular needs of these chapter 11 cases and was appropriate for the Holders of Claims in each Voting Class. The instructions on each Ballot advised that for the Ballot to be counted, the Ballot had to be properly executed, completed, and delivered to the Voting Agent so that it was actually received by the Voting Agent on or before the applicable Voting Deadline. The period during which the Debtors solicited acceptance of the Plan was a reasonable period of time for Holders of Claims in the Voting Classes to make an informed decision to accept or reject the Plan.

14. The Debtors were not required to solicit votes from the Holders of Claims in Class 1 (Other Priority Claims) or Class 2 (Other Secured Claims) (collectively, the "***Unimpaired Classes***"), as each such Class is Unimpaired under the Plan and thus presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

15. The Debtors were not required to solicit votes from the Holders of Claims in Class 5 (Intercompany Claims) and Class 7 (Intercompany Interests). Although these classes are Impaired under the Plan, each Holder of Claims or Interests in these classes is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

16. The Debtors were not required to solicit votes from Holders of Claims or Interests in Class 6 (Subordinated Claims) and Class 8 (Rockall Equity Interests), (collectively, the "***Deemed Rejecting Classes***"), as the Holders of Claims or Interests in such Classes are Impaired and not entitled to receive distributions on account of their Claims or Interests under the Plan and, thus, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

US 8836385

17. As described in and as evidenced by the Voting Reports, the transmittal and service of the Solicitation Packages (all of the foregoing, the "***Solicitation***") was timely, adequate, and sufficient under the circumstances and no other or further Solicitation was or shall be required. The Solicitation complied with the Solicitation and Tabulation Procedures, was appropriate and satisfactory based upon the circumstances of these chapter 11 cases, was conducted in good faith and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., the Disclosure Statement Order, the Disclosure Statement Supplement Order, and any other applicable rules, laws, and regulations.

**I. Adequacy of the Disclosure Statement.**

18. The Disclosure Statement and Disclosure Statement Supplement (a) contain sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable non-bankruptcy rules, laws, and regulations, including the Securities Act, (b) contain "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (c) are hereby approved on a final basis in all respects.

**J. Voting.**

19. The Voting Reports filed with the Bankruptcy Court certify the method and results of the Ballots tabulated for the Voting Classes. As of the Postpetition Voting Deadline, (a) 100% in number and 100% in dollar amount of the Holders of Claims in Class 3 (Secured Parties Claims) that timely voted, voted to accept the Plan, and (b) 72.1% in number and 85.8% in dollar amount of the Holders of Claims in Class 4 (General Unsecured Claims) that timely voted, voted to accept the Plan, in each case without counting the votes of any insider (as such term is defined in section 101(31) of the Bankruptcy Code). As evidenced by the Voting Reports, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the

13

Bankruptcy Code, the Bankruptcy Rules, the Solicitation and Tabulation Procedures, and the N.D. Tex. L.B.R.

**K. Plan Supplement.**

20. On April 29, 2022, the Debtors filed the First Plan Supplement, consisting of the List of Retained Causes of Action.[7] On May 23, 2022, the Debtors filed the Second Plan Supplement, consisting of the Liquidation Analysis and Schedule of Potential Other Secured Claims.[8] On May 24, 2022, the Debtors filed the Third Plan Supplement, consisting of the Form of Liquidation Trust Agreement and Winddown Budget.[9] On May 25, 2022, the Debtors filed the Fourth Plan Supplement, consisting of the Form of GUC Trust Agreement and Schedule of Liquidation Trust Assumed Executory Contracts and Unexpired Leases.[10] On May 30, 2022, the Debtors filed the Fifth Plan Supplement, consisting of the Schedule of Liquidation Trust Assumed Executory Contracts and Unexpired Leases.[11]

21. All such materials comply with the terms of the Plan, and the filing and notice of the Plan Supplement was proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and all applicable law and no other or further notice is or shall be required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan as if set forth in full therein. Subject to the terms of the Plan, the Debtors reserve the right to and may alter, amend, update, or modify the Plan Supplement before the Effective Date, *provided* that any such alteration, amendment, update, or modification

---

[7]   *See Notice of Filing Supplement to the Debtors' Joint Prepackaged Chapter 11 Plan* [Dkt. No. 368].

[8]   *See Notice of Filing Second Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 529].

[9]   *See Notice of Filing Third Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 545].

[10]   *See Notice of Filing Fourth Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 559].

[11]   *See Notice of Filing Fifth Supplement to the Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 581].

US 8836385

shall be in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of this Confirmation Order.

**L.**     **Modifications of the Plan.**

22.     Pursuant to and in compliance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors proposed certain modifications to the Plan as reflected herein, in the Plan Supplement, and/or in the revised Plan filed with the Bankruptcy Court prior to entry of this Confirmation Order (collectively, the "***Plan Modifications***").     In accordance with Bankruptcy Rule 3019, the Plan Modifications do not (a) constitute material modifications of the Plan under section 1127 of the Bankruptcy Code, (b) cause the Plan to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy Code, (c) materially and adversely change the treatment of any Claims, (d) require re-solicitation of any Holders of any Claims or Interests, or (e) require that Holders of Claims in the Voting Classes be afforded an opportunity to change their previously cast acceptances of the Plan.     Under the circumstances, the form and manner of notice of the proposed Plan Modifications are adequate, and no other or further notice of the proposed Plan Modifications is necessary or required.     In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims who voted to accept the Plan or who are conclusively presumed to have accepted the Plan are deemed to have accepted the Plan as modified by the Plan Modifications.     The Holders of Claims in the Voting Classes are not permitted to change their respective acceptances to rejections as a consequence of the Plan Modifications.

**M.**     **Bankruptcy Rule 3016.**

23.     In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the Plan proponents.     The Debtors appropriately filed the Disclosure Statement and Disclosure Statement Supplement with the Bankruptcy Court, thereby satisfying Bankruptcy

US 8836385

Rule 3016(b). The release, injunction, and exculpation provisions of the Plan are set forth in bold and with specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

**N.     Burden of Proof: Confirmation of the Plan.**

24.     The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation. In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard.

**O.     Compliance with Bankruptcy Code Requirements: Section 1129(a)(1).**

25.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, more particularly:

(i)     Proper Classification: Sections 1122 and 1123(a)(1).

26.     Article III of the Plan provides for the separate classification of Claims and Interests into eight Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications reflect no improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to other Claims or Interests within that Class. The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

(ii)     Specified Unimpaired Classes: Section 1123(a)(2).

27.     Article III of the Plan specifies that Claims in the following Classes are Unimpaired under the Plan, thereby satisfying section 1123(a)(2) of the Bankruptcy Code:

| Class | Claim or Interest |
| --- | --- |
| 1 | Other Priority Claims |
| 2 | Other Secured Claims |

16

US 8836385

(iii)     Specified Treatment of Impaired Classes: Section 1123(a)(3).

28.     Article III of the Plan specifies that the Claims in the following Classes are Impaired under the Plan, and describes the treatment of such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code:

| Class | Claim or Interest |
|-------|-------------------|
| 3 | Secured Parties Claims |
| 4 | General Unsecured Claims |
| 5 | Intercompany Claims |
| 6 | Subordinated Claims |
| 7 | Intercompany Interests |
| 8 | Rockall Equity Interests |

(iv)     No Discrimination: Section 1123(a)(4).

29.     Article III of the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest in accordance with the Plan, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(v)     Adequate Means for Plan Implementation: Section 1123(a)(5).

30.     The Plan, including the various documents and agreements in the Plan Supplement, provides adequate and proper means for implementation of the Plan, including, without limitation: (a) the general settlement of claims and interests; (b) the creation of specific segregated accounts for Plan Distributions; (c) the wind down of existing operations and corporate governance (other than the TSA Entities); (d) the creation and funding of the Liquidation Trust, and the appointment of the Liquidation Trustee; (e) to the extent necessary, the sale and abandonment of assets by the Liquidation Trust; (f) the creation and funding of the GUC Trust and the appointment of the GUC Trustee; (g) the cancellation of certain existing securities and agreements; (h) the release of liens; (i) the continuation of existing director and officer liability insurance; (j) the preservation of certain

17

causes of action, including non-Insider Avoidance Actions against Krewe Energy, LLC and its affiliates ("*Krewe*"); (k) the substitution of the Liquidation Trust or the Liquidation Trustee as the party to any litigation; and (l) the termination of any surviving obligations under the Restructuring Support Agreement.

(vi)     <u>Voting Power of Equity Securities: Section 1123(a)(6)</u>.

31. The Liquidation Trust is not a corporation and each Debtor that is a corporation will be dissolved on the Effective Date of the Plan. Therefore section 1123(a)(6) of the Bankruptcy Code is not applicable in these cases.

(vii)     <u>Designation of Directors and Officers: Section 1123(a)(7)</u>.

32. Article IV.C.8.b. of the Plan provides that, as of the Effective Date, the term of the current members of the board of directors of Rockall shall expire automatically and each person serving as a director of Rockall shall be removed and shall be deemed to have resigned and cease to serve automatically. The identities of the Liquidation Trustee and the GUC Trustee, to the extent known, have been or will be disclosed in the Plan Supplement prior to the Effective Date. To the extent that section 1123(a)(7) of the Bankruptcy Code applies to the Liquidation Trustee or the GUC Trustee, the Liquidation Trustee or the GUC Trustee was appointed in accordance with the interests of creditors and with public policy, and, therefore, satisfies section 1123(a)(7) of the Bankruptcy Code.

(viii)     <u>Impairment / Unimpairment of Classes: Section 1123(b)(1)</u>.

33. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Specifically, Article III of the Plan impairs or leaves Unimpaired each Class of Claims and Interests.

18

      (ix)   <u>Assumption and Rejection of Executory Contracts and Unexpired Leases: Section 1123(b)(2)</u>.

34.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article V.A of the Plan provides for the rejection of the Debtors' Executory Contracts and Unexpired Leases on the Effective Date. In accordance with the provisions of sections 365 and 1123(b)(2) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Supplement, or this Confirmation Order, all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on a schedule of assumed contracts by a Successful Bidder; (ii) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (v) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (vi) is subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

      (x)   <u>Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action: Section 1123(b)(3)</u>.

35.     The Plan is consistent with section 1123(b)(3) of the Bankruptcy Code. In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions, settlements, and other benefits provided under the Plan, except as stated otherwise in the Plan, the provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, subordination, and other legal rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest,

US 8836385

or any distribution to be made on account of such Allowed Claim or Interest. The compromise and settlement of such Claims and Interests embodied in the Plan are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable. The foregoing includes, without limitation, the Global Settlement (as defined below) and the corresponding settlement of Claims, Causes of Action and controversies embodied in Article IV of the Plan.

36.     Pursuant to the terms of the global settlement (the "***Global Settlement***"), the Committee, the Secured Parties, and the DIP Lenders have agreed to support the Debtors' Plan, which provides a guaranteed recovery of at least $3.75 million to Holders of Class 4 General Unsecured Claims. In particular, Holders of Class 4 General Unsecured Claims will receive a pro rata distribution of the GUC Global Settlement Amount, which includes (i) $3.75 million, plus (ii) 3.0% of any Net Sale Proceeds in excess of $130 million, plus (iii) any unused amounts from the Vendor Pot, plus (iv) any unused amounts allocated for the payment of the fees of Committee Professionals. The Debtors will create and fund the GUC Trust with the GUC Trust Budget of $250,000, and the GUC Trust will reconcile and administer General Unsecured Claims and make distributions on account thereof.

37.     Article VIII.E of the Plan describes certain releases granted by the Debtors and their Estates (the "***Debtor Releases***"). The Debtors have satisfied the business judgment standard with respect to the propriety of the Debtor Releases. For the reasons set forth on the record of these chapter 11 cases and the evidence proffered, admitted, or adduced at the Combined Hearing, such releases are a necessary and integral part of the Plan. The Debtor Releases are "fair and equitable" and "in the best interests of the estate" and the Holders of Claims and Interests considering (a) the probability of success in litigation of the released Claims and Causes of Action given uncertainty

20

in fact and law with respect to the Claims and Causes of Action; (b) the complexity and likely duration and expense of litigating the released Claims and Causes of Action; (c) the arm's-length negotiations that produced the settlements embodied in the Plan, including the Global Settlement; and (d) the overwhelming creditor support for the Debtor Releases, as evidenced by the Voting Reports. Additionally, the Debtor Releases are: (x) a good-faith settlement and compromise of the Claims and Causes of Action released by Article VIII.E of the Plan; (y) given and made, after due notice and opportunity for hearing; and (z) a bar to any of the Debtors, Reorganized Debtors, Liquidation Trustee, or GUC Trustee (as applicable) asserting any Claim or Cause of Action released by Article VIII.E of the Plan.

38.     Article VIII.F of the Plan describes certain releases granted by the Releasing Parties (the "***Third-Party Releases***"). The Third-Party Releases provide finality for the Debtors, Reorganized Debtors, Liquidation Trustee, GUC Trustee, and the Released Parties (as applicable) regarding the parties' respective historic relationships with the Debtors, obligations under the Plan, and with respect to the Liquidation Trust and the GUC Trust. The Ballots sent to all Holders of Claims in the Voting Classes unambiguously stated that the Plan contains the Third-Party Releases and set forth the terms of the Third-Party Releases. The Ballots also made clear that only Holders of Claims in the Voting Classes that affirmatively vote to accept the Plan are bound by the Third-Party Releases; for the avoidance of doubt, Holders of Claims or Interests not entitled to vote on the Plan are not Releasing Parties and Holders of Claims in the Voting Classes that did not vote or voted to reject the Plan are not Releasing Parties.

39.     The Third-Party Releases are (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and

US 8836385

their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases. The Third-Party Releases are fully consensual because all Releasing Parties were provided with extensive and sufficient notice of the chapter 11 cases, the Plan, and the deadline to object to confirmation of the Plan, and all such parties were properly informed that the Plan contained Third-Party Releases that could affect such parties' rights.

40. The Third-Party Releases are sufficiently specific as to put the Releasing Parties on notice of the nature of the released Claims and Causes of Action, and they are appropriately tailored under the facts and circumstances of these chapter 11 cases. The Third-Party Releases are conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, and the Ballots.

41. The Third-Party Releases are integral to the Plan because they, *inter alia*, facilitated participation in both the formation of the Plan and the chapter 11 process generally and were critical in incentivizing the parties to support the Plan. As such, the Third-Party Releases offer certain protections to parties that participated constructively in the Debtors' chapter 11 process by, among other things, supporting the Plan.

42. The exculpation, described in Article VIII.G of the Plan (the "***Exculpation***"), is appropriate under applicable law because it was proposed in good faith and is appropriately limited in scope. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions

shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, nothing in Article VIII.G of the Plan shall, nor shall it be deemed to, exculpate any Exculpated Party from any Causes of Action specifically enumerated in the List of Retained Causes of Action.

43.     The injunction provision set forth in Article VIII.H of the Plan is necessary to implement, preserve, and prevent actions against the Debtors, the Exculpated Parties, or the Released Parties and by extension the compromise and settlement upon which the Plan is founded, and is narrowly tailored to achieve this purpose.

44.     Article IV.C.10 of the Plan appropriately provides that in accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Liquidation Trust will retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and any other actions specifically enumerated in the List of Retained Causes of Action. The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

45.     The release of all mortgages, deeds of trust, Liens, pledges, or other security interests against the property of the Estates described in Article VIII.D (the "***Lien Release***") is necessary to implement the Plan. The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

US 8836385

(xi)     Distribution of Sale Proceeds:  Section 1123(b)(4)

46.     In accordance with section 1123(b)(4) of the Bankruptcy Code, Article IV.A of the Plan provides for (i) the sale of substantially all of the Debtors' Assets (the "*Sale*") and the transfer of Liquidation Trust Assets, including any cash proceeds of the Sale (other than the GUC Trust Assets) not distributed pursuant to the Plan on the Effective Date, to the Liquidation Trust on the Effective Date and (ii) the creation of the Liquidation Trust to effectuate the liquidation of all assets contributed to the Liquidation Trust and the distribution of proceeds to creditors in accordance with the terms of the Plan.  Liquidation Trust Assets are (i) any Assets of the Debtors' Estates not sold in the Sale, including, but not limited to, any Cause of Action specifically enumerated in the List of Retained Causes of Action and the equity or membership interests of the TSA Entities, (ii) Cash in the amount set forth in the Wind Down Budget to satisfy the Liquidation Trust Funding, and (iii) any Cash in the Claims Reserve (other than the GUC Global Settlement Amount and the GUC Trust Budget) after all applicable distributions are made on the Effective Date pursuant to the Plan.  Article IV.B of the Plan provides for the creation of a GUC Trust, which shall be funded with GUC Trust Assets.  GUC Trust Assets are (i) the GUC Global Settlement Amount and (ii) the GUC Trust Budget, which GUC Trust Assets may be funded with cash proceeds of the Sale.

(xii)    Modification of Rights: Section 1123(b)(5).

47.     The Plan modifies the rights of Holders of Claims or Interests, as applicable, in Class 3 (Secured Parties Claims), Class 4 (General Unsecured  Claims), Class 5 (Intercompany Claims), Class 6 (Subordinated Claims), Class 7 (Intercompany Interests), and Class 8 (Rockall Equity Interests), as permitted by section 1123(b)(5) of the Bankruptcy Code.

US 8836385

(xiii)    Additional Plan Provisions: Section 1123(b)(6).

48.    The other discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including provisions for (a) distributions to Holders of Claims and Interests, (b) resolution of Disputed Claims, (c) allowance of certain Claims, and (d) retention of Court jurisdiction, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.  The failure to address any provisions of the Bankruptcy Code specifically in this Confirmation Order shall not diminish or impair the effectiveness of this Confirmation Order.

(xiv)    Cure of Defaults: Section 1123(d).

49.    The Debtors have cured, or provided adequate assurance that the Debtors will cure, defaults (if any) under or relating to each of the Executory Contracts that are being assumed and assigned to the Purchaser pursuant to the Sale Approval Order and the Plan.  In addition, the Debtors' assigns to such Executory Contracts have provided adequate assurance of future performance under such Executory Contracts being assumed and assigned.

**P.    Debtor Compliance with the Bankruptcy Code: Section 1129(a)(2).**

50.    The Debtors have complied with the applicable provisions of the Bankruptcy Code and, thus, satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

   a.   is an eligible debtor under section 109 of the Bankruptcy Code, and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code;

   b.   has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Bankruptcy Court; and

   c.   complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., any applicable non-bankruptcy law, rule and regulation, the Disclosure Statement Order, the Disclosure Statement Supplement Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

25

US 8836385

**Q.** **Plan Proposed in Good Faith: Section 1129(a)(3).**

51.     The Debtors have negotiated, developed, and proposed the Plan (including the Plan Supplement and all other documents and agreements necessary to effectuate the Plan) in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.  In so determining, the Bankruptcy Court has considered the facts and record of these chapter 11 cases, the Disclosure Statement, and evidence proffered, admitted, or adduced at the Combined Hearing, and examined the totality of the circumstances surrounding the filing of these chapter 11 cases, the Plan, and the process leading to Confirmation.  The Debtors' chapter 11 cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to pursue the Sale Process and to distribute the proceeds from the sale of substantially all of the Debtors' Assets, or, in the alternative, implement the Restructuring, reorganize, and emerge from chapter 11 with financially deleveraged capital structure.  The Plan (including all documents necessary to effectuate the Plan) and the Plan Supplement were negotiated in good faith and at arm's length among the Debtors and their key stakeholders, including the Secured Parties, the Intercreditor Agent, the Term Loan Agent, the DIP Lenders, the DIP Agent, and the Committee.  Additionally, the Global Settlement that the Debtors negotiated and facilitated with and between the Secured Parties, the Intercreditor Agent, the Term Loan Agent, the DIP Lenders, the DIP Agent, and the Committee that is embodied in the Plan was negotiated in good faith and at arm's-length and reflects the best possible compromise and settlement that could be reached given the facts and circumstances surrounding the Debtors and these chapter 11 cases.  Further, the Plan's classification, indemnification, exculpation, release, and injunction provisions have been negotiated in good faith and at arm's-length, are consistent with sections 105, 1122, 1123(b)(3)(A),

26

1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are each integral to the Plan, and necessary for the Debtors' successful implementation of the Plan.

**R.      Payment for Services or Costs and Expenses: Section 1129(a)(4).**

52.      The Debtors have satisfied section 1129(a)(4) of the Bankruptcy Code.  Any payment made or to be made by the Debtors for services or for costs and expenses of the Debtors' professionals in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.  All such costs and expenses of the Debtors' professionals shall be paid in accordance with the Plan, and all other estimated costs and expenses of the Debtors' professionals shall be escrowed in the Professional Fee Escrow Account no later than the Effective Date.

**S.      Directors, Officers, and Insiders: Section 1129(a)(5).**

53.      The Debtors have complied with the requirements of section 1129(a)(5) of the Bankruptcy Code.  The Debtors are not appointing any directors or officers to serve after confirmation of the Plan.  To the extent known, the Plan Supplement discloses, or will disclose prior to the Effective Date, the identity and affiliations of the individuals or entities proposed to serve as the Liquidation Trustee of the Liquidation Trust and the GUC Trustee of the GUC Trust. The proposed Liquidation Trustee and GUC Trustee are qualified, and the appointment to such positions are consistent with the interests of the Holders of Claims and Interests and with public policy.

**T.      No Rate Changes: Section 1129(a)(6).**

54.      Section 1129(a)(6) of the Bankruptcy Code is not applicable to these chapter 11 cases.  The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

**U.      Best Interest of Creditors: Section 1129(a)(7).**

55.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code.  The liquidation analysis attached to the Second Plan Supplement as **<u>Exhibit A</u>** and the Pinsonnault Confirmation Declaration as **<u>Exhibit A</u>** and the other evidence related thereto in support of the Plan that was proffered, admitted, or adduced at the Combined Hearing:  (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses or evidence was prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that each Holder of an Impaired Claim or Interest against a Debtor either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if such Debtors were hypothetically liquidated under chapter 7 of the Bankruptcy Code as of the Effective Date.

**V.      Acceptance by Certain Classes: Section 1129(a)(8).**

56.     The Unimpaired Classes are Unimpaired by the Plan and, accordingly, Holders of Claims in such Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  The Voting Classes are Impaired and each has voted to accept the Plan, as established by the Voting Reports.

57.     The Deemed Rejecting Classes are Impaired and deemed to reject the Plan, pursuant to section 1126(g) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.  Holders of Claims in the Deemed Rejecting Classes will not receive or retain any property on account of their Claims or Interests.  Therefore, the Plan does not satisfy the requirements of section 1129(a)(8) with respect to the Deemed Rejecting Classes. Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) of

US 8836385

the Bankruptcy Code because Classes 3 and 4 have voted to accept the Plan, and, with respect to the Deemed Rejecting Classes, section 1129(b) of the Bankruptcy Code is satisfied as set forth below.

**W.** **Treatment of Claims Entitled to Priority Under Section 507(a) of the Bankruptcy Code: Section 1129(a)(9).**

58.    The treatment of Allowed Administrative Expense Claims, Allowed Professional Fee Claims, DIP Claims, Adequate Protection Claims, Priority Tax Claims, and statutory fees imposed by 28 U.S.C. § 1930 under Article II of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**X.** **Acceptance by At Least One Impaired Class: Section 1129(a)(10).**

59.    The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Reports, Classes 3 and 4, which are Impaired, voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code).

**Y.** **Feasibility: Section 1129(a)(11).**

60.    The Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The evidence supporting Confirmation of the Plan proffered, admitted, or adduced by the Debtors at or prior to the Combined Hearing:  (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, except as provided for under the Plan; and (e) establishes that the Debtors will have

sufficient funds available to meet their obligations under the Plan, including funding of the Wind Down Budget and Liquidation Trust.

**Z.     Payment of Fees: Section 1129(a)(12).**

61.     The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article II.F of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

**AA.     Continuation of Employee Benefits: Section 1129(a)(13).**

62.     The Debtors maintain no programs providing for employee retirement benefits, as defined in section 1114 of the Bankruptcy Code, accordingly, section 1129(a)(13) of the Bankruptcy Code is not applicable.

**BB.     Non-Applicability of Certain Sections: 1129(a)(14), (15), and (16).**

63.     Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these chapter 11 cases. The Debtors (a) are not required by a judicial or administrative order, or by statute, to pay a domestic support obligation, (b) are not individuals, and (c) are each a moneyed, business, or commercial corporation.

**CC.     "Cram Down" Requirements: Section 1129(b).**

64.     The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. Notwithstanding the fact that Class 5 (Intercompany Claims), Class 6 (Subordinated Claims), Class 7 (Intercompany Interests), and Class 8 (Rockall Equity Interests) are deemed to reject the Plan, the Plan may be confirmed pursuant to section 1129(b) of the Bankruptcy Code. The evidence in support of the Plan that was proffered, admitted, or adduced at or prior to the Combined Hearing is reasonable, persuasive, credible, and accurate, has not been controverted by other evidence, and establishes that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other

30

than section 1129(a)(8) have been met. *Second*, the Plan is fair and equitable with respect to such Classes. The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Classes will receive or retain any property under the Plan on account of such junior Claim or Interest and (b) no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than 100% on account of its Claim. *Third*, the Plan does not discriminate unfairly with respect to such Classes because similarly situated Holders of Claims and Interests will receive substantially similar treatment on account of their Claims and Interests irrespective of Class. Accordingly, the Plan satisfies the requirement of section 1129(b)(1) and (2) of the Bankruptcy Code. The Plan may therefore be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

**DD.    Only One Plan: Section 1129(c).**

65.    The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Plan is the only chapter 11 plan filed with respect to each Debtor in each of these chapter 11 cases.

**EE.    Principal Purpose of the Plan: Section 1129(d).**

66.    The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

**FF.    Not Small Business Cases: Section 1129(e).**

67.    These chapter 11 cases are not small business cases, and accordingly section 1129(e) of the Bankruptcy Code is inapplicable in these chapter 11 cases.

**GG.    Good Faith Solicitation: Section 1125(e).**

68.    Based on the record before the Bankruptcy Court in these chapter 11 cases, including evidence proffered, admitted, or adduced at or prior to the Combined Hearing, the Debtors and the other Exculpated Parties (i) have acted in "good faith" within the meaning of

section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the N.D. Tex. L.B.R., the Solicitation and Tabulation Procedures, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the development of the Plan, all their respective activities relating to the solicitation of acceptances to the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation set forth in Article VIII.G of the Plan.

## HH. Satisfaction of Confirmation Requirements.

69. Based upon the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with confirmation of the Plan, and all evidence and arguments made, proffered, admitted, or adduced at the Combined Hearing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

## II. Likelihood of Satisfaction of Conditions Precedent to the Effective Date.

70. Without limiting or modifying the rights of any party set forth in Article X.A or Article X.B of the Plan, each of the conditions precedent to the Effective Date, as set forth in Article IX.B of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with Article IX.C of the Plan.

US 8836385

**JJ.     Implementation.**

71.     The terms of the Plan, including the Plan Supplement, and all exhibits and schedules thereto, and all other documents filed in connection with the Plan, and/or executed or to be executed in connection with the transactions contemplated by the Plan and all amendments and modifications of any of the foregoing made pursuant to the provisions of the Plan governing such amendments and modifications (collectively, the "***Plan Documents***") are incorporated by reference and constitute essential elements of the Plan and this Confirmation Order. Consummation of each such Plan Document is in the best interests of the Debtors, the Debtors' Estates, and Holders of Claims and Interests, and such Plan Documents are hereby approved. The Debtors have exercised reasonable business judgment in determining to enter into the Plan Documents, and the Plan Documents have been negotiated in good faith, at arm's-length, are fair and reasonable, are supported by reasonably equivalent value and fair consideration, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

**KK.     Settlements Embodied in Plan Satisfy Bankruptcy Rule 9019.**

72.     All of the settlements and compromises pursuant to and in connection with the Plan or incorporated by reference into the Plan comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019. Pursuant to Bankruptcy Rule 9019 and in consideration for the benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the Debtors, the Debtors' Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable. The foregoing includes, without limitation, the Global Settlement and the corresponding settlement of Claims, Causes of Action and controversies embodied in Article IV of the Plan.

**LL.     Liquidation Trust.**

73.     The Debtors have exercised sound business judgment in determining to enter into the Liquidation Trust Agreement and have provided adequate notice thereof.  The Liquidation Trust Agreement has been negotiated in good faith and at arm's length and is deemed to have been made in good faith and for legitimate business purposes.  The terms and conditions of the Liquidation Trust Agreement are fair and reasonable.

**MM.   GUC Trust.**

74.     The Debtors have exercised sound business judgment in determining to enter into the GUC Trust Agreement and have provided adequate notice thereof.  The GUC Trust Agreement has been negotiated in good faith and at arm's length and is deemed to have been made in good faith and for legitimate business purposes.  The terms and conditions of the GUC Trust Agreement are fair and reasonable.

**NN.   Authority to Pursue, Settle, or Abandon Retained Causes of Action.**

75.     All Retained Causes of Action are reserved and preserved and shall not be impacted or affected in any way by deemed consolidation of the estates.  From and after the Effective Date, except as otherwise set forth in Article VIII of the Plan, prosecution and settlement of all Retained Causes of Action shall be the sole responsibility of the Liquidation Trustee pursuant to the Plan, the Confirmation Order and the Liquidation Trust Agreement.  From and after the Effective Date, the Liquidation Trustee shall retain and may enforce any claims, demands, rights, and causes of action that Debtors' Estate may hold.  The Liquidation Trustee may pursue any such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Liquidation Trust Beneficiaries as the sole representative of the estates pursuant to section 1123(b)(3) of the Bankruptcy Code.

US 8836385

**OO.** **Restructuring Support Agreement.**

76.     The Restructuring Support Agreement has been negotiated in good faith and at arm's length and is deemed to have been made in good faith and for legitimate business purposes. The terms and conditions of the Restructuring Support Agreement are fair and reasonable.  Any surviving obligations under the Restructuring Support Agreement shall terminate on a final basis upon the Effective Date.

**PP.** **Good Faith.**

77.     The Debtors, the Secured Parties, the Intercreditor Agent, the Term Loan Agent, the DIP Lenders, the DIP Agent, the Committee, and other Released Parties, the Exculpated Parties, and their respective successors, predecessors, control persons, affiliates, directors, officers, members, managers, shareholders, partners, employees, attorneys, investment bankers, advisors and agents, as applicable, acted in good faith and will be acting in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby in accordance with the Plan; and (b) take the actions authorized and directed by this Confirmation Order.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's finding and determination that (a) each Released Party's in-court or out-of-court efforts to develop, negotiate, and propose the Plan were, with respect to each other Released Party and any other Person, in good faith and not by any means forbidden by law and (b) the settlements reflected in the Plan are (i) in the best interests of the Debtors and their Estates, (ii) fair, equitable, and reasonable, and (iii) approved by the Bankruptcy Court pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

35

US 8836385

**QQ.    Retention of Jurisdiction.**

78.    The Bankruptcy Court may properly, and upon the Effective Date shall, retain exclusive jurisdiction over all matters arising in or related to, these chapter 11 cases, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

<u>**ORDER**</u>

**IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

1.    **Findings of Fact and Conclusions of Law**.  The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of law, it shall be deemed so, and vice versa.

2.    **Final Approval of Disclosure Statement**. The Disclosure Statement and Disclosure Statement Supplement (i) contain adequate information of a kind generally consistent with the disclosure requirements of all applicable non-bankruptcy law, including the Securities Act, (ii) contain "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) are approved on a final basis in all respects.

3.    **Confirmation of the Plan**. The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code.  The documents contained in or contemplated by the Plan, including, without limitation, the Plan Documents, are hereby authorized and approved.  The terms of the Plan are incorporated by reference into and are an integral part of this Confirmation Order.  The failure to specifically describe, include, or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan is

36

confirmed in its entirety, except as expressly modified herein, the Plan Documents are approved in their entirety, and all are incorporated herein by this reference.

4. **Objections**. All objections to Confirmation of the Plan or final approval of the Disclosure Statement (including the Disclosure Statement Supplement) and other responses, comments, statements, or reservation of rights, if any, in opposition to the Plan or Disclosure Statement (including the Disclosure Statement Supplement) that have not been withdrawn, waived, or otherwise resolved by the Debtors prior to entry of this Confirmation Order are overruled on the merits.

5. **Plan Classification Controlling.** The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder. The classification set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on the Debtors except for voting purposes.

6. **Combined Hearing Notice**. The Combined Hearing Notices, Combined Hearing Publication Notice, Bar Date Affidavits, and any other notice filed or otherwise published by the Debtors, complied with the terms of the Disclosure Statement Orders, was appropriate and satisfactory based upon the circumstances of these chapter 11 cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and applicable non-bankruptcy law.

7.    **Solicitation**.  The solicitation of votes on the Plan complied with the Solicitation and Tabulation Procedures, was appropriate and satisfactory based upon the circumstances of these chapter 11 cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., the Disclosure Statement Orders, and applicable non-bankruptcy law.

8.    **Plan Modifications**.  The modifications, amendments, and supplements made to the Plan following the solicitation of votes thereon constitute technical changes and do not materially adversely affect or change the proposed treatment of any Claims or Interests.  After giving effect to such modifications, the Plan continues to satisfy the requirements of sections 1122 and 1123 of the Bankruptcy Code.  The filing of the Plan and proposed form of this Confirmation Order with the Bankruptcy Court on May 23, 2022, which contain such modifications, and the disclosure of such modifications on the record at the Combined Hearing constitute due and sufficient notice thereof.  Accordingly, such modifications do not require additional disclosure or re-solicitation of votes under sections 1125, 1126, or 1127 of the Bankruptcy Code or Bankruptcy Rule 3019, nor do they require that the Holders of Claims in the Voting Classes be afforded an opportunity to change their previously cast votes on the Plan.  The Holders of Claims in the Voting Classes who voted to accept the solicitation version of the Plan are deemed to accept the Plan as modified.  The Plan, as modified, is, therefore, properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

9.    **No Action Required.**  As more particularly set forth in the Sale Approval Order, attached hereto as **<u>Exhibit B</u>**, which is a part of this Confirmation Order, the Debtors' entry into the PSA (as defined in the Sale Approval Order), and all transactions contemplated thereby and all

of the terms and conditions thereof, is hereby authorized in its entirety. The Debtors, Reorganized Debtors, and Liquidation Trustee, as applicable, are authorized to undertake the transactions contemplated by the PSA, including pursuant to sections 363, 365, and 1123(a)(5) of the Bankruptcy Code. Pursuant to the Sale Approval Order and sections 363(f), 363(m), 365(c)(1), and 365(f)(1) of the Bankruptcy Code, the Debtors shall have no obligation to give effect to any consent right, preferential purchase right, or other similar agreement with respect to the Debtors' Assets.

10. **No Action Required.** No action of the respective directors, equity holders, managers, or members of the Debtors, Reorganized Debtors, Liquidation Trust, Liquidation Trustee, or GUC Trustee (as applicable) is required to authorize the Debtors, Reorganized Debtors, Liquidation Trustee, or GUC Trustee (as applicable) to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, or any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including the Liquidation Trust Agreement and GUC Trust Agreement, and the other Plan Documents.

11. **Binding Effect**. On the date of and after entry of this Confirmation Order, in accordance with section 1141(a) of the Bankruptcy Code and subject to the occurrence of the Effective Date and notwithstanding Bankruptcy Rules 3020(e), 6004(d), 6004(h), or otherwise, the terms of the Plan, the Plan Documents, and this Confirmation Order shall be immediately effective (and/or adopted, where applicable) and enforceable and deemed binding upon the Debtors, Reorganized Debtors, Liquidation Trust, Liquidation Trustee, or GUC Trustee (as applicable), and any and all Holders of Claims or Interests and such Holder's respective successors and assigns (regardless of whether or not (a) the Holders of such Claims or Interests voted to accept or reject,

or are deemed to have accepted or rejected, the Plan or (b) the Holders of such Claims or Interests are entitled to a distribution under the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases (including the releases set forth in Article VIII of the Plan), waivers, discharges, exculpations, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or this Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan. The Plan and the Plan Documents constitute legal, valid, binding, and authorized obligations of the respective parties thereto and shall be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan and the Plan Documents, and any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

12. **Creation of the Liquidation Trust.** Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtor shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement. On and after the Effective Date, the Liquidation Trust is deemed created and effective without any further action by the Bankruptcy Court or any party. The Liquidation Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making distributions in accordance with the Plan and the Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidation Trust. The terms and conditions of the Liquidation Trust Agreement are approved.

US 8836385

13.     **Creation of the GUC Trust.** Except as otherwise provided in the Plan, this Confirmation Order, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, the GUC Trust Assets shall vest in the GUC Trust. On and after the Effective Date, the GUC Trust is deemed created and effective without any further action by the Bankruptcy Court or any party. The GUC Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making distributions in accordance with the Plan and the GUC Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the GUC Trust. The terms and conditions of the GUC Trust Agreement are approved.

14.     **Effectiveness of All Actions**. All actions contemplated by the Plan, including all actions pursuant to, in accordance with, or in connection with the Plan Documents, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the Debtors, Reorganized Debtors, Liquidation Trust, Liquidation Trustee, GUC Trust, or GUC Trustee (as applicable).

15.     **Plan Implementation**.

(a)     Pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, on, or, unless specifically provided otherwise herein or the Plan, prior to the Effective Date, or as soon thereafter as is reasonably practicable, the Debtors, Liquidation Trustee, and GUC Trustee (as applicable), in accordance with Article IV of the Plan, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan including (a) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the

US 8836385

Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; and (c) all other actions that the Debtors, Liquidation Trustee, and GUC Trustee (as applicable) determine are necessary or appropriate and that are not inconsistent with the Plan.

(b)     Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan, the Plan Supplement, and the Plan Documents including, (i) the rejection or assumption, as appropriate, of any Executory Contracts and Unexpired Leases, (ii) the sale and/or abandonment of Assets, (iii) contribution of Liquidation Trust Assets to the Liquidation Trust, (iv) contribution of GUC Trust Assets to the GUC Trust, and (v) entry into any contracts, instruments, releases, agreements, and documents necessary to implement, effectuate, and consummate the Plan shall be effective prior to, on, or after the Effective Date pursuant to this Confirmation Order, without further notice, application to, or order of this Court, or further action by the Debtors, Reorganized Debtors, Liquidation Trust, Liquidation Trustee, GUC Trust, or GUC Trustee (as applicable).

(c)     To the extent that, under applicable non-bankruptcy law, any of the foregoing actions would otherwise require the consent or approval of the Debtors, Reorganized Debtors, Liquidation Trust, Liquidation Trustee, GUC Trust, or GUC Trustee (as applicable), this Confirmation Order shall, pursuant to section 1123(a)(5)(D) of the Bankruptcy Code, constitute such consent or approval, and such actions are deemed to have been taken by unanimous action of Debtors, Reorganized Debtors, Liquidation Trust, Liquidation Trustee, GUC Trust, or GUC Trustee (as applicable).

(d)     All such transactions effected by the Debtors during the pendency of these chapter 11 cases from the Petition Date through the Confirmation Date (or as otherwise

42

contemplated by this Confirmation Order) are approved and ratified, subject to the satisfaction of any applicable terms and conditions to effectiveness of such transactions and the occurrence of the Effective Date.

16. **Settlement Approved**. The General Settlement of Claims and Interests described in Disclosure Statement and Disclosure Statement Supplement constitutes a settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 among the Debtors, the Secured Parties, the DIP Lenders, the Intercreditor Agent, the Term Loan Agent, the DIP Agent, and the Committee. The related provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, issues, disputes and controversies that were, or could have been asserted in connection with these chapter 11 cases.

17. The Global Settlement was negotiated at arm's length and in good faith, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of the Global Settlement, the settlement of all such Claims, Interests, and controversies, and the approval of all such releases granted in connection therewith. For the avoidance of doubt, the settlement, release, injunction, and related provisions described in Article VIII the Plan and approved by this Confirmation Order shall be in addition to, and not in lieu of, the settlements, releases, agreements, and compromises granted pursuant to the Global Settlement.

18. **Cancellation of Existing Securities and Agreements**. On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests (including the Term Loan Credit Documents, the Shell Master Agreement, the DIP Facility Documents, and the Rockall Equity Interests), and any Rockall Equity Interests that are not represented by certificates

US 8836385

or other instruments, shall be canceled and surrendered and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, canceled, and of no force or effect against the Debtors, Liquidation Trust, or GUC Trust without any further action on the part of the Debtors, Liquidation Trust, GUC Trust, or any other Person. Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

19. **Corporate Governance**. Each of the Debtors will be subject to a Dissolution Transaction on the Effective Date, or as promptly thereafter as possible, and each Debtor (other than the TSA Entities) will be deemed to cease to exist as of the Effective Date after the abandonment of any remaining Assets of their Estates; *provided, that*, the TSA Entities will not be subject to a Dissolution Transaction of the Effective Date and the equity or membership interests of the TSA Entity will vest in the Liquidation Trust pursuant to this Plan. For the avoidance of doubt, the TSA Entities will continue to exist after the Effective Date for the limited purpose of operating the Assets previously owned by the Debtors and sold to the Successful Bidder pursuant to TSA.

20. **Directors and Officers of the Debtors**. As of the Effective Date, the term of the current members of the board of directors of Rockall shall expire automatically and each person serving as a director of Rockall shall be removed and shall be deemed to have resigned and cease to serve automatically. Consistent with the Plan, each of the Debtors will cease to exist effective as of the Effective Date and, thus, no individuals will serve as directors, officers or voting trustees after the Effective Date.

21. **Transfer of Sale Proceeds and Other Assets**. Unless otherwise specified in the Plan, on the Effective Date, the Liquidation Trust Assets shall vest in the Liquidation Trust.

22. **Preservation of Causes of Action.** In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Liquidation Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including any Retained Cause of Action; *provided that*, the Liquidation Trustee will not retain any Causes of Action (including Avoidance Actions) that are assigned to a buyer in connection with the Sale. The Liquidation Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. Except to the extent any such claim is specifically satisfied, settled, and released herein, in accordance with and subject to any applicable law, the Debtor's inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtor or Estate may hold against any Person. Except to the extent any such claim is specifically satisfied, settled, and released herein, the Debtor intends to preserve those claims, demands, rights, or causes of action designated as Retained Causes of Action.

23. Notwithstanding the foregoing or anything to the contrary herein, all Avoidance Actions against non-Insiders of the Debtors shall be waived upon the Effective Date, except those against Krewe. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly

US 8836385

provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including pursuant to Article VIII of the Plan, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

24. **Substitution in Pending Legal Actions.** On the Effective Date, the Liquidation Trust or the Liquidation Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (i) pending contested matters or adversary proceedings in the Bankruptcy Court, (ii) any appeals of orders of the Bankruptcy Court and (iii) any state court or federal or state administrative proceedings pending as of the Petition Date. The Liquidation Trustee and its professionals are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

25. **Liquidation Trust Agreement**. The Liquidation Trust Agreement, substantially in the form filed with the Plan Supplement, is hereby approved in its entirety, and the Debtors are authorized to enter into the Liquidation Trust Agreement.

26. **Liquidation Trust**. On or prior to the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement for the purpose of liquidating the Liquidation Trust Assets, resolving all Disputed Claims that do not assert to be General Unsecured Claims, making all distributions of the proceeds of the Liquidation Trust Assets to Holders of Allowed Claims (other than Holders of Allowed General Unsecured Claims) in accordance with the terms of the Plan and otherwise implementing the Plan. Subject to and to the

US 8836385

extent set forth in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust shall be empowered to: (a) perform all actions and execute all agreements, instruments, and other documents necessary to implement the Plan; (b) establish, maintain, and administer the Liquidation Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle, and protect, as applicable, the Liquidation Trust Assets (directly or through its professionals or a Disbursing Agent), in accordance with the Plan; (d) review, reconcile, settle, or object to all such Claims (other than General Unsecured Claims) that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in the Plan; (e) calculate and make distributions of the proceeds of the Liquidation Trust Assets to Holders of Allowed Claims (other than Holders of Allowed General Unsecured Claims) in accordance with the terms of the Plan and otherwise implementing the Plan; (f) subject to Article VIII of the Plan, pursue Retained Causes of Actions that are transferred to the Liquidation Trust to the extent that their pursuit would likely result in a material economic benefit to Holders of Claims (other than Holders of General Unsecured Claims) under the Plan; (g) retain, compensate, and employ professionals to represent the Liquidation Trust; (h) file appropriate tax returns and other reports on behalf of the Liquidation Trust and pay taxes or other obligations owed by the Liquidation Trust; (i) file, to the extent reasonably feasible and subject to the Liquidation Trust Agreement, appropriate tax returns on behalf of the Debtor and pay taxes or other obligations arising in connection therewith; (j) exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and the Plan, or as are deemed by the Liquidation Trustee to be necessary and proper to implement the provisions of the Plan and the Liquidation Trust

Agreement; (k) take such actions as are necessary or appropriate to close the Debtors' chapter 11 cases; (l) dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement; and (m) undertaking the Dissolution Transactions, including with respect to the TSA Entities following termination of the TSA.

27.     **Liquidation Trustee**.  Ankura Consulting Group, LLC is hereby appointed to serve as the Liquidation Trustee for the Liquidation Trust in accordance with the terms of this Confirmation Order, the Plan, and the Liquidation Trust Agreement.  The Liquidation Trustee shall be authorized to take all actions necessary to establish, maintain, and administer the Liquidation Trust and any sub-trust of the Liquidation Trust pursuant to the terms of the Liquidation Trust Agreement, the Plan, and this Confirmation Order.

28.     **Funding and Transfer of Assets Into the Liquidation Trust**.  On the Effective Date, the Debtor shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement.  Except as set forth in the Plan, the Liquidation Trust Assets shall be transferred to the Liquidation Trust free and clear of all Claims, Liens, and encumbrances to the fullest extent provided by section 363 or 1123 of the Bankruptcy Code.  The Liquidation Trustee shall have the authority to create additional sub-accounts in the Liquidation Trust Accounts and sub-trusts within the Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Liquidation Trust. This shall include the creation of sub-accounts and/or sub-trusts to accomplish the purposes of the Liquidation Trust.

29.     **Fees and Expenses of the Liquidation Trust**.  The fees and expenses of the Liquidation Trustee (including those incurred prior to the Effective Date in connection with the

US 8836385

preparation of the Liquidation Trust Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Liquidation Trust Agreement and the Wind Down Budget. The Liquidation Trustee, on behalf of the Liquidation Trust, may employ, without further order of the Bankruptcy Court, individuals, professionals, or professional firms (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Liquidation Trust Agreement and may compensate and reimburse the expenses of such persons based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Liquidation Trust Agreement and the Wind Down Budget.

30. **Reports to be Filed by the Liquidation Trust**. The Liquidation Trustee, on behalf of the Liquidation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidation Trust Agreement), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

31. **Settlement of Claims by the Liquidation Trustee**. Except as otherwise provided in the Confirmation Order, the Plan or the Liquidation Trust Agreement, on and after the Effective Date, the Liquidation Trustee may compromise or settle any Claims or Causes of Action related to the Liquidation Trust Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Liquidation Trust Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

US 8836385

32. **GUC Trust Agreement**. The GUC Trust Agreement, substantially in the form filed with the Plan Supplement, is hereby approved in its entirety, and the Debtors are authorized to enter into the GUC Trust Agreement.

33. **GUC Trust**. On or prior to the Effective Date, the GUC Trust shall be established in accordance with the GUC Trust Agreement for the purpose of distributing the GUC Trust Assets, resolving all Disputed Claims to the extent related to the GUC Trust Assets, making all distributions of the proceeds of the GUC Trust Assets to Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and otherwise implementing the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the GUC Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the GUC Trust shall be empowered to: (a) perform all actions and execute all agreements, instruments, and other documents necessary to implement the Plan; (b) establish, maintain, and administer the GUC Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan as it relates to General Unsecured Claims; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, and protect, as applicable, the GUC Trust Assets (directly or through its professionals or a Disbursing Agent), in accordance with the Plan; (d) subject to the GUC Trust Agreement and the Plan, review, reconcile, settle, or object to all General Unsecured Claims that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in the Plan; (e) calculate and make distributions of the proceeds of the GUC Trust Assets to Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and otherwise implementing the Plan; (f) retain, compensate, and employ professionals to represent the GUC Trust; (g) file, to the extent reasonably feasible and subject to the GUC Trust Agreement, appropriate tax returns on behalf of the GUC Trust and pay taxes or other obligations arising in

50

connection therewith; (h) exercise such other powers as may be vested in the GUC Trust under the GUC Trust Agreement and the Plan, or as are deemed by the GUC Trustee to be necessary and proper to implement the provisions of the Plan and the GUC Trust Agreement; and (i) terminate the GUC Trust in accordance with the terms of the GUC Trust Agreement.

34.    **GUC Trustee**.  Riveron Management, LLC is hereby appointed to serve as the GUC Trustee for the GUC Trust in accordance with the terms of this Confirmation Order, the Plan, and the GUC Trust Agreement.  The GUC Trustee shall be authorized to take all actions necessary to establish, maintain, and administer the GUC Trust and any sub-trust of the GUC Trust pursuant to the terms of the GUC Trust Agreement, the Plan, and this Confirmation Order.

35.    **Funding and Transfer of Assets Into the GUC Trust**.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtor shall transfer the GUC Trust Assets to the GUC Trust, and all such assets shall vest in the GUC Trust on such date, to be administered by the GUC Trustee in accordance with the Plan and the GUC Trust Agreement. Except as set forth in the Plan, the GUC Trust Assets shall be transferred to the GUC Trust free and clear of all Claims, Liens, and encumbrances to the fullest extent provided by section 363 or 1123 of the Bankruptcy Code.  The GUC Trustee shall have the authority to create additional sub-accounts in the GUC Trust Accounts, which may have a separate legal existence, but which shall be considered subaccounts of the GUC Trust. This shall include the creation of sub-accounts to accomplish the purposes of the GUC Trust.

36.    **Settlement of Claims by the GUC Trustee**.  Except as otherwise provided in the Plan or the GUC Trust Agreement, on and after the Effective Date, the GUC Trustee may compromise or settle any Claims related to the GUC Trust Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules

51

and may pay the charges that it incurs on or after the Effective Date for GUC Trust Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

37. **Professional Compensation**. The provisions governing compensation of Professionals set forth in Article II.B of the Plan are approved in their entirety. All final requests for Professional Fee Claims through and including the Effective Date shall be Filed no later than 60 days after the Effective Date. Any objections to Professional Fee Claims shall be served and filed no later than 20 days after the filing of such final applications for payment of Professional Fee Claims.

38. **Payment of Professional Fee Claims**. On the Effective Date, the Debtors, Reorganized Debtors, or Liquidation Trustee (as applicable) shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" described in Article II.B.3 of the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or of the Liquidation Trust. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Liquidation Trustee from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.

39. After all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be returned to the Liquidation Trust for distribution by the Liquidation Trustee without any further action or order of the Bankruptcy Court.

40. **Establishment of Appropriate Reserves**. In accordance with the terms of the Confirmation Order and the Plan, the Debtors shall establish a Claims Reserve on or before the

US 8836385

Effective Date and comprised of Cash in the amount of the Claims Reserve Amount, less any portion of such amount that is distributed on the Effective Date pursuant to the Plan, which reserve shall vest in the Reorganized Debtors, the Liquidation Trust, or the GUC Trust (as applicable) as of the Effective Date.

41. **Subordination.** Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, Reorganized Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable) reserve(s) the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

42. **Release of Liens.** Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date concurrently and consistent with the treatment provided for Claims and Interests in Article III of the Plan, all mortgages, deeds of trust, Liens against, security interests in, or other encumbrances or interests in property of any Estate shall be deemed fully released and discharged.

43. **Insurance.** As of the Effective Date, each of the Debtors' insurance policies shall automatically vest in the Liquidation Trustee without necessity for further approvals or orders. Other than any insurance contracts specifically rejected pursuant to a Court Order (including the

US 8836385

Confirmation Order), from and after the Effective Date, all insurance contracts will be assumed by the Liquidation Trustee pursuant to section 365 of the Bankruptcy Code.

44. **Rejection of Contracts and Leases.** On the Effective Date, whether or not a Payout Event has occurred, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on a schedule of assumed contracts by a Successful Bidder; (ii) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (v) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (vi) is subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

45. **Taxing Authorities.** Notwithstanding anything contained in the Plan, any Plan Supplement, the Sale Approval Order, or the Confirmation Order, Dallas County, Texas and the Debtors agree that (i) Dallas County, Texas shall have an Allowed ad valorem tax Claim in the amount of $3,596.38 (the "***Dallas County Claim***"), (ii) Dallas County's liens shall attach to the proceeds of the Sale with the same validity, priority, and extent that they attached to the Assets on the Petition Date and (iii) the Debtors shall pay the Dallas County Claim in cash in full on the Effective Date, or as soon thereafter as reasonably practicable. In the event the Dallas County

Claim is paid after January 31, 2023, payment will include the actual amount owed for tax year 2022, notwithstanding the amount of the Dallas County Claim set forth herein, plus interest that has accrued at the state statutory rate pursuant to sections 506(b), 511, and 1129 of the Bankruptcy Code.

46.     **Louisiana Department of Revenue.**  Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any other order of the Bankruptcy Court, these provisions will govern the treatment of the Claims of the Secretary of the Louisiana Department of Revenue (the "**_LDR_**"):

    a.  The Debtors and the Liquidation Trustee (1) shall furnish such information as may be required by the LDR to determine the tax obligations for which returns are reflected as unfiled on Proofs of Claim numbers 563, 564, and 565 filed by the LDR (collectively, "**_LDR's Claims_**"), to the extent required by section 521(j) or 1106 of the Bankruptcy Code, and (2) will work in good faith with the LDR to provide available information to assist the LDR in determining the amount, if any, of its Claims.

    b.  All Administrative Expense Claims of the LDR, including but not limited to those that are currently on file, shall, to the extent Allowed after the Effective Date, be paid in accordance with section 1129(a)(9)(A) of the Bankruptcy Code, and no later than 30 days after the date such Claim is Allowed or, if not due on the Effective Date, in the ordinary course of business in accordance with applicable law, or as otherwise agreed to in writing by the Debtors or the Liquidation Trustee, as applicable, and the LDR.

    c.  Pursuant to section 503(b)(1)(D) of the Bankruptcy Code, the LDR shall not be required to file any proof of claim, motion or request for payment in order to be paid any Allowed Administrative Expense Claims for taxes that arise in the ordinary course of the Debtors' business, including taxes incurred by the Debtors after the Petition Date.

    d.  The Priority Tax Claims of the LDR shall, to the extent Allowed, be paid in full in cash (1) on the Effective Date; (2) beginning in the calendar month after such Priority Tax Claims are Allowed, in equal consecutive monthly installments of principal and interest in accordance with section 1129(a)(9)(C) with such installments ending not later than sixty (60)  months after the Petition Date; or (3) as otherwise agreed to in writing by the Debtors or the Liquidation Trustee, as applicable, and the LDR.

    e.  Any interest required by the Bankruptcy Code with respect to any Allowed Administrative Expense Claims or any Allowed Priority Tax Claims of the LDR shall be paid as required by section 511 of the Bankruptcy Code.

US 8836385

f.  LDR may amend LDR's Claims for which there are currently unfiled returns in accordance with applicable law to reflect the results of the actual assessment of tax liabilities without the consent of the Bankruptcy Court, the Debtors, the Liquidation Trust, the Liquidation Trustee, or any other related party, and all rights of parties in interest, including the Debtors, Liquidation Trust, and the Liquidation Trustee, to object to any such amended Claims are expressly preserved.

g.  In no event shall any Filed claim of the LDR be deemed disallowed or adjusted without notice and/or a filed claim objection to the LDR's Claims.

h.  In no event shall any amount owed to the LDR for any Allowed Priority Tax Claim or Allowed Administrative Expense Claim be forfeited or otherwise become property of the estate, whether unclaimed or if it would fall within the Disbursing Agent's designation of a minimum or *de minimis* amount.

i.  All rights of the LDR related to the LDR's Claims (including claims against any non-Debtor third parties) are reserved, and all rights of the Debtors, the Liquidation Trust, and the Liquidation Trustee related to the LDR's Claims are reserved.  For the avoidance of doubt, the LDR shall not be deemed to be, and is not, a Releasing Party and no non-Debtor shall be discharged of any liability for which it is liable with the Debtors to the LDR.

j.  Nothing provided in the Plan or this Confirmation Order shall modify the rights of the LDR to assert any right of setoff and/or recoupment the LDR may have under applicable bankruptcy or non-bankruptcy law.

47.     **Krewe Energy.**  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, and notwithstanding confirmation of the Plan, any and all setoff and recoupment rights held by Krewe related to the claims asserted in Proof of Claim No. 178 or to which Krewe may otherwise be entitled (whether at law or pursuant to any contract) are preserved and not discharged or enjoined.  The Debtors, the GUC Trustee, the Liquidation Trustee, and the Intercreditor Agent reserve and retain all rights and defenses with respect to their claims and any claims and any setoff and/or recoupment right asserted by Krewe, except any defense that such setoff and/or recoupment right was discharged or enjoined by the Plan or this Confirmation Order.  Krewe reserves and retains all rights and defenses with respect to its claims and any claims asserted against Krewe by the Debtors, the GUC Trustee, the Liquidation Trustee, and/or the

US 8836385

Intercreditor Agent. Neither the Plan nor this Confirmation Order shall constitute a finding that (i) Krewe has or does not have an Allowed Claim, or (ii) Krewe has or does not have any setoff or recoupment rights. To the extent that the Contribution Agreement (as defined in Proof of Claim No. 178) is assumed by the Debtors, the issue of the appropriate Cure Claim amount, if any, associated with such assumption shall be preserved and the parties reserve all rights with respect thereto.

48. **Ovintiv**. Ovintiv USA Inc., successor-in-interest to Encana Oil & Gas (USA) Inc., as sublandlord, and Rockall Energy, LLC, as successor-in-interest to Petro Harvester Oil & Gas, LLC, as subtenant, are parties to a Sublease Agreement entered into on or about December 2015 (together with all amendments thereto, the "*Ovintiv Sublease Agreement*"), for the lease of approximately 26,235 total rentable square feet located on the fifth floor, in the building located at 5851 Legacy Circle, Plano, Texas 75024, as more particularly described in the Sublease Agreement. Notwithstanding any provision of the Plan, the Sale Approval Order or this Order, the Ovintiv Sublease Agreement shall be rejected, effective as of the date of entry of this Order.

49. **Denbury**. Nothing herein or in the Plan, any Plan Supplement, the Confirmation Order, the Sale Approval Order, the PSA, any cure notice, or corresponding documents relating thereto to the contrary shall modify or impair any rights Denbury Inc. may have under any lease, sub-lease, and other contract or agreement with respect to the space located on the 5th floor of the building located at 5851 Legacy Circle in Plano, Texas (the "*Premises*"). For the avoidance of doubt, Denbury and the Debtors reserve all rights with respect to any claims, defenses, rights or otherwise with respect to the Premises and any and all agreements in connection with the Premises.

50. **COPC Affiliates.** Notwithstanding anything to the contrary in the Plan, the Confirmation Order, the Sale Approval Order, or the PSA, Burlington Resources Oil & Gas

US 8836385

Company LP, The Louisiana Land and Exploration Company LLC, and Inexco Oil Company's rights in any pre-petition credit support, including Bond No. B012265, are expressly reserved.

51. **Resolution of North Dakota's Objections.** To fully and finally resolve the North Dakota Objections,[12] as well as any and all other objections of the North Dakota Department of Environmental Quality ("***DEQ***") and North Dakota Industrial Commission-Department of Mineral Resources ("***DMR***," and collectively with DEQ, "***North Dakota***") to approval of (a) the sale of all or substantially all of the Debtors' assets to Formentera Partners Fund I, LP (the "***Purchaser***") and (b) the Disclosure Statement, and confirmation of the Plan:

    a. With respect to DEQ's claims against the Debtors, including with respect to any and all matters concerning the Debtors' prior operatorship and/or ownership of all sites and/or properties conveyed by the Debtors to 31 Operating, LLC and/or any of its affiliates (the "***31 Group Sites***") prior to the Petition Date, DEQ shall be entitled to an Allowed Administrative Expense Claim equal to $250,000.00, to be paid in cash by the Debtors to DEQ on the Effective Date (the "***Consideration***").

    b. Solely upon payment of the Consideration, DEQ shall agree not to (i) assert any other Claims of any priority, (ii) seek any other payments, or (iii) assert that any

---

[12] *Objections of North Dakota Department of Environmental Quality and North Dakota Industrial Commission-Department of Mineral Resources to (I) Approval of the Debtors' Proposed Disclosure Statement and (II) Confirmation of the Debtors Proposed Amended Joint Chapter 11 Plan* [Dkt No. 443]; *Objections of North Dakota Department of Environmental Quality and North Dakota Industrial Commission-Department of Mineral Resources to (I) Emergency Motion for Order Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Contract Assumption and Cure Notices* [Docket No. 489]; and *Supplemental Objections and Joinder of North Dakota Department of Environmental Quality and North Dakota Industrial Commission-Department of Mineral Resources to (I) Approval of the Debtors' Proposed Disclosure Statement, (II) Confirmation of the Debtors' Proposed Amended Joint Chapter 11 Plan and (III) Emergency Motion for Order Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (IV) Contract Assumption and Cure Notices* [Dkt. No. 558] (collectively, the "***North Dakota Objections***").

US 8836385

obligations of any kind (including any injunctive, police, or regulatory liabilities) exist related to the ownership or operation of any wells or properties prior to the Effective Date, in each case from or against the Debtors' Estates, the Liquidation Trust, or the GUC Trust.

c.  The Debtors shall not exercise the right to exclude Assets from the Sale pursuant to Section 3.2(g)(ii) of the PSA.

d.  For the avoidance of doubt, under the terms of the PSA, the Purchaser is assuming all Environmental Liabilities (as defined in the PSA) with respect to the Assets, except to the extent such Environmental Liabilities constitute Excluded Liabilities (which are retained by the Debtors) pursuant to the PSA. For the avoidance of doubt, the Purchaser is assuming the remediation and reporting obligations under Paragraph XIX of the Administrative Consent Agreement for the Peterson 2 SWD and Paragraph VI of the Administrative Consent Agreement for the Cramer 1 SWD Line Failure, and such obligations do not constitute Excluded Liabilities.

e.  Pursuant to the laws of the State of North Dakota, the agreement by North Dakota herein does not compromise, settle, or resolve the rights or claims of any other party, including any landowner, that they may have against the Debtors. The agreement herein only compromises and resolves North Dakota's rights and claims against the Debtors.

f.  North Dakota's agreements herein are only effective upon DEQ's receipt of the Consideration and the occurrence of the Payout Event (as defined by the Plan) based upon the terms and conditions of the PSA. North Dakota's agreements herein shall not be effective and shall be null and void in the event that the Payout Event

US 8836385

does not occur or the terms and conditions of the PSA are altered to adversely affect North Dakota.

52.    **Governmental Entities**.  Nothing in the Plan, this Confirmation Order (including paragraphs 58 and 71 hereof), the Sale, the Sale Approval Order, or the PSA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-Effective Date owner or operator of property after the Effective Date.  Nothing in the Plan, this Confirmation Order (including paragraphs 58 and 71 hereof), the Sale, the Sale Approval Order, or the PSA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

53.    **United States Department of the Interior.**  Notwithstanding any provision to the contrary in the Plan Documents, this Confirmation Order (including paragraphs 58 and 71 hereof), or any implementing Plan documents (collectively for purposes of paragraphs 53 and 54 of this Confirmation Order, the "***Documents***"), nothing shall:  (1) discharge, release, enjoin, impair or otherwise preclude (i) any liability to the United States of America, its agencies, departments, or agents (collectively, the "***United States***") or any state or local authority that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code, (ii) any claim of the United States arising after the Effective Date, or (iii) any liability of any entity or person under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property or rights to property that such entity or person owns, operates or leases after the Effective Date; (2) release, nullify, preclude or enjoin the enforcement of any Police or Regulatory Law[13] or

---

[13]    Solely with respect to paragraphs 53 and 54 of this Confirmation Order, "Environmental Law" means all federal, state and local statutes, regulations, ordinances concerning pollution, contamination, hazardous or

US 8836385

Environmental Law,[14] except to the extent that such enforcement constitutes a "claim" within the meaning of section 101(5) of the Bankruptcy Code that arises before the Effective Date; (3) affect any valid setoff or recoupment rights of the United States and such rights are preserved; (4) constitute an approval or consent by the United States without compliance with all applicable legal requirements and approvals under non-bankruptcy law; (5) be construed as a compromise or settlement of any liability, claim, Cause of Action or interest of the United States; (6) authorize or cause the assumption, sale, assignment and/or transfer of any interests in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the United States, including, but not limited to, those involving federal land or minerals (collectively, "***Federal Interests***"), without (a) obtaining the written consent of the United States, and (b) compliance with all applicable non-bankruptcy law and regulations; (7) be interpreted to set cure amounts with respect to Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption, sale, assignment and/or transfer of any Federal Interests; or (8) cause a Federal Interest to be deemed automatically assumed by the Effective Date; or (9) require rejection damage claims relating to Federal Interests to be filed other than by the later of (i) the Government Bar Date and (ii) thirty days after the effective date of the rejection of such Federal Interest. Nothing shall modify Paragraphs 30–33 of the Sale Approval Order and such paragraphs are specifically incorporated herein.

---

toxic substances, well plugging and restoration, or protection of the environment, or environmental impacts on human health and safety, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act; the Clean Water Act; the Clean Air Act; the Emergency Planning and Community Right-to-Know Act; the Federal insecticide, Fungicide, and Rodenticide Act; the Oil Pollution Act; the Safe Drinking Water Act; the Surface Mining Control and Reclamation Act; the Toxic Substances Control Act.

[14] Solely with respect to paragraphs 53 and 54 of this Confirmation Order, "Police or Regulatory Law" means any police power or regulatory statute or regulation including, but not limited to, Environmental Law.

US 8836385

54.     Except as provided in Article IV.C.12 of the Plan, nothing contained in the Documents shall be deemed to bind the United States or any state or local authority to any characterization of any transaction for tax purposes or to determine the tax liability of any person or entity, including, but not limited to, the Debtors and the Debtors' Estates, as applicable, nor shall the Documents be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in the Documents be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under section 505 of the Bankruptcy Code.

55.     **Distributions**.  All distributions pursuant to the Plan shall be made in accordance with Article VI of the Plan, and such methods of distribution are approved.

56.     **Compromise and Settlement of Claims, Interests, and Controversies**.  Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.  The entry of this Confirmation Order constitutes approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the

US 8836385

Effective Date, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

57.     In accordance with Bankruptcy Rule 9019, the Plan constitutes the good-faith compromise and settlement among the Global Settlement Parties regarding the treatment of General Unsecured Claims under the Plan, and reflects and implements such compromise and settlement, including by the establishment and funding of the GUC Global Settlement Amount. Such compromise and settlement is made in exchange for consideration and is in the best interests of the Global Settlement Parties and the Holders of General Unsecured Claims, is within the reasonable range of possible litigation outcomes, is fair, equitable and reasonable, and is an essential element of the resolution of these chapter 11 cases.

58.     **Release, Discharge, Exculpation, and Injunction Provisions**.  All discharge, injunction, release, and exculpation provisions set forth in the Plan, including but not limited to those contained in Articles VIII.B, VIII.C, VIII.D, VIII.E, VIII.F, VIII.G and VIII.H of the Plan, are approved and shall be effective and binding on all persons and entities to the extent provided therein.

59.     **Tax Withholding**.  Pursuant to the Plan, including Article VI.E thereof, to the extent applicable, the Debtors, Liquidation Trustee, Disbursing Agent, GUC Trustee, and any applicable withholding agent shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the

US 8836385

distribution to be made under the Plan to generate sufficient funds to pay applicable withholding Taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information necessary for the Debtors, Liquidation Trustee, Disbursing Agent, and any applicable withholding agent to comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, including an Internal Revenue Service Form W-8 or W-9, as applicable, and any other applicable tax forms.

60.     **Payment of Statutory Fees**.  On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash, including the fees due and payable for the disbursement of the Liquidation Trust Assets vesting in the Liquidation Trust pursuant Article IV.A.2 of the Plan and the fees due and payable for the disbursement of the GUC Trust Assets vesting in the GUC Trust pursuant Article IV.B.2 of the Plan.  After the Effective Date, the Liquidation Trustee will pay any and all fees due and payable pursuant to 28 U.S.C. § 1930 with respect to the Debtors for each quarter (including any fraction thereof), and the Liquidation Trustee and GUC Trustee shall file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines, until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

61.     **Documents, Mortgages and Instruments**.  Each federal, state, local, foreign or other governmental agency is authorized to accept any and all documents, mortgages or instruments necessary or appropriate to effectuate, implement or consummate the Plan.

62.     **Return of Deposits**.  All utilities, including any utility company who received a deposit or other form of "adequate assurance" of performance pursuant to section 366 of the

Bankruptcy Code during these chapter 11 cases (collectively, the "***Deposits***"), whether pursuant to the *Order (I) Approving the Debtors' Proposed Adequate Assurance Payments for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests* [Dkt. No. 201] (the "***Utilities Order***") or otherwise, including, but not limited to, gas, electric, telephone, data, cable, trash, freight, and waste management services, are directed to return such Deposits to the Reorganized Debtors or Liquidation Trustee (as applicable) within 15 days following the Effective Date. Additionally, the Reorganized Debtors or the Liquidation Trustee, as applicable, are hereby authorized to close the Adequate Assurance Account (as defined in the Utilities Order) upon entry of the Confirmation Order.

63. **Filing and Recording**. This Confirmation Order is binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument. Each and every federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions contemplated by the Plan and this Confirmation Order without payment of any stamp tax or similar tax imposed by state or local law.

64. **Continued Effect of Stays and Injunctions**. Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered

US 8836385

during the chapter 11 cases under section 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

65. **Debtors' Actions Post-Confirmation Through the Effective Date**. During the period from entry of this Confirmation Order through and until the Effective Date, each of the Debtors shall continue to operate its business as a debtor in possession, subject to the oversight of the Bankruptcy Court as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Confirmation Order and any order of the Bankruptcy Court that is in full force and effect.

66. **Authorization to Consummate**. The Debtors are authorized to consummate the Plan and the Restructuring at any time after entry of this Confirmation Order subject to satisfaction, or waiver in accordance with Article IX.C of the Plan, of the conditions precedent to the Effective Date set forth in Article IX of the Plan.

67. **Conditions Precedent to the Effective Date**. The Plan shall not become effective unless and until the conditions set forth in Article IX.B of the Plan have been satisfied or waived pursuant to Article IX.C of the Plan.

68. **Nonseverability of Plan Provisions Upon Confirmation**. Each provision of the Plan is: (a) valid and enforceable in accordance with its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent (and subject to other consents and consultation rights set forth in the Plan) in accordance with the terms set forth in the Plan; and (c) nonseverable and mutually dependent.

69. **Post-Confirmation Modifications**. Subject to the terms of the Plan and without need for further order or authorization of the Bankruptcy Court, the Debtors, Reorganized Debtors, or Liquidation Trustee, as applicable, are authorized and empowered to make any and all

US 8836385

modifications to any and all Plan Documents that are necessary to effectuate the Plan that do not materially modify the terms of such documents and are consistent with the Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors, Reorganized Debtors, and Liquidation Trustee reserve their respective rights prior to the Effective Date to withdraw, alter, amend, or modify materially the Plan with respect to such Debtor, Reorganized Debtor, Liquidation Trustee, or Liquidating Debtors, as applicable, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, or this Confirmation Order, as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X.A of the Plan.

70. **Reversal/Stay/Modification/Vacatur of Confirmation Order**. Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtors prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

US 8836385

71.     **Applicable Non-bankruptcy Law.**  The provisions of this Confirmation Order, the Plan, and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

72.     **Waiver of Filings**.  Any requirement under section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Bankruptcy Court or the Office of the United States Trustee for the Region 6 for the Northern District of Texas (the "***U.S. Trustee***") (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived as to any such list, schedule, or statement not filed as of the Confirmation Date.

73.     **Notice of Entry of the Confirmation Order and Effective Date**.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of the Sale Approval Order, substantially in the form annexed hereto as **Exhibit B**, and this Confirmation Order and notice of the Effective Date, substantially in the form annexed hereto as **Exhibit C**, to all parties who hold a Claim or Interest in these chapter 11 cases, the U.S. Trustee, and other parties in interest.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of confirmation of the Plan, entry of this Confirmation Order, and the occurrence of the Effective Date.

74.     **Waiver of Stay.**  The Confirmation Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  As set forth in the Sale Approval Order, time is of the essence in Closing the Sale.  Accordingly, sufficient cause has been shown to waive the stays contemplated by Bankruptcy Rule 3020(e) or any other Bankruptcy Rule. Any party objecting to this Confirmation Order must exercise due diligence in filing an appeal,

US 8836385

pursuing a stay, and obtaining a stay prior to the Closing or risk its appeal being foreclosed as moot.

75.      **Substantial Consummation**.  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

76.      **Termination of Restructuring Support Agreement**.  On the Effective Date, the Restructuring Support Agreement will terminate automatically in accordance with Section 9 thereof.

77.      **References to Particular Plan Provisions**.  References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan or this Confirmation Order.

78.      **Headings.**  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

79.      **Effect of Conflict**.  This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, then, solely to the extent of such inconsistency, the terms of this Confirmation Order govern and control.

80.      **Final Order.**  This Confirmation Order is a Final Order and the period in which an appeal must be filed shall commence upon the entry hereof.

81.      **Retention of Jurisdiction**.  Except as set forth in the Plan or this Confirmation Order, the Bankruptcy Court may properly, and, upon the Effective Date, shall retain jurisdiction over all matters arising out of, and related to, these chapter 11 cases, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

US 8836385

**# # # END OF ORDER # # #**

US 8836385

**Order submitted by:**

**VINSON & ELKINS LLP**
Michael A. Garza (Texas Bar No. 24126797)
Matthew J. Pyeatt (Texas Bar No. 24086609)
Trevor G. Spears (Texas Bar No. 24106681)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
mgarza@velaw.com
mpyeatt@velaw.com
tspears@velaw.com

- and -

David S. Meyer (admitted *pro hac vice*)
George R. Howard (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com
ghoward@velaw.com
lkanzer@velaw.com

**ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

**<u>Exhibit A</u>**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | **Case No. 22-90000 (MXM)** |
| | § | |
| **ROCKALL ENERGY HOLDINGS, LLC,** | § | **(Chapter 11)** |
| *et al.*, | § | |
| | § | **(Jointly Administered)** |
| | § | |
| Debtors.[1] | § | |

## DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

Michael A. Garza (TX 24126797)
Matthew J. Pyeatt (TX 24086609)
Trevor G. Spears (TX 24106681)
2001 Ross Ave., Suite 3900
Dallas, TX 75201

David S. Meyer (admitted *pro hac vice*)
George R. Howard (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036

**VINSON & ELKINS LLP**

**ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

**Dated: May 25, 2022**

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Arrow Rock Energy, LLC (7549), Petro Harvester Operating Company, LLC (2136), Rockall Agent Corp. (1653), Rockall Energy Holdings, LLC (5784), Rockall Energy, LLC (6340), Rockall EOR, LLC (4136), Rockall Exploration Company, LLC (0547), Rockall Intermediate, Inc. (9759), Rockall LA, LLC (4270), Rockall Laurel, LLC (1178), Rockall Midstream, LLC (0917), Rockall MS, LLC (0740), Rockall ND, LLC (9311), Rockall Pine Prairie, LLC (5799), White Marlin Investment Company, LLC (9987), and White Marlin Midstream, LLC (1466). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 5005 LBJ Freeway, Suite 700, Dallas, TX 75244.

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms* ......................................................................................................... 1
B.    *Rules of Interpretation* ......................................................................................... 19
C.    *Computation of Time* ............................................................................................ 20
D.    *Governing Law* ...................................................................................................... 20
E.    *Reference to Monetary Figures* .......................................................................... 20
F.    *Reference to the Debtors or the Reorganized Debtors* .................................... 20
G.    *Controlling Document* .......................................................................................... 20

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

A.    *Administrative Expense Claims* .......................................................................... 21
B.    *Professional Compensation* ................................................................................ 21
C.    *DIP Claims* ............................................................................................................ 23
D.    *Adequate Protection Claims* ............................................................................... 23
E.    *Priority Tax Claims* .............................................................................................. 23
F.    *Statutory Fees* ....................................................................................................... 23
G.    *Restructuring Expenses* ....................................................................................... 24

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims* ...................................................................................... 24
B.    *Treatment of Claims and Interests* ..................................................................... 25
C.    *Special Provision Governing Unimpaired or Reinstated Claims* .................... 28
D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* ...................................................................................................................... 28
E.    *Elimination of Vacant Classes* ........................................................................... 28
F.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* ...................... 28
G.    *Controversy Concerning Impairment* ................................................................ 28
H.    *Subordinated Claims* ........................................................................................... 28

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Liquidation Trust* ................................................................................................. 29
B.    *GUC Trust* ............................................................................................................. 33
C.    *Means for Implementation if a Payout Event Occurs* ...................................... 36
D.    *Means for Implementation if a Payout Event Does Not Occur* ....................... 41

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases* ..... 49

i

| | | |
|---|---|---|
| B. | *Pass-Through* | 50 |
| C. | *Claims Based on Rejection of Executory Contracts or Unexpired Leases* | 50 |
| D. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* | 51 |
| E. | *Indemnification Obligations* | 52 |
| F. | *Insurance Policies* | 52 |
| G. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements* | 53 |
| H. | *Reservation of Rights* | 53 |
| I. | *Nonoccurrence of Effective Date* | 53 |

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

| | | |
|---|---|---|
| A. | *Timing and Calculation of Amounts to Be Distributed* | 54 |
| B. | *Disbursing Agent.* | 54 |
| C. | *Delivery of Distributions and Undeliverable or Unclaimed Property* | 55 |
| D. | *Registration or Private Placement Exemption* | 56 |
| E. | *Compliance with Tax Requirements* | 57 |
| F. | *Foreign Currency Exchange Rate* | 57 |
| G. | *Surrender of Cancelled Instruments or Securities* | 57 |
| H. | *Allocations* | 58 |
| I. | *No Postpetition Interest on Claims* | 58 |
| J. | *Setoffs and Recoupment* | 58 |
| K. | *Claims Paid or Payable by Third Parties* | 58 |

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

| | | |
|---|---|---|
| A. | *Allowance of Claims* | 59 |
| B. | *Claims and Interests Administration Responsibilities* | 60 |
| C. | *Estimation of Claims* | 60 |
| D. | *Adjustment to Claims or Interests Without Objection* | 60 |
| E. | *Time to File Objections to Claims* | 61 |
| F. | *Disallowance of Claims* | 61 |
| G. | *Amendments to Claims* | 61 |
| H. | *No Distributions Pending Allowance* | 61 |
| I. | *Single Satisfaction of Claims* | 62 |

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

| | | |
|---|---|---|
| A. | *Compromise and Settlement of Claims, Interests, and Controversies* | 62 |
| B. | *Discharge of Claims and Termination of Interests* | 63 |
| C. | *Term of Injunctions or Stays* | 63 |
| D. | *Release of Liens* | 63 |
| E. | *Releases by the Debtors* | 64 |
| F. | *Releases by Releasing Parties* | 65 |
| G. | *Exculpation* | 66 |
| H. | *Injunction* | 67 |

| I. | *Protection Against Discriminatory Treatment* | 68 |
| J. | *Recoupment* | 68 |
| K. | *Subordination Rights* | 68 |
| L. | *Reimbursement or Contribution* | 68 |
| M. | *Document Retention.* | 69 |

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

| A. | *Conditions Precedent to Confirmation* | 69 |
| B. | *Conditions Precedent to the Effective Date* | 69 |
| C. | *Waiver of Conditions* | 71 |
| D. | *Substantial Consummation* | 71 |
| E. | *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date* | 71 |

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

| A. | *Modification and Amendments* | 71 |
| B. | *Effect of Confirmation on Modifications* | 71 |
| C. | *Revocation or Withdrawal of the Plan* | 72 |

## ARTICLE XI.
## RETENTION OF JURISDICTION

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

| A. | *Immediate Binding Effect* | 74 |
| B. | *Additional Documents* | 74 |
| C. | *Reservation of Rights* | 75 |
| D. | *Successors and Assigns* | 75 |
| E. | *Service of Documents* | 75 |
| F. | *Term of Injunctions or Stays* | 77 |
| G. | *Entire Agreement* | 77 |
| H. | *Exhibits* | 77 |
| I. | *Nonseverability of Plan Provisions* | 78 |
| J. | *Votes Solicited in Good Faith* | 78 |
| K. | *Request for Expedited Determination of Taxes* | 78 |
| L. | *Closing of Chapter 11 Cases* | 79 |
| M. | *No Stay of Confirmation Order* | 79 |
| N. | *Waiver or Estoppel* | 79 |
| O. | *Dissolution of the Committee* | 79 |

US 8895812

## INTRODUCTION

Rockall and its affiliated debtors, as Debtors and debtors in possession in the above-captioned chapter 11 cases, jointly propose this chapter 11 plan for the resolution of outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A of the Plan or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, Assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

> **ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "***Adequate Protection Claim***" means any Claim for adequate protection within the meaning of section 361 of the Bankruptcy Code arising under applicable law or pursuant to Final Order of the Bankruptcy Court.

2.      "***Administrative Expense Claim***" means any Claim (other than any Adequate Protection Claims or DIP Claims) for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses; (ii) Allowed Professional Fee Claims; (iii) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (iv) Restructuring Expenses.

3.      "***Administrative Expense Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Expense Claims, which: (a) with respect to Administrative Expense Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

4.      "***Affiliate***" shall have the meaning set forth in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that controls such Entity other than a Debtor.

1

5.    "*Allowed*" means with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan and such Claim or Interest is not Disputed or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (iii) any Claim or Interest expressly allowed under the Plan; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors (to the extent applicable) will retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

6.    "*Asserted General Unsecured Claim*" means any Claim that is (i) scheduled in the Debtors' Schedules as a General Unsecured Claim that is not contingent, unliquidated, and/or disputed, (ii) based on a proof of claim that asserts to be a General Unsecured Claim, or (iii) determined, or pending determination, by Final Order of the Bankruptcy Court to be a General Unsecured Claim.

7.    "*Assets*" means all of the Debtors' property, rights, and interests that are property of the Estates pursuant to section 541 of the Bankruptcy Code.

8.    "*Asset Sale*" means the sale of any of the Debtors' Assets pursuant to one or more transactions conducted in accordance with the Bidding Procedures.

9.    "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer and preference laws. For the avoidance of doubt, all Avoidance Actions against non-Insiders of the Debtors shall be waived upon the Effective Date, except those against Krewe.

10.   "*Ballots*" means the ballots distributed to certain Holders of Impaired Claims entitled to vote on the Plan upon which such Holders shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

11.   "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

12.   "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time.

13.   "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

14.   "*Bar Date Order*" means the order entered by the Bankruptcy Court setting the Claims Bar Date and the Governmental Bar Date.

US 8895812

15. "**Bid Deadline**" means such time as set forth in the Bidding Procedures, or such other time fixed by the Bankruptcy Court.

16. "**Bidding Procedures**" means the procedures approved by the Bankruptcy Court governing the marketing process for the sale of the Debtors' Assets.

17. "**Business Day**" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "**Cash**" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

19. "**Cause of Action**" means any action, claim, cause of action, controversy, third-party claim, dispute, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, Secured or Unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code (including Avoidance Actions); (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

20. "**Chapter 11 Cases**" means each individual case or the jointly administered cases pending under chapter 11 of the Bankruptcy Code for each individual Debtor or the Debtors, as applicable, in the Bankruptcy Court.

21. "**Claim**" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

22. "**Claims Bar Date**" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim (other than for Administrative Expense Claims and Claims held by Governmental Units) must be Filed.

23. "**Claims Objection Deadline**" means the deadline for objecting to a Claim against a Debtor, which shall be on the date that is the later of (a) 180 days after the Effective Date, subject to extension by order of the Bankruptcy Court, (b) 90 days after the Filing of a Proof of Claim, or (c) such other period of limitation as may be fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order for objecting to a Claim.

24. "**Claims Register**" means the official register of Claims against and Interests in the Debtors maintained by the Noticing and Claims Agent.

US 8895812

25. "*Claims Reserve*" means a reserve to be established by the Debtors on or before the Effective Date and comprised of Cash in the amount of the Claims Reserve Amount, less any portion of such amount that is distributed on the Effective Date pursuant to the Plan, which reserve shall vest in the Reorganized Debtors, the Liquidation Trust, or the GUC Trust (as applicable) as of the Effective Date.

26. "*Claims Reserve Amount*" means the sum of (a) the Other Priority Claims Reserve Amount, (b) the Other Secured Claims Reserve Amount, (c) the estimated aggregate face amount of accrued but unpaid Administrative Expense Claims (excluding Professional Fee Claims) against the Debtors as of the Effective Date, (d) the U.S. Trustee Fees, (e) the amount set forth in the Wind Down Budget, (f) the GUC Global Settlement Amount, and (g) the GUC Trust Budget.

27. "*Class*" means a category of Claims against or Interests in the Debtors as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

28. "*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the U.S. Trustee in the Chapter 11 Cases on March 18, 2022, pursuant to section 1102 of the Bankruptcy Code.

29. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

30. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

31. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

32. "*Confirmation Order*" means the Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

33. "*Consenting Creditor Advisors*" means (a) Cleary Gottlieb Steen & Hamilton LLP, as counsel to the DIP Agent, the Term Loan Agent, and the Intercreditor Agent, (b) Houlihan Lokey Capital, Inc., as financial advisor to the DIP Agent, the Term Loan Agent, and the Intercreditor Agent, and (c) Reed Smith LLP, as counsel to Shell.

34. "*Consenting Creditors*" means Shell and the Term Loan Lenders that are parties to the Restructuring Support Agreement.

35. "*Consummation*" means the occurrence of the Effective Date.

36. "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

US 8895812

37.  "**Cure Notice**" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

38.  "**D&O Liability Insurance Policies**" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

39.  "**Debtors**" means, collectively, the following: Arrow Rock Energy, LLC; Petro Harvester Operating Company, LLC; Rockall Agent Corp.; Rockall Energy Holdings, LLC; Rockall Energy, LLC; Rockall EOR, LLC; Rockall Exploration Company, LLC; Rockall Intermediate, Inc.; Rockall LA, LLC; Rockall Laurel, LLC; Rockall Midstream, LLC; Rockall MS, LLC; Rockall ND, LLC; Rockall Pine Prairie, LLC; White Marlin Investment Company, LLC; and White Marlin Midstream, LLC.  Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors shall mean the Reorganized Debtors to the extent context requires.

40.  "**Debtor Royalty and Working Interest**" means any Royalty and Working Interest of a Debtor.

41.  "**Deficiency Claim**" means the portion, if any, of the DIP Claims and the Secured Parties Claims that are not Secured Claims.  Solely for the purposes of this Plan, the Holders of Deficiency Claims, if any, agree to waive such Claims on the Effective Date.

42.  "**Definitive Documents**" is used as defined in the Restructuring Support Agreement.

43.  "**DIP Agent**" means Goldman Sachs Bank USA, in its capacity as administrative agent and collateral agent under the DIP Facility.

44.  "**DIP Claim**" means any Claim of the DIP Agent or any DIP Lender on account of or arising from, under or in connection with the DIP Facility.

45.  "**DIP Credit Agreement**" means that certain proposed debtor-in-possession financing credit agreement between Rockall Energy, as borrower, Rockall and its subsidiaries, as guarantors, the DIP Agent, and the DIP Lenders.

46.  "**DIP Facility**" means the senior secured superpriority debtor-in-possession financing facility to be provided by the DIP Lenders, all as set forth in, and consistent with and subject to, the terms and conditions of the DIP Facility Documents.

47.  "**DIP Facility Documents**" means the DIP Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including any DIP Orders, and any guaranty agreements, pledge and collateral agreements, UCC financing statements, or

US 8895812

other perfection documents, subordination agreements, fee letters, and any other security agreements.

48.    "*DIP Lender*" means each lender under the DIP Facility, including, for the avoidance of doubt, Shell in respect of its DIP Roll-Up Obligations (as defined in the DIP Order) incurred under the DIP Facility Documents (it being understood that Shell shall have no obligation to make any new money advances pursuant to the DIP Facility).

49.    "*DIP Liens*" mean the Liens granted to the DIP Agent under the DIP Order to secure the DIP Claims.

50.    "*DIP Order*" means both the interim and Final Order entered by the Bankruptcy Court approving the DIP Facility.

51.    "*Disallowed*" means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, is not Allowed; *provided, however*, that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

52.    "*Disbursing Agent*" means, (i) if a Payout Event occurs, the Debtors, the Liquidation Trustee, the GUC Trustee or the Entity or Entities selected by the Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable) to make or facilitate distributions pursuant to the Plan, or (ii) if a Payout Event does not occur, the Reorganized Debtors, the GUC Trustee or the Entity or Entities selected by the Reorganized Debtors or the GUC Trustee (as applicable) to make or facilitate distributions pursuant to the Plan.  For the avoidance of doubt, the GUC Trustee will only be the Disbursing Agent as it relates to making or facilitating distributions to Holders of Allowed General Unsecured Claims pursuant to the Plan.

53.    "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan*, dated as of March 9, 2022, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

54.    "*Disputed*" means, with respect to any Claim or Interest, that such Claim or Interest (a) is not yet Allowed, (b) is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable, (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (d) is or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with the Bar Date Order.

55.    "*Dissolution Transactions*" means, if a Payout Event occurs, the transactions that the Debtors or Liquidation Trustee, with the consent of the Majority Consenting Creditors, determine to be necessary or appropriate to implement the terms of the Plan, and ultimately result in the dissolution or other termination of the corporate entities that comprise the Debtors.

56.    "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date as designated in an order of the Bankruptcy Court.

57.     "**Effective Date**" means the date selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan becomes effective; *provided, however*, that if such date does not occur on a Business Day, the Effective Date shall be deemed to occur on the first Business Day after such date.

58.     "**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

59.     "**Estate**" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

60.     "**Exculpated Party**" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors (as applicable); (c) the Debtors' Professionals; (d) the Released Parties; and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, managed accounts and funds, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, subcontractors, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each solely in their capacity as such; *provided, however*, that the members of the Committee will be Exculpated Parties solely in their capacities as members of the Committee.

61.     "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

62.     "**Exit Facility**" means a new credit facility, if any, to be provided by the applicable existing Term Loan Lenders to Reorganized Rockall on the Effective Date if a Payout Event does not occur.

63.     "**Exit Facility Agent**" means the administrative agent and collateral agent under the Exit Facility, or any successor thereto, solely in its capacity as such.

64.     "**Exit Facility Credit Agreement**" means the credit agreement in respect of the Exit Facility to be entered into by Reorganized Rockall, as borrower, the Exit Facility Agent, and the Exit Facility Lenders on the Effective Date, which shall be subject to the approvals and consents as to form and substance set forth in the Restructuring Support Agreement. A substantially final form of the Exit Facility Credit Agreement, in form and substance acceptable to the DIP Agent and the Majority Consenting Creditors will be included in the Plan Supplement.

65.     "**Exit Facility Documents**" means the Exit Facility Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements. Any Exit Facility Documents shall be in form and substance acceptable to the DIP Agent and the Majority Consenting Creditors.

7

66. "***Exit Facility Lender***" means each lender party to the Exit Facility Credit Agreement.

67. "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date, compounded annually.

68. "***File***," "***Filed***," or "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Noticing and Claims Agent or the Bankruptcy Court through the PACER or CM/ECF website.

69. "***Final Decree***" means the decree contemplated under Bankruptcy Rule 3022.

70. "***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

71. "***General Unsecured Claim***" means any Claim that is not secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court (other than a Deficiency Claim, an Intercompany Claim, or a Subordinated Claim). For the avoidance of doubt, all rights to payment or production resulting from Non-Debtor Royalty and Working Interests and arising before the Petition Date, and any and all Claims (and Allowed Claims), liabilities, and obligations arising therefrom, including Claims (and Allowed Claims) and payment obligations arising before the Petition Date, in each case not already paid by the Debtors in the ordinary course pursuant to the Royalty Order or assumed by a Successful Bidder, are being treated as General Unsecured Claims under the Plan and shall be compromised and/or released by the Plan. Any Deficiency Claims, Intercompany Claims, and Subordinated Claims shall not constitute General Unsecured Claims.

72. "***Global Settlement***" means the global settlement between the Global Settlement Parties pursuant to the term sheet attached to the *Notice of Filing Global Settlement Term Sheet* [Dkt. No. 367].

73. "***Global Settlement Parties***" means the Debtors, the DIP Lenders, the Secured Parties, and the Committee.

8

74. "**_Governmental Bar Date_**" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim of Governmental Units must be Filed.

75. "**_Governmental Unit_**" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

76. "**_GUC Global Settlement Amount_**" means, in the aggregate, (i) $3.75 million in Cash, plus (ii) 3.0% of any Net Sale Proceeds in excess of $130 million, plus (iii) any unused amounts from the Vendor Pot, plus (iv) any portion of the $2 million allocated for payment of Committee Professionals under the Global Settlement that has not been, and will not be, paid to the Committee Professionals.

77. "**_GUC Trust_**" means the trust established pursuant to Article IV.B of the Plan to, among other things, hold the GUC Trust Assets and make distributions pursuant to the Plan.

78. "**_GUC Trust Accounts_**" means the bank accounts to be held in the name of the GUC Trustee that are created pursuant to Article IV.B of the Plan.

79. "**_GUC Trust Agreement_**" means the trust agreement, to be dated prior to the Effective Date, between the Debtors and the GUC Trustee, governing the GUC Trust, which agreement shall be in form and substance acceptable to the Committee and the Debtors.

80. "**_GUC Trust Assets_**" means the GUC Global Settlement Amount and GUC Trust Budget.

81. "**_GUC Trust Beneficiaries_**" means the "Beneficiaries" as defined in the GUC Trust Agreement.

82. "**_GUC Trust Budget_**" means the GUC Trust Expenses from and after the Effective Date, which shall total $250,000.

83. "**_GUC Trust Expenses_**" means any and all reasonable and documented fees, costs, and expenses incurred by the GUC Trust or the GUC Trustee (or any Disbursing Agent, Person, entity, or professional engaged by the GUC Trustee to effect distributions or otherwise assist the GUC Trustee with its duties under the GUC Trust Agreement) in connection with any of their duties under the Plan and the GUC Trust Agreement, including, without limitation, any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses and fees payable under 28 U.S.C. § 1930, costs associated with any maintenance of any going concern as part of the wind down of such going concern's business operations, or costs to maintain certain assets while they are held, in each case, in accordance with and subject to the GUC Trust Budget.

84. "**_GUC Trustee_**" means the trustee appointed pursuant to Article IV.B of the Plan (or any successor trustee), in their or its capacity as the trustee of the GUC Trust, who shall be solely responsible for overseeing the reconciliation, objection, settlement, or other disposition of General Unsecured Claims asserted in these Chapter 11 Cases.

9

85. "*Holder*" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

86. "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

87. "*Indemnification Obligations*" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former directors and the officers of the Debtors.

88. "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

89. "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

90. "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

91. "*Intercreditor Agent*" means Goldman Sachs Bank USA, in its capacity as Administrative Agent and Collateral Agent (as such terms are defined in the Intercreditor Agreement) under the Intercreditor Agreement.

92. "*Intercreditor Agreement*" means that certain *Intercreditor Agreement*, dated as of October 29, 2018 (as amended, restated, modified, supplemented, or replaced from time to time), by and among the Approved Counterparties (as defined therein), Rockall, Rockall Energy, and the Intercreditor Agent.

93. "*Intercreditor Agreement Documents*" means the Intercreditor Agreement and all other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements.

94. "*Interest*" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in the Debtors, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

95. "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

96. "*IRS*" means the Internal Revenue Service.

97. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

98. "*KERP Motion*" means the *Motion for Entry of an Order (I) Authorizing the Debtors to Implement a Key Employee Retention Plan and (II) Granting Related Relief* [Dkt. No. 172].

10

99.     "*Krewe*" means Krewe Energy, LLC and its affiliates.

100.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

101.     "*List of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors which shall be included in the Plan Supplement.

102.     "*Liquidation Trust*" means the trust established pursuant to Article IV.A to, among other things, hold the Liquidation Trust Assets and make distributions pursuant to the Plan.

103.     "*Liquidation Trust Accounts*" means the bank accounts to be held in the name of the Liquidation Trustee that are created pursuant to Article IV.A of the Plan.

104.     "*Liquidation Trust Agreement*" means the trust agreement, to be dated prior to the Effective Date, between the Debtors and the Liquidation Trustee, governing the Liquidation Trust, which agreement shall be in form and substance acceptable to the Majority Consenting Creditors.

105.     "*Liquidation Trust Assets*" means, (i)(a) if a Payout Event occurs, any Assets of the Debtors' Estates not sold in the Asset Sale, including, but not limited to, any Cause of Action specifically enumerated in the List of Retained Causes of Action and the equity or membership interests of the TSA Entities or (b) if a Payout Event does not occur, any Assets that the Majority Consenting Creditors have identified and designated in the Plan Supplement, and (ii) Cash in the amount set forth in the Wind Down Budget to satisfy the Liquidation Trust Funding. For the avoidance of doubt, no GUC Trust Assets shall be Liquidation Trust Assets.

106.     "*Liquidation Trust Beneficiaries*" means the "Beneficiaries" as defined in the Liquidation Trust Agreement.

107.     "*Liquidation Trust Expenses*" means any and all reasonable and documented fees, costs, and expenses incurred by the Liquidation Trust or the Liquidation Trustee (or any Disbursing Agent, Person, entity, or professional engaged by the Debtors or the Liquidation Trustee to effect distributions or otherwise assist the Liquidation Trustee with its duties under the Liquidation Trust Agreement) in connection with any of their duties under the Plan and the Liquidation Trust Agreement, including, without limitation, any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses and fees payable under 28 U.S.C. § 1930, costs associated with any maintenance of any going concern as part of the wind down of such going concern's business operations, or costs to maintain certain assets while they are held, in each case, in accordance with and subject to the Wind Down Budget.

108.     "*Liquidation Trust Funding*" means the contribution of the amount agreed upon by the Majority Consenting Creditors and the Debtors, as set forth in the Wind Down Budget, to fund the Liquidation Trust Expenses until all distributions required to be made under the Plan are made.

109.     "*Liquidation Trustee*" means the trustee appointed pursuant to Article IV.A (or any successor trustee), in their or its capacity as the trustee of the Liquidation Trust.

110. "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas.

111. "*Majority Consenting Creditors*" means those Consenting Creditors holding a majority in dollar amount of the aggregate outstanding principal amount of the Secured Parties Claims held by all Consenting Creditors.

112. "*Net Sale Proceeds*" means the Net Sale Proceeds as defined in Exhibit B to the KERP Motion.

113. "*New Board*" means, if a Payout Event does not occur, (a) with respect to Reorganized Rockall, the initial board of directors of Reorganized Rockall and (b) with respect to each other Reorganized Debtor, the initial board of directors, board of managers, or other governing body of such Reorganized Debtor, in each case as determined pursuant to Article IV.C of the Plan and the Plan Supplement.

114. "*New Governance Documents*" means, if a Payout Event does not occur, the organizational and corporate governance documents of Reorganized Rockall and its subsidiaries, including, without limitation, certificates of incorporation, certificates of formation, certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements (or equivalent governing documents).

115. "*Non-Debtor Royalty and Working Interest*" means any Royalty and Working Interest of an Entity other than a Debtor.

116. "*Noticing and Claims Agent*" means Stretto Inc., the noticing, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

117. "*Oil and Gas Leases*" means any and all unexpired instruments in which any of the Debtors or Reorganized Debtors, as the case may be, were granted or hold an existing leasehold, working interest, or similar interest in oil and gas and/or other liquid or gaseous hydrocarbons, including methane, as of the Effective Date, including, without limitation, any leases set forth in the Plan Supplement. The term "Oil and Gas Leases" specifically includes oil and gas leases issued by any department, branch, bureau, or division of the United States government in which the Debtors or Reorganized Debtors, as the case may be, hold an existing leasehold, working interest, or similar interest as of the Effective Date.

118. "*Other Priority Claim*" means any Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

119. "*Other Priority Claims Reserve Amount*" means the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Expense Claims, against the Debtors that are either (a) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, or (b) asserted to be entitled to such priority in a Proof of Claim validly submitted on or before the Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any

12

such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims.

120.  "*Other Secured Claim*" means a Secured Claim, other than a Priority Tax Claim, a DIP Claim, or a Secured Parties Claim, that is (i) identified on the Other Secured Claims Schedule or (ii) deemed by Final Order of the Bankruptcy Court to be an Other Secured Claim.

121.  "*Other Secured Claims Reserve Amount*" means the aggregate amount of Claims that are (i) included on the Other Secured Claims Schedule or (ii) deemed by Final Order of the Bankruptcy Court to be an Other Secured Claim.

122.  "*Other Secured Claims Schedule*" means the schedule of Claims that the Debtors identify as Secured Claims being secured by a Senior Priority Lien, which schedule shall be in form and substance acceptable to the Majority Consenting Creditors.

123.  "*Payout Event*" means the implementation of one or more Successful Bids, in accordance with the Bidding Procedures, by a Person that is not the DIP Agent or the Intercreditor Agent, for any portion of the Debtors' Assets in which the Successful Bid (or Successful Bids, as applicable) provides the Debtors with Cash sufficient to (i) pay DIP Claims in full in Cash, and (ii) fund (a) the Claims Reserve in the Claims Reserve Amount, and (b) the Professional Fee Escrow Account in the Professional Fee Reserve Amount

124.  "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

125.  "*Petition Date*" means the date on which each Debtor Filed its voluntary petition for relief commencing the Chapter 11 Cases.

126.  "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan, which shall be consistent with, and subject to the approvals and consents as to form and substance set forth in, the Restructuring Support Agreement.

127.  "*Plan Supplement*" means, to the extent applicable, the Exit Facility Credit Agreement, the Liquidation Trust Agreement, the GUC Trust Agreement, the List of Retained Causes of Action, an exhibit disclosing the identity and affiliations of any Person proposed to serve on any of the New Boards or proposed to serve as an officer of any of the Reorganized Debtors, the New Governance Documents, the list of Assets that the Majority Consenting Creditors have identified and designated for vesting in the Liquidation Trust, and the Schedule of Assumed Executory Contracts and Leases, all of which shall be incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before three business days prior to the Confirmation Hearing.

128.  "*Priority Tax Claim*" means a Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

129. "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest bears to the aggregate amount of Allowed Claims, Allowed Interests, or other matter so referenced, as the context requires.

130. "***Professional***" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

131. "***Professional Fee Claims***" means a Claim for the compensation of the Professionals and other professionals and the reimbursement of expenses incurred by such professionals through and including the Effective Date to the extent such fees and expenses have not been previously paid, including, for the avoidance of doubt, any costs, fees, expenses, or commissions (including with respect to any investment banking transaction fees or commissions) incurred in connection with the Restructuring.

132. "***Professional Fee Escrow Account***" means an interest-bearing account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B.

133. "***Professional Fee Reserve Amount***" means the total amount of Professional Fee Claims estimated in accordance with Article II.B.

134. "***Proof of Claim***" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

135. "***Quarterly Distribution Date***" means the twentieth day of the month following the end of each calendar quarter after the Effective Date (including, for the avoidance of doubt, the calendar quarter in which the Effective Date occurs), or as soon as reasonably practicable thereafter.

136. "***Reinstated***" or "***Reinstatement***" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code, which, in all instances, shall be acceptable to the Majority Consenting Creditors in their sole and absolute discretion.

137. "***Released Party***" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Agent; (d) the DIP Lenders; (e) the Term Loan Agent; (f) the Term Loan Lenders; (g) the Intercreditor Agent; (h) Shell; (i) the Committee; (j) Exit Facility Agent (as applicable); (k) the Exit Facility Lenders (as applicable); and (l) with respect to each of the foregoing parties under (a) through (k) such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, employees, managed accounts and funds, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity Holders, officers, directors, managers, principals, members, employees, subcontractors, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, each solely in their capacity as such; *provided, however*, that the members of the Committee will be released solely in their capacities as members of the Committee.

14

138.   "***Releasing Party***" means each of the following solely in its capacity as such: (a) all Released Parties and (b) all Holders of Claims who affirmatively cast a timely ballot to accept the Plan.

139.   "***Reorganized***" means, in relation to a Debtor, such Debtor (or any successor thereto, by merger, consolidation, or otherwise) as reorganized on or after the Effective Date.

140.   "***Reorganized Rockall***" means, if a Payout Event does not occur, Rockall Energy as reorganized on the Effective Date, which will hold, directly or indirectly, all or substantially all of the Assets of the Debtors that vest in the Reorganized Debtors pursuant to the Plan, including the Interests in the subsidiaries.

141.   "***Reorganized Rockall Interest***" means, if a Payout Event does not occur, an Interest in Reorganized Rockall that will be issued on the Effective Date (or such other date as set forth in the Confirmation Order).

142.   "***Restructuring***" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Plan.

143.   "***Restructuring Expenses***" means the reasonable and documented professional fees and expenses incurred by the Consenting Creditor Advisors and the Consenting Creditors, in each case, in connection with or arising as a result of the Restructuring, the Term Loan Credit Agreement, the Shell Master Agreement, the Restructuring Support Agreement, the Plan, or the Chapter 11 Cases.

144.   "***Restructuring Support Agreement***" means that certain *Restructuring Support Agreement*, dated March 9, 2022, by and among the Debtors and the Consenting Creditors, as may be further amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof.

145.   "***Retained Causes of Action***" means those Causes of Action identified on the List of Retained Causes of Action that are not released, waived, or transferred pursuant to the Plan or any Asset Sale.

146.   "***Rockall***" means Rockall Energy Holdings, LLC.

147.   "***Rockall Energy***" means Rockall Energy, LLC.

148.   "***Rockall Equity Interests***" means all Interests in Rockall.

149.   "***Royalty and Working Interest***" means any working interest granting the right to exploit oil and gas, and certain other royalty or mineral interests, including, but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, and non-participating royalty interests.

US 8895812

150. "***Royalty Order***" means the Final Order entered by the Bankruptcy Court approving the *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Make or Honor Mineral Payments, Working Interest Payments, and Joint Interest Billings Payments and (II) Granting Related Relief.*

151. "***Sales Process***" means the marketing and sales process for the Debtors' Assets conducted pursuant to the Bidding Procedures.

152. "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended from time to time prior to the Effective Date.

153. "***Schedule of Rejected Executory Contracts and Unexpired Leases***" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended from time to time prior to the Effective Date.

154. "***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified, or supplemented from time to time.

155. "***SEC***" means the United States Securities and Exchange Commission.

156. "***Secured Claim***" means a Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

157. "***Secured Parties***" means the Term Loan Lenders and Shell.

158. "***Secured Parties Claims***" means the Shell Hedge Claims and the Term Loan Claims, all of which are subject to the relative payment priorities established under the Intercreditor Agreement.

159. "***Secured Parties Cash Payment***" means Cash proceeds resulting from any Asset Sale, less amounts necessary to (i) satisfy all DIP Claims, (ii) fund the Claims Reserve in the Claims Reserve Amount, (iii) satisfy any break-up fee or expense reimbursement payable under any sale purchase agreement for the Debtors' Assets and in accordance with the Bidding Procedures, and (iv) fund the Professional Fee Escrow Account in the Professional Fee Reserve Amount.

160. "***Secured Parties Equity Distribution***" means 100% of the Reorganized Rockall Interests issued and outstanding as of the Effective Date.

16

US 8895812

161.    "**Secured Parties Liens**" means all Liens granted to the Intercreditor Agent to secure the Secured Parties Claims.

162.    "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

163.    "**Security**" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

164.    "**Senior Priority Liens**" means all enforceable, valid, perfected, and unavoidable Liens in existence immediately prior to the Petition Date or valid, enforceable, and unavoidable Liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and, in each case, that are senior to the Secured Parties Liens and the DIP Liens as determined by a Final Order (which may include the Confirmation Order) or by agreement between the Holder of such Lien and, with the prior written consent of the DIP Agent and the Intercreditor Agent, the Reorganized Debtors, or the Liquidation Trustee, as applicable.

165.    "**Shell**" means Shell Trading Risk Management, LLC, in its capacity as counterparty under the Shell Master Agreement.

166.    "**Shell Hedge Claim**" means Claims arising under or in connection with the Shell Master Agreement.

167.    "**Shell Master Agreement**" means that certain *ISDA Master Agreement*, dated as of October 19, 2018, between Shell and Rockall Energy (together with all related schedules, annexes, exhibits, amendments, and confirmations), as amended, modified, replaced, consolidated, extended, renewed, or supplemented from time to time.

168.    "**Subordinated Claim**" means any Claim against a Debtor arising from (a) rescission of a purchase or sale of a Security in any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a Security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

169.    "**Successful Bid**" means a qualified bid submitted in accordance with the Bidding Procedures that is determined to be a highest or otherwise best bid in accordance with the Bidding Procedures.

170.    "**Successful Bidder**" means a bidder determined to have a Successful Bid pursuant to the Bidding Procedures

171.    "**Talco Bond Parties**" means White Marlin Energy Partners, LLC, White Marlin Oil & Gas Company, LLC, White Marlin Operating Company, LLC, and Petro Harvester Oil & Gas, LLC, solely with respect to the Talco Obligations.

172.    "**Talco Obligations**" means any potential obligations related to any bonds, assets, or decommissioning responsibilities in connection with that certain *Membership Interest Purchase*

US 8895812

*Agreement*, dated as of November 8, 2019, between Rockall Energy, LLC and Talco Petroleum, LLC, and any related settlement agreements or other agreements.

173. "***Term Loan Agent***" means Goldman Sachs Bank USA, in its capacity as administrative agent and collateral agent under the Term Loan Credit Agreement.

174. "***Term Loan Claims***" means Claims arising under or in connection with the Term Loan Credit Documents, including without limitation, any principal, interest (including postpetition interest), fees, expenses, call premium, yield maintenance, make-whole, indemnification, and other obligation.

175. "***Term Loan Credit Agreement***" means that certain *Credit and Guaranty Agreement*, dated as of September 20, 2018 (as amended, restated, modified, supplemented, or replaced from time to time), by and among Rockall Energy, as borrower, Rockall and certain of their respective subsidiaries, as guarantors, the Term Loan Agent, and the Term Loan Lenders.

176. "***Term Loan Credit Documents***" means the Term Loan Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements.

177. "***Term Loan Facility***" means the secured credit facility pursuant to the Term Loan Credit Documents.

178. "***Term Loan Lenders***" means the lenders party to the Term Loan Credit Documents, in their capacity as such.

179. "***TSA***" means that certain *Transition Services Agreement*, dated as of [●], 2022, by and between Petro Harvester Operating Company, LLC and Formentera Partners Fund I, LP.

180. "***TSA Entities***" means Petro Harvester Operating Company, LLC, Rockall Energy, LLC, and White Marlin Midstream, LLC.

181. "***Unclaimed Property***" means any distribution under the Plan on account of an Allowed Claim whose Holder has not: (a) accepted such distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept such distribution; (c) responded to the Debtors', Reorganized Debtors', Liquidation Trustee's or GUC Trustee's (as applicable) requests for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

182. "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

183. "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

184.    "*Unsecured*" means, with respect to a Claim, not Secured.

185.    "*U.S. Trustee*" means the Office of the United States Trustee for the Northern District of Texas.

186.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

187.    "*Vendor Pot*" means up to $3.75 million of cash allocated in the Approved Budget (as defined in the DIP Order) to pay prepetition accounts payables pursuant to the *Final Order (I) Authorizing the Debtors to Pay (A) Certain Operating Expenses, (B) Marketing Expenses, (C) Shipping and Warehousing Claims, (D) 503(B)(9) Claims, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Dkt. No. 200]

188.    "*Wind Down Budget*" means (i) if a Payout Event occurs, the wind down budget in form and substance satisfactory to the Debtors, the DIP Agent, and the Majority Consenting Creditors, as set forth in the Approved Budget (as defined in the DIP Order), and (ii) if a Payout Event does not occur, the wind down budget in form and substance satisfactory to the Debtors, the DIP Agent, and the Majority Consenting Creditors.

B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified, or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

US 8895812

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided that* the corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    *Controlling Document*

In the event of an inconsistency between the Plan, the Disclosure Statement, or any other Final Order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims, Adequate Protection Claims, and Priority Tax

US 8895812

Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.     *Administrative Expense Claims*

Except with respect to Administrative Expense Claims that are Professional Fee Claims, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s), Reorganized Debtor(s), or Liquidation Trustee (as applicable) agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that **if a Payout Event does not occur***, Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses may be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A of the Plan and except with respect to Administrative Expense Claims that are Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable), pursuant to the procedures specified in the Bar Date Order, the Confirmation Order, and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date.  Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable) a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, the Liquidation Trust or their respective assets or property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable) and the requesting party no later than 90 days after the Effective Date or such other date fixed by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed.

B.     *Professional Compensation*

1.     <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Reorganized Debtors or the Liquidation Trustee, as applicable, no later than 60 days after the Effective Date.  Each such final request will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once

21

approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to its full Allowed amount.

If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Reorganized Debtors or the Liquidation Trustee, as applicable, without any further action or order of the Bankruptcy Court. Obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors or the Liquidation Trustee, as applicable, and the requesting party no later than 20 days after such Professional Fee Claim is Filed with the Bankruptcy Court.

2.      Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" described in Article II.B.3 of the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or of the Liquidation Trust. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Liquidation Trustee from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.

*If a Payout Event occurs*, after all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be returned to the Liquidation Trust for distribution by the Liquidation Trustee without any further action or order of the Bankruptcy Court.

*If a Payout Event does not occur*, after all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be distributed to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

3.      Professional Fee Reserve Amount

No later than five Business Days prior to the Effective Date, the Debtors shall solicit Professionals for estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such estimate to the Debtors in writing via email two Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable) shall, in the ordinary course of business and without any further notice or application to or action, order, or

22

approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable) may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C. *DIP Claims*

Notwithstanding anything to the contrary herein, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of all DIP Claims, on the Effective Date, the DIP Claims shall:

(1) *if a Payout Event occurs*, (i) be paid in Cash in full, or (ii) receive such other treatment as agreed by the Debtors and the applicable Holder of a DIP Claim; or

(2) *if a Payout Event does not occur*, (i) be paid Cash proceeds (if any) resulting from the Successful Bid(s) and any available Cash of the Debtors and (ii) with respect to any remaining DIP Claims, convert all or some portion of the DIP Claims into loans under the Exit Facility or receive such other treatment as agreed by the Debtors and the DIP Agent.

D. *Adequate Protection Claims*

On the Effective Date, the Adequate Protection Claims shall (i) be paid in Cash in full or (ii) receive such other treatment as agreed by (a) to the extent such Adequate Protection Claims are held by a Consenting Creditor, the Debtors and the Majority Consenting Creditors or (b) to the extent such Adequate Protection Claims are not held by a Consenting Creditor, the Debtors and the applicable Holder of such Adequate Protection Claims.

E. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

F. *Statutory Fees*

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash, including the fees due and payable for the disbursement of the Liquidation Trust Assets vesting in the Liquidation Trust pursuant Article IV.A.2 of the Plan and the fees due and payable for the disbursement of the GUC Trust Assets vesting in the GUC Trust pursuant Article IV.B.2 of the Plan.

23

After the Effective Date, the Liquidation Trustee will pay any and all fees due and payable pursuant to 28 U.S.C. § 1930 with respect to the Debtors for each quarter (including any fraction thereof), and the Liquidation Trustee and GUC Trustee shall file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines, until the Chapter 11 Cases are converted, dismissed, or a Final Decree is issued, whichever occurs first.

G.    *Restructuring Expenses*

The Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash pursuant to (and subject to) the Restructuring Support Agreement without the need to file a proof of such Claim and without further order of the Court.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay the Restructuring Expenses that have accrued and are unpaid as of the Effective Date, as set forth in the Restructuring Support Agreement.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims*

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Secured Parties Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept/Deemed to Reject |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept/Deemed to Reject |
| 8 | Rockall Equity Interests | Impaired | Deemed to Reject |

24

US 8895812

B.    *Treatment of Claims and Interests*

    1.    <u>Class 1 — Other Priority Claims</u>

        a.    *Classification*: Class 1 consists of all Other Priority Claims.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Majority Consenting Creditors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is 10 business days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter

        c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 — Other Secured Claims</u>

        a.    *Classification*: Class 2 consists of all Other Secured Claims.

        b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Majority Consenting Creditors, (i) such Holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is 10 business days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such Holder will receive such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

        c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

    3.    <u>Class 3 — Secured Parties Claims</u>

        a.    *Classification*: Class 3 consists of all Secured Parties Claims.

      b.    *Allowance*: The Class 3 Secured Parties Claims shall be deemed Allowed in the aggregate amount of the Secured Parties Claims; *provided that* the Term Loan Claims shall be deemed Allowed Claims in the aggregate amount of $104,041,301.78 as of the Petition Date and the Shell Hedge Claims shall be deemed Allowed Claims in the aggregate amount of $46,218,397.56 as of the Petition Date.

      c.    *Treatment*: In exchange for full and final satisfaction, settlement, release, and discharge of each Allowed Secured Parties Claim, each Holder of an Allowed Secured Parties Claim shall receive:

          (1) **if a Payout Event occurs**, (i) its Pro Rata share of the Secured Parties Cash Payment payable on the Effective Date or as soon as reasonably practicable thereafter, (ii) its Pro Rata Share of the beneficial interests in the Liquidation Trust, or (iii) such other treatment as agreed by the Debtors and the applicable Holder of a Secured Parties Claim; or

          (2) **if a Payout Event does not occur**, (i) its Pro Rata Share of the Secured Parties Equity Distribution and the Secured Parties Cash Payment (if any) payable on the Effective Date or as soon as reasonably practicable thereafter, (ii) its Pro Rata Share of the beneficial interests in the Liquidation Trust (if any), or (iii) such other treatment as agreed by the Debtors and the applicable Holder of a Secured Parties Claim.

      d.    *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Secured Parties Claims will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 — General Unsecured Claims</u>

      a.    *Classification*: Class 4 consists of all General Unsecured Claims.

      b.    *Treatment*: In exchange for full and final satisfaction, settlement, release, and discharge of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive either its Pro Rata share of (i) the GUC Global Settlement Amount or (ii) the beneficial interests in the GUC Trust.

      c.    *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 General Unsecured Claims will be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 — Intercompany Claims</u>

      a.    *Classification*: Class 5 consists of all Intercompany Claims.

US 8895812

b.    *Treatment*: All Intercompany Claims will be adjusted, Reinstated, compromised, or discharged on the Effective Date in the Debtors' discretion, subject to the consent of the Majority Consenting Creditors.

c.    *Voting*: Class 5 is Unimpaired/Impaired under the Plan. Holders of Class 5 Intercompany Claims are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

6.    Class 6 — Subordinated Claims

a.    *Classification*: Class 6 consists of all Subordinated Claims.

b.    *Treatment*: Holders of Subordinated Claims shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims shall be discharged, cancelled, released, and extinguished.

c.    *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Subordinated Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

7.    Class 7 — Intercompany Interests

a.    *Classification*: Class 7 consists of all Intercompany Interests.

b.    *Treatment*: All Intercompany Interests will be adjusted, Reinstated, compromised, or discharged on the Effective Date in the Debtors' or Reorganized Debtors' discretion, subject to the consent of the Majority Consenting Creditors.

c.    *Voting*: Class 7 is Unimpaired/Impaired under the Plan. Holders of a Class 7 Intercompany Interests are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

8.    Class 8 — Rockall Equity Interests

a.    *Classification*: Class 8 consists of all Rockall Equity Interests.

b.    *Treatment*: Holders of Rockall Equity Interests shall not receive any distribution on account of such Rockall Equity Interests unless all senior Claims are paid in full or otherwise treated as Unimpaired as a result of the Sales Process. On the Effective Date, all Rockall Equity Interests shall be cancelled, released, discharged, and extinguished.

US 8895812

       c.      *Voting*: Class 8 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 8 Rockall Equity Interests shall not receive any distribution on account of such Rockall Equity Interests and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired or Reinstated Claims*

Nothing under the Plan shall affect the Debtors', the Reorganized Debtors', or the Liquidation Trustee's (as applicable) claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.    *Elimination of Vacant Classes*

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

G.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date

H.    *Subordinated Claims*

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of

US 8895812

the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, Reorganized Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable) reserve(s) the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Liquidation Trust*

1.    Liquidation Trust Generally

On or prior to the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement for the purpose of liquidating the Liquidation Trust Assets, resolving all Disputed Claims to the extent related to the Liquidation Trust Assets, making all distributions of the proceeds of the Liquidation Trust Assets to Holders of Allowed Claims (other than Holders of Allowed General Unsecured Claims) in accordance with the terms of the Plan and otherwise implementing the Plan.    Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust shall be empowered to: (a) perform all actions and execute all agreements, instruments, and other documents necessary to implement the Plan; (b) establish, maintain, and administer the Liquidation Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle, and protect, as applicable, the Liquidation Trust Assets (directly or through its professionals or a Disbursing Agent), in accordance with the Plan and the Liquidation Trust Agreement; (d) to the extent Claims relate to the Liquidation Trust Assets, review, reconcile, settle, or object to all such Claims (other than Asserted General Unsecured Claims) that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in the Plan; (e) calculate and make distributions of the proceeds of the Liquidation Trust Assets to Holders of Allowed Claims (other than Holders of Allowed General Unsecured Claims, which claims shall be governed solely by the GUC Trust) in accordance with the terms of the Plan and otherwise implementing the Plan; (f) subject to Article VIII of the Plan, pursue Retained Causes of Actions that are transferred to the Liquidation Trust to the extent that their pursuit would likely result in a material economic benefit to Holders of Allowed Secured Parties Claims and raise any defenses in any adverse actions or counterclaims; (g) comply with the TSA and fulfill the TSA Entities' obligations in accordance with the terms thereunder; (h) serve as sole member, manager, director, officer, or other governing body or controlling authority of each TSA Entity in accordance with the Plan; (i) control and exercise authority over the management and conduct of the affairs of the TSA Entities and amend, modify, restate or otherwise alter the corporate constituent documents of each TSA Entity as necessary and appropriate to comply with the TSA and the Plan; (j) merge, dissolve, or otherwise terminate the corporate existence of the TSA Entities and implement any necessary or appropriate Dissolution Transactions, subject to, and in accordance with, the TSA and the Plan; (k) file appropriate certificates of incorporation, merger, or consolidation for the TSA Entities with the appropriate governmental authorities pursuant to applicable law; (l) retain, compensate, and

US 8895812

employ professionals to represent the Liquidation Trust; (m) file appropriate tax returns and other reports on behalf of the Liquidation Trust and the TSA Entities and pay or seek refunds in respect of taxes or other obligations owed by the Liquidation Trust; (n) exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and the Plan, or as are deemed by the Liquidation Trustee to be necessary and proper to implement the provisions of the Plan and the Liquidation Trust Agreement; (o) take such actions as are necessary or appropriate to close the Debtors' Chapter 11 Cases and not otherwise inconsistent with the Plan; and (p) dissolve and terminate the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement and the Plan. For the avoidance of doubt, the Liquidation Trust shall not be empowered with performing any actions designated to the GUC Trust or the GUC Trustee in connection with the GUC Trust Assets.

Notwithstanding anything to the contrary in this Article IV.A, the Liquidation Trust's primary purpose is liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidation Trust Assets, provide for the orderly liquidation thereof, and complete the TSA Entities obligations under the TSA. Accordingly, the Liquidation Trustee shall, in an orderly manner, liquidate the Liquidation Trust Assets and make timely distributions pursuant to the Plan, and not unduly prolong the duration of the Liquidating Trust.

2. Funding of and Transfer of Assets into the Liquidation Trust

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement. Except as set forth in the Plan, the Liquidation Trust Assets shall be transferred to the Liquidation Trust free and clear of all Claims, Liens, and encumbrances to the fullest extent provided by section 363 or 1123 of the Bankruptcy Code.

The act of transferring the Liquidation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidation Trust as if the asset or right was still held by the Debtors.

The Liquidation Trustee shall have the authority to create additional sub-accounts in the Liquidation Trust Accounts and sub-trusts within the Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Liquidation Trust. This shall include the creation of sub-accounts and/or sub-trusts to accomplish the purposes of the Liquidation Trust.

3. Liquidation Trustee

The Liquidation Trustee shall be selected by the Debtors, with the consent of the Majority Consenting Creditors. The Liquidation Trustee shall be the successor to and representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

US 8895812

The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

4. <u>Liquidation Trust Agreement</u>

The Liquidation Trust Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the Liquidation Trustee; (ii) the payment of other expenses of the Liquidation Trust, including the cost of pursuing the Retained Causes of Action assigned to the Liquidation Trust; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the Liquidation Trustee within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the Liquidation Trust and the Debtors and the payment of taxes or other obligations owed by the Liquidation Trust and the Debtors; (vi) the maintenance (if appropriate) of any going concern vested in the Liquidation Trust (subject to the limitations described herein and therein); (vii) the orderly liquidation of the Liquidation Trust Assets; and (viii) the litigation, settlement, abandonment, or dismissal of the Retained Causes of Action or any other claims, rights, or causes of action assigned to the Liquidation Trust.

5. <u>Reports to Be Filed by the Liquidation Trustee</u>

The Liquidation Trustee, on behalf of the Liquidation Trust, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidation Trust Agreement), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan.

6. <u>Fees and Expenses of the Liquidation Trust</u>

The fees and expenses of the Liquidation Trustee (including those incurred prior to the Effective Date in connection with the preparation of the Liquidation Trust Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Liquidation Trust Agreement and the Wind Down Budget. The Liquidation Trustee, on behalf of the Liquidation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Liquidation Trust Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Liquidation Trust Agreement and the Wind Down Budget.

7. <u>Indemnification</u>

The Liquidation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidation Trustee and/or other parties. Any such indemnification shall be the sole responsibility of the Liquidation Trust and payable solely from the Liquidation Trust Assets.

8.    Tax Treatment

The Liquidation Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more Disputed Claims reserves treated as disputed ownership funds described in Treasury Regulation § 1.468B-9 (each of which will be taxable as a "qualified settlement fund" if all assets of the Disputed Claims reserve are passive assets for U.S. federal income tax purposes).  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidation Trust will be treated in part as the transfer of assets by the Debtors to the Holders of Allowed Secured Parties Claims, subject to any liabilities of the Debtors or the Liquidation Trust payable from the proceeds of such assets, followed by the deemed transfer of such assets (subject to such liabilities) by such Holders to the Liquidation Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one more Disputed Claims reserves.  The Holders of Allowed Secured Parties Claims will be treated for U.S. federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidation Trust (subject to such liabilities), depending on their rights to distributions under the Plan.  As grantors and deemed owners of such assets, the Holders of Allowed Secured Parties Claims will be required to include in income their respective shares of the income, deductions, gains, losses, and credits attributable to such assets.  The value of such assets will be determined by the Liquidation Trustee as the trustee of the Liquidation Trust, and such values will be used consistently by all parties for all U.S. federal (and applicable state and local) income tax purposes.  Among other things, the Holders of Allowed Secured Parties Claims will be required to use the values assigned to such assets by the Liquidation Trustee for all U.S. federal (and applicable state and local) income tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the Holder holds an interest.  The Liquidation Trust Agreement will contain certain provisions intended to comply with IRS guidance for trusts treated as liquidating trusts.  The Liquidation Trust Agreement will (i) require that the Liquidation Trust terminate no later than three years after the Effective Date; *provided, however*, if the Bankruptcy Court approves an extension based upon a finding that such an extension is necessary for the Liquidation Trust to complete its liquidating purpose, the term of the Liquidation Trust may be extended one or more times for a finite period not to exceed six months (and such extensions shall not exceed a total of four extensions unless the Liquidation Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the liquidating trust as a grantor trust for U.S. federal income tax purposes, (ii) limit the Liquidation Trustee's investment powers, (iii) limit the business operations carried on by the Liquidation Trust to activities reasonably necessary to and consistent with the Liquidation Trust's purpose, (iv) prohibit the Liquidation Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (v) distribute at least annually to the Holders of Allowed Secured Parties Claims the Liquidation Trust's net income and the net proceeds from the sale of Liquidation Trust Assets in excess of an amount reasonably necessary to meet Claims and contingent liabilities (including Disputed Claims) and to maintain the value of the Liquidation Trust Assets. Liquidation Trust Assets reserved for Holders of Disputed Claims will be treated as one or more Disputed Claims reserves for U.S. federal income tax purposes, which will be subject to an entity-level tax on some or all of their net income or gain.  No Holder of a Claim will be treated as the grantor or deemed owner of an asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset.  The Liquidation Trustee will

32

file all tax returns on a basis consistent with the treatment of the Liquidation Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more Disputed Claims reserves taxed as disputed ownership funds governed by Treasury Regulation § 1.468B-9 (each of which will be taxable as "qualified settlement fund" if all assets of the Disputed Claims reserve are passive assets for U.S. federal income tax purposes), and will pay all taxes owed from Liquidation Trust Assets.

      9.    <u>Settlement of Claims</u>

Except as otherwise provided in the Plan or the Liquidation Trust Agreement, on and after the Effective Date, the Liquidation Trustee may compromise or settle any Claims related to the Liquidation Trust Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Liquidation Trust Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

      10.    <u>Sales of Assets by the Liquidation Trust</u>

The Liquidation Trustee may conduct any sales or liquidations of non-Cash Liquidation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court. Upon the sale, liquidation, transfer, or other disposition of the Liquidation Trust Assets by the Liquidation Trustee, the Liquidation Trustee shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Liquidation Trust Accounts.

      11.    <u>Abandonment of Assets by Liquidation Trust</u>

The Liquidation Trustee may, on no less than fourteen (14) days' written notice to the U.S. Trustee, abandon any Liquidation Trust Assets which the Liquidation Trustee determines in his, her, or its reasonable discretion to be of de minimis value or burdensome to the Liquidation Trust, including any pending adversary proceeding or other legal action commenced or commenceable by the Debtor prior to the Effective Date. If the U.S. Trustee provides a written objection to the Liquidation Trustee prior to the expiration of such fourteen-day period with respect to the proposed abandonment of any Liquidation Trust Asset, then such property may be abandoned only pursuant to an order by the Bankruptcy Court.

B.    *GUC Trust*

      1.    <u>GUC Trust Generally</u>

On or prior to the Effective Date, the GUC Trust shall be established in accordance with the GUC Trust Agreement for the purpose of distributing the GUC Trust Assets, resolving all Disputed Claims to the extent related to the GUC Trust Assets, making all distributions of the proceeds of the GUC Trust Assets to Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and otherwise implementing the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the GUC Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the GUC Trust shall be empowered to: (a) perform all actions and execute all agreements, instruments, and other documents necessary to

US 8895812

implement the Plan; (b) establish, maintain, and administer the GUC Trust Accounts, which shall be segregated to the extent appropriate in accordance with the Plan as it relates to General Unsecured Claims; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, and protect, as applicable, the GUC Trust Assets (directly or through its professionals or a Disbursing Agent), in accordance with the Plan; (d) subject to the GUC Trust Agreement and the Plan, review, reconcile, settle, or object to all Asserted General Unsecured Claims that are Disputed Claims as of the Effective Date pursuant to the procedures for allowing Claims prescribed in the Plan; (e) calculate and make distributions of the proceeds of the GUC Trust Assets to Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan and otherwise implementing the Plan; (f) retain, compensate, and employ professionals to represent the GUC Trust; (g) file, to the extent reasonably feasible and subject to the GUC Trust Agreement, appropriate tax returns on behalf of the GUC Trust and pay taxes or other obligations arising in connection therewith; (h) exercise such other powers as may be vested in the GUC Trust under the GUC Trust Agreement and the Plan, or as are deemed by the GUC Trustee to be necessary and proper to implement the provisions of the Plan and the GUC Trust Agreement; and (i) terminate the GUC Trust in accordance with the terms of the GUC Trust Agreement. For the avoidance of doubt, the GUC Trust shall not be empowered with performing any actions designated to the Liquidation Trust created pursuant to Article IV.A of the Plan and shall have no authority to pursue any Claims or Causes of Action against Released Parties or Exculpated Parties pursuant to Article VIII of the Plan.

Notwithstanding anything to the contrary in this Article IV.B, the GUC Trust's primary purpose is to reconcile Asserted General Unsecured Claims and distribute the GUC Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the GUC Trust's purpose and reasonably necessary to conserve and protect the GUC Trust Assets and provide for the orderly liquidation and distribution thereof. Accordingly, the GUC Trustee shall, in an orderly manner, liquidate the GUC Trust Assets and make timely distributions pursuant to the Plan, and not unduly prolong the duration of the GUC Trust.

2.     Funding of and Transfer of Assets into the GUC Trust

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtor shall transfer the GUC Trust Assets to the GUC Trust, and all such assets shall vest in the GUC Trust on such date, to be administered by the GUC Trustee in accordance with the Plan and the GUC Trust Agreement.  Except as set forth in the Plan, the GUC Trust Assets shall be transferred to the GUC Trust free and clear of all Claims, Liens, and encumbrances to the fullest extent provided by section 363 or 1123 of the Bankruptcy Code.

The act of transferring the GUC Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the GUC Trust as if the asset or right was still held by the Debtors.

The GUC Trustee shall have the authority to create additional sub-accounts in the GUC Trust Accounts, which may have a separate legal existence, but which shall be considered sub-accounts of the GUC Trust.  This shall include the creation of sub-accounts to accomplish the purposes of the GUC Trust.

US 8895812

3.      GUC Trustee

Solely with respect to the GUC Trust Assets and the administration of General Unsecured Claims, the GUC Trustee shall be the successor to and representative of the Estate of each of the Debtors appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The powers, rights, and responsibilities of the GUC Trustee shall be specified in the GUC Trust Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the GUC Trustee and the GUC Trust Beneficiaries shall be as set forth in the GUC Trust Agreement.

The Committee shall select the GUC Trustee, but shall provide five days' advance notice of such selection to the Debtors and the Secured Parties who shall have an opportunity to object on any reasonable basis. If an objection is timely asserted, the Committee can appoint someone else, again on notice to the Debtors and the Secured Parties, or seek approval of the Bankruptcy Court.

4.      GUC Trust Agreement

The GUC Trust Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the GUC Trustee; (ii) the payment of other expenses of the GUC Trust; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the GUC Trustee within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the GUC Trust and the Debtors and the payment of taxes or other obligations owed by the GUC Trust, if any; (vi) the orderly liquidation of the GUC Trust Assets; and (vii) any reconciliation, administration, objection, resolution, and distribution on account of General Unsecured Claims.

Additional terms of the GUC Trust and Obligations of the GUC Trustee, if any, will be addressed in the Plan Supplement or GUC Trust Agreement, as applicable.

5.      Settlement of Claims

Except as otherwise provided in the Plan or the GUC Trust Agreement, on and after the Effective Date, the GUC Trustee may compromise or settle any Claims related to the GUC Trust Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for GUC Trust Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

6.      Recourse Solely to GUC Trust Assets

All Claims against the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims under the Plan, and Holders of Allowed General Unsecured Claims against any Debtor will have recourse solely to the assets of the GUC Trust for the payment of their Allowed General Unsecured Claims in accordance with the terms of the Plan and the GUC Trust Agreement.

US 8895812

C. *Means for Implementation if a Payout Event Occurs*

**If a Payout Event occurs, the following provisions in this Article IV.C of the Plan shall govern the implementation of the Plan. For the avoidance of doubt, all provisions in this Article IV.C of the Plan shall apply only if a Payout Event occurs.**

1.    Asset Sale and Abandonment of Certain Assets

Unless otherwise specified in the Plan, all Assets, other than the GUC Trust Assets, not sold pursuant to the Debtors' Sales Process will be contributed to the Liquidation Trust as part of the Liquidation Trust Assets pursuant to the Plan. The Plan shall constitute a motion to abandon such Assets to the Liquidation Trust pursuant to section 554 of the Bankruptcy Code and relinquish such abandoned assets. Entry of the Confirmation Order shall constitute (i) approval, pursuant to section 554 of the Bankruptcy Code, of the abandonment of such abandoned assets and (ii) authorization to relinquish any interest the Debtors hold in such abandoned Assets.

2.    Segregated Accounts for Plan Distributions

a.    Claims Reserve

The Claims Reserve shall be held in trust in a segregated account by the Liquidation Trustee or GUC Trustee (as applicable) for distributions and/or payment in accordance with the terms of Articles II and III of the Plan. The Liquidation Trustee shall irrevocably pay to the Intercreditor Agent, on behalf of the Secured Parties, any Cash held in the Claims Reserve after all applicable distributions are made and any surplus Cash in the Claims Reserve, such surplus determined by the Liquidation Trustee based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Other Secured Claims that remain unpaid as of such date of determination. For the avoidance of doubt, the Liquidation Trustee shall not have any control over any portion of the Claims Reserve that relates to the GUC Trust.

b.    Professional Fee Claims Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Claims Escrow Account by the Liquidation Trustee for distributions or payment in accordance with the terms of Articles II of the Plan. Any Cash held in the Professional Fee Claims Escrow Account after all applicable distributions and/or payments are made shall be irrevocably paid to the Intercreditor Agent, on behalf of the Secured Parties.

3.    Corporate Existence

Each of the Debtors (other than the TSA Entities) will be subject to a Dissolution Transaction on the Effective Date, or as promptly thereafter as possible, and each Debtor (other than the TSA Entities) will be deemed to cease to exist as of the Effective Date after the abandonment of any remaining Assets of their Estates; *provided, that*, the TSA Entities will not be subject to a Dissolution Transaction on the Effective Date and the equity or membership interests of each TSA Entity will vest in the Liquidation Trust pursuant to this Plan. For the avoidance of doubt, the TSA Entities will continue to exist after the Effective Date for the limited purpose of

36

US 8895812

completing the obligations of the TSA Entities pursuant to TSA. Promptly after completing all of their obligations under the TSA, the TSA Entities shall be dissolved.

4.    Dissolution Transactions

On or after the entry of the Confirmation Order, the Debtors or the Liquidation Trustee will enter into such Dissolution Transactions and will take such actions as may be necessary or appropriate to merge, dissolve or otherwise terminate the corporate existence of the Debtors as of the Effective Date or as promptly as possible thereafter. The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authority; and (iv) the taking of all other actions that these entities determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

Notwithstanding the foregoing and regardless of whether the actions described above have yet been taken with respect to a particular Debtor, as of the Effective Date and upon the transfer of the assets to the Liquidation Trust under the Plan, the Debtors (other than the TSA Entities) shall be deemed dissolved and their business operations withdrawn for all purposes without any necessity of filing any document, taking any further action or making any payment to any governmental authority in connection therewith. Pursuant to the Liquidation Trust Agreement, the Liquidation Trust is empowered to amend, modify, restate or otherwise alter the corporate constituent documents of each TSA Entity as necessary and appropriate to comply with the TSA and the Plan.

5.    Recourse Solely to Liquidation Trust Assets

All Claims against the Debtors are deemed satisfied, waived and released as to the Debtors in exchange for the treatment of such Claims under the Plan, and Holders of Allowed Claims (other than Holders of Allowed General Unsecured Claims) against any Debtor will have recourse solely to the assets of the Liquidation Trust for the payment of their Allowed Claims (other than Holders of Allowed General Unsecured Claims) in accordance with the terms of the Plan and the Liquidation Trust Agreement.

6.    Cancellation of Existing Securities and Agreements.

On the Effective Date, except to the extent otherwise provided in the Plan (including with respect to the TSA Entities), all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests (including the Term Loan Credit Documents, the Shell Master Agreement, the DIP Facility Documents, and the Rockall Equity Interests), and any Rockall Equity Interests that are not represented by certificates or other instruments, shall be

US 8895812

canceled and surrendered and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, canceled, and of no force or effect against the Debtors or the Liquidation Trust, without any further action on the part of the Debtors, the Liquidation Trust, or any other Person.  Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.

Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VI of the Plan, the Term Loan Credit Documents and Intercreditor Agreement Documents shall continue in effect as between all non-Debtors. Except as provided in the Plan (including Article VI of the Plan), on the Effective Date, the Intercreditor Agent and Term Loan Agent, their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the Intercreditor Agreement Documents and Term Loan Credit Documents (as applicable).  The commitments and obligations (if any) of the Term Loan Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries or any of their respective successors or assigns under the Term Loan Credit Documents shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding anything to the contrary in this Article IV.C.6, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article IV.C.6 shall be deemed null and void and shall be of no force and effect.

7.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date concurrently and consistent with the treatment provided for Claims and Interests in Article III, all mortgages, deeds of trust, Liens against, security interests in, or other encumbrances or interests in property of any Estate shall be deemed fully released and discharged.

8.    Corporate Governance, Directors and Officers.

a.    Certificates of Incorporation and Bylaws

Consistent with the Plan, each of the Debtors (other than the TSA Entities) will cease to exist, and all existing certificates of incorporation and by-laws will be canceled, effective as of the Effective Date; accordingly, no new certificates of incorporation and by-laws will be necessary for any Debtors (other than the TSA Entities).  The TSA Entities will continue to exist after the Effective Date for a limited period and purpose.  Pursuant to the Liquidation Trust Agreement, the Liquidation Trust is empowered to amend, modify, restate or otherwise alter the corporate constituent documents of each TSA Entity as necessary and appropriate to comply with the TSA and the Plan.

US 8895812

b.    Directors and Officers

As of the Effective Date, the term of the current members of the board of directors of Rockall shall expire automatically and each person serving as a director of Rockall shall be removed and shall be deemed to have resigned and cease to serve automatically. Consistent with the Plan, each of the Debtors (other than the TSA Entities) will cease to exist effective as of the Effective Date and, thus, no individuals will serve as directors, officers or voting trustees after the Effective Date for any Debtors (other than the TSA Entities). The TSA Entities will continue to exist after the Effective Date and the Liquidation Trustee will be the sole member, manager, director, officer, or other governing body or controlling authority of each TSA Entity, upon the Effective Date.

c.    Dissolution Transactions

The Dissolution Transactions will occur and be effective as of the date specified in the documents effectuating the applicable Dissolution Transactions or the Effective Date if no such other date is specified in such other documents, and will be authorized and approved in all respects and for all purposes without any requirement of further action by the Debtors or any other Person.

9.    Indemnification and Insurance

Prior to the Effective Date, the Debtors, the Consenting Creditors, and the buyer(s) shall determine at such time whether the Indemnification Obligations shall be assumed, assumed and assigned, or rejected by the Debtors under the Plan.

10.    Preservation of Causes of Action

Except as provided in the Plan, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trustee will retain and may enforce any claims, demands, rights, and causes of action that any Estate may hold against any Person to the extent not satisfied, settled, and released under the Plan or otherwise, including the Retained Causes of Action; *provided that*, the Liquidation Trustee will not retain any Causes of Action (including Avoidance Actions) that are assigned to a buyer in connection with the Asset Sale. The Liquidation Trustee may pursue any such retained claims, demands, rights, or causes of action, as appropriate, in accordance with the best interests of the Liquidation Trust Beneficiaries. Except to the extent any such claim is specifically satisfied, settled, and released herein, in accordance with and subject to any applicable law, the Debtor's inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtor or Estate may hold against any Person. Except to the extent any such claim is specifically satisfied, settled, and released herein, the Debtor intends to preserve those claims, demands, rights, or causes of action designated as Retained Causes of Action. Notwithstanding the foregoing or anything to the contrary herein, all Avoidance Actions against non-Insiders of the Debtors shall be waived upon the Effective Date, except those against Krewe. Further, any Claims or Causes of Action against Krewe shall not be waived or released and all rights to pursue such claims against Krewe shall be transferred to the Intercreditor Agent or the Liquidation Trust, at the election of the Intercreditor Agent, on the Effective Date. For the

39

avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.C.10 include any claim or Cause of Action with respect to, or against, a Released Party other than, solely with respect to the Talco Obligations, the Talco Bond Parties.

11.  <u>Substitution in Pending Legal Actions</u>

On the Effective Date, the Liquidation Trust or the Liquidation Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (i) pending contested matters or adversary proceedings in the Bankruptcy Court, (ii) any appeals of orders of the Bankruptcy Court, and (iii) any state court or federal or state administrative proceedings pending as of the Petition Date. The Liquidation Trustee and its professionals are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

12.  <u>Effectuating Documents; Further Transactions</u>

The Debtors (prior to the Effective Date) and the Liquidation Trustee (on or after the Effective Date) are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and evidence the terms and conditions of the Plan and the Dissolution Transactions, in each case, in the name of and on behalf of any Debtor or the Liquidation Trust, as applicable, without the need for any approvals, authorizations, or consents except those expressly required pursuant to the Plan.

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment: (a) any transfer made by the Debtors to the Liquidation Trust; (b) any sales made by the Liquidation Trust to liquidate such assets in the trust and convert such assets into Cash; (c) any sales of Assets made by the Debtors under section 363 of the Bankruptcy Code, to the extent that title to the assets being sold transfers after the Confirmation Date; (d) the making or assignment of any lease or sublease; (e) any Dissolution Transaction; (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

13.  <u>Non-Debtor Royalty and Working Interests</u>

For the avoidance of doubt, all rights to payment or production resulting from Non-Debtor Royalty and Working Interests and arising before the Petition Date, and any and all Claims, liabilities, and obligations arising therefrom, including Claims and payment obligations arising before the Petition Date, in each case not already paid by the Debtors in the ordinary course pursuant to the Royalty Order or assumed by a Successful Bidder, shall be General Unsecured Claims under the Plan and shall be compromised and/or released by the Plan.

US 8895812

14.   Restructuring Support Agreement

Upon the Effective Date, any surviving obligations under the Restructuring Support Agreement shall terminate on a final basis.

D.   *Means for Implementation if a Payout Event Does Not Occur*

**If a Payout Event does not occur, the following provisions in this Article IV.D of the Plan shall govern the implementation of the Plan.  For the avoidance of doubt, all provisions in this Article IV.D of the Plan shall apply only if a Payout Event does not occur.**

1.   Restructuring

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall undertake the Restructuring, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the issuance of securities, including the Reorganized Rockall Interests, which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (6) the execution and delivery of the Exit Facility Documents (if any); (7) the execution and delivery of Definitive Documents not otherwise included in the foregoing, if any; (8) creation and funding of the GUC Trust; and (9) all other actions that the Debtors or the Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365 1123, and 1145(a) of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring.

2.   Segregated Accounts for Plan Distributions

a.   Claims Reserve

The Claims Reserve shall be held in trust in a segregated account by the Reorganized Debtors or GUC Trustee (as applicable) for distributions and/or payment in accordance with the terms of Articles II and III of the Plan.  The Reorganized Debtors shall be entitled to retain any Cash held in the Claims Reserve after all applicable distributions are made and any surplus Cash in the Claims Reserve, such surplus determined by the Reorganized Debtor based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Other Secured Claims that remain unpaid as of such date of determination. For the avoidance of doubt, the Reorganized

Debtors shall not have any control over any portion of the Claims Reserve that relates to the GUC Trust.

              b.       Professional Fee Claims Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Claims Escrow Account by the Reorganized Debtors for distributions or payment in accordance with the terms of Articles II of the Plan. The Reorganized Debtors shall be entitled to any Cash held in the Professional Fee Claims Escrow Account after all applicable distributions and/or payments are made.

          3.      <u>Sources of Consideration for Plan Distributions</u>

The Reorganized Debtors shall fund distributions under the Plan as follows:

              a.       Cash on Hand/DIP Facility Borrowings

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall make all distributions required to be made under the Plan, including funding the GUC Trust, the Claims Reserve, and the Professional Fee Escrow Account, using Cash on hand as of the Effective Date, including Cash from operations and the proceeds of borrowings under the DIP Facility to the extent permitted by the terms of the DIP Credit Agreement. All remaining Cash on hand as of the Effective Date, after payment of all distributions required to be made on the Effective Date, including Cash from operations and the proceeds of borrowings under the DIP Facility, but excluding the Cash funded into the Claims Reserve and the Professional Fee Escrow Account, shall be retained by or transferred to, as applicable, the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

              b.       Exit Facility

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Facility. The Reorganized Debtors may use the proceeds of the Exit Facility for any purpose permitted by the Exit Facility Documents, including the funding of the GUC Trust and distributions under the Plan and satisfaction of ongoing working capital needs.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, whether under the Bankruptcy Code or other applicable non-bankruptcy law, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (including any Liens and security interests previously granted with respect to the Intercreditor Agreement Documents, the Term Loan Credit Documents, the Shell Master Agreement, or the DIP Facility Documents that are deemed to be granted in accordance with the Exit Facility Documents) (a) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (b) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents, and (c) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.      Issuance and Distribution of Reorganized Rockall Interests

On the Effective Date, Reorganized Rockall shall be authorized to and shall issue the Reorganized Rockall Interests in accordance with the terms of the Plan without the need for any further corporate action. All of the Reorganized Rockall Interests, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Rockall Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

5.      Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited

liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, including, with respect to Reorganized Rockall, pursuant to the New Governance Documents.

6.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date: all Assets in each Estate, including all Causes of Action, and any Assets acquired by any of the Debtors, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances; *provided that* the foregoing vesting of Assets shall not apply to (a) any Assets sold pursuant to the Sales Process prior to the Effective Date, which Assets will vest in the applicable Successful Bidder(s) and (b) any Assets that the Majority Consenting Creditors have identified and designated in the Plan Supplement for vesting in the Liquidation Trust, which Assets, together with Cash in the amount set forth in the Wind Down Budget, will vest in the Liquidation Trust on the Effective Date or as soon as reasonably practicable thereafter. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Except with respect to Liens securing the Exit Facility (if any) or as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or any administrative agent under the Exit Facility Documents that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the Reorganized Debtors may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors. The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned, and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Bankruptcy Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan. Notwithstanding any of the foregoing in this Article IV.D.6 of the Plan, no GUC Trust Assets shall vest in the Reorganized Debtors or Liquidation Trust (as applicable).

US 8895812

7.    Cancellation of Existing Securities and Agreements

On the Effective Date, all Rockall Equity Interests shall be cancelled, released, discharged, and extinguished, and the Reorganized Rockall Interests shall be issued pursuant to the Plan. Except as otherwise provided in the Plan, on the Effective Date: (a) the obligations of the Debtors under the Term Loan Credit Agreement, the Shell Master Agreement, all Rockall Equity Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released and discharged; *provided that*, notwithstanding the releases set forth in Article VIII of the Plan, Confirmation, or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided*, *further*, absent the consent of the Majority Consenting Creditors, nothing in this section shall effectuate a cancellation of any Reorganized Rockall Interests, Intercompany Interests, or Intercompany Claims.

Notwithstanding anything to the contrary in this Article IV.D.7, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Article IV.D.7 shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such executory contract or unexpired lease has been assumed by such Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

8.    Corporate Action

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) entry into the Exit Facility (if any); (2) execution and delivery of the Exit Facility Documents (if any); (3) the issuance of the Reorganized Rockall Interests; (4) appointment of the New Board and other directors and officers for Reorganized Rockall and the other Reorganized Debtors; (5)  implementation of the Restructuring, including the creation and funding of the GUC Trust; and (6) all other actions contemplated by the Plan. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Rockall and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Rockall, or the other Reorganized Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors,

US 8895812

managers, or officers of the Debtors, Reorganized Rockall, or the other Reorganized Debtors, as applicable. On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors, Reorganized Rockall, or the other Reorganized Debtors shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of Reorganized Rockall and the other Reorganized Debtors, including the Exit Facility Documents (if any) and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.D.8 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

9.    New Governance Documents

To the extent required under the Plan or applicable non-bankruptcy law, Reorganized Rockall and the other Reorganized Debtors, as applicable, will, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, Reorganized Rockall and the other Reorganized Debtors, as applicable, may amend and restate their respective New Governance Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

10.    Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically, and the New Board and the officers of each of the Reorganized Debtors shall be appointed in accordance with the Plan, New Governance Documents, and other constituent documents of each Reorganized Debtor. Additionally, each Person serving as an officer of a Debtor shall be removed and cease to serve automatically as of the Effective Date, and the initial officers of each Reorganized Debtor will be appointed pursuant to the Plan and the New Governance Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of Reorganized Rockall or any of the other Reorganized Debtors. If any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation

US 8895812

to be paid to such director or officer will also be disclosed to the extent required under the Bankruptcy Code. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of Reorganized Rockall and each of the other Reorganized Debtors.

11.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the Reorganized Rockall Interests, in the name of and on behalf of Reorganized Rockall or the other Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

12.    Exemption from Certain Taxes and Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (including of the Reorganized Rockall Interests), (b) any grant of collateral under the Exit Facility, (c) any creation of any Lien, mortgage, deed of trust, or other security interest, or (d) any transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, including the transfer of any assets to the GUC Trust, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

13.    Exemption from Registration Requirements

The offering, issuance, and distribution of the Reorganized Rockall Interests pursuant to Article III of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (a) the Securities Act and all rules and regulations promulgated thereunder and (b) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities.  Pursuant to section 1145 of the Bankruptcy Code, the Reorganized Rockall Interests issued under Article III of the Plan will be freely transferable by the recipients thereof, subject to:  (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such securities or instruments, including, any restrictions on the transferability under the terms of the New Governance Documents; and (c) any other applicable

47

regulatory approval. If section 1145 of the Bankruptcy Code is deemed not to apply to the prepetition solicitation to the Holders of Class 3 Secured Parties Claims, such prepetition solicitation is nonetheless exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof.

14.     Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. Notwithstanding the foregoing or anything to the contrary herein, all Avoidance Actions against non-Insiders of the Debtors shall be waived upon the Effective Date, except those against Krewe. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including pursuant to Article VIII of the Plan, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.D.14 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. Further, any Claims or Causes of Action against Krewe shall not be waived or released and all rights to pursue such claims against Krewe shall be transferred to the Intercreditor Agent or the Liquidation Trust, at the election of the Intercreditor Agent, on the Effective Date.

15.     Director and Officer Liability Insurance

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies

(including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date.

16.    Payment of the Restructuring Expenses

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, will pay all Restructuring Expenses, including fees and expenses estimated to be incurred through the Effective Date by the Consenting Creditor Advisors, the DIP Agent, the Intercreditor Agent, the Term Loan Agent, or the Secured Parties (provided that counsel may submit such invoices on behalf of the DIP Agent, the Intercreditor Agent, the Term Loan Agent, or the Secured Parties) to the extent invoiced at least one (1) Business Day before the Effective Date, without the need for any such Person to file a fee or retention application in the Chapter 11 Cases.

17.    Preservation of Debtor Royalty and Working Interests

Notwithstanding any other provision in the Plan, but subject in all respects to all payments authorized and made pursuant to the Royalty Order, on and after the Effective Date all Debtor Royalty and Working Interests shall be fully preserved and remain in full force and effect in accordance with the terms of the relevant granting instruments or other governing documents applicable to such Debtor Royalty and Working Interests, which granting instruments and governing documents shall remain in full force and effect, and no Debtor Royalty and Working Interests shall be compromised or discharged by the Plan.

18.    Non-Debtor Royalty and Working Interests

For the avoidance of doubt, all rights to payment or production resulting from Non-Debtor Royalty and Working Interests and arising before the Petition Date, and any and all Claims (and Allowed Claims), liabilities, and obligations arising therefrom, including Claims (and Allowed Claims) and payment obligations arising before the Petition Date, in each case not already paid by the Debtors in the ordinary course pursuant to the Royalty Order or assumed by a Successful Bidder, shall be General Unsecured Claims under the Plan and shall be compromised and/or released by the Plan.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, whether or not a Payout Event has occurred, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and

49

1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on a schedule of assumed contracts by a Successful Bidder; (ii) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (v) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (vi) is subject to a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to, with the consent of the Majority Consenting Creditors, alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than seven days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.

B.    *Pass-Through*

***If a Payout Event does not occur***, then except as otherwise provided in the Plan, any rights or arrangements necessary or useful to the operation of the Reorganized Debtors' business, but not otherwise addressed as a Claim or Interest or assumed under Article V of the Plan, including non-exclusive or exclusive patent, trademark, copyright, maskwork, or other intellectual property licenses, Oil and Gas Leases to the extent not assumable under section 365 of the Bankruptcy Code, and other contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment under the Plan or Confirmation Order and with the prior written consent of the Majority Consenting Creditors, be passed through the Chapter 11 Cases for the benefit of the Reorganized Debtors, provided that, notwithstanding anything to the contrary herein, any Claim thereunder shall be treated in accordance with the distribution provisions of the Plan.

C.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases,

50

pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Liquidation Trust, the Estates, or their property (as applicable), without the need for any objection by the Reorganized Debtors or Liquidation Trustee (as applicable), or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

D.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

**If a Payout Event does not occur**, any monetary defaults under an Executory Contract or Unexpired Lease, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors or the Reorganized Debtors, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Reorganized Debtors to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. **Any counterparty that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Reorganized Debtor shall, with the consent of the Majority Consenting Creditors, have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; *provided further, however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

US 8895812

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, in each case with the consent of the Majority Consenting Creditors. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may, with the consent of the Majority Consenting Creditors, assume the Executory Contract or Unexpired Lease prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; *provided further*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Reorganized Debtor shall, with the consent of the Majority Consenting Creditors, have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Indemnification Obligations*

The Indemnification Obligations shall not be discharged or Impaired by Confirmation of the Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Reorganized Debtors; *provided*, *however*, that the Reorganized Debtors shall not indemnify directors or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes knowing and intentional fraud, gross negligence, or willful misconduct.

F.      *Insurance Policies*

1.      If a Payout Event Occurs

***If a Payout Event Occurs***, then to the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Liquidation Trustee on the Effective Date, and all other insurance policies shall vest in the Liquidation Trustee.

US 8895812

2.      If a Payout Event Does Not Occur

***If a Payout Event does not occur***, then to the extent any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the respective Reorganized Debtors on the Effective Date. All other insurance policies shall vest in the Reorganized Debtors.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors, the Reorganized Debtors, or the Liquidation Trustee (as applicable) that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor or the Liquidation Trustee (as applicable) has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors or the Liquidation Trustee (as applicable) shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

I.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

US 8895812

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim, shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors or the Liquidation Trust (as applicable).  For the avoidance of doubt, ***if a Payout Event occurs***, then notwithstanding anything to the contrary in the Plan, all distributions shall be made by the Liquidation Trustee or the GUC Trustee (as applicable) pursuant to the terms of the Plan, the Confirmation Order, the Liquidation Trust Agreement, and the GUC Trust Agreement

a.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

b.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors or the Liquidation Trustee (as applicable).

54

c.    No Liability

Except on account of gross negligence, fraud, or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Property*

1.    Delivery of Distributions

a.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

b.    Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable).

c.    Delivery of Distributions on Secured Parties Claims.

The Intercreditor Agent shall be deemed to be the Holder of all Secured Parties Claims for purposes of distributions to be made hereunder, and all distributions on account of such Allowed Claims shall be made to the Intercreditor Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the Intercreditor Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Secured Parties Claims in accordance with the terms of the Intercreditor Agreement Documents, subject to any modifications to such distributions in accordance with the terms of the Plan.

d.    Delivery of Distributions on DIP Claims

The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facility Documents, subject to any modifications to such distributions in accordance with the terms of the Plan.

55

US 8895812

e. Minimum Distributions

No Distribution shall be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250.

2. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Reorganized Debtors, as applicable, shall have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of this Article VI.C, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

D. *Registration or Private Placement Exemption*

***If a Payout Event does not occur***, then except as otherwise set forth immediately below, all shares of Reorganized Rockall Interests issued under Article III of the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of Reorganized Rockall Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. If section 1145 of the Bankruptcy Code is deemed not to apply to the prepetition solicitation to the Holders of Class 3 Secured Parties Claims, such prepetition solicitation is nonetheless exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof.

The Reorganized Rockall Interests issued pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any Holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the Reorganized Rockall Interests from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. Under Rule 144(a)(1), an "affiliate" of Reorganized Rockall is a person that directly or indirectly controls, or is controlled by, or is under common control with Reorganized Rockall. If any recipients of Reorganized Rockall Interests are Affiliates of Reorganized Rockall, such recipients will receive restricted Reorganized Rockall Interests that are subject to the non-holding period requirements of Rule 144, including volume limitations, current public information requirement, manner of sale requirements, and filing requirements. **Reorganized Rockall Interests issued to Holders of**

US 8895812

**Claims in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code.**

Notwithstanding anything to the contrary in the Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Reorganized Rockall Interests are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

E.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, Liquidation Trustee, Disbursing Agent, GUC Trustee, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, Liquidation Trustee, Disbursing Agent, GUC Trustee, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, Reorganized Debtors, Liquidation Trustee, Disbursing Agent, and GUC Trustee (as applicable) reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

F.      *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Effective Date

G.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall

be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

H.      *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

I.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.      *Setoffs and Recoupment*

The Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable), may, but shall not be required to, set off against, or recoup from, any Allowed Claim (other than an Allowed General Unsecured Claim) against a Debtor of any nature whatsoever that the applicable Debtor, Reorganized Debtor, Liquidation Trustee, or GUC Trustee (as applicable) may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor, Reorganized Debtor, Liquidation Trustee, GUC Trustee (as applicable) of any such Claim it may have against the Holder of such Allowed Claim.

K.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

The Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable), shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or the Liquidation Trustee, or GUC Trustee (as applicable); *provided that* the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor, a Reorganized Debtor, the Liquidation Trustee, or GUC Trustee (as applicable) on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing

58

the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

      2.    <u>Claims Payable by Insurers</u>

No distributions under the Plan shall be made on account of an Allowed Claim (other than any Allowed DIP Claim or any Allowed Secured Parties Claim) that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable), shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

      3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims*

On or after the Effective Date, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee(as applicable) shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim. All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

US 8895812

B. *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable), by order of the Bankruptcy Court, shall together have the sole authority to: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

A Claim (other than a General Unsecured Claim) cannot be reclassified as a General Unsecured Claim by the Liquidation Trustee or Reorganized Debtors (as applicable) without either (i) the consent of the GUC Trustee or (ii) a Final Order by the Bankruptcy Court.

A General Unsecured Claim cannot be reclassified as a Claim (other than a General Unsecured Claim) by the GUC Trustee without either (i) the consent of the Liquidation Trustee or Reorganized Debtors (as applicable) or (ii) a Final Order by the Bankruptcy Court.

C. *Estimation of Claims*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims

US 8895812

Register without the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.     *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

F.     *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Reorganized Debtors or the Liquidation Trustee (as applicable).

**ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

G.     *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

H.     *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made to the extent that all or any portion of

US 8895812

any Claim is a Disputed Claim, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided* that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

I.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

In accordance with Bankruptcy Rule 9019, the Plan constitutes the good-faith compromise and settlement among the Global Settlement Parties regarding the treatment of General Unsecured Claims under the Plan, and reflects and implements such compromise and settlement, including by the establishment and funding of the GUC Global Settlement Amount. Such compromise and settlement is made in exchange for consideration and is in the best interests of the Global Settlement Parties and the Holders of General Unsecured Claims, is within the reasonable range of possible litigation outcomes, is fair, equitable and reasonable, and is an essential element of the resolution of these Chapter 11 Cases.

US 8895812

B.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors or the Liquidation Trustee, as applicable), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Term of Injunctions or Stays*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, any Exit Facility Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Facility Documents), or in any other contract, instrument, agreement, or document created pursuant to the Plan or Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Liquidation Trust, the GUC Trust, or the Reorganized Debtors (as applicable), and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any**

US 8895812

action or Filing being required to be made by the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable).

E. *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is hereby released and discharged by the Debtors, their Estates, and the Reorganized Debtors (as applicable) from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or that could be asserted on behalf of the Debtors, that the Debtors, their Estates, or the Reorganized Debtors (as applicable), that such Person or its estate, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Reorganized Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Term Loan Credit Documents, the Shell Master Agreement, the Intercreditor Agreement Documents, the DIP Facility Documents (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Documents, any Asset Sale, the Exit Facility (if any), the Exit Facility Documents (if any), the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the Global Settlement, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.E do not release any post-Effective Date obligations of any party or Entity under

64

the Plan, including any such obligations created in connection with the Restructuring, and (ii) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud or willful misconduct; (iii) nothing in this Article VIII.E shall, nor shall it be deemed to, release any Causes of Action specifically enumerated in the List of Retained Causes of Action. For the avoidance of doubt, any Claims or Causes of Action against (i) Krewe and, (ii) solely with respect to the Talco Obligations, the Talco Bond Parties, shall not be waived or released. All rights to pursue any such Claims or Causes of Action against Krewe shall be transferred to the Intercreditor Agent or the Liquidation Trust, at the election of the Intercreditor Agent, on the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

F.      *Releases by Releasing Parties*

As of the Effective Date, each Releasing Party hereby releases and discharges each Debtor, Estate, Reorganized Debtor, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Reorganized Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, the Term Loan Credit Documents, the Shell Master Agreement, the Intercreditor Agreement Documents, the DIP Facility Documents (and any payments or transfers in connection therewith), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract,

65

instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Documents, any Asset Sale, the Exit Facility (if any), the Exit Facility Documents (if any), the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the Global Settlement, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process, the Definitive Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations of the Debtors on account of any Allowed Claims that are treated under the Plan or obligations otherwise arising under any contract, agreement, or other business arrangement between any non-Debtor Releasing Party and any non-Debtor Released Party. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in this Article VIII.F do not release any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the Global Settlement or the Restructuring; and (ii) nothing in this Article VIII.F shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct. For the avoidance of doubt, nothing in this Article VIII.F shall, nor shall it be deemed to, release any Causes of Action specifically enumerated in the List of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

G.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure

**Statement, the Plan, any Asset Sale, the related agreements, instruments, and other documents (including the Definitive Documentation), the solicitation of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the Restructuring Support Agreement, the related agreements, instruments, and other documents (including the Definitive Documentation), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, solicitation of votes with respect to the Plan, the Global Settlement, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documentation), or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, nothing in this Article VIII.G shall, nor shall it be deemed to, exculpate any Exculpated Party from any Causes of Action specifically enumerated in the List of Retained Causes of Action.**

H.   *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any**

67

**obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.**

I.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Liquidation Trustee (as applicable) or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or the Liquidation Trustee (as applicable), or another Entity with whom the Reorganized Debtors or the Liquidation Trustee (as applicable) have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable), unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.    *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

L.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is

US 8895812

contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

M.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors, the Liquidation Trustee, or GUC Trustee (as applicable) may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors or the Liquidation Trustee (as applicable).

# ARTICLE IX.
# CONDITIONS PRECEDENT TO CONFIRMATION
# AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of the Plan that the following conditions, as determined by the Debtors with the consent of the DIP Agent, the Majority Consenting Creditors, and the Committee shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

1.      the Bankruptcy Court shall have entered a Final Order in form and substance acceptable to the DIP Agent, the Majority Consenting Creditors, and the Committee approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

2.      all provisions, terms, and conditions hereof shall have been approved in the Confirmation Order in form and substance acceptable to the DIP Agent, the Majority Consenting Creditors, and the Committee; and

3.      the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors with the consent of the DIP Agent, the Majority Consenting Creditors, and the Committee shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan) on or prior to the Outside Date (as defined in the Restructuring Support Agreement):

1.      the Confirmation Order in form and substance acceptable to the DIP Agent, the Majority Consenting Creditors, and the Committee shall have been entered and the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

US 8895812

2.      the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated at any time;

3.      *if a Payout Event occurs*, the Asset Sale shall have closed and the transactions contemplated thereby shall have been consummated in accordance with the terms of the applicable asset purchase agreements;

4.      *if a Payout Event does not occur*, the Exit Facility Documents (if any) shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Facility shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Facility shall be deemed to occur concurrently with the occurrence of the Effective Date;

5.      *if a Payout Event does not occur*, the New Governance Documents, the effectiveness of which requires filing with the Secretary of State of any jurisdiction, shall have been duly filed with the applicable authorities in the relevant jurisdictions;

6.      all other Definitive Documentation are consistent with, and in form and substance as required by the approvals and consents set forth in, the Restructuring Support Agreement and shall have been effected or be executed and delivered in accordance with the terms of the Plan;

7.      *if a Payout Event does not occur*, all conditions precedent to the issuance of the Reorganized Rockall Interests, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

8.      all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

9.      all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, if applicable, the Exit Facility Documents);

10.     all Restructuring Expenses shall have been paid in Cash in full;

11.     the GUC Trust shall have been created and funded in accordance with the Plan;

12.     the Claims Reserve shall have been funded in an amount equal to the Claims Reserve Amount; and

13.     the Professional Fee Escrow Account shall have been funded in an amount equal to the Professional Fee Reserve Amount.

US 8895812

C.      *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX.A and Article IX.B may be amended, modified, supplemented, or waived in writing by mutual agreement of the Debtors, the DIP Agent, the Majority Consenting Creditors, and the Committee (such agreement to be provided by the DIP Agent, the Majority Consenting Creditors, and the Committee in their respective sole and absolute discretion) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

E.      *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do(es) not occur on or prior to , the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

# ARTICLE X.
# MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained herein, in the Global Settlement, and in the Restructuring Support Agreement, the Debtors reserve the right to alter, amend, or modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the

Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

Subject to the conditions and limitations set forth in the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured, Unsecured, or subordinated status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.    resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5.      consider any modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in each case, to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into, delivered, or created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

10.      enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

15.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

US 8895812

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any Restructuring Transactions;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.     hear and determine matters concerning section 1145 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute or matter involving the GUC Trust or relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     enter an order concluding or closing the Chapter 11 Cases;

24.     enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan; and

25.     hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Reorganized Debtors, the

74

Liquidation Trustee, or GUC Trustee, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs. Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, the Reorganized Debtors, the Liquidation Trustee, or the GUC Trustee, as applicable, shall be served on:

| | |
|---|---|
| **Debtors or the Reorganized Debtors** | **Rockall Energy Holdings, LLC**<br>5005 Lyndon B. Johnson Freeway, Suite 700<br>Dallas, TX 75244<br>Attn: David Mirkin |
| **Attorneys to the Debtors** | **Vinson & Elkins LLP**<br>2001 Ross Avenue, Suite 3900<br>Dallas, TX 75201<br>Attn: Michael A. Garza<br>       Matthew J. Pyeatt<br>       Trevor G. Spears |
| | and |

| | **Vinson & Elkins LLP** |
| --- | --- |
| | 1114 Avenue of the Americas, 32nd Floor |
| | New York, NY 10036 |
| | Attn:  David S. Meyer |
| | George R. Howard |
| | Lauren R. Kanzer |
| **Liquidation Trustee** | **Ankura Consulting Group, LLC** |
| | 2021 McKinney Ave., Suite 340 |
| | Dallas, TX 75201 |
| | Attn:  Scott Rinaldi |
| **GUC Trustee** | **Riveron Management, LLC** |
| | 909 Fannin Street, Suite 4000 |
| | Houston, TX 77010 |
| | Attn:  Gary Barton |
| | |
| | and |
| | |
| | **Pachulski Stang Ziehl & Jones LLP** |
| | 440 Louisiana St., Suite 900 |
| | Houston, TX 77002 |
| | Attn:  Jeffrey N. Pomerantz |
| | Michael D. Warner |
| **United States Trustee** | **Office of the United States Trustee** |
| | **for the Northern District of Texas** |
| | Earle Cabell Federal Building |
| | 1100 Commerce Street, Room 976 |
| | Attn:  Lisa L. Lambert |
| | Erin Schmidt |
| | Elizabeth A. Young |
| **Term Loan Agent** | **Goldman Sachs Bank USA** |
| | c/o Goldman Sachs Specialty Lending Group, L.P. |
| | 2001 Ross Ave, Suite 2800 |
| | Dallas, Texas 75201 |
| | Attn: GSSLG In-House Counsel |
| **Counsel to the Term Loan Agent** | **Cleary Gottlieb Steen & Hamilton LLP** |
| | One Liberty Plaza |
| | New York, NY 10006 |
| | Attn:  Sean A. O'Neal |
| | Jane VanLare |
| | |
| | and |

76

US 8895812

**Bonds Ellis Eppich Schafer Jones LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
Attn:  Joshua N. Eppich
      H. Brandon Jones

| | |
|---|---|
| **Counsel to Shell** | **Reed Smith LLP** |
| | 2850 N. Harwood Street, Suite 1500 |
| | Dallas, TX 75201 |
| | Attn:  Michael P. Cooley |

| | |
|---|---|
| **Counsel to the Committee** | **Pachulski Stang Ziehl & Jones LLP** |
| | 440 Louisiana Avenue, Suite 900 |
| | Houston, TX 77002 |
| | Attn:  Michael D. Warner |
| |       Steven W. Golden |

and

**Pachulski Stang Ziehl & Jones LLP**
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn:  Jeffrey N. Pomerantz
      Paul J. Labov

F.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

G.    *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Global Settlement and the Restructuring Support Agreement and any related agreements thereto, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed,

US 8895812

copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.stretto.com/Rockall or the Bankruptcy Court's website at https://www.txnb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors, the DIP Agent, the Majority Consenting Creditors, and the Committee. Notwithstanding any such alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors', the Majority Consenting Creditors', and the Committee's consent; and (3) nonseverable and mutually dependent.

J.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors or Liquidation Trustee (as applicable) will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan and any previous plan.

K.    *Request for Expedited Determination of Taxes*

The Debtors, the Reorganized Debtors, or the Liquidation Trustee, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

US 8895812

L.    *Closing of Chapter 11 Cases*

The Reorganized Debtors or the Liquidation Trustee (as applicable) shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.    *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

N.    *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors,' Reorganized Debtors,' or the Liquidation Trustee's (as applicable) right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Noticing and Claims Agent prior to the Confirmation Date.

O.    *Dissolution of the Committee*

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that the Committee shall continue to exist and its Professionals shall continue to be retained without further order of the Court with respect to (1) the preparation and prosecution of any final fee applications of the Committee's Professionals and (2) all final fee applications Filed with the Bankruptcy Court.

* * * *

US 8895812

Respectfully submitted, as of the date first set forth below,

Dated:     May 25, 2022
           Dallas, Texas

                                ROCKALL ENERGY HOLDINGS, LLC
                                on behalf of itself and all other Debtors


                                 \s\ *Lewis Gillies*_____
                                Lewis Gillies
                                President & Chief Executive Officer

US 8895812

**<u>Exhibit B</u>**

**Sale Approval Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22-9000 (MXM)** |
| | § | |
| **ROCKALL ENERGY HOLDINGS, LLC,** | § | **(Chapter 11)** |
| ***et al.*,** | § | |
| | § | **(Jointly Administered)** |
| | § | |
| **Debtors.**[1] | § | Re: Docket No. 16 |

**SALE APPROVAL SUPPLEMENT TO
PROPOSED FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER (I) APPROVING (A) THE DISCLOSURE
STATEMENT, AND (B) THE DISCLOSURE STATEMENT SUPPLEMENT,
AND (II) CONFIRMING THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN**

This supplement (the "***Sale Approval Order***") is part of the *Proposed Findings of Fact, Conclusions of Law, and Order (I) Approving (A) the Disclosure Statement, and (B) the Disclosure Statement Supplement, and (II) Confirming the Debtors' Amended Joint Chapter 11 Plan* (the "***Confirmation Order***") confirming the *Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 548] (as may be further modified, amended, or supplemented from time to time, the "***Plan***") filed by the above-referenced debtors and debtors-in-possession (collectively, the "***Debtors***"), and sets forth this Court's approval of the Sale and the PSA (each as defined below).[2] For the avoidance of doubt, this Sale Approval Order, together with the Confirmation Order, constitutes the Sale Order approving the Sale. The Purchaser (as defined below) may present this Sale

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Arrow Rock Energy, LLC (7549), Petro Harvester Operating Company, LLC (2136), Rockall Agent Corp. (1653), Rockall Energy Holdings, LLC (5784), Rockall Energy, LLC (6340), Rockall EOR, LLC (4136), Rockall Exploration Company, LLC (0547), Rockall Intermediate, Inc. (9759), Rockall LA, LLC (4270), Rockall Laurel, LLC (1178), Rockall Midstream, LLC (0917), Rockall MS, LLC (0740), Rockall ND, LLC (9311), Rockall Pine Prairie, LLC (5799), White Marlin Investment Company, LLC (9987), and White Marlin Midstream, LLC (1466). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 5005 LBJ Freeway, Suite 700, Dallas, TX 75244.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Sale Motion or the PSA (each as defined herein).

US 8817634

Approval Order to any person or entity as evidence of the entry and effect of an order of this Court, including, without limitation, to evidence the Purchaser's purchase of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances to the extent provided in the Plan, the Confirmation Order, this Sale Approval Order, and the PSA.

The Debtors having filed their *Emergency Motion for Entry of Orders (A)(I) Approving Bidding Procedures, (II) Scheduling the Bid Deadlines and the Auction, (III) Scheduling Hearings and Objection Deadlines With Respect to the Sale, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief; and (B)(I) Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Dkt. No. 16] (the "**Sale Motion**"), seeking, among other things, entry of an order (i) authorizing the sale of the Debtors' assets to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances; (ii) authorizing the assumption and assignment of the Assigned Contracts; and (iii) granting related relief, all as more fully set forth in the Sale Motion; and upon consideration of the *Declaration of Kevin Bonebrake in Support of Bidding Procedures and Sale Motion* [Dkt. No. 17] and the *Declaration of Christian Tempke in Support of the Debtors' Proposed Sale of Substantially All of Their Assets to Formentera Partners Fund I, LP* [Dkt. No. 533] (the "**Tempke Sale Declaration**"); and the Court having entered the *Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadline and the Auction, (III) Scheduling the Hearing and Objection Deadlines With Respect to the Sale, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Dkt. No. 91] (the "**Bidding Procedures Order**"), approving, among other things, the bidding procedures attached

2

thereto (the "*Bidding Procedures*"); and Formentera Partners Fund I, LP (the "*Purchaser*") having

been selected as the Successful Bidder for the Assets (as defined in the PSA) in accordance with

the Bidding Procedures; and upon the Purchaser and Debtors having agreed to the terms of that

certain *Purchase and Sale Agreement* (together with all ancillary documents, as may be amended,

modified, or supplemented, the "*PSA*"),[3] with respect to the sale of the Assets (the "*Sale*"); and

the Court having conducted a hearing on May 31, 2022 (the "*Sale Hearing*")[4] to consider, among

other things, the relief requested in the Sale Motion and pursuant to the Plan with respect to the

Sale, as set forth in this Sale Approval Order; and appearance of all interested parties having been

noted on the record of the Sale Hearing; and upon all proceedings had before this Court, including

the testimony and other evidence proffered or adduced at the Sale Hearing and the hearing held on

March 11, 2022 (the "*Bidding Procedures Hearing*"), to approve the Bidding Procedures; and the

Court having found that good and sufficient cause exists for the granting of the relief requested in

the Sale Motion and pursuant to the Plan with respect to the Sale after having given due

deliberation upon the Sale Motion, the Plan, and all of the proceedings had before the Court in

connection with the Sale Motion and the Plan, it is HEREBY FOUND AND DETERMINED

THAT:[5]

A. **Findings and Conclusions.** The findings of fact and the conclusions of law stated

herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy

Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent

any finding of fact shall be determined to be a conclusion of law, it shall be adopted as such, and

---

[3] A copy of the PSA is attached hereto as **Exhibit 1**.

[4] For the avoidance of doubt, Sale Hearing also means the hearing to consider approval of the Plan and adequacy of the Disclosure Statement (as defined in the Plan) (in such context, the "*Combined Hearing*").

[5] All findings of fact and conclusions of law set forth in the Confirmation Order or announced by the Court at the Sale Hearing are hereby incorporated herein.

US 8817634

to the extent any conclusion of law shall be determined to be a finding of fact, it shall be adopted as such.

B. **Jurisdiction and Venue.** This Court has jurisdiction to consider the Sale Motion and the Plan with respect to the Sale and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates, and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding under 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

C. **Final Order; Immediate Effect.** The Confirmation Order and this Sale Approval Order together constitute a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of the Sale as approved by this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

D. **Time is of the Essence.** Time is of the essence in consummating the Sale referenced herein, and the Debtors and the Purchaser intend to close the Sale as soon as practicable. In order to maximize the value of the Debtors' Assets, it is essential that the sale and assignment of the Assets occur within the time constraints set forth in the Plan, the RSA, the DIP Credit Agreement (as defined in the Bidding Procedures), the Bidding Procedures Order, and the PSA.

E. **Statutory Predicates.** The statutory predicates for the relief requested in the Sale Motion and the Plan with respect to the Sale are sections 105, 363, 365, 503, 507, and 1123 of the

Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, and 9014, and Rules 2002-1 and 9013-1 of the N.D. Tex. L.B.R.

F.     **Assets Property of the Estate.**  The Assets sought to be sold and assigned by the Debtors to the Purchaser pursuant to the PSA are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

G.     **Notice and Opportunity to Object.**  Notice of the Sale Motion, the Bidding Procedures, the Bidding Procedures Order, and the deadlines related thereto has been provided to all parties required to receive such notice under the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and the Bidding Procedures Order.  *See Certificate of Service* [Dkt. Nos. 44, 123, 140, 143, 249, 358].

H.     The Debtors filed the *Notice of the Auction and Sale Hearing* [Dkt. No. 128] (the "*Auction and Sale Notice*") and served the same on all parties required to receive such notice under the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and the Bidding Procedures Order.  *See Certificate of Service* [Dkt. Nos. 143, 249, 273, 303, 359, 418, 423, 451]. The Debtors timely published the Auction and Sale Notice in accordance with the Bidding Procedures Order in The New York Times, *see Certificate of Publication for Shannon Schmidt of The New York Times* [Dkt. No. 258], the Jackson Clarion-Ledger, *see Certificate of Publication for the Authorized Clerk of the Clarion-Ledger* [Dkt. No. 256], the Baton Rouge Advocate, *see Certificate of Publication for Joy Newman of the Advocate* [Dkt. No. 252], and the Bismarck Tribune, *see Certificate of Publication for Jill Lindsay of the Bismarck Tribune* [Dkt. No. 254]. Additionally, the Debtors timely posted the Auction and Sale Notice to the Debtors' case information website at https://cases.stretto.com/rockall/.

5

I.     The Debtors filed the *Notice to Contract Counterparties and Third-Party Holders of Consent Rights and Preferential Purchase Rights of (I) Potential Assumption and Assignment of Contracts and Leases, and (II) Cure Amounts and Adequate Assurance in Connection Therewith* [Dkt. No. 142], the *Supplemental Notice to Contract Counterparties and Third-Party Holders of Consent Rights and Preferential Purchase Rights of (I) Potential Assumption and Assignment of Contracts and Leases, and (II) Cure Amounts and Adequate Assurance in Connection Therewith* [Dkt. No. 180], and the *Second Supplemental Notice to Contract Counterparties and Third-Party Holders of Consent Rights and Preferential Purchase Rights of (I) Potential Assumption and Assignment of Contracts and Leases, and (II) Cure Amounts and Adequate Assurance in Connection Therewith* [Dkt. No. 455] (collectively, the "***Cure Notices***"), and served the same on all parties required to receive such notice under the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and the Bidding Procedures Order. *See Certificate of Service* [Dkt. Nos. 169, 204, 249, 273, 280, 303, 359, 423, 470].

J.     A reasonable opportunity to object and/or to be heard regarding the relief granted by the Confirmation Order and this Sale Approval Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., the Bidding Procedures Order, and applicable law.

K.     **Consent Rights and Preferential Rights to Purchase.**  The Cure Notices were reasonably calculated to provide any holders of consent rights with respect to the Assets or holders of any preferential rights associated with the Assets with reasonable and proper notice of the potential deemed waiver of any such rights should such holders fail to timely object to the transfer of any lease subject to a hard consent or fail to indicate its intent to exercise any preferential right as set forth in the Cure Notices.  The deadline to file an objection to any assignment of the Assets

US 8817634

based on a hard consent in a lease or to exercise any preferential right to purchase has expired and no objections were timely filed.

L. **Business Justification.** This Court finds that the Debtors have (a) demonstrated that entry into and consummation of the PSA constitute an exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, their creditors, and all parties in interest; (b) articulated good and sufficient business reasons justifying the sale of the Assets to the Purchaser pursuant to the terms and conditions set forth in the PSA; (c) demonstrated that it is an exercise of their sound business judgment to assume and/or assign the Assumed 365 Contracts in accordance with the terms of the PSA to the Purchaser in connection with the consummation of the Sale, and the assumption and/or assignment of the Assumed 365 Contracts is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Assumed 365 Contracts being assigned to the Purchaser are an integral part of the Sale and, accordingly, their assumption and/or assignment is reasonable and appropriate.

M. **Fiduciary Duties.** The Debtors' decision to enter into the PSA and consummate the Sale constitutes a proper exercise of the fiduciary duties of the Debtors and their directors and officers.

N. **Corporate Authority.** The Debtors (a) have full corporate power and authority to execute the PSA and all other documents contemplated thereby, (b) have all of the power and authority necessary to consummate the Sale, and (c) have taken all corporate action necessary to authorize and approve the PSA and any actions required to be performed by the Debtors to consummate the Sale. No further consents or approvals of the Debtors are required for the Debtors to consummate the Sale.

US 8817634

O.      **Opportunity to Bid.**  As demonstrated by:  (a) the Tempke Sale Declaration; (b) the testimony and other evidence proffered or adduced at the Bidding Procedures Hearing and the Sale Hearing; and (c) the representations of the Debtors' counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, the Debtors and their advisors thoroughly marketed the Assets and conducted the marketing and sale process as set forth in and in accordance with  the Sale Motion and the Bidding Procedures Order.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Assets.  The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects.

P.      **Highest or Otherwise Best Offer.**  The Debtors have demonstrated that (a) the total consideration provided by the Purchaser for the Assets as reflected in the PSA is the highest and otherwise best offer for the Assets, (b) the Purchaser is the Successful Bidder for the Assets in accordance with the Bidding Procedures, (c) the PSA and the Closing thereon presents the best opportunity to realize the maximum value of the Assets and avoid a decline and devaluation of the Assets, (d) there is risk of deterioration of the value of the Assets if the Sale is not consummated promptly, and (e) the Debtors' entry into the PSA and consummation of the Sale is reasonable and appropriate.

Q.      **Arm's-Length Sale and Good Faith Purchaser.**  The PSA and the Sale contemplated by the PSA were negotiated and undertaken by the Debtors and the Purchaser at arm's length and in good faith, as that term is used in section 363(m) of the Bankruptcy Code.  The Purchaser has acted without collusion in undertaking the Sale contemplated by the PSA and has

US 8817634

proceeded in good faith in all respects in connection with the Sale specifically and these chapter 11 cases generally. The Purchaser is a Purchaser in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. The Purchaser (a) recognizes that the Debtors were free to deal with any other party interested in acquiring the Assets, (b) complied with the Bidding Procedures Order in all respects, and (c) willingly subjected its bid to the competitive Bidding Procedures. All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed, the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale of the Assets to the Purchaser (including the assumption and assignment by the Debtors of any of the Assumed 365 Contracts), unless such authorization is duly stayed pending such appeal.

R. **No Fraudulent Transfer.** The total consideration provided by the Purchaser pursuant to the PSA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and is not subject to avoidance or recovery of costs or damages pursuant to sections 363(n) or 548 of the Bankruptcy Code or any other applicable law. The PSA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser have entered into the PSA or are consummating the Sale with any fraudulent or otherwise improper purpose.

9

S.  **No Successor Liability.**  The Purchaser has given substantial consideration under the PSA, which consideration shall constitute valid, valuable, and sufficient consideration for the absolution from any potential claims of successor liability of the Purchaser to the greatest extent allowed by applicable law.

T.  **Free and Clear.**  Upon Closing, the sale of the Assets and the assignment of the Assumed 365 Contracts to the Purchaser shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person.  Further, upon the Closing Date, the sale of the Assets and the assignment of the Assumed 365 Contracts shall vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of any and all claims, Liens, damages, obligations, liabilities, losses, costs and expenses (collectively, the "***Liens, Claims, and/or Interests***") (other than Permitted Encumbrances and Assumed Obligations) with any and all such Liens, Claims, and/or Interests to attach to the proceeds of the Sale with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, and/or Interests had with respect to the Assets immediately prior to Closing.

U.  **Satisfaction of Sections 363(f) and 1123(a) Standards.**  Sections 363 and 1123(a)(5)(D) of the Bankruptcy Code permit such Sale and/or one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Any and all holders of Liens, Claims, and/or Interests in the Assets who did not object to the Sale or who withdrew such objection are deemed to have consented to the Sale under section 363(f)(2) of the Bankruptcy Code.  Any and all holders of Liens, Claims, and/or Interests in the Assets who did object to the Sale fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, Claims, and/or Interests (if any) attach to the

10

proceeds of the Sale with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, and/or Interests encumbered the Assets immediately prior to Closing, and with such Liens, Claims, and/or Interests being treated in accordance with the Plan. The Purchaser would not enter into the Sale if the sale of the Assets was not free and clear of all Liens (other than Permitted Encumbrances and Assumed Obligations) to the extent provided in the PSA.

V. **Assumption and Assignment of Assumed 365 Contracts.** The Debtors' assumption and assignment to Purchaser of the Assumed 365 Contracts pursuant to the terms of the Plan, the Confirmation Order, this Sale Approval Order, and the PSA is integral to the Sale and is in the best interests of the Debtors, their estates and their creditors, and represents the Debtors' exercise of reasonable business judgment. Each and every provision of the Assumed 365 Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed 365 Contract has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. Any and all counterparties of the Assumed 365 Contracts who failed to timely file an objection (the "**Assumed 365 Contract Objections**") to the assumption and/or assignment of their respective Assumed 365 Contract(s), including objections to Cure Costs and/or adequate assurance, or failed to raise any other alleged default or breach of contract, shall be deemed to have consented to the assumption and/or assignment by the Debtors of their respective Assumed 365 Contract(s) to the Purchaser and any such Cure Costs, as set forth in the Cure Notices, and to have waived any other defaults or breaches.

W. The Assumed 365 Contracts shall be deemed valid and binding, and remain in full force and effect in accordance with their terms, without existing default(s), subject only to payment of the appropriate Cure Costs, if any, by the Debtors. For the avoidance of doubt, the Purchaser

US 8817634

and the counterparties to the Assumed 365 Contracts shall have all rights and benefits under the Assumed 365 Contracts without the necessity of obtaining any such counterparty's consent to the assumption and/or assignment thereof. The Assumed 365 Contracts shall be assigned and transferred to the Purchaser, notwithstanding any provision of the Assumed 365 Contracts prohibiting or otherwise restricting assignment or transfer. The entry of this Confirmation Order and this Sale Approval Order constitutes the consent of the counterparties to the Assumed 365 Contracts to the Debtors' assumption and assignment of such agreements to the Purchaser.

X.     The Debtors, their estates, or any of their predecessors, shall have no further liability or obligation for any (a) defaults or breaches under the Assumed 365 Contracts that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (b) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assumed 365 Contracts, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

Y.     **Cure Costs; Adequate Assurance.** The Debtors and Purchaser have, to the extent necessary, met all of the requirements of sections 363, 365 and 1123 of the Bankruptcy Code in connection with the sale and assumption and assignment of the Assumed 365 Contracts. The Court finds that the payment of the Cure Costs under each Assumed 365 Contract, as provided in the PSA, is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b)(1) and 365(f) of the Bankruptcy Code. The Cure Costs under the Assumed 365 Contracts will be paid in accordance with the terms of the PSA. The Purchaser has demonstrated adequate assurance of future performance of each Assumed 365 Contract within the meaning of section 365 of the Bankruptcy Code that is assumed by the Purchaser or any of its permitted assignees to which such Assumed 365 Contract is assumed and assigned by the Debtors, including

US 8817634

a promise to perform the Debtors' obligations under such Assumed 365 Contract for periods at or after the Closing Date. The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such Assumed 365 Contracts that are assumed and assigned to the Purchaser. The payment of Cure Costs in accordance with the terms of the PSA and the Purchaser's promise under the PSA to perform the obligations under the Assumed 365 Contracts as of the Closing shall constitute adequate assurance of future performance under such Assumed 365 Contracts. Accordingly, the payment of Cure Costs in accordance with the terms of the PSA and the Purchaser's promise under the PSA to perform the obligations under the Assumed 365 Contracts as of the Closing shall constitute adequate assurance of future performance under such Assumed 365 Contracts.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. **Notice and Opportunity to Object.** The notice described in Paragraphs G, H, and I was appropriate and satisfactory based upon the facts and circumstances and complied with the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., and the Bidding Procedures Order. Because such notice was adequate and sufficient, no other or further notice of the Sale Motion, the Bidding Procedures Order, the Bidding Procedures, the assumption and/or assignment of the Assumed 365 Contracts, the Auction, the Sale Hearing, the Sale, including the vesting of the Assets in the Purchaser free and clear of all Liens, Claims, and/or Interests (other than Permitted Encumbrances and Assumed Obligations), the Cure Costs, the Cure, Consent, or Preferential Right Objection Deadline, the Sale Objection Deadline (each as defined in the Bidding Procedures Order), any and all other applicable pleadings, and/or any deadlines related thereto is necessary or shall be required.

US 8817634

2.      A reasonable opportunity to object and/or to be heard regarding the relief granted by the Confirmation Order and this Sale Approval Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, the N.D. Tex. L.B.R., the Bidding Procedures Order, and applicable law.

3.      **Objections Overruled.**  Except as otherwise provided herein, all objections and responses to the Sale Motion and/or the Plan with respect to the Sale or the relief granted herein, that have not been overruled, withdrawn, waived, settled or otherwise resolved, are hereby overruled and denied on their respective merits with prejudice.  Any and all objections that relate to the Plan, the Confirmation Order, the Sale, this Sale Approval Order, the PSA, or to the relief granted herein that were not timely filed are hereby forever barred.

4.      **Approval of Sale.**  Pursuant to sections 105, 363, 365, and 1123 of the Bankruptcy Code, the relief requested in the Sale Motion and the Plan with respect to the Sale is granted and approved in its entirety, and the PSA is hereby approved as set forth herein.

5.      **Authorization of Performance by the Debtors.**  The Debtors are authorized to fully perform under, consummate, and implement the terms of the PSA together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Plan, the Confirmation Order, the Sale, this Sale Approval Order, and the PSA, and to take all further actions as may reasonably be requested by the Purchaser pursuant to the PSA for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession any or all of the Assets and all of the Assumed 365 Contracts, as may be reasonably necessary or appropriate to the performance of the Debtors' obligations as contemplated by the PSA, without any further corporate or similar action or orders of the Court.

14

6.      The Debtors and the Purchaser are authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all deeds, certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the Plan, the Confirmation Order, the Sale, this Sale Approval Order, the PSA, and any related agreements, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors or Purchaser may determine are necessary or appropriate in connection with consummation of the Sale.

7.      **Valid Sale; Transfer of Assets Free and Clear.**  Except to the extent specifically provided in the PSA, upon Closing, the Debtors shall be, and hereby are, authorized and empowered, pursuant to sections 105(a), 363(b), 363(f), 365(b), and 1123(a) of the Bankruptcy Code, to sell the Assets and assign the Assumed 365 Contracts to the Purchaser.  Effective upon Closing, the sale of the Assets and the assignment of the Assumed 365 Contracts to the Purchaser shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person.  Further, upon the Closing Date, the sale of the Assets and the assignment of the Assumed 365 Contracts shall vest the Purchaser with all right, title, and interest of the Debtors to the Assets free and clear of any all Liens, Claims, and/or Interests (other than Permitted Encumbrances and Assumed Obligations) with any and all such Liens, Claims, and/or Interests to attach to the proceeds of the Sale with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, and/or Interests had with respect to the Assets immediately prior to Closing.

US 8817634

8.      Any and all holders of Liens, Claims, and/or Interests in the Assets who did not object to the Sale or who withdrew such objection are deemed to have consented to the Sale under section 363(f)(2) of the Bankruptcy Code. Any and all holders of Liens, Claims, and/or Interests in the Assets who did object to the Sale fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens, Claims, and/or Interests (if any) attach to the proceeds of the Sale with the same nature, validity, priority, extent, perfection, and force and effect that such Liens, Claims, and/or Interests had with respect to the Assets immediately prior to Closing, and with such Liens, Claims, and/or Interests being treated in accordance with the Plan.

9.      The provisions of this Sale Approval Order authorizing the sale of the Assets free and clear of all Liens, Claims, and/or Interests (other than Permitted Encumbrances and Assumed Obligations) shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the Sale of the Assets free and clear of all Liens, Claims, and/or Interests (other than Permitted Encumbrances and Assumed Obligations).

10.      **Fiduciary Duties.** As set forth above, the Debtors' decision to enter into the PSA and consummate the Sale constitutes a proper exercise of the fiduciary duties of the Debtors and their directors and officers. Accordingly, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the PSA or the consummation of the Sale contemplated thereunder, other than liability of the Debtors arising out

of or relating to any act or omission that constitutes a breach of the PSA, willful misconduct, or fraud, in each case as determined by a court of competent jurisdiction.

11. **No Successor Liability.** As set forth above, the Purchaser has given substantial consideration under the PSA, which consideration shall constitute valid, valuable, and sufficient consideration. Accordingly, the Purchaser and its affiliates and their respective predecessors, successors, assigns, members, partners, principals, directors, officers and shareholders (or equivalent) shall have no obligations with respect to any liabilities of the Debtors (other than the Permitted Encumbrances and Assumed Obligations). For the avoidance of doubt, and without limiting the foregoing free and clear findings and conclusions, the Purchaser shall have no liability for any claims or causes of action arising from or relating to the Suspense Funds (as defined in the PSA) for the period prior to the Petition Date. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the PSA, the Purchaser and their affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser and their affiliates shall have no successor or vicarious liabilities of any kind or character including but not limited to any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, liquidated or unliquidated, with respect to the Debtors or any obligations of the Debtors, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors.

12. **Direction to Creditors.** On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Liens, Claims, and/or Interests (other than Permitted Encumbrances and Assumed Obligations) on the Assets, if any, as such Liens, Claims, and/or Interests may otherwise exist.

13. If any person or entity that has filed financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens* or other documents, instruments, notices or agreements evidencing any such Liens, Claims, and/or Interests in or against the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Assets, then with regard to the Assets, (a) the Purchaser is authorized to execute and file such termination statements, releases, instruments of satisfaction or other documents on behalf of the person or entity with respect to the Assets; and (b) the Debtors and/or Purchaser are authorized to file, register or otherwise record a certified copy of the Confirmation Order and this Sale Approval Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of such Liens, Claims, and/or Interests in or against the Assets. The Confirmation Order and this Sale Approval Order are deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county, local, tribal or foreign government agency, department or office.

14. **Direction to Government Agencies.** Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, county, federal, state and local official and any other persons or entities that may be required by operation of law or the duties of their office or contract, to accept, file, register or otherwise record or release any

documents or instruments or who may be required to report or insure any title in or to the Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Plan, the Confirmation Order, the Sale, this Sale Approval Order, and the PSA.

15.     **Licenses and Permits.**  Except as otherwise provided in this Sale Approval Order and/or the PSA, to the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing.  To the extent any license or permit necessary for operation is determined not to be an executory contract assumable and assignable under section 365 of the Bankruptcy Code, the Purchaser shall apply for and obtain any necessary license or permit as provided in the PSA, and such licenses or permits of the Debtors shall remain in place for the Purchaser's benefit until new licenses and permits are obtained.

16.     No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale. For the avoidance of doubt, the Sale authorized herein shall be of full force and effect, regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

17.     **Direction to Surrender Possession or Control.**  All persons or entities, presently or on or after the Closing Date, in possession or control of some or all of the Assets are directed to

surrender possession or control of the Assets to the Purchaser and shall be deemed to surrender possession or control of the Assets at the time of Closing (or at such other time as provided in the PSA).

18.     **Governmental Entities.**  Nothing in the Plan, the Confirmation Order, the Sale, this Sale Approval Order, or the PSA releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-Effective Date owner or operator of property after the Effective Date.  Nothing in the Plan, the Confirmation Order, the Sale, this Sale Approval Order, or the PSA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.

19.     **Resolution of North Dakota's Objections.**  To fully and finally resolve the North Dakota Objections,[6] as well as any and all other objections of the North Dakota Department of Environmental Quality ("***DEQ***") and North Dakota Industrial Commission-Department of Mineral Resources ("***DMR***," and collectively with DEQ, "***North Dakota***") to approval of (a) the sale of all

---

[6]     *Objections of North Dakota Department of Environmental Quality and North Dakota Industrial Commission-Department of Mineral Resources to (I) Approval of the Debtors' Proposed Disclosure Statement and (II) Confirmation of the Debtors Proposed Amended Joint Chapter 11 Plan* [Dkt No. 443]; *Objections of North Dakota Department of Environmental Quality and North Dakota Industrial Commission-Department of Mineral Resources to (I) Emergency Motion for Order Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Contract Assumption and Cure Notices* [Docket No. 489]; and *Supplemental Objections and Joinder of North Dakota Department of Environmental Quality and North Dakota Industrial Commission-Department of Mineral Resources to (I) Approval of the Debtors' Proposed Disclosure Statement, (II) Confirmation of the Debtors' Proposed Amended Joint Chapter 11 Plan and (III) Emergency Motion for Order Approving the Sale of the Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances and Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (IV) Contract Assumption and Cure Notices* [Dkt. No. 558] (collectively, the "***North Dakota Objections***").

US 8817634

or substantially all of the Debtors' assets to Formentera Partners Fund I, LP (as the Purchaser) and

(b) the Disclosure Statement, and confirmation of the Plan:

a. With respect to DEQ's claims against the Debtors, including with respect to any and all matters concerning the Debtors' prior operatorship and/or ownership of all sites and/or properties conveyed by the Debtors to 31 Operating, LLC and/or any of its affiliates (the "*31 Group Sites*") prior to the Petition Date, DEQ shall be entitled to an Allowed Administrative Expense Claim equal to $250,000.00, to be paid in cash by the Debtors to DEQ on the Effective Date (the "*Consideration*").

b. Solely upon payment of the Consideration, DEQ shall agree not to (i) assert any other Claims of any priority, (ii) seek any other payments, or (iii) assert that any obligations of any kind (including any injunctive, police, or regulatory liabilities) exist related to the ownership or operation of any wells or properties prior to the Effective Date, in each case from or against the Debtors' Estates, the Liquidation Trust, or the GUC Trust.

c. The Debtors shall not exercise the right to exclude Assets from the Sale pursuant to Section 3.2(g)(ii) of the PSA.

d. For the avoidance of doubt, under the terms of the PSA, the Purchaser is assuming all Environmental Liabilities (as defined in the PSA) with respect to the Assets, except to the extent such Environmental Liabilities constitute Excluded Liabilities (which are retained by the Debtors) pursuant to the PSA. For the avoidance of doubt, the Purchaser is assuming the remediation and reporting obligations under Paragraph XIX of the Administrative Consent Agreement for the Peterson 2 SWD

US 8817634

and Paragraph VI of the Administrative Consent Agreement for the Cramer 1 SWD Line Failure, and such obligations do not constitute Excluded Liabilities.

e. Pursuant to the laws of the State of North Dakota, the agreement by North Dakota herein does not compromise, settle, or resolve the rights or claims of any other party, including any landowner, that they may have against the Debtors. The agreement herein only compromises and resolves North Dakota's rights and claims against the Debtors.

f. North Dakota's agreements herein are only effective upon DEQ's receipt of the Consideration and the occurrence of the Payout Event (as defined by the Plan) based upon the terms and conditions of the PSA. North Dakota's agreements herein shall not be effective and shall be null and void in the event that the Payout Event does not occur or the terms and conditions of the PSA are altered to adversely affect North Dakota.

20. **Assumption and Assignment of Assumed 365 Contracts.** As set forth above, the Debtors' assumption and assignment to Purchaser of the Assumed 365 Contracts pursuant to the terms of the Plan, the Confirmation Order, this Sale Approval Order, and the PSA is integral to the Sale and is in the best interests of the Debtors, their estates and their creditors, and represents the Debtors' exercise of reasonable business judgment. Accordingly, under sections 105(a), 363, 365, and 1123 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale and payment of applicable Cure Costs, the Debtors' assumption and assignment of the Assumed 365 Contracts to the Purchaser pursuant to the terms set forth in the Plan, the Confirmation Order, this Sale Approval Order, and the PSA is hereby approved, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied. Notwithstanding the

foregoing, the Debtors may, at the Purchaser's direction, amend the list of Assumed 365 Contracts to add or remove any Assumed 365 Contract to or from such list of Assumed 365 Contracts prior to Closing of the Sale in accordance with the terms of the PSA.

21.     Any and all counterparties of the Assumed 365 Contracts who failed to timely file an Assumed 365 Contract Objection to the assumption and assignment of their respective Assumed 365 Contract(s), including objections to Cure Costs and/or adequate assurance, or failed to raise any other alleged default or breach of contract, shall be deemed to have consented to the assumption and assignment by the Debtors of their respective Assumed 365 Contract(s) to the Purchaser and any such Cure Costs, as set forth in the Cure Notices, and to have waived any other defaults or breaches.  The Assumed 365 Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, without existing default(s), subject only to payment of the Cure Costs, if any, by the Purchaser.  All Assumed 365 Contracts shall remain in full force and effect, without existing default(s), subject only to payment of the appropriate Cure Costs, if any, by the Purchaser; and, for the avoidance of doubt, the Purchaser and the counterparties to the Assumed 365 Contracts shall have all rights and benefits under the Assumed 365 Contracts without the necessity of obtaining any such counterparty's consent to the assumption and/or assignment thereof. The entry of the Confirmation Order and this Sale Approval Order constitutes the consent of the counterparties to the Assumed 365 Contracts to the Debtors' assumption and assignment of such agreements to the Purchaser.

22.     **Cure Costs; Adequate Assurance.**  The Debtors and Purchaser have, to the extent necessary, met all of the requirements of sections 363, 365 and 1123 of the Bankruptcy Code in connection with the sale and assumption and assignment of the Assumed 365 Contracts.  The Purchaser has provided adequate assurance of its future performance under each Assumed 365

US 8817634

Contract within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code (including to the extent, if any, modified by section 365(b)(3) of the Bankruptcy Code). All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment to the Purchaser of the Assumed 365 Contracts have been satisfied.

23.     Payment of the Cure Costs pursuant to the PSA is hereby authorized. Upon Closing, (a) all defaults (monetary and non-monetary) under the Assumed 365 Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs, (b) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Obligations, the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed 365 Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Purchaser, or the Assets that any additional amounts are due or defaults exist under the Assumed 365 Contracts that arose or accrued, or relate to or are attributable to the period before the Closing Date (other than claims against the Purchaser with respect to any Assumed Obligations).

24.     **Anti-Assignment Provisions Unenforceable.** Each and every provision of the Assumed 365 Contracts or applicable non-bankruptcy law that purports to (a) prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning the Debtors' assignment of any Assumed 365 Contracts, including, but not limited to, the conditioning of such assignment on the consent of the counterparty to such Assumed 365 Contracts; (b) authorize the termination, cancellation, or modification of the Assumed 365 Contracts based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, penalties, conditions, renewals, extensions, charges, or other financial

accommodations in favor of the counterparty to the Assumed 365 Contracts, or modification of any term or condition upon the assignment of Assumed 365 Contracts or the occurrence of the conditions set forth in subsection (b) above, shall have no force and effect as against the Purchaser, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code. The Assumed 365 Contracts shall be assigned and transferred to the Purchaser, notwithstanding any provision of the Assumed 365 Contracts prohibiting or otherwise restricting assignment or transfer.

25. **Direction to Assumed 365 Contract Counterparties.** All counterparties to the Assumed 365 Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Debtors or the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents or other documents that may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale, nor shall there be any accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed 365 Contracts.

26. **The Debtors Shall Not Retain Liability for Assumed 365 Contracts and Assumed Obligations.** Effective on the Closing, (a) the assumption of the Assumed 365 Contracts and the Assumed Obligations by the Purchaser constitutes a legal, valid, effective, complete and absolute sale, conveyance and transfer from the Debtors to the Purchaser of any and all obligations, liabilities, and Damages, known or unknown, relating to, in connection with, or arising under the Assumed 365 Contracts and Assumed Obligations and (b) the Debtors shall have no liability to the Purchaser, any governmental agency, surety, or any other creditor or person for

25

US 8817634

any obligations, liabilities, and Damages, with respect to the Assumed 365 Contracts and the Assumed Obligations (which shall, for the avoidance of doubt, include, among other things, all Environmental Liabilities (as defined in the PSA)).

27. In addition, the Debtors, their estates, or any of their predecessors shall have no further liability or obligation for any (a) defaults or breaches under the Assumed 365 Contracts that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (b) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assumed 365 Contracts, that relate to any acts or omissions that arose or occurred prior to the Closing Date.

28. **Assumed 365 Contract Objections.** To the extent a timely filed Assumed 365 Contract Objection remains unresolved following the Sale Hearing, the applicable Assumed 365 Contracts shall be assumed and assigned only upon resolution of the Assumed 365 Contract Objection acceptable to the Debtors and the Purchaser, after notice and a hearing. If an Assumed 365 Contract Objection is not resolved to the satisfaction of the Debtors and the Purchaser, the Purchaser may determine that such Assumed 365 Contract should be rejected and not assigned, in which case such contract shall be deemed rejected as of the Effective Date (as defined in the Plan) pursuant to Article V of the Plan without the need for any further notice to or action, order, or approval of the Court, and neither the Purchaser nor the Debtors will be responsible for any Cure Costs or adequate assurance with respect to such contract. The pendency of a dispute relating to a particular Assumed 365 Contract shall not prevent or delay the assumption and assignment of any other Assumed 365 Contract or the Closing of the Sale.

29. **Consent Rights and Preferential Rights to Purchase.** Because the deadline to file an objection to any assignment of the Assets based on a hard consent in a lease or to exercise

any preferential right to purchase has expired and no objections were timely filed, all holders of consent rights and/or preferential rights with respect to the Assets shall be deemed to have consented to the assignment of any such Assets to the Purchaser and waived any consent right, preferential right to purchase, or any similar right or restraint with respect to such Assets.

30.    **Provisions Regarding Certain Governmental Units.**  Notwithstanding any other provision in the Sale Motion, this Sale Approval Order, the Plan, the Confirmation Order, any Cure Notices, the Bidding Procedures, any assumption documents, the PSA, or any other implementing sale documents (collectively, the "***Documents***") to the contrary, no assumption, sale, assignment and/or transfer of any interests in contracts, leases, covenants, operating rights agreements, rights-of-use and easements, and rights-of-way or other interests or agreements of the Debtors with the United States, including but not limited to, those involving (i) federal land or minerals or (ii) lands or minerals held in trust for federally-recognized Indian tribes or Indian individuals (together, "***Indian Landowners***"); or (iii) held by such Indian Landowners in fee with federal restriction on alienation, (collectively, "***Federal Interests***"), will be effective with respect thereto absent the consent of the United States and any applicable Indian Landowner as provided for in applicable non-bankruptcy laws and regulations.

31.    The Debtors and the Purchaser agree to comply with all applicable non-bankruptcy law with respect to the Federal Interests, and nothing in the Documents shall otherwise affect any decommissioning and financial assurance requirements under the Federal Interests as determined by the United States that must be met by the Debtors and the Purchaser.  Nothing in the Documents shall expand the scope of section 525 of the Bankruptcy Code or confer exclusive jurisdiction upon the Court.  Moreover, nothing in the Documents shall be interpreted to require the United States to novate, approve, or otherwise consent to the assumption, sale, assignment and/or transfer of any

interest in the Federal Interests.  For the avoidance of doubt, in order to obtain the consent of the United States to the assumption, sale, assignment and/or transfer of any interest in a Federal Interest, all existing defaults and liabilities under such Federal Interest, including any outstanding rents, royalties, or other lease obligations known, accrued, or owing  to date, plus any accrued and unpaid interest lawfully chargeable must be paid (*i.e.*, assumed and/or cured, to the extent appropriate), and nothing in the Documents shall be interpreted to set cure amounts for the Federal Interests.  Further, nothing in the Documents shall affect the United States' police and regulatory powers or prohibit or limit its right to draw on any surety bond issued to support Debtors' obligations under the Federal Interests, and all parties, including the Debtors and the Purchaser, reserve and preserve all rights and defenses thereto with respect to such bonds, and the United States' rights to offset or recoup any amounts due thereunder, or relating to, any Federal Interests are expressly preserved.  Nothing herein or in the Documents shall constitute an admission as to any amounts that may be owed with respect to the Federal Interests or otherwise.

32.     Without limiting the foregoing, with respect to Federal Interests with the Department of Interior ("***Interior***"), any challenge to any default required to be cured must be raised in the United States' administrative review process leading to a final agency determination by the Interior.  If the Debtors and/or the Purchaser, as applicable, do not timely pay the cure amounts, if any, when due in the ordinary course pursuant to applicable non-bankruptcy laws, regulations and administrative procedures, the Debtors and/or the Purchaser, as applicable, will pay late payment charges on the untimely payment at the rate established in 30 C.F.R. § 1218.54 to the fullest extent permitted by applicable non-bankruptcy laws and regulations.  For the avoidance of any doubt, the payment of any cure amounts, or any other payment that must be made in connection with the assumption and/or assignment of any the Debtors' interests in the Federal

Interests, shall not release any monetary or non-monetary obligations that are owing by either the Debtors or the Purchaser, as applicable, under applicable laws and regulations other than with respect to the specific monetary obligation being paid.

33. Interior will retain, and have, the right to audit and/or perform any compliance review related to the Federal Interests with Interior to the extent provided under applicable non-bankruptcy law, and if appropriate, to collect from the Debtors and/or the Purchaser any additional monies owed by the Debtors that accrued prior to the sale, assumption, assignment, and/or transfer of the Federal Interest(s), without those rights being adversely affected by these Chapter 11 Cases. The Debtors (and, to the extent of any sale, assumption, assignment, and/or transfer of Federal Interest(s) to the Purchaser with Interior's consent as set forth above, the Purchaser) will retain all defenses and/or rights, other than defenses and/or rights arising from bankruptcy law, to challenge any such determination relating to the Federal Interests; provided, however, that any such challenge, including any challenge associated with these chapter 11 cases and/or Interior's exercise of consent, must be raised in the United States' administrative review process leading to a final agency determination by Interior. The audit and/or compliance review period shall remain open for the full statute of limitations period in accordance with applicable law.

34. **Verde Services, LLC.** Notwithstanding anything to the contrary in the *Second Supplemental Notice to Contract Counterparties and Third-Party Holders of Consent Rights and Preferential Purchase Rights of (I) Potential Assumption and Assignment of Contracts and Leases, and (II) Cure Amounts and Adequate Assurance in Connection Therewith* [Dkt. No. 455], the Plan, this Sale Approval Order or the PSA, the rights of Verde Services, LLC ("***Verde***") with respect to any amounts due Verde for services post-petition rendered from and after the Petition Date and through the Closing Date (the "***Verde Post-Petition Claim***") to or for the benefit of any one or

29

more of the Debtors shall not be impaired, modified, or prejudiced and Verde may seek payment of any unpaid amounts due on account of the Verde Post-Petition Claim as of the Closing Date as an administrative expense claim under section 503(b) of the Bankruptcy Code to the extent any portion of the Verde Post-Petition Claim is not paid by the Debtor in the ordinary course of business or otherwise paid in connection with the assumption and assignment of the Master Services Agreement between Petro Harvester Operating Company, LLC and Verde. All rights and defenses of Verde, the Debtors, the Liquidation Trustee, and the Purchaser, as applicable, are reserved and preserved with respect to the Verde Post-Petition Claim.

35. **Seitel Data, Ltd.** Notwithstanding anything in the Plan, any Plan Supplement, the Confirmation Order, this Sale Approval Order, the PSA, any cure notice, or corresponding documents relating thereto to the contrary, (a) all executory contracts, including, but not limited to that certain *Master Seismic Data Participation and Licensing Agreement* and all supplements, amendments, schedules and attachments thereto (collectively, the "*Seitel Agreements*") between any of the Debtors, on the one hand, and Seitel Data, Ltd., Seitel Data Corp., Seitel Offshore Corp., and any other affiliates (collectively, "*Seitel*"), on the other hand, shall be and hereby are rejected pursuant to section 365 of the Bankruptcy Code as of the date of entry of the Confirmation Order and this Sale Approval Order, (b) the Debtors shall comply with all confidentiality provisions, destruction of data, and verification of destruction of data provisions required by the Seitel Agreements. Nothing in the Plan, any Plan Supplement, the Confirmation Order, this Sale Approval Order, the PSA, any cure notice, or corresponding documents relating thereto may be construed to authorize or permit the transfer of any seismic, geological or geophysical data or intellectual property owned by Seitel.

30

US 8817634

36.     **Archrock Partners Operating, LLC.**  Notwithstanding anything contained in the Plan, any Plan Supplement, Cure Notice, Schedule of Assumed Executory Contracts and Unexpired Leases, this Sale Approval Order, or the Confirmation Order to the contrary, the Archrock Contracts[7] shall constitute Assumed 365 Contracts.  Subject to the terms of the PSA, at Closing, the Debtors shall assume and assign the Archrock Contracts to the Purchaser.

37.     Subject to the occurrence of the Closing, the Debtors and Archrock have agreed, and the Court so orders, that the amount necessary to cure all defaults under the Archrock Contracts for purposes of section 365(a) of the Bankruptcy Code shall be an amount in cash sufficient to satisfy the following:  (i)  the net amount owed by the Debtors to Archrock as of the Petition Date, which the Debtors and Archrock have agreed is $229,365.67 (the "***Archrock Cure Amount***"), plus (ii) the aggregate of all net amounts owed by the Debtors to Archrock pursuant to the terms and conditions of the Archrock Contracts and payable by the Debtors that accrued from the Petition Date through the Effective Time (as defined in the PSA) (the "***Archrock Pre-Effective Time Claim Amount***"); plus (iii) the aggregate of all net amounts owed to Archrock pursuant to the terms and conditions of the Archrock Contracts and payable by the Purchaser as Property Costs (as defined in the PSA) that accrue from the Effective Time through the Closing Date ((ii) and (iii) collectively, the "***Archrock Post-Petition Claim Amount***," and collectively with the Archrock Cure Amount, the "***Archrock Claim Amount***").  To the extent that there are any disputes regarding the Archrock Post-Petition Claim Amount, Archrock may file an Administrative Expense Claim with the Bankruptcy Court, and the rights of Archrock, the Debtors, the Liquidation Trustee, the

---

[7]     "***Archrock Contracts***" means the Master Compression Services Agreement dated April 16, 2013 between Archrock Partners Operating, LLC, f/k/a EXLP Operating Partners LLC ("***Archrock***"), and Petro Harvester Operating Company, LLC, four (4) Schedule "A's" executed by ConocoPhillips Company and one (1) Schedule "A" executed by Denbury Onshore, LLC, as amended, each of which have previously been ratified and assumed by Petro Harvester Operating Company, LLC.

US 8817634

Intercreditor Agent, and the Purchaser with respect to such amounts and Claim are reserved and preserved. Subject to the conditions set forth in the Plan and the Schedule of Potential Other Secured Claims, the estimated Archrock Pre-Effective Time Claim Amount will be included in the Claims Reserve.

38.     If the Closing does not occur, the agreements set forth in the foregoing paragraphs with respect to the Archrock Contracts shall be null and void in all respects, and nothing herein, in the Plan, the Plan Supplement (including the Schedule of Potential Other Secured Claims), or the Confirmation Order, shall: (1) prejudice in any manner the rights of any Debtors, Archrock, or any other party in interest with respect to the Archrock Contracts; or (2) constitute an admission of any sort by any of the Debtors, Archrock, or any other party in interest with respect to the Archrock Contracts. For the avoidance of doubt, notwithstanding anything contained in this paragraph to the contrary, subject to the conditions set forth in the Plan, the Confirmation Order, this Sale Approval Order, and the Schedule of Potential Other Secured Claims, the estimated Archrock Pre-Effective Time Claim Amount, less any portion of such amount distributed on the Effective Date in accordance with the Plan, will be included in the Claims Reserve.

39.     **Daryl G. Peterson and Christine Peterson.** Notwithstanding anything contained in the Plan, Cure Notice, this Sale Approval Order, or the Confirmation Order to the contrary, the Peterson Contracts[8] shall constitute Assumed 365 Contracts and, subject to the occurrence of the Closing, the Debtors shall assume and assign the Peterson Contracts to the Purchaser.

---

[8]     "*Peterson Contracts*" means, collectively, that certain (i) Lease (Bottineau County, ND) – Township 162 North, Range 81 West, dated December 14, 2018, and all amendments and schedules thereto, (ii) Settlement Agreement, by and between Petro Harvester Operating Company, LLC and Daryl G. Peterson and Christine Peterson (the "*Petersons*"), dated December 14, 2018, and all amendments and schedules thereto, and (iii) Salt Water Disposal Agreement, Right-of-Way and Easement, by and between, Petro Harvester Operating Company, LLC and Daryl and Christine Peterson, dated December 14, 2018.

40.     Subject to the occurrence of the Closing, the Debtors and the Petersons have agreed, and the Court so orders, that the amount necessary to cure all defaults under the Peterson Contracts for purposes of section 365(a) of the Bankruptcy Code, shall be an amount in cash sufficient to satisfy the following:  (i) the aggregate of all net amounts owed by the Debtors to the Petersons pursuant to the terms and conditions of the Peterson Contracts that accrued from the Petition Date through the Effective Time (as defined in the PSA); plus (ii) the aggregate of all net amounts owed to the Petersons by the Debtors pursuant to the Peterson Contracts and payable by the Purchaser as Property Costs (as defined in the PSA) that accrued from the Effective Time through the Closing Date ((i) and (ii) collectively, the "***Peterson Post-Petition Claim Amount***").  To the extent that there are any disputes regarding the Peterson Post-Petition Claim Amount, the Petersons may file an Administrative Expense Claim with the Bankruptcy Court, and the rights of the Petersons, the Debtors, the Liquidation Trustee, and the Intercreditor Agent with respect to such amounts and Claim are reserved and preserved.

41.     If the Closing does not occur, the agreements set forth in the foregoing paragraphs with respect to the Peterson Contracts shall be null and void in all respects, and nothing herein, in the Plan, or the Confirmation Order shall: (1) prejudice in any manner the rights of any Debtors, the Petersons, or any other party in interest with respect to the Peterson Contracts; or (2) constitute an admission of any sort by any of the Debtors, the Petersons, or any other party in interest with respect to the Peterson Contracts.

42.     **U.S. Specialty Insurance Company.**  U.S. Specialty Insurance Company ("***USSIC***") has issued various surety bonds on behalf of certain of the Debtors (collectively, the "***Surety Bonds***," and each individually, a "***Surety Bond***").  These Surety Bonds were issued pursuant to certain payment and indemnity agreements and/or related agreements by and between

USSIC, on the one hand, and one or more of the Debtors, certain of their affiliates and certain non-Debtors, as applicable, on the other hand (collectively, the "***Indemnity Agreements***," and each an "***Indemnity Agreement***").

43.    Section 7.12 of the PSA provides that the Purchaser will either "(i) post and provide all Credit Support necessary to consummate the transactions contemplated by [the PSA] and to replace the Credit Support set forth in Schedule 4.13 issued or posted by the Seller Group to any Governmental Authority as may be required to own and operate the Assets following Closing or (ii) execute an indemnity agreement with the surety that has posted such Credit Support to permit the Credit Support to remain in place until Purchaser's replacement Credit Support is obtained, at no cost or liability to the Seller Group."  The Debtors, USSIC, and the Purchaser acknowledge that certain of the Surety Bonds are identified on Schedule 4.13 of the PSA (the "***Identified Surety Bonds***") and will be treated in accordance with Section 7.12 of the PSA.  In accordance with the terms of the PSA, the Purchaser has agreed to execute new Payment and Indemnity Agreements with USSIC in a form satisfactory to USSIC (the "***New Indemnity Agreements***") with regard to the Identified Surety Bonds, to remain in place until replacement Credit Support has been obtained by the Purchaser and the Identified Surety Bonds have been released.  Nothing in the Confirmation Order or this Sale Approval Order shall affect or modify the respective rights and obligations of USSIC and the Purchaser under the New Indemnity Agreements, and the New Indemnity Agreements shall remain in full force and effect from their execution until the Identified Surety Bonds have been released.

44.    Nothing in the Confirmation Order or this Sale Approval Order shall affect, modify, or abridge the obligations of the Purchaser under Section 12.1 of the PSA.  Additionally, to provide further security to USSIC for the Surety Bonds, the Debtors and the Purchaser hereby agree, and

US 8817634

it is so ordered, that USSIC shall be subrogated to the Debtors' rights of indemnification against the Purchaser under Section 12.2 of the PSA to the extent that such right of indemnification relates to actions to collect, receive, recover, and/or be reimbursed from the Purchaser for liabilities related to any Assets that would be covered by the Surety Bonds, and shall be entitled to enforce such rights against the Purchaser as set out in Article 12 of the PSA. Such right of subrogation shall be in addition to all of USSIC's existing rights and remedies related to the Surety Bonds, and nothing in the Confirmation Order or this Sale Approval Order shall be construed to limit or otherwise affect USSIC's other rights and remedies that might exist under applicable law.

45. Nothing, including the Plan, the Confirmation Order, or this Sale Approval Order, shall affect, impair, alter, limit, release, or modify any rights of USSIC, including its rights under any of the Surety Bonds, the Indemnity Agreements, the New Indemnity Agreements, or any other applicable agreement, against Talco Petroleum LLC, White Marlin Operating, LLC, or White Marlin Petroleum, LLC in any way.

46. Nothing in the Plan, the Confirmation Order, this Sale Approval Order, or any document or other agreement or exhibits to the Plan shall be interpreted to alter, diminish, or enlarge the rights or obligations of USSIC or any obligee under the Surety Bonds, nor shall any provision of the Plan be deemed to enjoin or preclude USSIC from asserting any rights or claims against any obligees under such Surety Bonds; *provided*, *however*, that any rights or claims USSIC may have against the Debtors shall be treated in accordance with the terms of the Plan. Nothing in the Plan or this paragraph shall affect in any way USSIC's rights against any non-debtor or any non-debtor's rights against USSIC with regard to the Surety Bonds or any collateral securing the Surety Bonds. Notwithstanding anything to the contrary in the Plan, the Confirmation Order, this Sale Approval Order or otherwise, the Debtors and USSIC reserve all rights and defenses with

US 8817634

respect to any right, claim, interest, or obligation arising under the Surety Bonds, the Indemnity Agreements, the New Indemnity Agreements, or any document related to them.

47.     For the avoidance of doubt, USSIC is deemed to have opted out of the Releases and is not a Releasing Party or a Released Party under the Plan.

48.     **Chevron U.S.A. Inc.** Chevron U.S.A. Inc's, and its affiliates, including without limitation, Texaco Inc. (collectively "***Chevron***"), rights and claims under any Credit Support (or any other financial accommodation) are unaffected by this Sale Approval Order, the PSA, or any other order of the Court. In the event that the Purchaser seeks to replace any of the Credit Support in which Chevron (or any Chevron affiliate) is a beneficiary (or co-beneficiary), Chevron has sole discretion to accept or approve any replacement Credit Support (or any other financial accommodation) in connection with Sections 7.12 and 9.3 of the PSA, or otherwise (provided that nothing herein shall expand the Purchaser's obligations in Section 7.12 of the PSA with respect to any replacement Credit Support).

49.     **Crowell Land and Mineral Corporation.** Notwithstanding anything to the contrary in the PSA, this Sale Approval Order, or the Confirmation Order, the Purchaser is assuming, and shall assume, any and all obligations and liabilities under each mineral lease and contract with Crowell Land and Mineral Corporation ("***CLM***") associated with each mineral lease, contract, and well described in Exhibits A-1, A-2, and A-3 of the CLM Proofs of Claims[9] (collectively, the "***CLM Agreements***"), which leases, contracts, and wells shall constitute "Assets" under the PSA, whether or not set forth on the exhibits to the PSA.

---

[9]     "***CLM Proofs of Claim***" shall mean any proof of claim filed by CLM in the Debtors' chapter 11 cases, including proofs of claims against (i) Rockall Energy Holdings, LLC (Claim No. 575); (ii) Petro Harvester Operating Company, LLC (Claim No. 574); (iii) Rockall LA, LLC (Claim No. 577); and (iv) Rockall Pine Prairie, LLC (Claim No. 576).

50. **Taxing Authorities.** Notwithstanding anything contained in the Plan, any Plan Supplement, this Sale Approval Order, or the Confirmation Order, Dallas County, Texas and the Debtors agree that (i) Dallas County, Texas shall have an Allowed ad valorem tax Claim in the amount of $3,596.38 (the "***Dallas County Claim***"), (ii) Dallas County's liens shall attach to the proceeds of the Sale with the same validity, priority and extent that they attached to the Assets on the Petition Date and (iii) the Debtors shall pay the Dallas County Claim in cash in full on the Effective Date, or as soon thereafter as reasonably practicable. In the event the Dallas County Claim is paid after January 31, 2023, payment will include the actual amount owed for tax year 2022, notwithstanding the amount of the Dallas County Claim set forth herein, plus interest that has accrued at the state statutory rate pursuant to sections 506(b), 511, and 1129 of the Bankruptcy Code.

51. **Steel Reef.** Notwithstanding anything to the contrary in this Sale Approval Order, any Cure Notice, the Plan, the Confirmation Order, or the Plan Supplement, the following agreements shall constitute "Assumed 365 Contracts" within the meaning of the PSA: (i) the Lignite Area Gas Handling Agreement between Petro Harvester Operating Company, LLC ("***Petro Harvester***") and Steel Reef Burke, LLC ("***SRB***"), dated March 1, 2019, as amended; (ii) the Portal Area Gas Handling Agreement between Petro Harvester and Steel Reef Infrastructure Corp. ("***SRIC***"), Steel Reef Pipelines Canada Corp. Steel ("***SRPCC***"), Reef Pipelines US LLC ("***SRPUS***", and collectively with SRB, SRIC, and SRPCC, "***Steel Reef***") and SRB, dated November 13, 2017, as amended; (iii) the Master Natural Gas and NGL Purchase and Sale Agreement between Petro Harvester and SRB, dated March 1, 2019, and any Confirmation thereto as defined therein; and (iv) the Master Crude Oil and NGL Purchase and Sale Agreement between Petro Harvester and SRIC, dated September 24, 2018, and any Confirmation thereto as defined

37

therein (collectively, the "*Steel Reef Agreements*"). Subject to the terms of the PSA, at Closing, the Debtors shall assume and assign the Steel Reef Agreements, to be amended as contemplated by that certain *Letter of Intent Regarding Lignite Area Gas Gathering and Processing Proposal*, dated May 18, 2022, by and between SRB and Formentera Partners Fund I, LP, to the Purchaser.

52. Nothing in this Sale Approval Order, the Plan, the Confirmation Order, the PSA, the Plan Supplement, or any Plan-related document shall impair, condition, limit, release, discharge, enjoin, or otherwise prejudice or diminish in any manner whatsoever Steel Reef's, the Debtors', the Liquidation Trustee's, or the Purchaser's, as applicable, respective rights to setoff, recoup, net, true-up, or otherwise reconcile amounts on account of obligations arising under the Steel Reef Agreements that accrue on or after the Petition Date and through the Closing Date, whether such amounts become due on, prior to, or after the Closing Date.

53. Subject to the occurrence or consummation of the Closing, the Debtors and Steel Reef have agreed, and the Court so orders, that the amount necessary to cure all defaults under the Steel Reef Agreements for purposes of section 365(a) of the Bankruptcy Code shall be an amount in cash sufficient to satisfy the following: (i) the net amount owed by the Debtors to Steel Reef as of the Petition Date, which the Debtors and Steel Reef have agreed is $1,108,754.26 (the "*Petition Date Cure Amount*"); *plus* (ii) the aggregate of all net amounts owed by the Debtors to Steel Reef pursuant to the terms and conditions of the Steel Reef Agreements that accrued from the Petition Date through the Effective Time (as defined in the PSA) (the "*Pre-Effective Time Cure Amount*"); *plus* (iii) the aggregate of all net amounts owed by the Debtors to Steel Reef pursuant to the terms and conditions of the Steel Reef Agreements that accrued from the Effective Time through the Closing Date and that are Property Costs (as defined in the PSA) (the "*Post-Effective Time Purchaser Cure Amount*"); *plus* (iv) the aggregate of all net amounts owed by the Debtors to Steel

US 8817634

Reef pursuant to the terms and conditions of the Steel Reef Agreements that accrued from the Effective Time through the Closing Date and that are not Property Costs (as defined in the PSA) (if any) (the "***Post-Effective Time Debtors Cure Amount***", and collectively with the Post-Effective Time Purchaser Cure Amount, the Pre-Effective Time Cure Amount and the Petition Date Cure Amount, the "***Steel Reef Claim Amount***"). For avoidance of doubt, the Debtors, Petro Harvester (in its capacity as a TSA Entity), or Liquidation Trustee shall pay the Pre-Effective Time Cure Amount, the Post-Effective Time Debtors Cure Amount and the Petition Date Cure Amount to Steel Reef, and the Purchaser shall pay the Post-Effective Time Purchaser Cure Amount to Steel Reef.

54.     For the avoidance of doubt, all fees paid by the Debtors, Petro Harvester (in its capacity as a TSA Entity), the Liquidation Trustee, or the Purchaser, as applicable, to Steel Reef on account of the Steel Reef Agreements, whether prior to or after the Petition Date, and whether by setoff, recoupment, netting or otherwise, shall be retained by Steel Reef, and shall not be subject to avoidance or challenge, whether by the Debtors or any successor thereto, including without limitation the GUC Trust, GUC Trustee, Liquidation Trust and Liquidation Trustee. The Debtors, Petro Harvester (in its capacity as a TSA Entity), the Liquidation Trustee, or the Purchaser, as applicable, shall promptly pay Steel Reef for services provided under the Steel Reef Agreements that have accrued from the Petition Date through the Closing Date, consistent with the terms and conditions of the Steel Reef Agreements and this Sale Approval Order. Subject to the terms of the Steel Reef Agreements, the Debtors, Petro Harvester (in its capacity as a TSA Entity), the Liquidation Trustee, or the Purchaser, as applicable, shall be permitted to set off, recoup, net, and/or otherwise true-up or reconcile against any such amounts owed by Steel Reef to the applicable counterparty to the Steel Reef Agreements through the Closing Date, and Steel Reef

US 8817634

shall be permitted to set off, recoup, net and/or otherwise true-up or reconcile against any amounts owed by the applicable counterparty to the Steel Reef Agreements to Steel Reef, whether such amounts are payable by the Debtors, Petro Harvester (in its capacity as a TSA Entity), the Liquidation Trustee, or the Purchaser; *provided, however*, that (i) the Purchaser may not set off amounts owed by Steel Reef to the Debtors, Petro Harvester (in its capacity as a TSA Entity), or the Liquidation Trustee, as applicable, and (ii) the Debtors, Petro Harvester (in its capacity as a TSA Entity), and the Liquidation Trustee, as applicable, may not set off amounts owed by Steel Reef to the Purchaser.

55.    As soon as practical after the occurrence of the Closing Date, and in accordance with the terms of the Steel Reef Agreements, Petro Harvester (in its capacity as a TSA Entity), the Liquidation Trustee, or the Purchaser, as applicable, and Steel Reef, shall true-up, reconcile and pay all amounts due to Steel Reef for services provided and due to the Debtors on account of gas sales, in each case occurring on or prior to the Closing Date, including through setoff, recoupment, netting, reconciliation or otherwise.  In the event that Steel Reef, Petro Harvester (in its capacity as a TSA Entity), the Liquidation Trustee, or the Purchaser, as applicable, are unable to consensually resolve the amount of the Post-Effective Time Debtors Cure Amount, the Post-Effective Time Purchaser Cure Amount, or the Pre-Effective Time Cure Amount, as applicable, the Bankruptcy Court retains jurisdiction and shall determine the Post-Effective Time Debtors Cure Amount, the Post-Effective Time Purchaser Cure Amount or Pre-Effective Time Cure Amount.  All rights and defenses of the Debtors, Petro Harvester (in its capacity as a TSA Entity),the Liquidation Trustee, Steel Reef, and the Purchaser are reserved and preserved with respect to the calculation of the Post-Effective Time Debtors Cure Amount, the Post-Effective Time Purchaser Cure Amount and the Pre-Effective Time Cure Amount.  If the Closing does not

occur, the agreements set forth in the foregoing paragraphs with respect to the Steel Reef Agreements shall be null and void in all respects, and nothing therein, in the Plan, or the Confirmation Order (including this Sale Approval Order), shall: (1) prejudice in any manner the rights of any Debtors, Steel Reef or any other party in interest with respect to the Steel Reef Agreements; or (2) constitute an admission of any sort by any of the Debtors, Steel Reef, or any other party in interest with respect to the Steel Reef Agreements.

56. **Ford Motor Credit Company LLC.** Notwithstanding anything contained in the Plan, any Plan Supplement, Cure Notice, Schedule of Assumed Executory Contracts and Unexpired Leases, this Sale Approval Order, or the Confirmation Order to the contrary, the Ford Motor Leases[10] shall constitute Assumed 365 Contracts.

57. **A2D Technologies, Inc.** Notwithstanding anything in the Plan, any Plan Supplement, the Confirmation Order, this Sale Approval Order, the PSA, any cure notice, or corresponding documents relating thereto to the contrary (but subject to the proviso set forth in this sentence): (a) all executory contracts, including, but not limited to that certain *Master License Agreement for Geological Data* dated September 21, 2018, and all supplements, amendments, schedules and attachments thereto that may be in effect (collectively, the "***TGS Agreements***") between any of the Debtors, on the one hand, and A2D Technologies, Inc. d/b/a TGS Geological Products and Services ("***TGS***"), on the other hand, shall be and hereby are rejected pursuant to section 365 of the Bankruptcy Code effective as of the Effective Date of the Plan, (b) the Debtors shall comply with all destruction of data and verification of destruction of data provisions required by the TGS Agreements within ten (10) business days of the Effective Date, and (c) nothing in the

---

[10] "***Ford Motor Leases***" shall mean the (i) Master Lease Agreement dated February 28, 2016, between Petro Harvester Operating Company, LLC and Ford Motor Credit Company LLC, including any amendments and schedules thereto, and (ii) the lease agreements identified as contract numbers 733, 734, 735, 736, 737, 738, 739, 740, 1968, and 1969 of the *Amended Assumed 365 Contracts Schedule* [Dkt. No. 547, Ex. A].

Plan, any Plan Supplement, the Confirmation Order, this Sale Approval Order, the PSA, any cure notice, or corresponding documents relating thereto may be construed to authorize or permit the transfer of any seismic, geological or geophysical data or intellectual property owned by TGS; *provided, however*, that if the Purchaser elects for the TGS Agreements to be assumed and assigned to the Purchaser in accordance with the PSA, the TGS Agreements shall be assumed by the Debtors and assigned to the Purchaser effective as of the Effective Date of the Plan pursuant to terms mutually acceptable to the Debtors, TGS, and the Purchaser. As adequate assurance of future performance under the TGS Agreements, the Purchaser agrees to comply with all of the obligations of the TGS Agreements, including but not limited to, all confidentiality provisions, destruction of data and verification of destruction of data provisions required by the TGS Agreements. If the Purchaser elects for the TGS Agreements to be assumed and assigned to the Purchaser in accordance with the PSA, the Debtors shall file a notice on the docket of the Court indicating the same.

58. **Failure to Specify Provisions.** The failure specifically to include any particular provisions of the PSA or any related agreements in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors, and the Purchaser that the PSA and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Sale Approval Order.

59. **Provisions Non-Severable.** The provisions of this Sale Approval Order are non-severable and mutually dependent.

60. **Binding Order**. This Sale Approval Order, which is part of the Confirmation Order, and the PSA shall be binding in all respects upon the Debtors, their estates, all creditors of,

US 8817634

and holders of equity interests in, the Debtors, any holders of Liens, Claims, and/or Interests in, against, or on all or any portion of the Assets (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code, and the PSA shall not be subject to rejection or avoidance under any circumstances. This Sale Approval Order and the PSA shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and assigns, including the Liquidation Trust (as defined in the Plan).

61. **No Material Modification.** The PSA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

62. **No Bulk Sales.** No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale, this Sale Approval Order, or the PSA.

63. **Final Order.** The Confirmation Order and this Sale Approval Order together constitute a final order within the meaning of 28 U.S.C. § 158(a).

64. **No Stay of Order.** This Sale Approval Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. Time is of the essence in Closing the Sale. Accordingly, sufficient cause has been shown to waive the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d). Any party objecting to this Sale Approval Order must

43

exercise due diligence in filing an appeal, pursuing a stay and obtaining a stay prior to the Closing or risk its appeal being foreclosed as moot.

65. **Retention of Jurisdiction.** The Court shall retain jurisdiction to: (a) interpret, implement and enforce the terms and provisions of the Plan, the Confirmation Order, this Sale Approval Order, and the PSA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, in all respects; and (b) to decide any disputes concerning the Plan, the Confirmation Order, the Sale, this Sale Approval Order, and the PSA, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Sale, this Sale Approval Order, and the PSA, including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Assets and any Assumed 365 Contracts and all issues and disputes arising in connection with the relief authorized herein.

66. **Governing Terms.** To the extent this Sale Approval Order is inconsistent with the Confirmation Order or any prior order or pleading in these chapter 11 cases, with respect to any Sale-related provisions, the terms of this Sale Approval Order shall govern. To the extent there is any inconsistency between the terms of this Sale Approval Order and the terms of the PSA (including all ancillary documents executed in connection therewith), the terms of this Sale Approval Order shall govern.

# EXHIBIT 1

**Purchase and Sale Agreement**

**PURCHASE AND SALE AGREEMENT**

by and among

**the Persons listed on <u>Schedule S</u>**

**Individually each a Seller and collectively, as Sellers,**

**and**

**Formentera Partners Fund I, LP,**

**as Purchaser**

Dated as of May 20, 2022

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................. 1

    Section 1.1    Certain Definitions ........................................................................... 1
    Section 1.2    Interpretation ................................................................................. 31

ARTICLE 2 PURCHASE AND SALE ............................................................................... 32

    Section 2.1    Purchase and Sale ......................................................................... 32
    Section 2.2    Purchase Price ............................................................................... 32
    Section 2.3    Deposit .......................................................................................... 32
    Section 2.4    Adjustments to Unadjusted Purchase Price ................................. 32
    Section 2.5    Procedures ..................................................................................... 34
    Section 2.6    Closing Payment and Post-Closing Adjustments ......................... 35
    Section 2.7    Costs and Revenues ...................................................................... 37
    Section 2.8    Allocation of Purchase Price ........................................................ 38
    Section 2.9    Withholding .................................................................................. 39

ARTICLE 3 TITLE AND ENVIRONMENTAL MATTERS .............................................. 39

    Section 3.1    Sole and Exclusive Remedies for Title and Environmental Matters ............... 39
    Section 3.2    Defects; Adjustments .................................................................... 39

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................... 46

    Section 4.1    Existence and Qualification .......................................................... 47
    Section 4.2    Power ............................................................................................ 47
    Section 4.3    Authorization and Enforceability ................................................. 47
    Section 4.4    No Conflicts .................................................................................. 47
    Section 4.5    Litigation ...................................................................................... 47
    Section 4.6    Taxes ............................................................................................ 48
    Section 4.7    Compliance with Laws ................................................................. 48
    Section 4.8    Material Contracts ........................................................................ 48
    Section 4.9    Consents, Preferential Rights and Tag-Along Rights ................... 49
    Section 4.10    Outstanding Capital Commitments ............................................. 49
    Section 4.11    Imbalances ................................................................................... 49
    Section 4.12    Wells ............................................................................................ 49
    Section 4.13    Credit Support .............................................................................. 49
    Section 4.14    Leases ........................................................................................... 50
    Section 4.15    Non-Consent Operations .............................................................. 50
    Section 4.16    Environmental Matters ................................................................. 50
    Section 4.17    Hedges .......................................................................................... 50
    Section 4.18    Employee Benefit Plans ............................................................... 50
    Section 4.19    Employment Matters .................................................................... 51
    Section 4.20    Permits ......................................................................................... 51
    Section 4.21    No Transfer .................................................................................. 51

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................... 52

i

Section 5.1     Existence and Qualification ........................................................... 52
Section 5.2     Power .............................................................................................. 52
Section 5.3     Authorization and Enforceability .................................................... 52
Section 5.4     No Conflicts .................................................................................... 52
Section 5.5     Consents, Approvals or Waivers ..................................................... 52
Section 5.6     Defense Production Act .................................................................. 53
Section 5.7     Litigation ........................................................................................ 53
Section 5.8     Bankruptcy ..................................................................................... 53
Section 5.9     Financing ........................................................................................ 53
Section 5.10    Investment Intent ............................................................................ 53
Section 5.11    Qualification ................................................................................... 53
Section 5.12    Independent Evaluation .................................................................. 53

ARTICLE 6 DISCLAIMERS AND ACKNOWLEDGEMENTS ...................................... 54

Section 6.1     General Disclaimers ........................................................................ 54
Section 6.2     Environmental Disclaimers ............................................................. 55
Section 6.3     Calculations, Reporting and Payments ........................................... 56
Section 6.4     Changes in Prices; Well Events ...................................................... 56
Section 6.5     Limited Duties ................................................................................ 57
Section 6.6     Operatorship of the Assets ............................................................. 57
Section 6.7     Conspicuousness ............................................................................ 57

ARTICLE 7 COVENANTS OF THE PARTIES .............................................................. 57

Section 7.1     Access ............................................................................................ 57
Section 7.2     Operation of Business .................................................................... 60
Section 7.3     Available 365 Contracts ................................................................. 62
Section 7.4     Consent, Preferential Right and Tag-Along Right Notices ............ 64
Section 7.5     Consents to Assignment ................................................................. 65
Section 7.6     Preferential Rights ......................................................................... 65
Section 7.7     Tag-Along Rights ........................................................................... 66
Section 7.8     Casualty and Condemnation .......................................................... 67
Section 7.9     Closing Efforts and Further Assurances ......................................... 67
Section 7.10    Notifications ................................................................................... 67
Section 7.11    Liability for Brokers' Fees ............................................................. 68
Section 7.12    Credit Support ............................................................................... 68
Section 7.13    Employee Matters .......................................................................... 68
Section 7.14    Expenses; Filings, Certain Governmental Approvals and Removal of
                Names ............................................................................................ 70
Section 7.15    Records .......................................................................................... 71
Section 7.16    Sale Order and Auction .................................................................. 71
Section 7.17    Seismic Fees .................................................................................. 72

ARTICLE 8 CONDITIONS TO CLOSING ..................................................................... 73

Section 8.1     Conditions of Sellers to Closing .................................................... 73
Section 8.2     Conditions of Purchaser to Closing ............................................... 74

ARTICLE 9 CLOSING ..................................................................................................... 74

Section 9.1    Time and Place of Closing ............................................................ 74
Section 9.2    Obligations of Sellers at Closing ................................................. 75
Section 9.3    Obligations of Purchaser at Closing ............................................ 76

ARTICLE 10 TAX MATTERS .......................................................................... 77

Section 10.1    Asset Taxes .............................................................................. 77
Section 10.2    Transfer Taxes and Recording Fees ......................................... 78
Section 10.3    Cooperation .............................................................................. 78
Section 10.4    Existing Tax Partnerships. ....................................................... 78
Section 10.5    Tax Returns .............................................................................. 78

ARTICLE 11 TERMINATION .......................................................................... 79

Section 11.1    Termination ............................................................................... 79
Section 11.2    Effect of Termination ............................................................... 80

ARTICLE 12 INDEMNIFICATION; LIMITATIONS .................................... 82

Section 12.1    Assumption ............................................................................... 82
Section 12.2    Seller Group's Indemnification Rights ..................................... 83
Section 12.3    Survival ..................................................................................... 83
Section 12.4    Exclusive Remedy and Certain Limitations ............................ 84
Section 12.5    Indemnification Actions ........................................................... 85
Section 12.6    Express Negligence/Conspicuous Manner ............................... 87

ARTICLE 13 MISCELLANEOUS ................................................................... 88

Section 13.1    Notices ...................................................................................... 88
Section 13.2    Governing Law ......................................................................... 89
Section 13.3    Venue and Waiver of Jury Trial ............................................... 89
Section 13.4    Headings and Construction ...................................................... 90
Section 13.5    Waivers ..................................................................................... 90
Section 13.6    Severability ............................................................................... 91
Section 13.7    Assignment ............................................................................... 91
Section 13.8    Entire Agreement ..................................................................... 91
Section 13.9    Amendment ............................................................................... 92
Section 13.10   No Third-Person Beneficiaries ................................................. 92
Section 13.11   Non-Recourse Persons .............................................................. 92
Section 13.12   Limitation on Damages ............................................................ 93
Section 13.13   Deceptive Trade Practices Act ................................................. 93
Section 13.14   Time of the Essence; Calculation of Time ............................... 93
Section 13.15   Sellers' Representative ............................................................. 93
Section 13.16   Counterparts ............................................................................. 94

**EXHIBITS**:

| | |
|---|---|
| Exhibit A | Assets |
| Exhibit A-1 | Leases |
| Exhibit A-2 | Wells |
| Exhibit A-3 | Future Wells |
| Exhibit A-4 | Rights of Way |
| Exhibit A-5 | Realty Interests |
| Exhibit A-6 | Inventory and Equipment |
| Exhibit A-7 | Vehicles |
| Exhibit A-8-A | O&G Contracts |
| Exhibit A-8-B | Carbon Contracts |
| Exhibit B | Forms of Recordable Conveyance |
| Exhibit C | Form of Closing Certificates |
| Exhibit C-1 | Form of Seller Closing Certificate |
| Exhibit C-2 | Form of Purchaser Closing Certificate |
| Exhibit D | Form of Resignation of Operator |
| Exhibit E | Form of Sale Order |
| Exhibit F | Form of Transition Services Agreement |
| Exhibit G | Form of Letter in Lieu |
| Exhibit H | Form of Mineral Deed |

**SCHEDULES**:

| | |
|---|---|
| Schedule 1.1(a) | Excluded Assets |
| Schedule 1.1(b) | Seller Knowledge Persons |
| Schedule 1.1(c) | Excluded Liabilities |
| Schedule 1.1(d) | Subject Formation |
| Schedule 1.1(e) | Sale Area |
| Schedule 1.1-PE | Permitted Encumbrances |
| Schedule 2.4(h)(iii) | Prepaid Property Costs |
| Schedule 2.4(h)(iv) | Unreimbursed Property Costs |
| Schedule 2.8 | Allocated Values |
| Schedule 4.4 | No Conflicts |
| Schedule 4.5 | Litigation |
| Schedule 4.6 | Taxes |
| Schedule 4.7 | Compliance with Laws |
| Schedule 4.8(a) | Material Contracts |
| Schedule 4.8(b) | Certain Material Contract Matters |
| Schedule 4.9 | Consents, Preferential Rights and Tag-Along Rights |
| Schedule 4.10 | Outstanding Capital Commitments |
| Schedule 4.11 | Imbalances |
| Schedule 4.12 | Wells |
| Schedule 4.13 | Credit Support |
| Schedule 4.14(a) | Leases |
| Schedule 4.14(b) | Drilling Commitments |
| Schedule 4.15 | Non-Consent Operations |

Schedule 4.17        Hedges
Schedule 4.18        Benefit Plans
Schedule 4.21        Transfers
Schedule 7.2         Operation of Business
Schedule 7.3         365 Contracts
   Part 1            Available 365 Contracts
   Part 2            Unavailable 365 Contracts
Schedule S           Seller Entities

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "***Agreement***"), is dated as of May 20, 2022 ("***Execution Date***"), by and among the Persons listed on <u>Schedule S</u> (each individually a "***Seller***" and collectively, the "***Sellers***"), and Formentera Partners Fund I, LP, a Delaware limited partnership ("***Purchaser***"). Each Seller and Purchaser are sometimes referred to individually as a "***Party***" and collectively as the "***Parties***."

WHEREAS, the Sellers desire to sell, and Purchaser desires to purchase, those certain interests in oil and gas properties, rights and related assets that are defined and described as "***Assets***" herein.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confessed, the Parties agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1    **Certain Definitions**. As used herein:

"***365 Contract***" means each Contract that is an executory contract that may be rejected by operation of Sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable.

"***AAA***" means the American Arbitration Association.

"***Accounting Principles***" is defined in <u>Section 2.5(a)</u>.

"***Accounting Referee***" is defined in <u>Section 2.6(b)</u>.

"***Adjusted Purchase Price***" is defined in <u>Section 2.2</u>.

"***Affiliate***" means, with respect to any Person, a Person that directly or indirectly controls, is controlled by or is under common control with such Person, with control in such context meaning the ability to direct the management or policies of a Person through ownership of voting shares or other securities, pursuant to a written agreement, or otherwise.

"***Agreement***" is defined in the introductory paragraph hereof.

"***Allocated Value***" means, (a) with respect to the Subject Formation as to each Well or Future Well, the portion of the Unadjusted Purchase Price allocated on <u>Schedule 2.8</u> to each such Well or Future Well and (b) as to the other Assets listed on <u>Schedule 2.8</u>, the portion of the Unadjusted Purchase Price allocated to each such Asset on <u>Schedule 2.8</u>, in each case of (a) and (b), as such amount shall be increased or decreased by the portion of each applicable adjustment to the Unadjusted Purchase Price under <u>Section 2.4(a)</u>.

"***Allocation***" is defined in <u>Section 2.8</u>.

"***Assets***" means all of the Sellers' aggregate right, title and interest in and to the following (but reserving unto the Sellers and expressly excluding from the "Assets" any and all Excluded Assets):

(a) all Hydrocarbon leases, overriding leasehold royalties, leasehold reversionary interests, leasehold net profit interests, leasehold production payments, other royalty and other interests payable out of production of Hydrocarbons from or allocated to the foregoing, fee minerals, mineral servitudes, non-participating royalty interests, lessor royalties and other lessor rights under any oil and gas leases (including reversionary rights and rights to bonus, delay rentals and other payments), appurtenant surface rights with respect to the foregoing interests, executive rights and any other similar interests in, or rights to produce, Hydrocarbons and minerals in place, in each case, to the extent located within the Sale Area, including those interests described on <u>Exhibit A-1</u> (such leases and other interests, collectively, the "***Leases***"), together with all pooled, communitized or unitized acreage attributable to or allocated to all or part of any of the Leases, together with any and all tenements, hereditaments and appurtenances arising out of or derived from any of the Leases;

(b) any and all Hydrocarbon, water, $CO_2$ (but excluding any CO2 injection wells that constitute a "***Carbon Storage Well***"), injection, disposal or other wells located on, under, or within the Sale Area or any lands allocated to the Leases, including those wells described on <u>Exhibit A-2</u> (the "***Wells***" and, together with the Leases, the "***Oil and Gas Properties***"), in each case whether producing, non-producing or permanently or temporarily Plugged and Abandoned;

(c) all (i) Hydrocarbons in, on, under or that may be produced from or attributable to the Oil and Gas Properties on or after the Effective Time, (ii) Hydrocarbon inventories including all oil, condensate, and scrubber liquids and ethane, propane, iso-butane, nor-butane and gasoline inventories of the Sellers from the Oil and Gas Properties in storage or constituting linefill as of the Effective Time, and (iii) all Imbalances as of the Effective Time (the economic transfer of which shall be made by a financial adjustment pursuant to <u>Section 2.4(g)</u> and the physical transfer of which shall occur on the Closing Date);

(d) to the extent assignable, all easements, permits, licenses, servitudes, rights of way, surface leases and other rights to use the surface, in each case to the extent located within the Sale Area or appurtenant to, to the extent used or held for use in connection with, the ownership or operation of the Oil and Gas Properties, including the property described on <u>Exhibit A-4</u> (the "***Rights of Way***");

(e) all fee surface interests located within the Sale Area, including those described on <u>Exhibit A-5</u> (the "***Realty Interests***");

(f) all tank batteries, pipelines, metering facilities, tubular inventory, valves, laydown yards, interconnections and other equipment, machinery, facilities, fixtures and

other tangible personal property and improvements, flowlines, gathering lines, casing, rods, tanks, boilers, buildings, tubing, pumps, motors, compression equipment, processing and separation facilities, structures, materials, SCADA system assets and Well equipment (both surface and subsurface) located within the lands burdened by or allocated to the Leases, that are used in transporting or processing Hydrocarbons produced from the Oil and Gas Properties, including the inventory and other equipment described on Exhibit A-6 (the "*Equipment*");

(g)     all data, core and fluid samples and other engineering, geological or geophysical studies (including seismic data, studies and information), all proprietary or confidential geologic, seismic, geophysical and interpretative data and analyses, including any and all interpretations of any of the foregoing and other similar information and records, in each case relating to the Oil and Gas Properties;

(h)     all Assumed 365 Contracts, to the extent pertaining to the Sale Area and/or the other "Assets";

(i)     to the extent assignable and following the termination and expiration of the Transition Services Agreement, all leased and owned vehicles described on Exhibit A-7 (the "*Vehicles*");

(j)     all Contracts described on Exhibit A-8-A (to the extent, and only to the extent, each such Contract set forth therein is finally determined by the Bankruptcy Court not to be a 365 Contract), in each case to the extent binding on the Oil and Gas Properties, Rights of Way and/or the Realty Interests (but only to the extent applicable to the Oil and Gas Properties, Rights of Way and/or the Realty Interests) (such Contracts, the "*Required O&G Contracts*" and together with the Assumed 365 Contracts described in subclause (h) of this definition, the "*Assumed O&G Contracts*");

(k)     all franchises, licenses, permits, approvals, consents, certificates and other authorizations and rights granted by Third Parties that relate to, or arise from, the other Assets, or the ownership or operation thereof, including any of the foregoing required under Environmental Law, relating to the Carbon Sequestration Assets, or relating to the generation of environmental credits or attributes;

(l)     except as set forth on Schedule 1.1(a), any offices, office leases and any personal property including personal computers, computer servers, computer hardware, phones, cellular phones, radios and similar equipment and property, located in or on such offices or office leases;

(m)     subject to Section 7.15, (i) originals of the Records that relate solely to the Assets and are in the possession of the Sellers and (ii) copies of the Records that relate to both the Assets and any Excluded Asset;

(n)     all rights, claims and causes of action (including all audit rights, rights of indemnity, set-off or refunds and any and all rights and interests of the Sellers under any policy or agreement of insurance) of the Sellers to the extent such rights, claims or causes of action relate to or cover (i) any Casualty Losses or (ii) Assumed O&G Contracts, Leases

-3-

or other instruments of claims of any Seller or any Affiliate of Seller to the extent attributable to (x) periods from and after the Effective Time (including claims for adjustments or refunds) or (y) the Assumed Obligations (but excluding any such rights insofar as they pertain to matters related to the Excluded Liabilities and Avoidance Actions which are solely covered by subsection (o) below);

(o)      except (i) as otherwise released pursuant to the Sale Order, (ii) for any claims, rights or causes of action of any Sellers arising under Chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law related to Excluded Assets and (iii) to the extent set forth in the Plan, all Avoidance Actions (other than Avoidance Actions against Krewe Energy, LLC and its Affiliates); *provided* that such Avoidance Actions shall be deemed waived effective as of the Closing; and

(p)      the Carbon Sequestration Assets.

"*Asset Taxes*" means ad valorem, property, excise, severance, production, sales, use, and similar Taxes based upon or measured by the acquisition, ownership or operation of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom, but excluding, for the avoidance of doubt, Income Taxes and Transfer Taxes.

"*Assumed 365 Contract*" means each Available 365 Contract that Purchaser has elected to assume in accordance with Section 7.3.

"*Assumed Carbon Contracts*" is defined in subsection (i) of the definition of "Carbon Sequestration Assets."

"*Assumed Contracts*" means the Assumed O&G Contracts and the Assumed Carbon Contracts.

"*Assumed O&G Contracts*" is defined in subsection (j) of the definition of "Assets."

"*Assumed Obligations*" is defined in Section 12.1.

"*Auction*" means the auction for the sale of the Assets, if any, to be conducted in accordance with the Bidding Procedures.

"*Available 365 Contract*" means each 365 Contract set forth on Part 1 of Schedule 7.3, but excluding all Unavailable 365 Contracts.

"*Avoidance Action*" means any claim, right or cause of action of any Sellers arising under Chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law relating to the Assets, Assumed Obligations, or Assumed Contracts.

"*Backup Bidder*" means the bidder for the Assets with the next-highest or otherwise second-best bid for the Assets as determined in accordance with the Bidding Procedures.

"*Bankruptcy Code*" means Title 11 of the United States Code.

"**_Bankruptcy Court_**" means the United States Bankruptcy Court for the Northern District of Texas Fort Worth Division.

"**_Barrel_**" means forty-two (42) United States standard gallons of two hundred and thirty-one (231) cubic inches per gallon at sixty degrees (60°) Fahrenheit.

"**_Bidding Procedures_**" means the Bidding Procedures attached to the Bidding Procedures Order under the heading "Bidding and Auction Process."

"**_Bidding Procedures Order_**" means the _Order (I) Approving Bidding Procedures, (II) Scheduling the Bid Deadline and the Auction, (III) Scheduling Hearing and Objection Deadlines With Respect to the Sale, (IV) Approving the Form and Manner of Notice Thereof, (V) Approving Contract Assumption and Assignment Procedures, and (VI) Granting Related Relief_ Docket No. 91 entered by the Bankruptcy Court on March 14, 2022 approving the Bidding Procedures, as such order may be amended, supplemented or modified from time to time.

"**_BTU_**" means a British Thermal Unit, which is the amount of energy required to raise the temperature of one pound avoirdupois of water from fifty-nine degrees (59°) Fahrenheit to sixty degrees (60°) Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

"**_Business Day_**" means any day other than a Saturday, a Sunday, or a day on which banks are closed for business in Dallas, Texas.

"**_Carbon Equipment_**" is defined in <u>subsection (c)</u> of the definition of "Carbon Sequestration Assets."

"**_Carbon Leases_**" is defined in <u>subsection (a)</u> of the definition of "Carbon Sequestration Assets."

"**_Carbon Rights of Way_**" is defined in <u>subsection (e)</u> of the definition of "Carbon Sequestration Assets."

"**_Carbon Sequestration Assets_**" means all of the Sellers' aggregate right, title and interest in and to the following (but reserving unto the Sellers and expressly excluding from the "Carbon Sequestration Assets" any and all Excluded Assets):

(a) all leases, leasehold reversionary interests and other leasehold rights, fee minerals, mineral servitudes and other surface or subsurface interests, leases and/or servitudes or other rights to use the surface located in the Sale Area (collectively, the "**_Carbon Leases_**"), limited, however, to the Subject Formation, to the extent primarily used or held for use for the injection, disposal, and permanent sequestration of $CO_2$ and associated gases, substances and vapors (collectively referred to as "**_Gas_**") (collectively, the "**_Carbon Sequestration Lands_**"), together with all pooled, communitized or unitized acreage attributable to or allocated to all or part of any of the Carbon Sequestration Lands, together with any and all tenements, hereditaments and appurtenances arising out of or derived from any of the Carbon Sequestration Lands;

(b) all Gas (including $CO_2$ to the extent not attributable to an Oil and Gas Property) injection, disposal, and sequestration projects, including, without limitation, all

injection, disposal and other wells, in each case, located on the Carbon Sequestration Lands, in each case, whether active or permanently or temporarily Plugged and Abandoned (collectively, the "***Carbon Storage Wells***" and together with the Carbon Sequestration Lands, the "***Carbon Sequestration Properties***");

(c)     all pipelines, facilities, roads, fixtures, structures, metering facilities, interconnections and other equipment, machinery, facilities, fixtures and other tangible personal property and improvements, flowlines, gathering lines, casing, rods, tanks, boilers, buildings, tubing, pumps, motors, compression equipment, processing and separation facilities, structures, materials, SCADA system assets and Carbon Storage Well equipment (both surface and subsurface) located within the lands burdened by or allocated to the Carbon Leases, that are primarily used in transporting or processing Gas stored at the Carbon Sequestration Properties (the "***Carbon Equipment***");

(d)     all pipelines, flowlines and gathering lines on or below the surface of the Carbon Sequestration Lands to the extent used or held for use in connection with the transportation of Gas to the Carbon Storage Wells or across the Carbon Sequestration Lands;

(e)     to the extent assignable, all easements, permits, licenses and rights of way, in each case to the extent located within the Sale Area or appurtenant to, and primarily used or primarily held for use in connection with, the ownership or operation of the other Carbon Sequestration Assets (collectively, the "***Carbon Rights of Way***");

(f)     all franchises, licenses, permits, approvals, consents, certificates and other authorizations and rights granted by Third Parties that relate to, or arise from, the Carbon Sequestration Assets not described in this <u>subsection (f)</u>, or the ownership or operation thereof;

(g)     all data, core and fluid samples and other engineering, geological or geophysical studies (including seismic data, studies and information), all proprietary or confidential geologic, seismic, geophysical and interpretative data and analyses, including any and all interpretations of any of the foregoing and other similar information and records, in each case relating to the Carbon Sequestration Assets;

(h)     all Assumed 365 Contracts, to the extent associated with the Carbon Sequestration Properties and/or the other Carbon Sequestration Assets (but only to the extent applicable to the Carbon Sequestration Properties and/or the other Carbon Sequestration Assets);

(i)     all Contracts described on Exhibit A-8-B (to the extent, and only to the extent, each such Contract set forth therein is finally determined by the Bankruptcy Court not to be a 365 Contract), in each case to the extent binding on the Carbon Sequestration Properties (but only to the extent applicable to the Carbon Sequestration Properties) (such Contracts, the "***Required Carbon Contracts***" and together with the Assumed 365 Contracts described in subclause (e) of this definition, the "***Assumed Carbon Contracts***"); and

-6-

(j)     all rights, claims and causes of action (including all audit rights, rights of indemnity, set-off or refunds and any and all rights and interests of the Sellers under any policy or agreement of insurance) of the Sellers to the extent such rights, claims or causes of action relate to or cover (i) any Casualty Losses (ii) Assumed Carbon Contracts, Carbon Leases or other instruments of claims of any Seller or any Affiliate of Seller to the extent attributable to (x) periods from and after the Effective Time (including claims for adjustments or refunds) or (y) the Assumed Obligations (but excluding any such rights insofar as they pertain to matters related to the Excluded Liabilities and Avoidance Actions).

"*Carbon Sequestration Lands*" is defined in subsection (a) of the definition of "Carbon Sequestration Assets."

"*Carbon Sequestration Properties*" is defined in subsection (b) of the definition of "Carbon Sequestration Assets."

"*Carbon Storage Wells*" is defined in subsection (b) of the definition of "Carbon Sequestration Assets."

"*Cash and Cash Equivalents*" means (a) money, currency or a credit balance in a deposit account at a financial institution, net of checks outstanding as of the time of determination, (b) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, (c) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, (d) commercial paper issued by any bank or any bank holding company owning any bank and (e) certificates of deposit or bankers' acceptances issued by any commercial bank organized under the applicable Laws of the United States of America.

"*Casualty Loss*" is defined in Section 7.8.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended.

"*Chapter 11 Case*" means, collectively, the voluntary cases commenced by the Sellers in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code on March 9, 2022, jointly administered under the caption *In re: Rockall Energy Holdings, LLC, et al.*, Case No. 22-90000 (MXM).

"*Claim Notice*" is defined in Section 12.5(a).

"*Closing*" is defined in Section 9.1.

"*Closing Date*" is defined in Section 9.1.

"*Closing Payment*" means the amount of cash consideration payable by Purchaser to the Sellers' Representative at the Closing, which shall be an amount equal to the remainder of (a) the Sellers' Representative's good faith estimate of the Adjusted Purchase Price as determined

pursuant to Section 2.6(a) *minus* (b) the Deposit *minus* (c) the Defect Escrow Amount (if any) *minus* (d) the amounts deposited into the Escrow Account pursuant to Section 2.6(a).

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Confidentiality Agreement***" means that certain Confidentiality Agreement dated as of March 6, 2022 by and between Rockall Energy Holdings, LLC and Formentera Partners, LP, as may be amended from time to time.

"***Consent***" means any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authorities or any other Person, in each case, which are required to be obtained, made or complied with, or otherwise applicable to, for or in connection with the sale, assignment or transfer of any Assets, in each case, in connection with the transactions contemplated hereunder, in each case after giving effect to Sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code.

"***Contract Notices***" is defined in Section 7.3(b).

"***Contracts***" means any and all contracts, agreements, and instruments that are binding on the Properties or other Assets, the Purchaser (after Closing) or that relate to the ownership or operation of the Properties or other Assets (but only to the extent applicable to the Properties or other Assets), including operating agreements, unitization, pooling, and communitization agreements, declarations and orders, area of mutual interest agreements, joint venture agreements, farmin and farmout agreements, exchange agreements, purchase and sale agreements, and other contracts pursuant to which any Seller acquired interests in any other Assets, vehicle leases, office leases, transportation agreements, agreements for the sale and purchase of Hydrocarbons, and processing agreements, but excluding any contracts, agreements, and instruments included within the definition of "Excluded Assets"; *provided*, *however*, without limiting the instruments included in the Assets, the defined term "Contracts" shall not include the Leases, and other instruments constituting any Seller's chain of title to the Properties, the Carbon Sequestration Lands, Rights of Way or Realty Interests.

"***Controlled Group Liabilities***" means any and all Damages, obligations or liabilities of the Sellers or any of its respective ERISA Affiliates (a) under Title IV of ERISA, including, without limitation, withdrawal liability (as such term is defined under ERISA), (b) under Sections 206(g), 302 or 303 of ERISA, (c) under Sections 412, 430, 431, 436 or 4971 of the Code, (d) as a result of the failure to comply with the continuation of coverage requirements of Section 4980B of the Internal Revenue Code and Title I, Subtitle B, Part 6 of ERISA, and (e) under corresponding or similar provisions of any foreign Laws.

"***Conveyances***" is defined in Section 9.2(c).

"***COPAS***" means the COPAS 2005 Accounting Procedure recommended by the Council of Petroleum Accountants Societies, as interpreted by the Council of Petroleum Accountants Societies of North America under MFI-51 2005 COPAS Accounting Procedure.

"***Credit Support***" means any cash deposits, guarantees, letters of credit, treasury securities, surety bonds and other forms of credit assurances or credit support.

"***Cure Costs***" is defined in <u>Section 7.3(a)</u>.

"***Customary Consent***" means any Consent that is not a Required Consent.

"***Cut-Off Date***" means the date on which the final calculation of the Adjusted Purchase Price is finally agreed to or determined pursuant to the terms of <u>Section 2.6(b)</u>.

"***Damages***" means the amount of any actual loss, cost, cost of settlement, damage, expense, claim, award or judgment incurred or suffered by any Indemnified Person arising out of or resulting from the indemnified matter, whether attributable to personal injury or death, property damage, contract claims, torts or otherwise, including reasonable fees and expenses of attorneys, consultants, accountants or other agents and experts reasonably incident to matters indemnified against, the costs of investigation or monitoring of such matters, and the costs of enforcement of the indemnity; *provided*, *however*, that "Damages" shall not include (a) any Taxes that may be assessed on payments under <u>Article 12</u> or (b) any damages that are waived, released or restricted under <u>Section 13.12</u>.

"***Deduct Amounts***" means any (a) Royalties paid by or paid on behalf of a Seller, (b) gathering, processing, and transportation costs paid by or on behalf of a Seller in connection with sales of Hydrocarbons (including any and all pro rata amounts paid or otherwise deducted from the proceeds of such sales pursuant to the applicable contracts) and (c) Property Costs that are deducted by the applicable purchasers of production.

"***Defect***" means any Environmental Defect or Title Defect.

"***Defect Amount***" is defined in <u>Section 3.2(d)</u>.

"***Defect Deadline***" is defined in <u>Section 3.2(a)</u>.

"***Defect Deductible***" means an amount equal to three percent (3.0%) of the Unadjusted Purchase Price.

"***Defect Escrow Amount***" means an amount equal to the positive remainder, if any, of (a) the aggregate Defect Amounts with respect to all alleged Title Defects and Environmental Defects (after giving effect to <u>Section 3.2(f)(i)</u> and the exclusion of any Assets subject thereto pursuant to <u>Section 3.2(g)(ii)</u>) asserted by Purchaser pursuant to one or more valid Defect Notices prior to the Defect Deadline *minus* (b) the Defect Deductible *minus* (c) the aggregate amount of all Defect Amounts with respect to any and all Title Defects and Environmental Defects and, in each case, the Defect Amounts with respect thereto, that the Sellers and Purchaser have agreed upon prior to Closing and that the Sellers have not elected to cure pursuant to <u>Section 3.2(c)</u>.

"***Defect Notice***" is defined in <u>Section 3.2(a)</u>.

"***Defect Referee***" is defined in <u>Section 3.2(i)(i)</u>.

"***Defect Threshold***" means, (a) with respect to Title Defects, the Title Defect Threshold and (b) with respect to Environmental Defects, the Environmental Defect Threshold.

"***Defensible Title***" means that aggregate record and/or contractual title (to the extent such contractual title is arising from (x) interests held pursuant to elections made under joint operating agreements, (y) other interests held pursuant to applicable Law on account of forced pooling arrangements or pooling under the terms of Leases, Contracts or operation of Law or (z) interests to or by which Hydrocarbon production from such Well is attributable or allocated to the extent related to a production sharing agreement, allocation agreement or other tract or production allocation arrangement) of the Sellers, in and to, the Wells and Future Wells with a positive Allocated Value, that, as of the Effective Time and Closing Date and subject to and except for Permitted Encumbrances:

(a)  as to the applicable Subject Formation, entitles the Sellers in the aggregate to receive a Net Revenue Interest as to Hydrocarbons, in the case of any Well or Future Well, not less than the Net Revenue Interest percentage shown for such Subject Formation as to such Well in Exhibit A-2 or such Future Well in Exhibit A-3, as applicable; except, in each case, (A) any decreases in connection with those operations in which any Sellers may elect after the Execution Date to be a non-consenting co-owner in accordance with the terms hereof, (B) any decreases resulting from reversion of interest to co-owners with respect to operations in which such co-owners elect, after the Execution Date, not to consent, (C) any decreases resulting from the establishment or amendment, after the Execution Date, of pools or units in accordance with the terms hereof, (D) any decreases required to allow other Working Interest owners to make up or settle Imbalances or (E) as otherwise stated in Exhibit A;

(b)  as to the applicable Subject Formation as to each Well in Exhibit A-2 or Future Well in Exhibit A-3, obligates the Sellers to bear an aggregate Working Interest no greater than the Working Interest shown for such Subject Formation as to such Well in Exhibit A-2 or such Future Well in Exhibit A-3, except, in each case, (i) as stated in Exhibit A, (ii) any increases resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements or applicable Law or (iii) increases that are accompanied by at least a proportionate increase in the Sellers' Net Revenue Interest in such Subject Formation; and

(c)  is Free and Clear.

"***Deposit***" is defined in Section 2.3(a).

"***Direct Claim***" is defined in Section 12.5(f).

"***Disclosure Schedules***" means the aggregate of all schedules that set forth exceptions, disclosures or otherwise relate to or are referenced in any of the representations or warranties of the Sellers set forth in Article 4.

"***Dispute***" is defined in Section 13.3(a).

"***Disputed Matters***" is defined in Section 3.2(i)(i).

"***DTPA***" is defined in Section 13.13.

"*Effective Time*" means 12:01 a.m. Central Time on May 1, 2022.

"*Employee Transfer Date*" is defined in Section 7.13(a).

"*Employees*" is defined in Section 7.13(a).

"*Environmental Defect*" means any violation of any Environmental Laws at or with respect to any of the Properties or any other condition (including any Release of Hazardous Substances) that presently requires (or if known, would require) Remediation under applicable Environmental Laws; *provided, however*, the following conditions, matters, Releases and Environmental Liabilities shall be excluded from and in no event constitute an "Environmental Defect": (a) the presence or absence of NORM except to the extent constituting a current violation of Environmental Laws or currently requiring Remediation under Environmental Laws, (b) Plugging and Abandonment obligations or liabilities (except to the extent constituting a current violation of, or for which corrective action is presently required by, Environmental Laws); (c) the flaring of natural gas or other gaseous Hydrocarbons except to the extent constituting a current violation of Environmental Laws or currently requiring Remediation under Environmental Laws, (d) any condition, matter, Release or Environmental Liability disclosed in the Disclosure Schedules, (e) the physical condition of any surface or subsurface equipment (including water or oil tanks, separators or other ancillary equipment), except with respect to equipment that causes or has caused environmental pollution, contamination or degradation that presently requires Remediation under Environmental Laws or (f) any Environmental Liabilities under any Environmental Law, franchise, license, permit, approval, consent, certificate or other authorization that does not presently require Remediation or constitute a current violation of Environmental Laws.

"*Environmental Defect Threshold*" means an amount equal to One Hundred Thousand Dollars ($100,000).

"*Environmental Laws*" means the following: CERCLA; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 *et seq.*; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j, the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (regarding Hazardous Substances), in each case as amended in effect as of the Execution Date, and all similar Laws in effect as of the Closing Date issued by any Governmental Authority having jurisdiction over the Properties addressing (i) pollution or pollution control; (ii) protection of natural resources, the environment or biological resources; (iii) the disposal or Release or threat of Release of, or exposure to, Hazardous Substances; and (iv) public or worker health or safety (regarding exposure to Hazardous Substances).

"*Environmental Liabilities*" means any and all Damages, Remediation obligations, liabilities, environmental response costs, costs to cure, cost to investigate or monitor, restoration costs, costs of Remediation or removal, settlements, penalties and fines arising out of or related to any violations of, liability under, or non-compliance with, any Environmental Laws, including any

contribution obligation under CERCLA or any other Environmental Law or matters incurred or imposed pursuant to any claim or cause of action by a Governmental Authority or other Person, attributable to any Environmental Defects, any failure to comply with Environmental Laws, any Release of Hazardous Substances or any other environmental condition with respect to the ownership or operation of Assets.

"*Environmental Referee*" is defined in Section 3.2(i)(i).

"*Equipment*" is defined in subsection (f) of the definition of "Assets."

"*Escrow Agent*" means JPMorgan Chase Bank, N.A.

"*Escrow Agreement*" means that certain Escrow Agreement, dated as of the date hereof, among the Parties and the Escrow Agent, as such may be amended, supplemented or replaced from time to time.

"*Excluded Assets*" means:

(a)     all proceeds of the Unadjusted Purchase Price delivered to the Sellers pursuant to this Agreement;

(b)     all rights, claims and/or causes of action of the Sellers under this Agreement or any other Transaction Document;

(c)     all Cash and Cash Equivalents of the Sellers;

(d)     all right, title and interest to the properties and assets (including personal property) of any Seller or any Affiliate of any Seller described on Schedule 1.1(a);

(e)     all right, title and interest of Sellers not specifically described or included in the definition of "Assets";

(f)     the Excluded Records;

(g)     Assets excluded from this Agreement pursuant to Section 3.2(g)(ii), Section 7.5 or Section 7.6;

(h)     all franchises, licenses, permits, approvals, consents, certificates and other authorizations and rights granted by Third Parties to the extent relating primarily to, or arising primarily from, any other Excluded Assets, or the ownership or operation thereof;

(i)     except to the extent pertaining to any Assumed Obligations, all trade credits, accounts, receivables and other proceeds, income or revenues attributable to the Assets with respect to any period of time prior to the Effective Time;

(j)     all Suspense Funds attributable to the production of Hydrocarbons at or prior to the Effective Time;

(k)      all Suspense Funds attributable to the production of Hydrocarbons for which the Unadjusted Purchase Price is adjusted downwards pursuant to Section 2.4;

(l)      except to the extent pertaining to any Assumed Obligations, any indemnity rights, rights under any Contracts and all claims and causes of action of any Seller or any Affiliate of Seller against any Third Party to the extent related or attributable to, periods on or prior to the Closing Date (including claims for adjustments or refunds) or for which any Seller is liable for payment or required to indemnify any Person (in each case whether or not such claims are pending or threatened as of the Execution Date or the Closing Date);

(m)      all of each Seller's proprietary computer software, patents, trade secrets, copyrights, logos, trademarks, trade names and other intellectual property;

(n)      all proceeds of Hydrocarbons produced and sold from the Assets with respect to all periods prior to the Effective Time except (i) proceeds from such Hydrocarbons for which the Adjusted Purchase Price is adjusted under Section 2.4(g)(iii) and (ii) the Hydrocarbons expressly identified in subpart (c) of the definition of "Assets";

(o)      any and all claims for refunds of, credits attributable to, loss carryforwards with respect to or similar Tax assets relating to (i) Asset Taxes paid or economically borne by any Seller, (ii) Income Taxes imposed on any Seller, (iii) Taxes attributable to the Excluded Assets and (iv) any other Taxes relating to the acquisition, ownership or operation of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom paid or economically borne by any Seller;

(p)      except to the extent pertaining to any Assumed Obligations, all claims, rights and interests of the Sellers or Affiliates of the Sellers (i) under any policy or agreement of insurance or indemnity agreement, (ii) under any bond or security instrument or (iii) as to any condemnation proceeds or awards arising from acts, omissions or events prior to the Effective Time (excluding, in each case of (i) through (iii), the claims, rights and interests described in subpart (n) of the definition of "Assets");

(q)      except to the extent pertaining to any Assumed Obligations, all audit rights and claims for reimbursements from Third Parties for any and all Property Costs, overhead or joint account reimbursements and revenues associated with all joint interest audits and other audits of any (i) Excluded Assets or (ii) Property Costs under any Contracts or under Law covering periods prior to the Effective Time or for which any Seller is, in whole or in part, entitled to receive an adjustment under Section 2.4;

(r)      all Contracts other than the Assumed Contracts;

(s)      all Third Party COPAS reimbursement payments owed or payable to any Seller attributable to any periods of time at or prior to the Effective Time;

(t)      all Hedges and proceeds thereof;

(u)     any shares of capital stock or other equity interest of any Seller or of any Seller subsidiaries or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller or any Seller's subsidiaries;

(v)     all claims, rights or causes of action of any Sellers arising under Chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law relating to the Excluded Assets;

(w)     all prepayments, good faith and other deposits submitted by any Third Party under the terms of the Bidding Procedures Order;

(x)     all "cash collateral" as defined in Section 363 of the Bankruptcy Code and any other collateral or dollar amounts, in each instance, securing any obligations under any 365 Contracts or securing any obligations, Credit Support or credit support obligations (including letters of credit) securing any obligations of any Seller or any of its Affiliates;

(y)     all claims, refunds, credits, abatements, variances, allocations, causes of action (including any and all avoidance, fraudulent transfer, preference or similar claims, causes of action, rights or proceedings of any Seller, including, under Chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act enacted by any state, or any other similar state or Federal law), claims for relief, choses in action, rights of recovery, rights of set-off, bond or security, security interests, lien rights, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses, rights and interests under any policy or agreement of insurance or indemnity, audit rights and claims for reimbursements (excluding, in each case the claims, rights and interests described in subpart (n) of the definition of "Assets"); and

(z)     all rights, claims or causes of action by or in the right of the Sellers or their Affiliates against any current or former director or officer of any Seller or any of their respective Affiliates.

"*Excluded Liabilities*" means with respect to any Seller, any Damages, obligations or liabilities constituting, related to or arising out of any of the following:

(a)     Indebtedness of such Seller;

(b)     any Property Costs attributable to periods prior to the Effective Time (other than Property Costs that are taken into account pursuant to Section 2.4) and all accrued expenses and accounts payable attributable to periods prior to the Effective Time;

(c)     death or physical injury to any employees of such Seller or any Third Party related to or arising out of such Seller's ownership or operation of the Assets and occurring prior to the Closing Date;

(d)     claims for compensation or reimbursement of such Seller's employees for work performed for such Seller prior to the Employee Transfer Date (but excluding any Property Costs) or the termination of employment prior to the Employee Transfer Date of any employee of such Seller;

(e)     the accounting for, failure to pay or the incorrect payment of any and all Royalties attributable to the sale of Hydrocarbons or injection and/or storage of Gas insofar as the same are attributable to periods and Hydrocarbons produced and marketed with respect to the Assets prior to the Effective Time, in each case, to the extent not attributable to Suspense Funds;

(f)     Controlled Group Liabilities;

(g)     Seller Taxes;

(h)     any Excluded Assets;

(i)     other than with respect to Taxes, any civil fines or penalties or criminal fines, penalties or sanctions arising out of, in respect of or in connection with the failure by the Sellers to comply with any Law (including Environmental Laws) or judgment or order of any Governmental Authority on or prior to the Closing to the extent relating to the Assets and arising from or related to acts or omissions existing or occurring on or prior to the Closing;

(j)     all liabilities of Sellers to any owner or former owner of capital stock or warrants, or holder of indebtedness for borrowed money;

(k)     any matters set forth on Schedule 4.5, or that should have been set forth on Schedule 4.5;

(l)     any Environmental Liabilities arising out of the transportation, disposal, or arrangement therefor of any Hazardous Substances off the premises of the Assets by or on behalf of Sellers prior to the Closing; or

(m)     the matters set forth on Schedule 1.1(c).

"**_Excluded Records_**" means any and all:

(a)     copies of any records and information to which Purchaser is entitled hereunder (including under Section 7.15);

(b)     corporate, financial, Income Tax and legal data and Records of any Seller that relate primarily to any Seller's business generally (whether or not relating to the Assets or Excluded Assets), or to businesses of any Seller and any Affiliate of such Seller other than the exploration and production of Hydrocarbons;

(c)     data, software and records to the extent disclosure or transfer is restricted, prohibited or subjected to payment of a fee, penalty or other consideration by any license agreement or other agreement with a Person other than Affiliates of any Seller, or by applicable Law, and for which no consent to transfer has been received (provided that Sellers shall use commercially reasonable efforts to obtain any such consent or approval, but without requiring Sellers to pay any fee or assume any obligation for such consent or

approval) or for which Purchaser has not agreed in writing to pay such fee, penalty or other consideration, as applicable;

(d) legal records and legal files of any Seller, including all work product of and attorney-client communications with any Seller's legal counsel or any other documents or instruments that may be protected by an attorney-client privilege, but excluding any title opinions covering the Properties;

(e) all legal privileges, engagements and similar letters and agreements with any Seller's legal advisors, including all rights to claim, own or waive any attorney-client privilege or other privilege in favor of any Seller or any Affiliates of any Seller;

(f) data, correspondence, materials, documents, descriptions and records relating to the auction, marketing, sales negotiation or sale of any Seller or any of the Assets, including the existence or identities of any prospective inquirers, bidders or prospective purchasers of any of the Assets, any bids received from and records of negotiations with any such prospective purchasers and any analyses of such bids by any Person;

(g) all employee and personnel files except for those files required to be provided to Purchaser pursuant to applicable Law for Transferred Employees;

(h) any reserve reports, valuations and estimates of any quantities of Hydrocarbons or the valuation thereof with respect to the Oil and Gas Properties, and any Hydrocarbon or other pricing assumptions, forward Hydrocarbon, Gas or other pricing estimates, Hydrocarbon, Gas or price decks, or Hydrocarbon, Gas or pricing studies related thereto, in each case whether prepared by any Seller, its Affiliates or any Third Parties;

(i) data and records to the extent relating to the other Excluded Assets; and

(j) emails and similar electronic files.

"*Execution Date*" is defined in the introductory paragraph hereof.

"*Existing Tax Partnership*" means any tax partnership set forth on Schedule 4.6.

"*Final Order*" means any award, decision, decree, settlement, order, injunction, ruling, judgment or consent of or entered, issued, made or rendered by any Governmental Authority as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"*Free and Clear*" means free and clear of all claims, Liens, damages, obligations, liabilities, losses, costs and expenses other than the Assumed Obligations and Permitted Encumbrances, in each case to the maximum extent permitted by Sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code.

"*Future Wells*" means those future well locations set forth on Exhibit A-3.

-16-

"***Gas***" is defined in <u>subsection (a)</u> of the definition of "Carbon Sequestration Assets."

"***Governing Documents***" means with respect to any Person that is not a natural person, the articles of incorporation or organization, memorandum of association, articles of association and by-laws, the limited partnership agreement, the partnership agreement or the limited liability company agreement or such other formation and organizational documents of such Person.

"***Governmental Authority***" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States, any foreign country or any domestic or foreign state, county, city, tribe, quasi-governmental entity or other political subdivision or authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power.

"***Hazardous Substances***" means any substances, material or waste defined as "hazardous waste," "hazardous substance" or "hazardous material" or otherwise regulated under, or for which liability may be imposed pursuant to, applicable Environmental Laws, including hazardous substances under CERCLA, petroleum and petroleum byproducts, asbestos, toxic mold, per- and polyfluoroalkyl substances, polychlorinated biphenyls, and radioactive materials; *provided*, *however*, NORM shall not constitute a "Hazardous Substance".

"***Hedge***" means any future hedge, derivative, swap, collar, put, call, cap, option or other contract that is intended to benefit from, relate to, or reduce or eliminate the risk of fluctuations in interest rates, basis risk or the price of commodities, including Hydrocarbons or securities, to which any Seller, its Affiliates or the Oil and Gas Properties are bound.

"***Highest or Best Proposal***" shall mean any bona fide proposal or offer to or from a Person other than Purchaser or its representatives with respect to (a) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Assets, or (b) any other direct or indirect acquisition involving the Assets, that, in each case, Sellers' Representative has determined in good faith, after consultation with its outside financial advisors and outside legal counsel, would, if consummated, result in the highest or otherwise best transaction for the Sellers, taking into account all terms thereof, including (w) the type and amount of assets sought to be purchased; (x) the amount of the purchase price and nature of the payment thereof; (y) the prospective purchaser's ability to consummate the transactions and the timing thereof; and (z) the effect on the Sellers' ability to wind down their estates in accordance with applicable Law.

"***Hire Date***" is defined in <u>Section 7.13(a)</u>.

"***Hydrocarbons***" means oil and gas and other hydrocarbons produced or processed in association therewith (whether or not such item is in liquid or gaseous form), or any combination thereof, and any minerals (whether in liquid or gaseous form) produced in association therewith, including all crude oil, gas, casinghead gas, condensate, natural gas liquids, and other gaseous or liquid hydrocarbons (including ethane, propane, iso-butane, nor-butane, gasoline, and scrubber liquids) of any type and chemical composition.

"*__Imbalance__*" means any over-production, under-production, over-delivery, under-delivery or similar imbalance of Hydrocarbons produced from or allocated to the Assets, regardless of whether such over-production, under-production, over-delivery, under-delivery or similar imbalance arises at the wellhead, pipeline, gathering system, transportation system, processing plant or other location, including any imbalances under gas balancing or similar agreements, processing agreements and/or gathering or transportation agreements.

"*__Income Taxes__*" means (i) all Taxes based upon, measured by, or calculated with respect to gross or net income, gross or net receipts or profits (including franchise Taxes and any capital gains, alternative minimum and net worth Taxes, but excluding ad valorem, property, excise, severance, production, sales, use, real or personal property transfer or other similar Taxes), (ii) Taxes based upon, measured by or calculated with respect to multiple bases (including corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based, measured by, or calculated with respect to is included in clause (i) above, or (iii) withholding Taxes measured with reference to or as a substitute for any Tax included in clauses (i) or (ii) above.

"*__Indebtedness__*" means, with respect to any Person, at any date, without duplication, (a) all obligations of such Person for borrowed money, including all principal, interest, premiums, fees, expenses, overdrafts and, to the extent required to be carried on a balance sheet prepared in accordance with the Accounting Principles penalties with respect thereto, whether short-term or long-term, and whether secured or unsecured, or with respect to deposits or advances of any kind (other than deposits and advances of any Person relating to the purchase of products or services from the Sellers or their Affiliates in the ordinary course of business), (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or debt securities, (c) all obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit or bankers' acceptances or similar instruments, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all guarantees, whether direct or indirect, by such Person of indebtedness of others or indebtedness of any other Person secured by any assets of such Person and (f) all other obligations of a Person which would be required to be shown as indebtedness on a balance sheet of such Person prepared in accordance with the Accounting Principles.

"*__Indemnified Person__*" means the applicable member of the Seller Group seeking or entitled to indemnification under this Agreement.

"*__Initial Contract Notices__*" is defined in Section 7.3(b).

"*__Knowledge__*" means, with respect to Sellers, the actual conscious knowledge, without any duty or obligation of investigation or inquiry, of only those Persons named on Schedule 1.1(b).

"*__Laws__*" means all laws (including common law), statutes, rules, regulations, ordinances, orders, decrees, requirements, judgments and codes of Governmental Authorities.

"*__Leases__*" is defined in subsection (a) of the definition of "Assets."

"*__Lien__*" means any lien, mortgage, pledge, charge, collateral assignment or security interest, of any kind (including any agreement to give any of the foregoing, any conditional sale or other

title retention agreement) and any option, trust, or other preferential arrangement having the practical effect of any of the foregoing.

"*Liquidating Trust*" means a liquidating or similar trust as may be established with respect to the Sellers' estates in conjunction with the Chapter 11 Case.

"*Liquidating Trustee*" means the trustees or other representatives of the Liquidating Trust.

"*Material Adverse Effect*" means any event, change or circumstance that has had, or is reasonably likely to have, individually, or in the aggregate, a material adverse effect on (a) the ownership, operation or financial condition of the Assets, taken as a whole, as currently operated as of the Execution Date or (b) the ability of Sellers to consummate the transactions contemplated by this Agreement, or to perform the Sellers' obligations and covenants hereunder that are to be performed at Closing; *provided*, *however*, that "Material Adverse Effect" shall not include a material adverse effect resulting from (i) general changes in Hydrocarbon or other commodity prices; (ii) changes in condition or developments generally applicable to the oil and gas industry in the United States or any areas where the Assets are located that do not disproportionately affect any Seller or the Assets as compared to similarly situated oil and gas assets (or owners thereof) in the same geographic area; (iii) economic, financial, credit or political conditions and general changes in markets that do not disproportionately affect any Seller or the Assets as compared to similarly situated oil and gas assets (or owners thereof) in the same geographic area; (iv) Casualty Losses or acts of God, including naturally occurring events, hurricanes, tornados, meteorological events and storms; (v) orders, acts or failures to act of Governmental Authorities (unless such order, act, or failure is the result of any Seller's or its Affiliate's action or inaction); (vi) civil unrest or similar disorder, terrorist acts or any outbreak of hostilities or war; (vii) epidemics, pandemics (including COVID-19) or other similar health emergencies; (viii) any reclassification or recalculation of reserves; (ix) changes in Laws or the Accounting Principles; (x) effects or changes that are cured or no longer exist by the earlier of the Closing and the termination of this Agreement pursuant to Article 11, including matters to the extent a downward adjustment to the Unadjusted Purchase Price is provided for in this Agreement; (xi) any effect resulting from any action taken by Purchaser or any Affiliate of Purchaser, other than those expressly permitted in accordance with the terms of this Agreement; (xii) action taken by the Sellers or any Affiliate of the Sellers with Purchaser's written consent or that are otherwise prescribed or expressly contemplated hereunder; (xiii) natural declines in well performance; (xiv) entering into this Agreement or the announcement of the transactions contemplated hereby; (xv) any matters, facts, or disclosures set forth in the Disclosure Schedules; (xvi) the pendency of the Chapter 11 Case; (xvii) any objections in the Bankruptcy Court to (A) this Agreement and/or the other Transaction Documents and the transactions contemplated hereby and thereby, (B) the reorganization of the Sellers and any related plan of reorganization or disclosure statement, (C) the Bidding Procedures or the sale motion or (D) the assumption or rejection of any Contract; and/or (xviii) any order of the Bankruptcy Court (except any such order that would preclude or prohibit the Sellers from consummating the transactions contemplated by this Agreement) or any actions or omissions of the Sellers in compliance therewith.

"*Material Contract*" means, to the extent binding on the Assets or Purchaser's ownership thereof after Closing, any Contract that is one or more of the following types or that (a) in the case of subsections (ii) or (iii), below, can reasonably be expected to result in gross revenue per fiscal

year in excess of One Hundred Fifty Thousand Dollars ($150,000.00) or (b) in the case of subsection (ii) below, can reasonably be expected to result in expenditures per fiscal year in excess of One Hundred Fifty Thousand Dollars ($150,000.00), in each case, net to the aggregate interests of the Sellers:

        (i)     Contracts with any Affiliate of the Sellers that will not be terminated on or prior to Closing;

        (ii)     Contracts for the sale, purchase, exchange or other disposition of Hydrocarbons or Gas produced from or delivered to the Assets that (A) are not cancellable without penalty to the Sellers, their Affiliates or their permitted successors and assigns, on at least sixty (60) days' prior written notice or (B) obligate the Sellers by virtue of any material take or pay payment, advance payment, production payment or other similar material payment (other than Royalties established in any Leases or any such obligations reflected on Exhibit A), to deliver Hydrocarbons or Gas, or proceeds from the sale thereof, attributable to the Sellers' interest in the Assets at some future time without receiving payment therefor at or after the time of delivery of such Hydrocarbons or Gas;

        (iii)     to the extent currently pending, Contracts of the Sellers to sell, lease, farmout, exchange or otherwise dispose of all or any part of the Properties after Closing, but excluding right of reassignment upon intent to abandon any such Property;

        (iv)     Contracts containing any area of mutual interest agreements or similar provisions;

        (v)     any Contract that constitutes an operating agreement, farmout agreement, farmin agreement, joint development agreement, participation agreement or similar agreement, pooling agreement or allocation agreement;

        (vi)     Contracts for the gathering, treatment, processing, storage or transportation of Hydrocarbons or Gas that (A) contain guaranteed or minimum throughput, minimum volume or similar requirements or (B) that are not cancellable without penalty on sixty (60) days' or less prior written notice;

        (vii)     any Contract that is a farmout or farmin agreement, joint venture agreement, term assignment, participation agreement, exploration agreement or development agreement;

        (viii)     any Contract that constitutes an Existing Tax Partnership;

        (ix)     any Contract that (i) provides for a call upon, option to purchase or similar right under any agreements with respect to the Hydrocarbons or Gas produced from or delivered to the Assets, (ii) contains "take or pay" or similar provisions, or (iii) contains any "minimum volume commitment" or "minimum revenue commitment" or similar obligations; and

(x)     any Contract that constitutes a Hedge.

"***Mineral Deed***" is defined in Section 9.2(l).

"***MMBtu***" means one million (1,000,000) BTU.

"***Net Revenue Interest***" means, with respect to any Well or Future Well, the percentage interest in and to all production of Hydrocarbons saved, produced and sold from or allocated to such Well or Future Well, after giving effect to all Royalties.

"***Non-Recourse Person***" is defined in <u>Section 13.11</u>.

"***NORM***" means naturally occurring radioactive material, radon gas and asbestos.

"***Notice***" is defined in <u>Section 13.1</u>.

"***Oil and Gas Properties***" is defined in <u>subsection (b)</u> of the definition of "Assets."

"***Outside Date***" means July 5, 2022.

"***Party***" or "***Parties***" is defined in the introductory paragraph hereof.

"***Permitted Encumbrances***" means any or all of the following:

(a)     all Royalties if the net cumulative effect of such burdens do not, individually or in the aggregate, (i) materially interfere with the ownership and/or operation of the Assets as currently owned and operated; (ii) reduce the Sellers' Net Revenue Interest in the applicable Subject Formations as to each Well or Future Well below that shown in <u>Exhibit A-2</u> for such Well or <u>Exhibit A-3</u> for such Future Well, as applicable; or (iii) obligate Sellers to bear a Working Interest with respect to any Well or Future Well in an amount greater than the Working Interest set forth on <u>Exhibit A-2</u> for such Well or <u>Exhibit A-3</u> for such Future Well (unless the Net Revenue Interest for such Well or Future Well is greater than the Net Revenue Interest set forth on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, in the same proportion as any increase in such Working Interest) (each, a "***Negative Title Effect***");

(b)     the terms of any (i) Assumed 365 Contract, Lease or Right of Way, including provisions for penalties, suspensions, or forfeitures contained therein solely to the extent such terms would not result in a Negative Title Effect and (ii) any Contract that is a Rejected 365 Contract;

(c)     any action, suits or proceedings described on <u>Schedule 4.5</u>;

(d)     all (i) rights of first refusal, preferential purchase rights and similar rights with respect to the Assets or (ii) consents, notice requirements and similar restrictions;

(e)     Liens created under the terms of the Leases, Rights of Way, Realty Interests or the Contracts, Liens for Taxes, materialman's Liens, warehouseman's Liens, workman's

Liens, carrier's Liens, mechanic's Liens, vendor's Liens, repairman's Liens, employee's Liens, contractor's Liens, operator's Liens, construction Liens, Liens pursuant to any applicable federal or state securities Law, and other similar Liens arising in the ordinary course of business that, in each case, secure amounts or obligations (i) owed by Persons other than a Seller or any predecessor in interest of a Seller or (ii) not yet delinquent (including any amounts being withheld as provided by Law), or, if delinquent, being contested in good faith by appropriate actions and are set forth on <u>Schedule 1.1 - PE</u> and, will be permanently and fully extinguished with respect to the Assets pursuant to the Sale Order;

(f)     unless the same have been triggered, rights of reassignment arising upon the expiration or final intention to abandon or release any of the Assets;

(g)     any easement, right of way, covenant, servitude, permit, surface lease, condition, restriction and other rights included in or burdening the Assets for the purpose of surface or subsurface operations, roads, alleys, highways, railways, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines, removal of timber, grazing, logging operations, canals, ditches, reservoirs and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, in each case, to the extent recorded in the applicable Governmental Authority recording office as of the Execution Date solely to the extent the same would not result in a Negative Title Effect;

(h)     all applicable Laws and rights reserved to or vested in any Governmental Authorities (i) to control or regulate any of the Assets in any manner, (ii) to assess Taxes with respect to the Assets, the ownership, use or operation thereof or revenue, income or capital gains with respect thereto, (iii) by the terms of any right, power, franchise, grant, license or permit, or by any provision of Law, to terminate such right, power, franchise grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any of the Assets, (iv) to use any property in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated as of the Execution Date or (v) to enforce any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit;

(i)     rights of any (i) owner or lessee of any oil and gas interests in formations, strata, horizons or depths other than the Subject Formation or (ii) common owner of any interest in Rights of Way or Realty Interests currently held by a Seller and such common owner as tenants in common or through common ownership or by contract solely to the extent the effect of such rights would not result in a Negative Title Effect;

(j)     calls on production under existing Contracts; *provided*, that the holder of such right must pay an index-based price for any production purchased by virtue of such call on production;

(k)     (i) failure to record Leases, Rights of Way or Realty Interests issued by any Governmental Authority in the real property, conveyance, or other records of the county in

-22-

which such Leases, Rights of Way or Realty Interests are located, *provided*, that the instruments evidencing the conveyance of such title to such Seller from its immediate predecessor in title are recorded with the Governmental Authority that issued any such Lease or Right of Way; or (ii) delay or failure of any Governmental Authority to approve, record or reflect the assignment of any Oil and Gas Property to a Seller or any predecessor in title to such Seller unless the same has been expressly denied or rejected in writing by such Governmental Authority;

(l)     any other Liens, defects, burdens or irregularities which are based solely on (i) a lack of information in a Seller's files or of record, (ii) references to any document if a copy of such document is not in such Seller's files or of record, (iii) the inability to locate an unrecorded instrument of which Purchaser has constructive or inquiry notice by virtue of a reference to such unrecorded instrument in a recorded instrument (or a reference to a further unrecorded instrument in such unrecorded instrument), if no claim has been made under such unrecorded instruments within the last ten (10) years or (iv) any Lien or instrument that will be or is released, avoided or rejected with respect to the Assets pursuant to the Sale Order;

(m)     lack of (i) Contracts or rights for the transportation or processing of Hydrocarbons produced from the Assets, (ii) any rights of way for gathering or transportation pipelines or facilities that do not constitute any of the Assets, or (iii) in the case of a well or other operation that has not been commenced as of the Closing Date, any permits, easements, rights of way, pooling or operating agreements, unit designations, or production or drilling units not yet obtained, formed or created;

(n)     any Liens, defects, irregularities or other matters expressly described on Exhibit A or the Disclosure Schedules or that are expressly waived in writing by Purchaser prior to Closing;

(o)     the terms and conditions of this Agreement, or any other Transaction Document;

(p)     Liens created under deeds of trust, mortgages and similar instruments by the lessor under a Lease covering the lessor's surface and mineral interests in the land covered thereby to the extent such mortgages, deeds of trust or similar instruments (i) do not contain express language that prohibits the lessors from entering into an oil and gas lease or otherwise invalidates an oil and gas lease and (ii) no mortgagee or lienholder of any such deeds of trust, mortgage and similar instrument has, prior to the Defect Deadline, initiated foreclosure or similar proceedings against the interest of lessor in such Lease nor has any Seller received any written notice of default under any such mortgage, deed of trust or similar instrument;

(q)     lack of a division order or an operating agreement covering any Asset (including portions of an Asset that were formerly within a unit but which have been excluded from the unit as a result of a contraction of the unit).

(r)    any defect arising from the failure of any deed or conveyance granting the applicable lessor or its predecessors in interest title to Hydrocarbon minerals under a tract or parcel that is platted in a subdivision or platted lots to the extent such defect constitutes or is based on the failure to adequately describe the entirety of such tract or parcel and the portion of such tract or parcel burdened by such defect underlies lands up to the centerline of any easement, right of way, covenant, servitude, permit for the purpose of surface or subsurface operations, roads, alleys, highways, railways, pipelines, transmission lines, transportation lines, distribution lines, power lines, telephone lines, canals, ditches, reservoirs and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment;

(s)    defects based on or arising out of the failure of any Seller to enter into, be party to, or be bound by, pooling provisions, a pooling agreement, production sharing agreement, production handling agreement or other similar agreement with respect to any horizontal Well that crosses more than one Lease or tract, to the extent (i) such Well has been permitted by the applicable Governmental Authority or (ii) the allocation of Hydrocarbons produced from such Well among such Lease or tracts is based upon the length of the "as drilled" horizontal wellbore open for production, the total length of the horizontal wellbore, or other methodology that is intended to reasonably attribute to each such lease or leasehold tract its share of such production;

(t)    the termination or expiration of any Lease after the expiration date set forth for such Lease on <u>Exhibit A</u>; or

(u)    any Liens, defects, irregularities or other matter which, individually or in the aggregate, do not (i) materially detract from the value of or materiality interfere with the use, operation or ownership of the Assets subject thereto or affected thereby and (ii) result in a Negative Title Effect.

"***Person***" means any individual, corporation, partnership, limited liability company, trust, estate, Governmental Authority or any other entity.

"***Petition Date***" means March 9, 2022.

"***Phase I***" is defined in <u>Section 7.1(a)</u>.

"***Phase II***" is defined in <u>Section 7.1(a)</u>.

"***Plan***" means the *Debtors' Amended Joint Chapter 11 Plan* [Docket No. 411], as may be amended from time to time.

"***Plugging and Abandonment***," "***Plugged and Abandoned***" and "***Plug and Abandon***" and its derivatives mean all plugging, replugging, abandonment, re-plugging and re-abandonment, equipment removal, disposal or restoration associated with the properties and assets included in or burdened by the Assets, including all plugging and abandonment, dismantling, decommissioning, Remediation, removal, surface and subsurface restoration, site clearance and disposal of the Wells, Carbon Storage Wells, well cellars, fixtures, flowlines, pipelines, structures, equipment, facilities and personal property located on or associated with assets and properties included in the Assets

and the lands burdened thereby, the removal and capping of all associated flowlines, field transmission and gathering lines, pit closures, the restoration of the surface, site clearance, any disposal of related waste materials, excluding NORM and asbestos and obligations to obtain plugging exceptions for any Well or injection Well with a current plugging exception, all in accordance with all applicable Laws, the requirements of Governmental Authorities and the terms and conditions of the Leases, other leases, Rights of Way, Realty Interests and Contracts.

"*Preferential Rights*" means any preferential purchase rights, rights of first refusal, preemptive rights or similar rights held by Third Parties that are triggered or required in connection with the sale of the Assets contemplated hereby; excluding, in each case, any such rights for which the Bankruptcy Court has entered an order approving the sale and assignment of an Asset subject to such rights without complying with such right.

"*Preliminary Settlement Statement*" is defined in Section 2.6(a).

"*Property*" means the Oil and Gas Properties and the Carbon Sequestration Properties.

"*Property Costs*" means all operating expenses (including costs of insurance, Third Party overhead), employees, rentals, shut-in payments and title examination and capital expenditures (including bonuses, broker fees and other lease acquisition costs, costs of drilling and completing wells and costs of acquiring equipment) incurred in the ownership and operation of the Assets and Third Party overhead costs charged to the Assets under any applicable Contracts, but excluding (without limitation) (a) personal injury or death, property damage, or violation of any Law; (b) Plugging and Abandonment obligations; (c) curing any Title Defect or Environmental Defect or obligations to Remediate any contamination of water or personal property under applicable Environmental Laws; (d) obligations with respect to Imbalances; (e) obligations to pay working interests, Royalties, or other interest owners revenues or proceeds attributable to the sales of Hydrocarbons or the storage of Gas, including those held in suspense; (f) Asset Taxes, Income Taxes and Transfer Taxes; (g) amounts (if any) incurred to obtain any Consent; and (h) the reparation of any damage to the Assets resulting from a Casualty Loss.

"*Purchaser*" is defined in the introductory paragraph hereof.

"*Purchaser 401(k) Plan*" is defined in Section 7.13(c).

"*Purchaser Group*" means Purchaser, the Affiliates of Purchaser and each of their respective shareholders, members, officers, directors, employees, agents, advisors, representatives, accountants, attorneys and consultants.

"*Purchaser's Representatives*" is defined in Section 7.1(a).

"*Realty Interests*" is defined in subsection (e) of the definition of "Assets."

"*Reasonable Documentation*" means with respect to any Title Defect or Environmental Defect asserted by Purchaser, as applicable:

       (a)      a copy of any available title opinion or landman's title report describing the asserted Title Defect;

(b)      a copy of the relevant document to the extent the alleged Defect is a document;

(c)      the deed preceding and following a gap in the chain of title or a title opinion describing the gap in reasonable detail, to the extent the basis of the alleged Defect is a gap in the Sellers' chain of title;

(d)      a copy of the document creating or evidencing the Lien or encumbrance, to the extent the basis of the alleged Defect is a Lien or encumbrance;

(e)      a copy of the environmental report (including any Phase I (or, if applicable, Phase II)) describing in reasonable detail the Defect, to the extent the alleged Defect is an Environmental Defect; or

(f)      any other documents relied upon by Purchaser and reasonably necessary for the Sellers and any Defect Referee (as well as any title attorney, examiner, or environmental consultant hired by such Persons) to identify the existence of and Defect Amount with respect to such alleged Defect.

"*Records*" means all books, records, files, data, information, drawings and maps to the extent (and only to the extent) related to the Assets or any Existing Tax Partnership, including electronic copies of all computer records where available, contract files, lease files, well logs, division order files, title opinions and other title information (including abstracts, evidences of rental payments, maps, surveys, and data sheets), hazard data, surveys, production records, engineering files and environmental records, but excluding, however, in each case, the Excluded Records.

"*Rejected 365 Contract*" means each 365 Contract that is not an Assumed 365 Contract, including all Unavailable 365 Contracts.

"*Rejection Date*" means three (3) Business Days prior to the Closing Date.

"*Release*" means any discharge, emission, spilling, leaking, pumping, pouring, placing, depositing, injecting, dumping, burying, leaching, migrating, abandoning, releasing or disposing into, on, under or through the environment of any Hazardous Substance, including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Substance.

"*Remediate*" means any remediation, removal, response, investigation, monitoring, cure, construction, closure, disposal, testing, integrity testing or other corrective actions presently required under applicable Environmental Laws to address the Release of a Hazardous Substance taking into account permanent or non-permanent remedies or actions, including mechanisms to contain or stabilize Hazardous Substances, including monitoring site conditions, natural attenuation, risk-based corrective action, institutional controls or other appropriate restrictions on the Properties, including caps, dikes, encapsulation or leachate collection systems to the extent such remedies or actions are allowed under Environmental Law. The term "*Remediation*" shall have its correlative meaning.

"***Required Carbon Contracts***" is defined in <u>subsection (i)</u> of the definition of "Carbon Sequestration Assets."

"***Required Consent***" means any Consent that expressly provides in the applicable agreement, Lease or Contract that the sale or transfer of such Asset without obtaining such Consent (a) would result in termination of, or give rise to a right for the Consent holder to terminate all rights in relation to such Asset; (b) would cause the assignment of such Asset to be void or voidable; or (c) would permit the holder of such Consent to receive liquidated damages; *provided*, *however*, "Required Consent" shall not include (i) any Consent that cannot, under its express terms, be unreasonably withheld, conditioned or delayed (unless and except such Consent also includes any language or concept contemplated in <u>subsections (a)</u>, <u>(b)</u> or <u>(c)</u> above) or (ii) is subject to an order of the Bankruptcy Court approving the sale and assignment of an Asset without obtaining such Consent.

"***Required Contracts***" means the Required O&G Contracts and the Required Carbon Contracts.

"***Required O&G Contracts***" is defined in <u>subsection (j)</u> of the definition of "Assets."

"***Rights of Way***" is defined in <u>subsection (d)</u> of the definition of "Assets."

"***Royalties***" means all royalties, overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, reversionary interests and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the Oil and Gas Properties or the proceeds thereof to Third Parties.

"***Sale Area***" means lands described on <u>Schedule 1.1(e)</u>.

"***Sale Order***" means an order of the Bankruptcy Court substantially in the form attached hereto as <u>Exhibit E</u> authorizing and approving, inter alia, the sale of the Assets to Purchaser on the terms and conditions set forth herein, Free and Clear, the releases set forth therein, and authorizing and approving the assumption and assignment of the Assumed 365 Contracts to Purchaser.

"***Securities Act***" shall mean the Securities Act of 1933, as amended, and any successor statute thereto, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

"***Seismic Agreements***" means those seismic contracts, agreements or licenses or other similar agreements of Sellers that are listed on <u>Part 1</u> of <u>Schedule 7.3</u>.

"***Seismic Fees***" is defined in <u>Section 7.17</u>.

"***Seller***" and "***Sellers***" is defined in the introductory paragraph hereof.

"***Seller 401(k) Plan***" is defined in <u>Section 7.13(c)</u>.

"***Seller Group***" is defined in <u>Section 12.2</u>.

"***Sellers' Representative***" means Petro Harvester Operating Co., LLC, a Delaware limited liability company.

"***Seller Taxes***" means (i) Income Taxes imposed on any Seller (including any Income Taxes attributable to Seller's interest in any Existing Tax Partnership for any tax period (or portion thereof) ending on or prior to the Closing Date), (ii) Asset Taxes allocable to the Sellers pursuant to Section 10.1 (taking into account, and without duplication of, such Asset Taxes effectively borne by the Sellers as a result of the adjustments to the Unadjusted Purchase Price made pursuant to Section 2.4 or Section 2.6, as applicable), (iii) Taxes attributable to the Excluded Assets, and (iv) any other Taxes relating to the acquisition, ownership or operation of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom that are attributable to any Tax period (or portion thereof) ending prior to the Effective Time.

"***Settlement Price***" means, (a) in the case of gaseous Hydrocarbons, $6.84/MMBtu, and (b) in the case of crude oil, $104.69/Barrel and (c) in the case of condensate, scrubber liquids inventories and ethane, propane, iso-butane, nor-butane and gasoline Hydrocarbons, $47.11/Barrel, as applicable.

"***Straddle Period***" means any Tax period beginning before and ending after the Effective Time.

"***Subject Formation***" means:

(a)     For each producing (or capable of producing) Well with a positive Allocated Value, the depth at which such Well is completed;

(b)     For each Future Well with a positive Allocated Value, the formation identified for such Future Well on Exhibit A-3; and

(c)     For the Carbon Sequestration Properties, the depths and formations specifically from the stratigraphic equivalent below the top of the Eutaw Formation in the Jones Massey #2 Well (API# 23089000230001) at 4802'MD through to the stratigraphic equivalent above the base of the Eutaw Formation at 4885'MD, as illustrated in the log attached on Schedule 1.1(d).

"***Supplemental Contract Notice***" is defined in Section 7.3(b).

"***Suspense Funds***" means any and all Royalties and other amounts (a) held in suspense by any Seller at the Closing and any interest accrued in escrow accounts for such suspended funds or (b) that would otherwise be an obligation or liability of any Seller with respect to any such Royalties and/or other amounts at the Closing.

"***Tag-Along Right***" means the right or option of any Person under any Contract, Lease or other instrument binding on a Seller, any Affiliate of a Seller or the Assets to require and cause a Seller, any Affiliate of a Seller or Purchaser to purchase, acquire and receive an assignment of any interest in any Properties or other Assets, excluding, in each case, any such rights for which the Bankruptcy Court has entered an order approving the sale and assignment an Asset subject to such rights without complying with such right.

"***Target Closing Date***" is defined in <u>Section 9.1</u>.

"***Tax Return***" means any return, declaration, report, claim for refund or information return or statement relating to Taxes filed or required to be filed with any Governmental Authority, including any schedule or attachment thereto and any amendment thereof.

"***Taxes***" means (a) any taxes, fees, assessments and other governmental charges in the nature of a tax imposed by any Governmental Authority, including income, profits, gross receipts, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real property, personal property, transfer, value added, sales, use, customs, duties, capital stock, franchise, excise, withholding, social security (or similar), unemployment, disability, payroll, windfall profit, severance, production, estimated or other tax, including any interest, penalty or addition thereto and (b) any liability in respect of any items described in clause (a) above that arises by reason of a contract, assumption, transferee or successor liability, operation of Law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"***Termination Date***" is defined in <u>Section 11.1</u>.

"***Third Party***" means any Person other than the Sellers, Purchaser or any of their respective Affiliates.

"***Third Party Claim***" is defined in <u>Section 12.5(b)</u>.

"***Title Arbitration Panel***" is defined in <u>Section 3.2(i)(i)</u>.

"***Title Benefit***" means the aggregate beneficial or record title of any Seller which, as of the Closing Date:

(a)     as to the Subject Formation, entitles the Sellers to receive a Net Revenue Interest, (i) in the case of any Well, greater than the Net Revenue Interest shown in <u>Exhibit A-2</u> for such Well and (ii) in the case of any Future Well, greater than the Net Revenue Interest shown in <u>Exhibit A-3</u>, except, in each case, as otherwise stated in <u>Exhibit A</u>; or

(b)     as to the Subject Formation, obligates the Sellers to bear a Working Interest, (i) in the case of any Well, less than the "working interest" percentage shown in <u>Exhibit A-2</u>, with respect to such Well and (ii) in the case of any Future Well, less than the "working interest" percentage shown in <u>Exhibit A-3</u>, with respect to such Future Well, except, in each case, (i) as stated in <u>Exhibit A</u> and (ii) decreases that are accompanied by no or a less than proportionate increase in the Sellers' Net Revenue Interest.

"***Title Benefit Amount***" is defined in <u>Section 3.2(e)</u>.

"***Title Benefit Notice***" is defined in <u>Section 3.2(b)</u>.

"***Title Defect***" means any individual Lien, obligation, burden or defect, including a discrepancy in Net Revenue Interest or Working Interest that results in the failure of the Sellers to

have Defensible Title as to any individual Well or Future Well; *provided*, *however*, in no event shall any of the following be considered or constitute a "Title Defect": (a) any defect arising out of lack of survey or lack of metes and bounds descriptions, unless a survey or metes and bounds description is expressly required by applicable Law; (b) any defect in the chain of the title consisting of the failure to recite marital status in a document or omissions of succession or heirship proceedings, unless affirmative evidence shows that such failure or omission results in another party's superior claim of title to the Assets; (c) any defect arising out of lack of corporate or entity authorization, unless affirmative evidence shows that such corporate or entity action was not authorized and results in another party's superior claim of title to the Assets; (d) any defect arising by the failure to obtain verification of identity of people in a class, heirship or intestate succession; (e) any defect arising from any Lease having no pooling provision or requiring consent to drill a production sharing well, or an inadequate horizontal pooling provision; (f) any gap in the chain of title, unless affirmative evidence shows that another party has a superior chain of title by an abstract of title, title opinion or landman's title chain or runsheet; (g) any defect that is cured, released or waived by any Law of limitation or prescription, including adverse possession and the doctrine of laches; (h) any burden or defect arising from prior oil and gas leases that are terminated but are not surrendered or released of record; (i) any defect arising from any change in applicable Law after the Execution Date; (j) any Lien, obligation, burden or defect that affects only which Person has the right to receive Royalty payments (rather than the amount of such Royalty) and that does not affect the validity of the underlying Asset; (k) any Lien, obligation, burden or defect arising from any Lien created by a mineral owner that has not been subordinated to the lessee's interest, except to the extent the same is, as of the Execution Date, subject to a proceeding to enforce said Lien; (l) any defects or irregularities in acknowledgements; (m) any defects arising from lack of an affidavit of identity or the need for one if the relevant Person's name is readily apparent; (n) any defects arising from a lack of power of attorney; (o) any defect arising from the failure of any non-participating royalty owners or non-executive mineral interest owners to ratify a unit or Lease; (p) any defects or irregularities resulting from Liens, mortgages, deeds of trust or other encumbrances that have expired by their own terms or the enforcement of which are barred by applicable statutes of limitation, or which, by their own terms, matured more than ten (10) years ago, but which have not been released of record or (q) any Lien, obligation, burden, defect or loss of title solely resulting from the Sellers' conduct of business required pursuant to this Agreement.

"***Title Defect Threshold***" means an amount equal to Fifty Thousand Dollars ($50,000).

"***Title Referee***" is defined in Section 3.2(i)(i).

"***Transaction Documents***" means (a) this Agreement, (b) the Conveyances and Mineral Deeds, (c) the Confidentiality Agreement, (d) the Transition Services Agreement and (e) each other agreement, document, certificate or other instrument that is contemplated to be executed by and among the Parties (or their Affiliates) pursuant to or in connection with any of the foregoing.

"***Transfer Taxes***" is defined in Section 10.2.

"***Transition Services Agreement***" means the Transition Services Agreement in substantially the same form as Exhibit F, executed and delivered by the Parties at Closing.

"***Unadjusted Purchase Price***" is defined in Section 2.2.

"*Unavailable 365 Contract*" means each 365 Contract set forth on <u>Part 2</u> of <u>Schedule 7.3</u>.

"*Vehicles*" is defined in <u>subsection (i)</u> of the definition of "Assets."

"*Wells*" is defined in <u>subsection (b)</u> of the definition of "Assets."

"*Winning Bidder*" means the bidder for the Assets with the highest or otherwise best bid for the Assets as determined in accordance with the Bidding Procedures.

"*Working Interest*" means, with respect to any Oil and Gas Property, the percentage of costs and expenses associated with the exploration, drilling, development, operation, maintenance and abandonment on or in connection with such Oil and Gas Property required to be borne with respect thereto, but without regard to the effect of any Royalties.

Section 1.2    **Interpretation**.

(a)    In this Agreement, unless a clear contrary intention appears: (b) the singular form includes the plural form and vice versa; (c) reference to any Person includes such Person's successors and assigns but only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually; (d) reference to any gender includes each other gender; (e) reference to any agreement (including this Agreement), document, or instrument means, unless specifically provided otherwise, such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; (f) reference to any Law means, unless specifically provided otherwise, such Law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Law means, unless specifically provided otherwise, that provision of such Law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision; (g) reference in this Agreement to any Article, Section, Appendix, Schedule or Exhibit means such Article or Section hereof or Appendix, Schedule or Exhibit hereto; (h) "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section, or other provision thereof; (i) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term; (j) "or" is not exclusive; (k) relative to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; (l) the Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein; *provided*, that in the event a word or phrase defined in this Agreement is expressly given a different meaning in any Schedule or Exhibit, such different definition shall apply only to such Schedule or Exhibit defining such word or phrase independently, and the meaning given such word or phrase in this Agreement shall control for purposes of this Agreement, and such alternative meaning shall have no bearing or effect on the interpretation of this Agreement; (m) all references to "Dollars" means United States Dollars; (n) references to "days" shall mean calendar days, unless the term "Business Days" is used; and (o) except as otherwise provided herein, all actions which any Person may take and all determinations which any Person may make pursuant to this Agreement may be taken and made at the sole and absolute discretion of such Person.

(b)     In this Agreement, with respect to any Assets which are physically located in the State of Louisiana (i) the term "real property" shall mean "immovable property" as that term is used in the Louisiana Civil Code; (ii) the term "personal property" shall mean "movable property" as that term is used in the Louisiana Civil Code; (iii) the term "easement" shall mean "servitude" as that term is used in the Louisiana Civil Code; (iv) the term "building" shall also include "other constructions" as that term is used in the Louisiana Civil Code; (v) the term "tangible" shall mean "corporeal" as that term is used in the Louisiana Civil Code; (vi) the term "intangible" shall mean "incorporeal" as that term is used in the Louisiana Civil Code; (vii) the term "fee simple" shall mean "full ownership interest" as provided in Louisiana Civil Code Art. 477 unburdened by real rights in favor of others; and (viii) the term "condemnation" shall include "expropriation" as that term is used in the Louisiana Civil Code.

## ARTICLE 2

## PURCHASE AND SALE

Section 2.1     **Purchase and Sale**. Subject to the terms and conditions contained in this Agreement, the Sellers agree to sell to Purchaser, and Purchaser agrees to purchase, accept and pay for, the Assets.

Section 2.2     **Purchase Price**. The purchase price for the Assets shall be Eighty Five Million Dollars ($85,000,000) (the "***Unadjusted Purchase Price***"), adjusted as provided in Section 2.4 (as adjusted, the "***Adjusted Purchase Price***").

Section 2.3     **Deposit**.

(a)     On the Execution Date, Purchaser has deposited with the Escrow Agent an amount equal to Eight Million Five Hundred Thousand Dollars (the "***Deposit***") via wire transfer of immediately available funds to the account or accounts designated in the Escrow Agreement, such Deposit to be held in escrow by the Escrow Agent in accordance with the terms of the Escrow Agreement (such account, the "***Escrow Account***").

(b)     In the event that Closing occurs, then on the Closing Date the entirety of the Deposit shall be disbursed to or on behalf of the Sellers as provided in the Preliminary Settlement Statement.

(c)     If for any reason this Agreement is terminated in accordance with Section 11.1, then the Deposit shall be disbursed as provided in Section 11.2.

Section 2.4     **Adjustments to Unadjusted Purchase Price**. The Unadjusted Purchase Price shall be adjusted, without duplication, as follows:

(a)     decreased in accordance with Section 3.2(g) with respect to Defects (net of any offsetting Title Benefit Amounts in accordance with Section 3.2(e));

(b)     decreased in accordance with Section 7.5 with respect to any and all applicable Required Consents;

(c)     decreased in accordance with Section 7.6 with respect to any and all applicable Preferential Rights;

(d)     decreased in accordance with Section 7.7 with respect to any and all applicable Tag-Along Rights;

(e)     decreased by the amount of all Suspense Funds held by any Seller to the extent attributable to Hydrocarbons produced during any periods after the Petition Date, to the extent such funds are not transferred to Purchaser's control at the Closing;

(f)     adjusted for Asset Taxes (without duplication) as follows:

(i)     increased by the amount of all Asset Taxes allocated to Purchaser in accordance with Section 10.1 but paid or otherwise economically borne by any Seller; and

(ii)     decreased by the amount of all Asset Taxes allocated to any Seller in accordance with Section 10.1 but paid or otherwise economically borne by Purchaser;

(g)     adjusted for Imbalances, merchantable Hydrocarbon inventories and merchantable Hydrocarbons in storage as of the Effective Time as follows:

(i)     decreased by the aggregate amount owed by any Seller to Third Parties for Imbalances attributable to periods prior to the Effective Time (on the basis of the applicable Settlement Price);

(ii)     increased by the aggregate amount owed to any Seller by Third Parties for Imbalances attributable to periods prior to the Effective Time on the basis of the applicable Settlement Price; and

(iii)     increased by the aggregate amount equal to the Sellers' share of any merchantable Hydrocarbons in tanks or storage facilities produced from or credited to the Assets as of the Effective Time based upon the quantities in tanks or storage facilities as of the Effective Time as measured by and reflected in the Sellers' records *multiplied by* the applicable Settlement Price, but excluding in all cases, tank bottoms, liquid or gaseous linefill and basic sediment and water;

(h)     without prejudice to any Party's rights under Article 12, adjusted for proceeds and other income, receivables, Property Costs, and other costs (other than Asset Taxes, Income Taxes and Transfer Taxes) attributable to the Assets as follows:

(i)     decreased by an amount equal to the aggregate amount of the following proceeds to the extent received by a Seller:

(A)     amounts earned from the sale of Hydrocarbons produced from or attributable to the Assets during any period from and after the Effective Time (net of any Deduct Amounts); and

(B)     other income earned with respect to the Assets that is attributable to periods from and after the Effective Time (*provided*, that for purposes of this Section 2.4(h)(i)(B), no adjustment shall be made for funds initially received by a Seller for the account of any Third Party (including other Working Interest owners) and for which a Seller does not become entitled to retain such income for its own account prior to the Cut-Off Date and excluding the effects or proceeds of any Hedges);

(ii)     increased by an amount equal to the amount of all Property Costs which are borne or incurred by or on behalf of any Seller or any Affiliate of any Seller in connection with the ownership and operation of any Assets from and after the Effective Time (including any and all such costs borne by such Seller or its Affiliates that are chargeable to the Working Interest of Third Party non-operators with respect to the applicable operations), except in each case any costs already deducted in the determination of proceeds in Section 2.4(h)(i);

(iii)     increased by the amount of all prepaid Property Costs incurred or paid by or on behalf of any Seller and attributable to periods from and after the Effective Time as such prepaid Property Costs are set forth on Schedule 2.4(h)(iii);

(iv)     increased by the amount of all unreimbursed Property Costs, borne or paid by a Seller or its Affiliates that are chargeable to the Working Interest of Third Party non-operators of the Assets attributable to periods prior to the Effective Time as such unreimbursed Property Costs are set forth on Schedule 2.4(h)(iv);

(i)     increased by the amount of an overhead reimbursement fee equal to Five Hundred Thousand Dollars ($500,000) per month for each calendar month (prorated for any partial month) between the Effective Time and the Closing Date; and

(j)     increased by the amount set forth on Exhibit A-6 with respect to Equipment and inventory.

Section 2.5     **Procedures**.

(a)     The amount of each adjustment to the Unadjusted Purchase Price described in Section 2.4(h) shall be determined in accordance with COPAS and to the extent consistent with COPAS, United States generally accepted accounting principles using the accrual method of accounting, as consistently applied (the "***Accounting Principles***").

(b)     All adjustments and payments made pursuant to this Article 2 shall be without duplication of any other amounts paid, credited, debited or received under this Agreement.

(c)     For purposes of allocating production (and accounts receivable with respect thereto), under Section 2.4 and Section 2.7, (i) liquid Hydrocarbons shall be deemed to be "from or attributable to" the Assets when they are produced into the tank batteries related to each Well and (ii) gaseous Hydrocarbons shall be deemed to be "from or attributable to" the Assets when they pass through the delivery point sales meters or similar meters at the point of entry into the pipelines through which they are transported. The Sellers shall use reasonable interpolative procedures to arrive at an allocation of production when exact meter readings, gauging or strapping data are not available.

(d)      Surface use or damage fees and other Property Costs that are paid periodically shall be prorated based on the number of days in the applicable period falling on or before, or after, the Effective Time.

(e)      After Closing, the Sellers shall at their election, in their sole discretion, handle all joint interest audits and other audits of Property Costs covering periods for which the Sellers are in whole or in part responsible under Section 2.4; *provided*, that the Sellers shall not agree to any adjustments to previously assessed costs for which Purchaser is liable, or any compromise of any audit claims to which Purchaser would be entitled, without the prior written consent of Purchaser. Each Party shall provide the other Party with a copy of all applicable audit reports and written audit agreements received by such Party and relating to periods for which any Seller is partially responsible.

(f)      "Earned" and "incurred," as used in Section 2.4(h) and Section 2.7, shall be interpreted in accordance with accounting recognition guidance under the Accounting Principles.

Section 2.6      **Closing Payment and Post-Closing Adjustments**.

(a)      Not later than three (3) Business Days prior to the Closing Date, the Sellers' Representative shall prepare and deliver to Purchaser, a draft preliminary settlement statement ("***Preliminary Settlement Statement***") setting forth (i) the Sellers' good faith estimate of the Adjusted Purchase Price for the Assets as of the Closing Date after giving effect to all adjustments set forth in Section 2.4, (ii) the Persons, accounts and amounts of disbursements that the Sellers designate and nominate to receive the Closing Payment, and (iii) the wiring instructions for all such payments and disbursements. The Sellers' Representative shall deliver to Purchaser reasonable documentation in the possession of the Sellers or any of their Affiliates to support the items for which adjustments are proposed or made in the Preliminary Settlement Statement delivered by the Sellers' Representative and a brief explanation of any such adjustments and the reasons therefor. Within two (2) Business Day after receipt of the Sellers' draft Preliminary Settlement Statement, Purchaser may deliver to the Sellers' Representative a written report containing all good faith changes that Purchaser proposes to be made to the Preliminary Settlement Statement, if any, together with a brief explanation of any such changes. The Preliminary Settlement Statement, as agreed upon by the Parties, will be used to adjust the Unadjusted Purchase Price at Closing; *provided*, that if the Parties cannot reasonably agree on all adjustments set forth in the Preliminary Settlement Statement prior to the Closing (with each Party affirmatively obligated to use good faith efforts to reach such an agreement), then Purchaser shall deposit into the Escrow Account a portion of the Unadjusted Purchase Price equal to the positive difference between Seller's proposed adjustment and Purchaser's proposed adjustment (as set forth in Purchaser's written report) for such disputed adjustments (adjusted for any amounts therein actually agreed by the Parties prior to Closing), and such amounts shall be credited towards the Adjusted Purchase Price at Closing, subject to the resolution as between the Parties prior to the date that the final settlement statement is mutually agreed upon by the Parties. Notwithstanding anything to the contrary set forth in the foregoing sentence, Purchaser's right to deposit into the Escrow Account the disputed portion of the Unadjusted Purchase Price described in the foregoing sentence shall not exceed Five Hundred Thousand Dollars ($500,000) (the "***Cap***"), with any disputed amount in excess of the Cap to be paid directly to Sellers at Closing.

(b)        As soon as reasonably practicable after the Closing, but no later than ninety (90) days following the Closing Date, the Sellers' Representative shall prepare and deliver to Purchaser a draft final settlement statement setting forth the final calculation of the Adjusted Purchase Price and showing the calculation of each adjustment under Section 2.4, based on the most recent actual figures for each adjustment (which Adjusted Purchase Price and calculation shall exclude the Defect Escrow Amount, which shall be maintained and disbursed in accordance with the terms of Section 3.2(h)). The Sellers shall make reasonable documentation available to support the final figures. As soon as reasonably practicable, but not later than the fifteenth (15th) day following receipt of the Sellers' statement hereunder, Purchaser may deliver to the Sellers' Representative a written report containing any changes that Purchaser proposes be made in such final settlement statement. Any changes not so specified in such written report shall be deemed waived and the Sellers' determinations with respect to all such elements of the final settlement statement that are not addressed specifically in such report shall prevail. If Purchaser fails to timely deliver a written report to the Sellers' Representative containing changes Purchaser proposes to be made to the final settlement statement, the final settlement statement as delivered by the Sellers' Representative will be deemed to be correct and mutually agreed upon by the Parties, and will be final and binding on the Parties and not subject to further audit or arbitration. The Sellers' Representative may deliver a written report to Purchaser during the same fifteen (15) day period reflecting any changes that the Sellers propose to be made in such statement as a result of additional information received after the statement was prepared. The Parties shall undertake to agree on the final settlement statement of the Adjusted Purchase Price no later than thirty (30) days following Purchaser's receipt of the Sellers' statement delivered hereunder. In the event that the Parties cannot reach agreement as to the final settlement statement of the Adjusted Purchase Price within such period of time, any Party may refer the items of adjustment which are in dispute or the interpretation or effect of this Section 2.6 (other than disputed adjustments under Section 2.4(a), which shall be resolved exclusively in accordance with Section 3.2(h)) to a nationally recognized independent accounting firm or consulting firm mutually acceptable to both Purchaser and the Sellers' Representative (the "*Accounting Referee*"), for review and final determination by arbitration. The Accounting Referee shall conduct the arbitration proceedings in Dallas, Texas in accordance with the Commercial Arbitration Rules of the AAA, to the extent such rules do not conflict with the terms of this Section 2.6(b). The Accounting Referee's determination shall be made within fifteen (15) days after submission of the matters in dispute and shall be final and binding on all Parties, without right of appeal. In determining the amount of any individual disputed adjustment to the Adjusted Purchase Price, the Accounting Referee shall be bound by the terms of Section 2.4 and must select either the amount of such adjustment proposed by the Sellers or the amount of such adjustment proposed by Purchaser, and not any other amount. The Accounting Referee shall act as an expert for the limited purpose of determining the specific disputed aspects of the Adjusted Purchase Price adjustments submitted by any Party (other than disputed adjustments under Section 2.4(a), which shall be resolved exclusively in accordance with Section 3.2(h)) and may not award damages, interest (except to the extent expressly provided for in this Section 2.6) or penalties to any Party with respect to any matter. The Sellers and Purchaser shall each bear its own legal fees and other costs of presenting its case. The Seller shall bear one-half and Purchaser shall bear one-half of the fees, costs and expenses of the Accounting Referee. If the final Adjusted Purchase Price is (a) more than the Adjusted Purchase Price used at Closing pursuant to Section 2.6(a), Sellers shall be entitled to receive from Purchaser the amount of such difference, or (b) less than the Adjusted Purchase Price used at Closing pursuant to Section 2.6(a),

Purchaser shall be entitled to receive from Sellers the amount of such difference. To that end, within two (2) Business Days after the final resolution by the Parties of the final Adjusted Purchase Price, the Parties shall execute and deliver joint written instruction to Escrow Agent requiring Escrow Agent to disburse to each Party the funds in the Escrow Account to which such Party is entitled in accordance hereof; *provided* that, if (i) Sellers are owed amounts in excess of the amounts in the Escrow Account, then Purchaser shall promptly (and in any event within three (3) Business Days following the final resolution by the Parties of the final Adjusted Purchase Price) pay to Sellers via wire transfer to the account designated by Sellers, the amount of any such difference; and (ii) if Purchaser is owed amounts in excess of the amounts in the Escrow Account, then Sellers shall promptly (and in any event within three (3) Business Days following the final resolution by the Parties of the final Adjusted Purchase Price) pay to Purchaser via wire transfer to the account designated by Purchasers, the amount of any such difference.

(c)        Purchaser shall assist the Sellers in preparation of the final settlement statement of the Adjusted Purchase Price under <u>Section 2.6(b)</u> by furnishing invoices, receipts, reasonable access to personnel and such other assistance as may be reasonably requested by the Sellers' Representative to facilitate such process post-Closing.

(d)        All payments made or to be made under this Agreement to any Seller shall be made by electronic transfer of immediately available funds to such banks and accounts as may be designated by the Sellers' Representative in writing prior to the date such payments are required to be made by Purchaser. All payments made or to be made hereunder to Purchaser shall be by electronic transfer of immediately available funds to such banks and accounts as may be designated by Purchaser in writing.

Section 2.7      **Costs and Revenues**.

(a)        With respect to revenues earned or Property Costs incurred with respect to the Assets prior to the Effective Time but received or paid after the Effective Time:

(i)        Except for amounts for which the Unadjusted Purchase Price was adjusted under <u>Section 2.4(g)(iii)</u> or otherwise included in the Assets, the Sellers shall be entitled to all amounts earned from the sale of Hydrocarbons produced from, or attributable to, the Oil and Gas Properties prior to the Effective Time, which amounts are received prior to, on or after Closing, and to all other income earned with respect to the Assets up to but excluding the Effective Time and received prior to, on or after Closing.

(ii)        The Sellers shall be responsible for (and entitled to any refunds and indemnities with respect to) all Property Costs with respect to the Sellers' interests in the Assets incurred prior to the Effective Time; *provided*, *however*, that the Sellers' responsibility for the foregoing shall terminate on the Cut-Off Date.

(iii)        Except amounts for which the Unadjusted Purchase Price was adjusted under <u>Section 2.4(g)(i)</u>, Purchaser shall be entitled to all Hydrocarbons produced from, or attributable to, the Oil and Gas Properties from and after the Effective Time.

(iv)    Purchaser shall pay and be responsible for (and entitled to any refunds and indemnities with respect to) all Property Costs incurred from and after the Effective Time.

(b)    Without duplication of any adjustments made pursuant to Section 2.4(h), (i) should Purchaser or any Affiliate of Purchaser receive after Closing any proceeds or other income to which any Sellers are entitled under Section 2.7(a), Purchaser shall fully disclose, account for and promptly remit the same to the Sellers' Representative and (ii) should any Seller or any Affiliate of any Seller receive after Closing any proceeds or other income to which Purchaser is entitled under Section 2.7(a), such Seller shall fully disclose, account for, and promptly remit the same to Purchaser.

(c)    Without duplication of any adjustments made pursuant to Section 2.4(h), (i) should Purchaser, or any Affiliate of Purchaser, pay after Closing but before the Cut-Off Date any Property Costs for which the Sellers are responsible under Section 2.7(a), Purchaser shall be reimbursed by the Sellers promptly after receipt of Purchaser's invoice, accompanied by copies of the relevant vendor or other invoice and proof of payment and (ii) should any Seller, or any Affiliate of any Seller, pay after Closing any Property Costs for which Purchaser is responsible under Section 2.7(a), the Sellers shall be reimbursed by Purchaser promptly after receipt of the Sellers' invoice, accompanied by copies of the relevant vendor or other invoice and proof of payment.

(d)    The Sellers shall have no further responsibility for Property Costs incurred with respect to the Assets for which the Sellers otherwise would be responsible under Section 2.7(a), to the extent such amounts have not been paid on or before the Cut-Off Date.

Section 2.8    **Allocation of Purchase Price**. Purchaser and the Sellers' Representative shall use commercially reasonable efforts to agree to an allocation of the Adjusted Purchase Price and any other items properly treated as consideration for U.S. federal income tax purposes among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder and, to the extent allowed under applicable U.S. federal income tax Law, in a manner consistent with the Allocated Values, within ninety (90) days after the final determination of the Adjusted Purchase Price (the "***Allocation***"). If the Sellers' Representative and Purchaser reach an agreement with respect to the Allocation, (a) Purchaser and the Sellers' Representative shall use commercially reasonable efforts to update the Allocation in accordance with Section 1060 of the Code following any adjustment to the Unadjusted Purchase Price or the Adjusted Purchase Price pursuant to this Agreement, and (b) Purchaser and the Sellers' Representative shall, and shall cause their respective Affiliates to, report consistently with the Allocation, as adjusted, on all Tax Returns, including Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060), which Purchaser and Sellers' Representative shall timely file with the IRS, and neither the Sellers' Representative nor Purchaser shall take any position on any Tax Return that is inconsistent with the Allocation, as adjusted, unless otherwise required by a determination within the meaning of Section 1313(a) of the Code; *provided*, *however*, that no Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise or settle any Tax audit, claim or similar proceedings in connection with the Allocation.

Section 2.9     **Withholding**. Purchaser and any other applicable withholding agent shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payment under applicable Law; *provided*, that Purchaser shall, prior to any deduction or withholding (other than any deduction or withholding required as a result of Seller's failure to deliver the form required by Section 9.2(e)), use commercially reasonable efforts to notify Sellers of any anticipated withholding, and reasonably cooperate with Sellers to minimize the amount of any applicable withholding to such affected Person. To the extent any amounts are so deducted or withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

# ARTICLE 3

## TITLE AND ENVIRONMENTAL MATTERS

Section 3.1     **Sole and Exclusive Remedies for Title and Environmental Matters**. Purchaser hereby acknowledges and agrees that except with respect to the rights of Purchaser to terminate this Agreement pursuant to Article 11 and without limiting Purchaser's remedies with respect to Required Consents, Preferential Rights and Tag-Along Rights contained Section 7.5, Section 7.6 and Section 7.7 or Purchaser's conditions to Closing set forth in Section 8.2, this Article 3 sets forth Purchaser's sole and exclusive remedy against any member of the Seller Group with respect to (A) any Defect, (B) the failure of the Sellers or any other Person to have title to any of the Assets (whether Defensible Title or otherwise) and (C) the existence of any Environmental Defect, Environmental Liabilities, Release of Hazardous Substances or any other environmental condition with respect to the Assets.

Section 3.2     **Defects; Adjustments**.

(a)     Notice of Defects. As a condition to Purchaser asserting any claim with respect to any alleged Defect, Purchaser must deliver a valid Notice or Notices (each a "***Defect Notice***") with respect to such alleged Defect to the Sellers' Representative on or before 5:00 p.m. Central Time on June 3, 2022 (the "***Defect Deadline***"); *provided*, that Purchaser shall provide to the Sellers weekly written updates (which may be amended or supplemented by a Defect Notice) that describe any alleged Defects identified by or on behalf of Purchaser or Purchaser's Representatives during the prior calendar week; *provided* that the failure of Purchaser to provide such weekly written updates shall not prejudice Purchaser's right to assert any Title Defect or Environmental Defect on or prior to the Defect Deadline. In order to be a valid Defect Notice as to each alleged Defect, each such notice shall be in writing and must include:

(i)      a description of the alleged Defect;

(ii)     the Oil and Gas Property and Subject Formation(s) subject to such alleged Defect;

(iii)    if applicable, the Allocated Value of each Oil and Gas Property subject to the alleged Defect;

(iv)     Purchaser's good faith estimate of the Defect Amount attributable to such alleged Defect and the computations and information upon which Purchaser's estimate is based;

(v)     all Reasonable Documentation in Purchaser's or Purchaser's Representatives' possession or control supporting Purchaser's assertion and claim of such alleged Defect; and

(vi)     with respect to any alleged Environmental Defect, reference to the specific section of the applicable Environmental Law(s) that Purchaser alleges have been violated or the conditions that Purchaser believes require Remediation with respect to the applicable Assets as of the Effective Time.

(vii)     WITHOUT LIMITING PURCHASER'S RIGHTS REGARDING ANY EXCLUDED LIABILITIES, PURCHASER SHALL BE DEEMED TO HAVE WAIVED AND RELEASED, AND COVENANTS THAT IT SHALL WAIVE AND RELEASE, ANY AND ALL DEFECTS (AND ANY ADJUSTMENTS TO THE UNADJUSTED PURCHASE PRICE ATTRIBUTABLE THERETO) FOR WHICH THE SELLERS' REPRESENTATIVE HAS NOT RECEIVED ON OR BEFORE THE APPLICABLE DEFECT DEADLINE A DEFECT NOTICE THAT SATISFIES ALL OF THE CONDITIONS AND REQUIREMENTS SET FORTH IN THIS <u>SECTION 3.2(a)</u>.

(b)     <u>Notice of Title Benefits</u>. Should any Party discover any Title Benefit at any time on or prior to the Defect Deadline, such Party shall promptly, but in no event later than the Defect Deadline, deliver to the other Party a written notice (each a "***Title Benefit Notice***") including:

(i)     a description of the alleged Title Benefit;

(ii)     the Well or Future Well and Subject Formation(s) subject to such alleged Title Benefit;

(iii)     the Allocated Value of each Well or Future Well subject to such alleged Title Benefit;

(iv)     such discovering Party's good faith reasonable estimate of the Title Benefit Amount attributable to such alleged Title Benefit and the computations and information upon which such Party's estimate is based;

(v)     all supporting documents in such Party's possession and control reasonably necessary for the other Party and the Defect Referee (as well as any title attorney or examiner hired by any such Persons) to identify the existence of the alleged Title Benefit; and

(vi)     EACH SELLER SHALL BE DEEMED TO HAVE WAIVED AND RELEASED, AND COVENANTS THAT IT SHALL WAIVE AND RELEASE, ANY AND ALL TITLE BENEFITS (AND ANY ADJUSTMENTS TO THE UNADJUSTED PURCHASE PRICE ATTRIBUTABLE THERETO) FOR WHICH THE SELLERS HAVE NOT RECEIVED OR SENT TO PURCHASER ON OR BEFORE THE DEFECT DEADLINE A VALID TITLE

BENEFIT NOTICE THAT SATISFIES ALL OF THE CONDITIONS AND REQUIREMENTS SET FORTH IN THIS <u>SECTION 3.2(b)</u>.

(c) <u>Option to Cure Defects</u>. The Sellers shall have the right, but not the obligation to attempt, at the Sellers' sole cost, to cure or remove any alleged Defects asserted in a Defect Notice on or prior to (i) with respect to Environmental Defects, the Closing and (ii) with respect to Title Defects, the Cut-Off Date. The Seller shall be deemed to have cured or removed a Defect if the Asset affected by such alleged Defect is free of all Defects as of the Closing Date or Cut-Off Date, as applicable, for any alleged Defects asserted in a Defect Notice. If any validly asserted Defect is not cured or removed as elected by the Sellers, or if the Sellers and Purchaser cannot agree as to whether such Defect has been cured or removed, and it is determined under <u>Section 3.2 (i)(i)</u> by the applicable Defect Referee that such Defect is not cured by the Closing Date or the Cut-Off Date, as applicable, the Unadjusted Purchase Price shall be adjusted under <u>Section 3.2(g)</u> by the Defect Amount attributable to such Defect. The Sellers' attempt to cure or remove a Defect shall not constitute an obligation to cure or attempt to cure such Defect or a waiver of the Sellers' right to dispute the validity, nature or value of, or cost to cure, such Defect.

(d) <u>Defect Amounts</u>. The diminution of value of an Asset attributable to any valid Defect (the "***Defect Amount***") as to the applicable Asset affected by such Defect shall be determined as follows:

(i) if Purchaser and the Sellers agree on the Defect Amount as to an Asset, that amount shall be the Defect Amount;

(ii) if a Title Defect is a Lien that is liquidated in amount and to the extent the same is not discharged with respect to the Assets pursuant to the Sale Order, then the Defect Amount with respect to the applicable Oil and Gas Property shall be the amount necessary to be paid to remove the Title Defect from the Sellers' interest in the affected Oil and Gas Property;

(iii) if a Title Defect as to the Subject Formation affecting any Well or Future Well represents a negative discrepancy between (A) the actual Net Revenue Interest for the Subject Formation as to such Well or Future Well, as applicable, and (B) the "Net Revenue Interest" percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for such Subject Formation as to such Well or Future Well, as applicable, then the Defect Amount shall be equal to the product of (1) the Allocated Value of such Subject Formation as to such Well or Future Well *multiplied by* (2) a fraction, (x) the numerator of which is the remainder of (i) the "Net Revenue Interest" percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for such Subject Formation as to such Well or Future Well *minus* (ii) the actual Net Revenue Interest as to the Subject Formation as to such Well or Future Well, and (y) the denominator of which is the "Net Revenue Interest" percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for the Subject Formation as to such Well or Future Well; *provided*, that if the Title Defect does not affect the "Net Revenue Interest" percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable for the Subject Formation as to such Well or Future Well throughout its entire productive life, the Defect Amount determined under this <u>Section 3.2(d)(iii)</u> shall be reduced to take into account the applicable time period only;

(iv)    if the Title Defect represents an obligation, encumbrance, burden or charge upon or other defect in title to the Subject Formation as to a Well or Future Well of a type not described in Section 3.2(d)(i), through Section 3.2(d)(iii), the Defect Amount shall be determined by taking into account the Allocated Value of the Well or Future Well so affected, the portion of the Sellers' interest in the Subject Formation as to such Well or Future Well affected by the Title Defect, the legal effect of the Title Defect, the potential present value economic effect of the Title Defect over the life of the Subject Formation as to such Well or Future Well, the values placed upon the Title Defect by Purchaser and the Sellers, the estimated capital and operational costs and expenses (or reduction or increases thereof) attributable to the Sellers' Working Interest, and such other factors as are necessary to make an evaluation and determination of such value;

(v)    if a Defect is an Environmental Defect, the Defect Amount shall be equal to the costs and expenses (as of the Closing Date) to Remediate the applicable Asset subject to such Environmental Defect in the most cost-effective manner reasonably available  (considered as a whole, taking into consideration any material negative impact such Remediation may have on the operations of the relevant Assets and any potential material additional costs that may likely arise as a result of such Remediation), consistent with applicable Environmental Laws taking into account that non-permanent remedies (including mechanisms to contain or stabilize Hazardous Substances, including monitoring site conditions, natural attenuation, risk-based corrective action, institutional controls, or other appropriate restrictions on the industrial use of the property, caps, dikes, encapsulation, leachate collection systems, and the like) may be the most cost-effective manner reasonably available and, where applicable, to the satisfaction of the applicable Governmental Authorities; *provided*, *however*, such Defect Amount shall expressly exclude (A) the costs, fees and expenses of Purchaser's and/or its Affiliate's employees or attorneys, (B) costs, fees and expenses for matters that are ordinary costs of doing business regardless of the presence of an Environmental Defect (*e.g.*, those costs that would ordinarily be incurred in the day-to-day operations of the Assets or in connection with permit renewal/amendment activities), (C) overhead costs of Purchaser or its Affiliates and (D) any Remediation costs, fees or expenses charged or chargeable to any other Working Interest owner or co-tenant or joint owner of the underlying Assets burdened by such Environmental Defect; *provided*, *further*, that, for the avoidance of doubt, Environmental Defects of a similar nature at different properties cannot be aggregated for the purposes of meeting the Environmental Defect Threshold;

(vi)    the Defect Amount with respect to a Defect shall be determined without duplication of any costs or losses included in another Defect Amount hereunder, or for which Purchaser otherwise receives credit in the calculation of the Adjusted Purchase Price.

(vii)    except as provided in Section 3.2(d)(ii), the aggregate adjustment to the Unadjusted Purchase Price for all Defect Amounts attributable to Title Defects with respect to each Asset shall not exceed the Allocated Value of such Asset (after giving effect to any applicable adjustments due to prior Title Defects).

(e)    Title Benefit Amounts. The "***Title Benefit Amount***" for any Title Benefit shall be determined as follows:

(i)    if a Title Benefit applicable to any Subject Formation as to any Well or Future Well represents a positive discrepancy between (A) the actual Net Revenue Interest for

such Subject Formation as to such Well or Future Well and (B) the Net Revenue Interest percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for such Subject Formation as to such Well or Future Well, then the Title Benefit Amount shall be equal to the product of (1) the Allocated Value of such Subject Formation as to such Well or Future Well *multiplied by* (2) a fraction, (x) the numerator of which is the remainder of (i) the actual Net Revenue Interest of such Subject Formation as to such Well or Future Well *minus* (ii) the Net Revenue Interest percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for such Subject Formation as to such Well or Future Well, and (y) the denominator of which is the Net Revenue Interest percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for such Subject Formation as to such Well or Future Well; *provided*, that if the Title Benefit does not affect the Net Revenue Interest percentage stated on <u>Exhibit A-2</u> or <u>Exhibit A-3</u>, as applicable, for such Subject Formation as to such Well or Future Well throughout its entire productive life, the Title Benefit Amount determined under this <u>Section 3.2(e)(i)</u> shall be reduced to take into account the applicable time period only; and

(ii)    if the Title Benefit represents a benefit of a type not described in <u>Section 3.2(e)(i)</u>, the Title Benefit Amount shall be determined by taking into account the Allocated Value of the Well or Future Well so affected, the portion of the Sellers' interest in the Well or Future Well affected by the Title Benefit, the legal effect of the Title Benefit, the potential positive economic effect of the Title Benefit over the life of the affected Well or Future Well, the values placed upon the Title Benefit by Purchaser and the Sellers and such other factors as are necessary to make an evaluation and determination of such value.

(f)    <u>Individual Threshold and Defect Deductible</u>. Notwithstanding anything to the contrary in this Agreement:

(i)    There shall be no adjustments to the Unadjusted Purchase Price under <u>Section 3.2(g)</u> for any finally determined or agreed Defect as to any Asset to the extent the finally determined or agreed Defect Amount for such Defect as to such Asset is less than the applicable Defect Threshold (it being agreed that the applicable Defect Threshold represents a threshold and not a deductible); and

(ii)    With respect to all valid and finally determined or agreed Defects with respect to an Asset where the finally determined or agreed Defect Amount thereof exceeds the applicable Defect Threshold, there shall be no adjustment to the Unadjusted Purchase Price under <u>Section 3.2(g)</u> with respect to any and all such Defects unless and until the aggregate of all finally determined or agreed Defect Amounts with respect thereto exceeds the Defect Deductible and then only to the extent such aggregate amount exceeds the Defect Deductible (it being the intention of the Parties, in each case, that the applicable Defect Deductible represents a deductible and not a threshold).

(g)    <u>Sole and Exclusive Remedies for Defects</u>. Subject to <u>Section 3.2(i)</u>, the Sellers' right to cure or Remediate any Defects and/or dispute the existence of a Defect and the Defect Amount asserted with respect thereto, in the event that any valid Defect is not waived in writing by Purchaser or is not cured or Remediated on or prior to the Closing Date for Environmental Defects and the Cut-Off Date for Title Defects, then:

(i)    subject to satisfaction of the applicable Defect Threshold and the Defect Deductible pursuant to Section 3.2(f) and the Sellers' rights under Section 3.2(g)(ii), all Assets subject to any Defects shall be conveyed to Purchaser at Closing and the Unadjusted Purchase Price shall be decreased by the sum of the aggregate finally determined or agreed Defect Amounts attributable to all such finally determined or agreed Defects hereunder, but only to the extent such aggregate sum with respect to such Defects exceeds the Defect Deductible, it being the intention of the Parties that the Defect Deductible constitutes a deductible and not a threshold; or

(ii)    notwithstanding anything herein to the contrary, in lieu of the remedy for Defects set forth in Section 3.2(g)(i), in the event that (x) the aggregate Defect Amounts for asserted Title Defects attributable to an Asset equal or exceed one hundred percent (100%) of the Allocated Value of such Asset or (y) the aggregate Defect Amounts for asserted Environmental Defects attributable to an Asset equal or exceed one hundred percent (100%) of the Allocated Value of such Asset, the Sellers shall have the right, but not the obligation, to elect in writing delivered to Purchaser on or prior to the Closing Date, to exclude the Well(s) or Future Well(s) subject to such Title Defects or the Oil and Gas Property(ies) subject to such Environmental Defects (together with all associated Assets) from the transactions contemplated hereunder and, in such event, (A) the Unadjusted Purchase Price shall be decreased by the Allocated Value of such excluded Assets, (B) all such Assets shall be deemed to be excluded from the definition of Assets and from Exhibit A, (C) such Assets shall be deemed to constitute Excluded Assets set forth on Schedule 1.1(a) and (D) Purchaser shall have no rights or obligations hereunder with respect to such Excluded Assets.

(h)    Remedies for Title Benefits. Subject to Purchaser's right to dispute the existence of a Title Benefit and the Title Benefit Amount asserted with respect thereto, the downward adjustment to the Unadjusted Purchase Price with respect to Defects set forth in Section 2.4(a) shall be offset by the sum of the aggregate finally determined or agreed Title Benefit Amounts attributable to all finally determined or agreed Title Benefits. For the avoidance of doubt, no finally determined or agreed Title Benefits or Title Benefit Amounts shall result in an increase to the Unadjusted Purchase Price.

(i)    Disputed Defects.

(i)    The Sellers and Purchaser shall use good faith efforts to agree prior to and after Closing on the interpretation and effect of this Article 3 and the existence, validity and determination of all Title Benefits, Title Benefit Amounts, Defects and Defect Amounts (or the cure thereof). If the Sellers and Purchaser are unable to agree on any of the matters described in the foregoing sentence or any other matter related to title to the Assets (each, a "***Disputed Matter***"), then Purchaser shall deliver the Defect Escrow Amount to the Escrow Agent at Closing to be held pursuant to the terms hereof and the terms of the Escrow Agreement and the affected Asset(s) subject to such Defects shall nonetheless be conveyed to Purchaser at Closing. If the Sellers and Purchaser are unable to agree on any Disputed Matter by the date sixty (60) days after the Closing Date, then, subject to Section 3.2(c), Section 3.2(d), Section 3.2(f) and Section 3.2(g), all such Disputed Matters shall be exclusively and finally resolved pursuant to this Section 3.2(i). During the ten (10) Business Day period following the date sixty (60) days after the Closing Date, (A) such Disputed Matters shall be submitted to a three-person panel of neutral title attorneys (the "***Title***

-44-

*Arbitration Panel*"), each of which shall have at least ten (10) years' experience in oil and gas titles in the state where the Assets are located (each such neutral title attorney, a "*Title Referee*") and (B) such Disputed Matters with respect to Environmental Defects, related Defect Amounts or the Remediation thereof shall be submitted to a neutral nationally recognized independent environmental consulting firm mutually acceptable to the Sellers and Purchaser or, absent such agreement during the ten (10) Business Day period, by the Bankruptcy Court (the "*Environmental Referee*" and collectively with the Title Referees, each a "*Defect Referee*"). The Sellers' Representative and Purchaser shall each appoint one (1) Title Referee to sit on the Title Arbitration Panel and such Title Referees shall collectively appoint the third (3rd) Title Referee. The Defect Referee shall not have worked as an employee or outside counsel for any Party or any Affiliate of any Party during the ten (10) year period preceding the arbitration or have any financial interest in the dispute.

(ii)     Within ten (10) Business Days after the selection of the applicable Defect Referee, the Parties shall provide to such Defect Referee only the documents and materials described in this Section 3.2(i)(ii), as applicable (it being the intention of the Parties that any Party submitting a Defect Notice or Title Benefit Notice shall only be able to submit to the applicable Defect Referee the information, reports, opinions and materials included with or provided as part of such Defect Notice or Title Benefit Notice):

(A)     each Defect Notice and all documentation provided therewith with respect to each disputed Defect;

(B)     each Title Benefit Notice and all documentation provided therewith with respect to each disputed Title Benefit;

(C)     such evidence as the Sellers' Representative deems appropriate to explain and dispute the existence, waiver and cure of each disputed Defect or the Defect Amount assigned thereto by Purchaser in any Defect Notice, together with the Sellers' good faith estimate of the Defect Amount, if any, with respect to each such disputed Defect;

(D)     such evidence as Purchaser deems appropriate to dispute the existence of any disputed Title Benefit or the Title Benefit Amount assigned thereto in any Title Benefit Notice with respect any such disputed Title Benefit, together with Purchaser's good faith estimate of the disputed Title Benefit Amount, if any, with respect to each such disputed Title Benefit; and

(E)     this Article 3, Exhibit A (including Exhibit A-1, Exhibit A-2 and Exhibit A-3) and Schedule 2.8, together with any definitions of terms used in this Article 3 and such Exhibits and Schedule, but no other provisions of this Agreement.

(iii)     The arbitration proceeding shall be held in Dallas, Texas and shall be conducted in accordance with, but not under the auspices or jurisdiction of, the Commercial Arbitration Rules of the AAA, to the extent such rules do not conflict with the terms of this Section 3.2. The applicable Defect Referee's determination shall be made within fifteen (15) days after submission of the matters in dispute and shall be final and binding upon the Parties, without a right of appeal. In making a determination, the applicable Defect Referee shall be bound by the

rules set forth in this Article 3 and may consider such other matters as in the opinion of the applicable Defect Referee are necessary or helpful to make a determination; *provided*, *however*, in determining the existence or amount of any Defect, Defect Amount, Title Benefit or Title Benefit Amount, neither Sellers (solely to the extent related to a Title Benefit or Title Benefit Amount) nor Purchaser (solely to the extent related to a Title Defect or Defect Amount) may submit any evidence, records, materials, data or information that was not included in a valid Defect Notice delivered to the Sellers' Representative by the Defect Deadline or Title Benefit Notice delivered to Purchaser by the Defect Deadline. Additionally, the applicable Defect Referee may consult with and engage any disinterested Third Party to advise the Defect Referee, including title attorneys, petroleum engineers and environmental consultants. Any decision of the Title Arbitration Panel shall require the unanimous vote of all of the Title Referees.

(iv)　　In rendering his or her award, the applicable Defect Referee shall be limited to selecting either the Sellers' position or Purchaser's position on each of the disputed Title Benefits, Title Benefit Amounts, Defects or Defect Amounts. Notwithstanding anything herein to the contrary, the Defect Referee shall have exclusive, final and binding authority with respect to the scope of the Defect Referee's authority with respect to any dispute arising under or related to this Article 3 or any disputed Title Benefits, Title Benefit Amounts, Defect or Defect Amount and in no event shall any dispute as to the authority of the Defect Referee to determine any such disputes be subject to resolution or the provisions of Section 13.3. The applicable Defect Referee shall act as an expert for the limited purpose of determining the interpretation and effect of this Article 3 and any and all specific disputed Title Benefit Amounts, Defects or Defect Amount submitted by any Party and may not award any damages, interest or penalties to any Party with respect to any matter. Sellers and Purchaser shall pay all of their own costs and expenses (including reasonable attorneys' fees and the costs associated with such Party presenting its case), and Sellers, on one hand, and Purchaser, on the other hand, shall each bear and pay fifty percent (50%) of the costs and fees of the Defect Referee and/or Environmental Referee, as applicable.

(v)　　From time to time after the Closing Date, to the extent the Parties have mutually agreed on any disputed Title Benefit and Title Benefit Amount with respect thereto and/or any disputed Defect and Defect Amount with respect thereto (or the cure thereof), or such disputed Title Benefit and Title Benefit Amount with respect thereto and/or any Defect and Defect Amount with respect thereto (or the cure thereof) has been finally determined by a Defect Referee, then, no later than three (3) Business Days after the date of such agreement or determination, the Parties shall deliver joint written instructions directing the Escrow Agent to disburse from the Defect Escrow Amount the Title Benefit Amount or Defect Amount with respect thereto to the Party entitled to such amount pursuant to the terms of this Agreement, together with any interest accrued on such amount under the terms of the Escrow Agreement.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Subject to the provisions of this Article 4 and the other terms and conditions of this Agreement and the exceptions and matters set forth in the Disclosure Schedules, the Sellers represent and warrant to Purchaser on the Execution Date and the Closing Date the matters set out in this Article 4; *provided*, *however*, to the extent that each representation and warranty of the

Sellers in this <u>Article 4</u> relates to Assets that are not operated by any Seller, each such representation and warranty is expressly limited to the Knowledge of the Sellers.

Section 4.1 **Existence and Qualification**. Each Seller is duly formed or organized, validly existing and in good standing under the Laws of its state of formation or organization (as set forth in the introductory paragraph) and, except where the failure to do so does not result in a Material Adverse Effect, is duly qualified to carry on its business in the states where the Assets are located and those other states where it is required to be so qualified.

Section 4.2 **Power**. Subject to the approval of the Bankruptcy Court, each Seller has the applicable corporate, limited liability company and/or limited partnership power to enter into and perform its obligations under this Agreement and the other Transaction Documents and to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

Section 4.3 **Authorization and Enforceability**. The execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary applicable corporate, limited liability company and/or limited partnership action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller (and all Transaction Documents required to be executed and delivered by each Seller at Closing shall be duly executed and delivered by such Seller) and this Agreement constitutes, and at the Closing such Transaction Documents shall constitute, the valid and binding obligations of each Seller, enforceable in accordance with their respective terms except as such enforceability may be limited by applicable bankruptcy or other similar Laws affecting the rights and remedies of creditors generally as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.4 **No Conflicts**. Except as set forth on <u>Schedule 4.4</u> and any Consents, Cure Costs under any Assumed 365 Contracts or Permitted Encumbrances, the execution, delivery and performance of this Agreement and the other Transaction Documents by each Seller, and the consummation of the transactions contemplated hereby and thereby shall not (a) violate any provision of any Governing Documents of such Seller, (b) result in the creation of any material Lien on the Assets, (c) result in material default (with due notice or lapse of time or both) the creation of any Lien or give rise to any right of termination, cancellation or acceleration under any material note, bond, mortgage, indenture, or other financing instrument to which such Seller is a party or by which such Seller or the Assets are bound that will not be avoided, satisfied, assigned or terminated on or prior to the Closing as a result of the transactions contemplated hereunder or any orders of the Bankruptcy Court, (d) violate any judgment, order, ruling, or decree applicable to such Seller as a party in interest, or (e) violate any Laws applicable to such Seller, except in each case of the foregoing <u>clauses (b)</u> through <u>(e)</u> for any matters that do not result in a Material Adverse Effect.

Section 4.5 **Litigation**. Except as set forth on <u>Schedule 4.5</u>, the Chapter 11 Case, and except with respect to Environmental Laws and Environmental Liabilities, which are solely addressed in <u>Section 4.16</u> and <u>Article 3</u>, there are no actions, suits, claims, charges, arbitrations, or other proceedings (including condemnation, expropriation, or forfeiture proceedings) (a) pending

before any Governmental Authority against any Seller (i) relating to any Asset or any Seller's ownership or operation thereof or (ii) seeking to prevent the consummation of the transactions contemplated hereby or (b) to Sellers' Knowledge, expressly threatened in writing against any Seller (i) relating to any Asset or any Seller's ownership thereof or (ii) seeking to prevent the consummation of the transactions contemplated hereby.

Section 4.6    **Taxes**. Except as set forth on <u>Section 4.6</u>, (a) all material Asset Taxes that have become due and payable have been paid, (b) all material Tax Returns with respect to Asset Taxes required to be filed have been timely filed and such Tax Returns are true, correct and complete in all material respects, (c) there is no ongoing, pending or, to the Knowledge of the Sellers, threatened audit, adjustment, claim, examination, assessment, or other proceeding relating to or in connection with any Asset Taxes, (d) all Tax withholding and deposit requirements imposed by applicable Laws with respect to any of the Assets have been satisfied in all material respects, (e) no written claim has been made by a Governmental Authority in a jurisdiction where any Seller does not file Tax Returns with respect to Asset Taxes that such Seller is or may be subject to taxation by that jurisdiction with respect to such Asset Taxes, (f) there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any Asset Taxes, (g) there are no liens for Taxes on the Assets, other than with respect to Taxes not yet delinquent, or, if delinquent, being contested in good faith by appropriate actions set forth on <u>Schedule 4.6</u> and (h) none of the Assets are subject to any tax partnership agreement or is otherwise treated, or required to be treated, as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code.

Section 4.7    **Compliance with Laws**. Except as set forth on <u>Schedule 4.7</u> and except with respect to Environmental Laws and Environmental Liabilities, which are solely addressed in <u>Section 4.16</u>, <u>Section 4.20</u> and <u>Article 3</u>, each Seller's ownership of the Assets is not in material violation of any applicable Laws.

Section 4.8    **Material Contracts**.

(a)    Except for any Material Contracts (and amendments thereto) executed in accordance with <u>Section 7.2</u>, the 365 Contracts set forth on <u>Schedule 7.3</u> and the Required Contracts, <u>Schedule 4.8(a)</u> sets forth a complete and accurate list of all Material Contracts to which any Seller is party that (x) relate to the ownership or operation of the Properties or (y) are otherwise binding on any of the Properties and (z) will not be avoided, satisfied, assigned or terminated on or prior to the Closing as a result of the transactions contemplated hereunder or any orders of the Bankruptcy Court.

(b)    Except as set forth on <u>Schedule 4.8(b)</u> or with respect to any defaults or breaches (i) for which Cure Costs are asserted in the Chapter 11 Case or (ii) that have been asserted in any matters or proceedings described on <u>Schedule 4.5</u>, (x) there exist no material defaults under such Material Contracts by any Seller or, to such Seller's Knowledge, by any other Person that is a party to such Material Contract, (y) each Seller has not received from any other party to any 365 Contracts set forth on <u>Schedule 7.3</u> or Required Contracts that constitute a Material Contract, any written notice of any material default or material breach thereof by the Sellers or termination or intention to terminate such Material Contract that remains unresolved and/or uncured as of the

Execution Date (except for any Assumed Contracts for which Sellers are obligated hereunder to bear and pay the Cure Costs).

(c)     Complete and accurate copies of all Available 365 Contracts and Required Contracts constituting Material Contracts set forth on Schedule 4.8(a) have been made available to Purchaser prior to the Execution Date (*provided* that, Sellers shall not be obligated to make available to Purchaser any pooling orders that are filed with a Governmental Authority that are made available or accessible online to the general public).

Section 4.9     **Consents, Preferential Rights and Tag-Along Rights**. Except as set forth on Schedule 4.9, (a) there are no Required Consents required to be obtained, made, or complied with for or in connection with the sale, assignment or transfer of any Asset as contemplated by this Agreement and (b) there are no Preferential Rights or Tag-Along Rights applicable to the sale of Assets by the Sellers as contemplated by this Agreement.

Section 4.10     **Outstanding Capital Commitments**. Except as set forth on Schedule 4.10, as of the Execution Date, there are no outstanding authorizations for expenditure or similar requests or invoices for funding or participation under any Contract that are binding on Sellers or the Assets and that Sellers reasonably anticipate will individually require expenditures by the owner of the Assets attributable to periods on or after the Effective Time in excess of One Hundred Fifty Thousand Dollars ($150,000.00) (net to the Sellers' Working Interest).

Section 4.11     **Imbalances**. Except as set forth on Schedule 4.11 or for which the Unadjusted Purchase Price shall be adjusted under Section 2.4(g), to the Sellers' Knowledge as of the Execution Date there are no material Imbalances as of the date(s) set forth on Schedule 4.11.

Section 4.12     **Wells**.

(a)     All Wells and Carbon Storage Wells (if any) have been drilled and completed within the limits permitted by all applicable Leases and Carbon Leases, as applicable, in all material respects, and no Well or Carbon Storage Well is subject to penalties on allowables (or similar restrictions on injection wells) with regard to periods after the Effective Time; and

(b)     except as described on Schedule 4.12, with respect to the Properties operated by any Seller or an Affiliate of any Seller and, to the Sellers' Knowledge, Oil and Gas Properties operated by any Third Party, and other than Wells that have been Plugged and Abandoned in accordance with all applicable Laws, (i) there are no dry holes, or shut in or otherwise inactive wells that are located on the Leases or the units that any Seller or an Affiliate of any Seller is currently obligated by applicable Law to Plug and Abandon, and (ii) there are no Wells in respect of which Seller or any of its Affiliates (or any Third Party) has received a written order from any Governmental Authority or a written demand from any Third Party (in each case) requiring that such wells be Plugged and Abandoned.

Section 4.13     **Credit Support**. Schedule 4.13 is a complete and accurate list of all Credit Support provided by or on behalf of any Seller in support of the obligations of such Seller to any Governmental Authority, contract counterparty or other Person related to the ownership or operation of the Assets.

Section 4.14 **Leases**.

(a) To Sellers' Knowledge, Schedule 4.14(a) sets forth (i) an accurate schedule of each Lease or Carbon Lease that is not held by production or perpetuated by ongoing operations and (ii) the expiration dates of the primary term for each Lease or Carbon Lease with a primary term that will expire prior to the Target Closing Date or in the six (6) month period immediately following the Target Closing Date, in each case of (i) and (ii) as determined as of December 31, 2021;

(b) except as set forth on Schedule 4.14(b), none of the Leases or Carbon Leases operated by such Seller or such Seller's Affiliates is subject to any unfulfilled obligations to drill any commitment wells within the six (6) month period immediately following the Target Closing Date; and

(c) Except for any rental or lease payments for which Cure Costs are asserted in the Chapter 11 Case, to such Seller's Knowledge, all material Royalties, rentals and lease payments due and payable by such Seller or any of such Seller's Affiliates to royalty holders, overriding royalty holders, and other interest owners under or with respect to any of the Assets and any Hydrocarbons or Gas produced or stored in connection therewith, measured thereby, or attributable thereto (including working interest amounts), in each case, have been properly and timely paid (or constitute Suspense Funds) in all material respects.

Section 4.15 **Non-Consent Operations**. Except as set forth on Schedule 4.15, no operations are being conducted or have been conducted on the Assets with respect to which such Seller has elected to be a nonconsenting party under the applicable operating agreement and with respect to which such Seller's rights have not yet reverted to such Seller.

Section 4.16 **Environmental Matters**. As of the Execution Date, (i) to the Knowledge of the Sellers, there is no unresolved violation by the Sellers (or any Third Party operator) of any applicable Environmental Laws (including all permits required thereunder) with respect to the ownership and operation of the Assets; (ii) there are no pending or, to the Knowledge of the Sellers, threatened material actions, suits, or proceedings relating to violations of, or liability under, Environmental Laws with respect to the Assets; and (iii) the Sellers have not entered into and are not otherwise bound by any outstanding, material agreements, orders, decrees or judgments of any Governmental Authority issued under or otherwise relating to Environmental Laws.

Section 4.17 **Hedges**. Except as set forth in Schedule 4.17, there are no futures, options, swaps, or other derivatives with respect to the sale of Hydrocarbons from the Assets that will be binding on the Assets after Closing.

Section 4.18 **Employee Benefit Plans.** Schedule 4.18 lists each material Benefit Plan. "Benefit Plan" means each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA), all other severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing, employment or deferred compensation plans, contracts, programs, funds, or arrangements of any kind, and all other material employee benefit plans, contracts, programs, funds, or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic) that are maintained, sponsored or

-50-

contributed to by Seller in relation to the Employees, excluding any benefit or compensation plan or arrangement maintained or to which contributions are required by a governmental entity. With respect to each such material Benefit Plan currently in effect, Seller has made available to Purchaser copies of, as applicable: the current plan document and summary plan description and the most recent IRS determination or opinion letter, if any. Sellers′ 401(k) Plan has been administered in compliance in all material respects with applicable Laws and in all material respects in accordance with its terms. Sellers′ 401(k) Plan that is intended to be qualified under Section 401(a) of the Code has either (i) received a favorable determination letter from the IRS, (ii) is a prototype plan that is entitled to rely on an opinion letter issued by the IRS to the prototype plan sponsor or (iii) the period for applying for a favorable determination letter from the IRS has not lapsed.

Section 4.19 **Employment Matters**. No Employee is represented by a labor union or other representative of employees and no Seller nor any Affiliate of any Seller nor any of the Assets is a party to, subject to, or bound by a collective bargaining agreement or any other contract, agreement or understanding with a labor union or similar representative of employees. There are no strikes, lockouts or work stoppages existing or, to each Seller's Knowledge, threatened, with respect to any Employees. For the past three (3) years, there have been no union certification or representation petitions or demands with respect to the Assets, any Seller or any Affiliate of any Seller, or any Employee with respect to his or her employment with Seller or its Affiliate and, to each Seller's Knowledge, no union organizing campaign or similar effort is pending or threatened with respect to the Assets, any Seller or any Affiliate of any Seller, or any Employee.

Section 4.20 **Permits**. To Sellers' Knowledge, (a) all material permits required to be issued by a Governmental Authority to operate the Properties currently operated by Sellers as of the Execution Date have been obtained and maintained, (b) there exists no material uncured violation of the terms and provisions of any such permits, (c) no such Seller nor its Affiliates have received any written notice from a Governmental Authority claiming the lack of a permit or default under any existing permit with respect to any Asset operated by such Seller or its Affiliates, and (d) Sellers have not conducted any operations on the Assets that would require (i) a Class VI underground injection control well permit or (ii) a Monitoring Reporting and Verification Plan, in each case of clause (i) and (ii), as may be required under Environmental Laws and issued and approved by the United States Environmental Protection Agency.

Section 4.21 **No Transfer**. Except as set forth on Schedule 4.21 and subject to the Permitted Encumbrances, to Sellers' Knowledge, Sellers have not transferred, sold, mortgaged, or pledged any material portion of the Properties covered any depths other than the applicable Subject Formations to (i) any Affiliate (except for any Assets that such Seller or Affiliate is conveying to Purchaser under this Agreement) or (ii) any Third Party, in either case, within the one (1) year period prior to the Execution Date.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Subject to the provisions of this <u>Article 5</u> and the other terms and conditions of this Agreement, Purchaser represents and warrants to the Sellers as of the Execution Date and the Closing Date the following:

Section 5.1   **Existence and Qualification**. Purchaser is a limited partnership duly organized, validly existing and in good standing under the Laws of the state of Delaware (as set forth in the introductory paragraph) and is duly qualified and in good standing to carry on its business in states where the Assets are located and those other states where it is required to be so qualified.

Section 5.2   **Power**. Purchaser has the limited partnership power to enter into and perform its obligations under this Agreement, the other Transaction Documents and to consummate the transactions contemplated by this Agreement and the other Transaction Documents.

Section 5.3   **Authorization and Enforceability**. The execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary limited partnership action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser (and all documents required to be executed and delivered by Purchaser at Closing shall be duly executed and delivered by Purchaser) and this Agreement constitutes, and at the Closing such Transaction Documents shall constitute, the valid and binding obligations of Purchaser, enforceable in accordance with their respective terms except as such enforceability may be limited by applicable bankruptcy or other similar Laws affecting the rights and remedies of creditors generally as well as to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.4   **No Conflicts**. The execution, delivery, and performance of this Agreement and the other Transaction Documents by Purchaser, and the consummation of the transactions contemplated hereby and thereby, shall not (a) violate any provision of any Governing Documents of Purchaser or any agreement or instrument to which it is a party or by which it is bound, (b) result in a material default (with due notice or lapse of time or both) or give rise to any right of termination, cancellation or acceleration under any material note, bond, mortgage, indenture or other financing instrument to which Purchaser is a party or by which it is bound, (c) materially violate any judgment, order, ruling or regulation applicable to Purchaser as a party in interest, or (d) materially violate any Law applicable to Purchaser.

Section 5.5   **Consents, Approvals or Waivers**. The execution, delivery and performance of this Agreement and the other Transaction Documents by Purchaser shall not be subject to any consent, approval, notice or waiver from any Governmental Authority or other Third Party.

-52-

Section 5.6 **Defense Production Act**. Purchaser is not a foreign person and the transactions contemplated by this Agreement are not a "covered transaction" as those terms are defined in Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. App. 2170, and the regulations promulgated thereunder, 31 C.F.R. Part 800 or if the transactions contemplated by this Agreement constitute a "covered transaction" neither Purchaser nor its Affiliates are required under Section 721 of the Defense Production Act of 1950, as amended, 50 U.S.C. App. 2170, and the regulations promulgated thereunder, or 31 C.F.R. Part 800 to provide any notice to or obtain any consent, approval or waiver from, any Governmental Authority.

Section 5.7 **Litigation**. There are no actions, suits, or proceedings (including condemnation, expropriation or forfeiture proceedings) (a) pending before any Governmental Authority or arbitrator against Purchaser or its Affiliates seeking to prevent the consummation of the transactions contemplated hereby or (b) to Purchaser's knowledge, expressly threatened in writing with reasonable specificity by any Third Party or Governmental Authority against Purchaser or its Affiliates seeking to prevent the consummation of the transactions contemplated hereby.

Section 5.8 **Bankruptcy**. There are no bankruptcy, reorganization or receivership proceedings pending against, being contemplated by or, to the knowledge of Purchaser, threatened against Purchaser or any Affiliate thereof (whether by Purchaser or any Third Party).

Section 5.9 **Financing**. Purchaser has sufficient cash, available lines of credit or equity or other sources of immediately available funds (subject, however, to a reasonable amount of time necessary to call capital or equity) to enable it to deliver to Sellers the Closing Payment at the Closing and to take and fulfill all other actions as may be required at Closing to consummate the transaction contemplated hereunder. Purchaser expressly acknowledges that the failure to have sufficient funds at Closing shall in no event be a condition to the performance of its obligations hereunder at Closing, and in no event shall the Purchaser's failure to perform its obligations hereunder be excused by the failure to receive funds from any source.

Section 5.10 **Investment Intent**. Purchaser is acquiring the Assets for its own account and not with a view to their sale or distribution in violation of the Securities Act of 1933, as amended, the rules and regulations thereunder, any applicable state blue sky laws or any other applicable securities laws.

Section 5.11 **Qualification**. Purchaser will be qualified under all applicable Laws to (a) own the Assets as of the Closing Date and (b) operate the Assets (if any) operated by the Sellers immediately upon expiration or termination of the Transition Services Agreement and Purchaser has, or as of the Closing will have, posted and provided all Credit Support, and provided such evidence of Credit Support, as may be required under Section 7.12 for the ownership of the Assets and operation of the Assets operated by the Sellers immediately prior to Closing.

Section 5.12 **Independent Evaluation**. Purchaser is a sophisticated, experienced and knowledgeable investor in the oil and gas business. In entering into this Agreement, Purchaser has relied solely upon Purchaser's own expertise in legal, tax, reservoir engineering and other professional counsel concerning this transaction, the Assets and the value thereof. Purchaser acknowledges and affirms that (a) Purchaser has completed such independent investigation,

verification, analysis and evaluation of the Assets and has made all such reviews and inspections of the Assets as it has deemed necessary or appropriate to enter into this Agreement and (b) at Closing, Purchaser shall have completed, or caused to be completed, its independent investigation, verification, analysis, and evaluation of the Assets and made all such reviews and inspections of the Assets as Purchaser has deemed necessary or appropriate to consummate the transaction. Purchaser understands and acknowledges that neither the United States Securities and Exchange Commission nor any federal, state or foreign agency has passed upon the Assets or made any finding or determination as to the fairness of an investment in the Assets or the accuracy or adequacy of the disclosures made to Purchaser.

## ARTICLE 6

## DISCLAIMERS AND ACKNOWLEDGEMENTS

Section 6.1 **General Disclaimers**. EXCEPT AS EXPRESSLY REPRESENTED OTHERWISE IN <u>ARTICLE 4</u> AND THE CERTIFICATES OF THE SELLERS TO BE DELIVERED AT THE CLOSING PURSUANT TO <u>SECTION 9.2(H)</u>, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, (A) NO MEMBER OF THE SELLER GROUP MAKES, EACH SELLER EXPRESSLY DISCLAIMS, AND PURCHASER WAIVES AND REPRESENTS AND WARRANTS THAT PURCHASER HAS NOT RELIED UPON, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IN THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER INSTRUMENT, AGREEMENT OR CONTRACT DELIVERED HEREUNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER, INCLUDING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED AS TO (a) ANY MEMBER OF THE SELLER GROUP, (b) ANY TITLE TO ANY OF THE ASSETS OR THE EXISTENCE OR NON-EXISTENCE OF ANY TITLE DEFECTS OR OTHER ENCUMBRANCES OR BURDENS ON THE ASSETS, (c) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT OR ANY GEOLOGICAL, SEISMIC DATA, RESERVE DATA, RESERVE REPORTS, OR RESERVE INFORMATION (ANY ANALYSIS OR INTERPRETATION THEREOF) RELATING TO THE ASSETS, (d) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (e) THE EXISTENCE OF ANY PROSPECT, RECOMPLETION, INFILL OR STEP-OUT DRILLING OPPORTUNITIES, (f) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (g) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM THE ASSETS, OR WHETHER PRODUCTION HAS BEEN CONTINUOUS OR IN PAYING QUANTITIES, OR ANY PRODUCTION OR DECLINE RATES, (h) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (i) INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHT, (j) ANY BULK SALES LAWS OR SIMILAR LAWS, (k) THE TRANSFERABILITY OR ASSIGNABILITY OF OPERATORSHIP OF ANY OF THE ASSETS OR THE ABILITY OF PURCHASER TO BE DESIGNATED OR QUALIFIED AS OPERATOR OF ANY ASSETS AND/OR (l) ANY OTHER RECORD, FILES, MATERIALS OR INFORMATION (INCLUDING AS TO THE ACCURACY, COMPLETENESS, OR CONTENTS OF THE RECORDS) THAT

**MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO PURCHASER GROUP OR THEIR REPRESENTATIVES IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (B) EACH SELLER FURTHER DISCLAIMS, AND PURCHASER WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY EQUIPMENT, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT EXCEPT AS SET FORTH ABOVE THE ASSETS ARE BEING TRANSFERRED "AS IS, WHERE IS," WITH ALL FAULTS AND DEFECTS, AND THAT PURCHASER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS PURCHASER DEEMS APPROPRIATE. PURCHASER SPECIFICALLY DISCLAIMS ANY OBLIGATION OR DUTY BY THE SELLERS OR ANY MEMBER OF THE SELLER GROUP TO MAKE ANY DISCLOSURES OF FACT NOT REQUIRED TO BE DISCLOSED PURSUANT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH HEREIN AND IN THE CONVEYANCES AND MINERAL DEEDS AND PURCHASER EXPRESSLY ACKNOWLEDGES AND COVENANTS THAT PURCHASER DOES NOT HAVE AND WILL NOT HAVE AND WILL NOT ASSERT ANY CLAIMS, DAMAGES, OR EQUITABLE REMEDIES WHATSOEVER AGAINST ANY MEMBER OF THE SELLER GROUP EXCEPT FOR CLAIMS, DAMAGES, AND EQUITABLE REMEDIES AGAINST THE SELLERS FOR BREACH OF AN EXPRESS REPRESENTATION, WARRANTY, OR COVENANT OF THE SELLERS UNDER THIS AGREEMENT OR THE TRANSACTION DOCUMENTS AND TO THE EXTENT PROVIDED HEREIN OR THEREIN.**

Section 6.2 **Environmental Disclaimers**. Purchaser acknowledges that (a) the Assets have been used for exploration, development, production, gathering and transportation of oil and gas and other Hydrocarbons and there may be petroleum, produced water, wastes, scale, NORM, Hazardous Substances or other substances or materials located in, on or under the Assets or associated with the Assets; (b) Equipment and sites included in the Assets may contain NORM or other Hazardous Substances; (c) NORM may affix or attach itself to the inside of wells, pipelines, materials and equipment as scale, or in other forms; (d) the wells, materials, and equipment located on the Assets or included in the Assets may contain NORM and other wastes or Hazardous Substances; (e) NORM containing material or other wastes or Hazardous Substances may have come in contact with various environmental media, including water, soils, or sediment; and (f) special procedures may be required for the assessment, Remediation, removal, transportation, or disposal of environmental media, wastes, NORM and other Hazardous Substances from the Assets. **NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, EXCEPT AS SET FORTH IN Section 4.16 AND SUBJECT TO PURCHASER'S RIGHTS IN ARTICLE 3 AND ARTICLE 12, NO SELLER MAKES, EACH SELLER EXPRESSLY DISCLAIMS AND PURCHASER WAIVES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY ENVIRONMENTAL DEFECT, ENVIRONMENTAL LIABILITIES, RELEASE OF HAZARDOUS SUBSTANCES OR ANY OTHER ENVIRONMENTAL CONDITION, INCLUDING THE PRESENCE OR ABSENCE OF ASBESTOS OR NORM IN OR ON THE ASSETS IN QUANTITIES**

TYPICAL FOR OILFIELD OPERATIONS IN THE AREAS WHERE THE ASSETS ARE LOCATED. SUBJECT TO PURCHASER'S RIGHTS IN <u>ARTICLE 3</u> AND <u>ARTICLE 12</u> AS OF CLOSING, PURCHASER SHALL HAVE INSPECTED AND WAIVED ITS RIGHT TO INSPECT THE ASSETS FOR ALL PURPOSES, AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, INCLUDING CONDITIONS SPECIFICALLY RELATING TO THE PRESENCE, RELEASE, OR DISPOSAL OF HAZARDOUS SUBSTANCES, SOLID WASTES, ASBESTOS, OTHER MAN-MADE FIBERS, AND NORM. PURCHASER IS RELYING SOLELY UPON THE TERMS OF THIS AGREEMENT AND ITS OWN INSPECTION OF THE ASSETS. AS OF CLOSING, PURCHASER HAS MADE ALL SUCH REVIEWS AND INSPECTIONS OF THE ASSETS AND THE RECORDS AS PURCHASER HAS DEEMED NECESSARY OR APPROPRIATE TO CONSUMMATE THE TRANSACTION.

Section 6.3 <u>**Calculations, Reporting and Payments**</u>. PURCHASER ACKNOWLEDGES AND AGREES THAT CLAIMS OR PROCEEDINGS AGAINST THE SELLERS OR TO WHICH ANY SELLER IS OR MAY BECOME A PARTY BEFORE, ON OR AFTER THE CLOSING MAY HAVE AN EFFECT ON THE CALCULATION OF, AND LIABILITY WITH RESPECT TO TAXES, ROYALTIES, RENTALS AND OTHER PAYMENT OBLIGATIONS OF PURCHASER ARISING AFTER THE EFFECTIVE TIME RELATING TO THE ASSETS AND THE ASSUMED OBLIGATIONS AND THE NET REVENUE INTEREST OR WORKING INTEREST WITH RESPECT TO THE ASSETS. NOTWITHSTANDING THAT THE SELLERS HAVE RETAINED ANY LIABILITY OR RESPONSIBILITY UNDER THIS AGREEMENT FOR THE PAYMENT OF ANY DAMAGES, LOSSES OR CLAIMS WITH RESPECT TO ANY OF THE FOREGOING, THE EXCLUDED LIABILITIES SHALL NOT INCLUDE, AND PURCHASER HEREBY EXPRESSLY RELEASES THE MEMBERS OF THE SELLER GROUP FROM, ANY LIABILITY OR RESPONSIBILITY ARISING OUT OF OR RELATING TO ANY EFFECT THAT THE OUTCOME OR SETTLEMENT OF ANY SUCH CLAIMS OR PROCEEDINGS MAY HAVE ON THE CALCULATION OF TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF PURCHASER ARISING AFTER THE EFFECTIVE TIME OR THE NET REVENUE INTEREST OR WORKING INTEREST WITH RESPECT TO THE ASSETS. FOR THE AVOIDANCE OF DOUBT, PURCHASER ACKNOWLEDGES AND AGREES THAT PURCHASER CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM THE SELLERS' METHODOLOGIES FOR (A) THE CALCULATION AND REPORTING OF PRODUCTION AND ROYALTIES ATTRIBUTABLE TO PRODUCTION PRIOR TO THE EFFECTIVE TIME OR (B) THE DETERMINATION AND REPORTING OF ANY ASSET TAXES THAT WERE UTILIZED FOR ANY TAX RETURN FILED PRIOR TO THE CLOSING DATE FOR PURPOSES OF CALCULATING AND REPORTING ASSET TAXES ATTRIBUTABLE TO ANY TAX RETURN FILED AFTER THE CLOSING DATE, IT BEING UNDERSTOOD THAT PURCHASER MUST MAKE ITS OWN DETERMINATION AS TO THE PROPER METHODOLOGIES THAT CAN OR SHOULD BE USED FOR ANY SUCH LATER TAX RETURN.

Section 6.4 <u>**Changes in Prices; Well Events**</u>. PURCHASER ACKNOWLEDGES THAT IT SHALL ASSUME ALL RISK OF LOSS WITH RESPECT TO: (A) CHANGES

IN COMMODITY OR PRODUCT PRICES AND ANY OTHER MARKET FACTORS OR CONDITIONS FROM AND AFTER THE EFFECTIVE TIME; (B) PRODUCTION DECLINES OR ANY ADVERSE CHANGE IN THE PRODUCTION CHARACTERISTICS OR DOWNHOLE CONDITION OF ANY WELL, INCLUDING ANY WELL WATERING OUT, OR EXPERIENCING A COLLAPSE IN THE CASING OR SAND INFILTRATION, FROM AND AFTER THE EXECUTION DATE AND (C) DEPRECIATION OF ANY ASSETS THAT CONSTITUTE PERSONAL PROPERTY THROUGH ORDINARY WEAR AND TEAR.

Section 6.5 **Limited Duties**. ANY AND ALL DUTIES AND OBLIGATIONS WHICH ANY PARTY MAY HAVE TO ANOTHER PARTY WITH RESPECT TO OR IN CONNECTION WITH THE ASSETS, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY ARE LIMITED TO THOSE IN THIS AGREEMENT. THE PARTIES DO NOT INTEND (A) THAT THE DUTIES OR OBLIGATIONS OF ANY PARTY, OR THE RIGHTS OF ANY PARTY, SHALL BE EXPANDED BEYOND THE TERMS OF THIS AGREEMENT ON THE BASIS OF ANY LEGAL OR EQUITABLE PRINCIPLE OR ON ANY OTHER BASIS WHATSOEVER OR (B) THAT ANY EQUITABLE OR LEGAL PRINCIPLE OR ANY IMPLIED OBLIGATION OF GOOD FAITH OR FAIR DEALING OR ANY OTHER MATTER REQUIRES ANY PARTY TO INCUR, SUFFER OR PERFORM ANY ACT, CONDITION OR OBLIGATION CONTRARY TO THE TERMS OF THIS AGREEMENT AND THAT IT WOULD BE UNFAIR, AND THAT THEY DO NOT INTEND, TO INCREASE ANY OF THE OBLIGATIONS OF ANY PARTY UNDER THIS AGREEMENT ON THE BASIS OF ANY IMPLIED OBLIGATION OR OTHERWISE.

Section 6.6 **Operatorship of the Assets**. The Sellers do not make any representation or warranty to Purchaser as to transferability or assignability of operatorship of the Assets or the ability of Purchaser or any other Person to be designated or qualified as the operator of the Assets.

Section 6.7 **Conspicuousness**. THE SELLERS AND PURCHASER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE 6</u> AND THE REST OF THIS AGREEMENT ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

## ARTICLE 7

## COVENANTS OF THE PARTIES

Section 7.1 **Access**.

(a) Upon execution of this Agreement until the Closing, the Sellers shall give Purchaser, its Affiliates and each of their respective officers, agents, accountants, attorneys, investment bankers, environmental consultants and other authorized representatives ("***Purchaser's Representatives***") reasonable access to the Person set forth on <u>Schedule 1.1(b)</u> and the Records in the Sellers' possession and any Assets operated by any Seller (if any), in each case during the Sellers' normal business hours, for the purpose of conducting a confirmatory review of

the Assets, in each case, to the extent that the Sellers may provide such access without (i) violating applicable Laws or breaching any Contracts, (ii) waiving any legal privilege (except as may be applicable to title opinions) of the Sellers, any of their Affiliates, or its counselors, attorneys, accountants, or consultants or (iii) violating any obligations to any Third Party. Such access shall be granted to Purchaser (A) in the offices of the Sellers located in Dallas, Texas and (B) on the premises of the Assets (if any) that are operated by such Seller except that promptly upon the execution of this Agreement, Sellers shall provide, in electronic format (to the extent currently existing and available in electronic format and, if otherwise, in its current form), Purchaser with access to all title opinions, abstracts of title, elections, division order files, title runsheets and well files and other similar data and information in Sellers' files as may be reasonably necessary in connection with Purchaser's title due diligence activities with respect to the Assets; *provided*, *however*, if Sellers fail to deliver such data and information described in the foregoing within two (2) Business Days following the Execution Date, then the Defect Deadline shall be extended one (1) day for each day thereafter that Sellers have not delivered or made available such data and information until such date that Sellers have delivered or made available such data and information; *provided further*, *however*, the Defect Deadline shall never be extended beyond the date that is one (1) Business Day prior to the Target Closing Date. To the extent that any Third Parties operate the Assets, the Sellers' obligations to provide Purchaser with access to such Assets shall be limited to requesting that the applicable Third Party operator provide Purchaser's Representatives with access to such Assets *provided*, *however*, the Sellers shall use its commercially reasonable efforts to obtain the necessary consents or waivers from Third Parties to provide such access to Purchaser. All investigations and due diligence conducted by Purchaser or any of Purchaser's Representatives with respect to the Assets shall be conducted at Purchaser's sole cost, risk and expense and any conclusions made from any examination done by Purchaser or any of Purchaser's Representatives shall result from Purchaser's own independent review and judgment. The Sellers or their designee shall have the right to accompany Purchaser and Purchaser's Representatives whenever they are on site on the Assets and are permitted to collect split test samples if any are collected pursuant to approved invasive activities under this Section 7.1(a). Purchaser's investigation and review shall be conducted in a manner that minimizes interference with the ownership or operation of the Assets or the business of the Sellers or co-owners thereof and Purchaser's inspection right with respect to the environmental condition of the Assets shall be limited to conducting a Phase I Environmental Site Assessment in accordance with the American Society for Testing and Materials (A.S.T.M.) Standard Practice Environmental Site Assessments: Phase I Environmental Site Assessment Process (Publication Designation: E1527-21) ("***Phase I***") or a similar visual assessment that does not include sampling or testing of any environmental media. Purchaser shall not be entitled to conduct any Phase II Environmental Site Assessments similar to A.S.T.M. Standard Practice Environmental Site Assessments: Phase II Environmental Site Assessment Process (Publication Designation: E1903-19) ("***Phase II***"), to include operating any equipment or conducting any other invasive or intrusive testing, or sampling on, or relating to the Assets without prior written consent of the Sellers' Representative, such consent to be granted, conditioned, or withheld at the sole discretion of the Sellers. If and to the extent Seller or any applicable Third Party operator withholds consent for such Phase II, Purchaser may elect to submit a Defect Notice for the alleged Environmental Defect; *provided*, *however*, if and to the extent Seller or any applicable Third Party operator withholds consent for such Phase II, Purchaser may elect, in its sole discretion, to submit a Defect Notice for the alleged Defect, and the failure of Purchaser to conduct such Phase II shall not invalidate, or be taken into account in

determining the existence of, the relevant Environmental Defect for purposes of meeting the requirements of <u>Section 3.2</u>, subject to the limitations set forth in <u>Article 3</u>. No later than five (5) Business Days after Purchaser's receipt, Purchaser shall furnish to the Sellers' Representative, free of costs, a copy of all final reports and test results prepared by or for Purchaser related to Purchaser's diligence and investigation of the Assets, including any and all Phase I, Phase II or further environmental assessments, intrusive testing or sampling (invasive or otherwise) on or relating to any of the Assets, to the extent relevant to any claimed Environmental Defect. Purchaser shall obtain from any applicable Governmental Authorities and Third Parties all permits required to conduct any approved invasive activities permitted by the Sellers; *provided*, that upon request, the Sellers' Representative shall provide Purchaser with assistance (at no cost or liability to the Sellers) as reasonably requested by Purchaser that may be necessary to secure such permits. The Sellers shall have the right, at their option, to split with Purchaser any samples collected pursuant to approved invasive activities under this <u>Section 7.1(a)</u>. If the Closing does not occur, Purchaser (1) shall promptly return to the Sellers' Representative or destroy all copies of the Records, reports, summaries, evaluations, due diligence memos, and derivative materials related thereto in the possession or control of Purchaser or any of Purchaser's Representatives and (2) shall keep and shall cause each of Purchaser's Representatives to keep, any and all information obtained by or on behalf of Purchaser confidential in accordance with the terms of the Confidentiality Agreement.

(b) Purchaser agrees to indemnify, defend and hold harmless each member of the Seller Group, the other owners of interests in the Assets and all such Persons' stockholders, members, managers, officers, directors, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants from and against any and all Damages (including court costs and reasonable attorneys' fees), including Damages attributable to, arising out of, or relating to Purchaser or Purchaser's Representatives' access to the Records, any offices of the Sellers or the Assets prior to the Closing, **EVEN IF SUCH CLAIMS, DAMAGES, LIABILITIES, OBLIGATIONS, LOSSES, COSTS AND EXPENSES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY MEMBER OF THE SELLER GROUP (BUT EXCLUDING (I) GROSS NEGLIGENCE OR WILLFUL MISCONDUCT ON THE PART OF THE SELLERS; AND (II) LIABILITIES ARISING FROM OR RELATED TO ENVIRONMENTAL DEFECTS THAT ARE DISCOVERED BY PURCHASER OR PURCHASER'S REPRESENTATIVES OR WERE EXISTING AS OF THE TIME PURCHASER OR PURCHASER'S REPRESENTATIVES' ACCESS THE AFFECTED ASSET, EXCEPT TO THE EXTENT ANY SUCH LIABILITY IS INCREASED DUE TO PURCHASER OR PURCHASER'S REPRESENTATIVES PHYSICAL ACTIONS (BUT NOT THE DISCOVERY OR DISCLOSURE OF AN ENVIRONMENTAL DEFECT) ON THE ASSETS).**

(c) Upon completion of Purchaser's due diligence, Purchaser shall at its sole cost and expense and without any cost or expense to any member of the Seller Group, (i) repair all damage done to the Assets in connection with Purchaser's or Purchaser's Representatives' due diligence, (ii) restore the Assets to the approximate same or better condition than they were prior to commencement of Purchaser's or Purchaser's Representative's due diligence, and (iii) remove all equipment, tools, or other property brought onto the Assets in connection with Purchaser's or Purchaser's Representatives' due diligence. Any disturbance to the Assets (including the leasehold

associated therewith) resulting from Purchaser's or Purchaser's Representatives' due diligence shall be promptly corrected by Purchaser.

(d)     During all periods that Purchaser or any of Purchaser's Representatives are on the Assets or the Sellers' premises, Purchaser shall maintain, at its sole expense and with insurers, policies of insurance of the types and in the amounts customary for such review. Upon request by the Sellers' Representative, Purchaser shall provide evidence of such insurance to the Sellers' Representative prior to entering the Assets or premises of the Sellers or their Affiliates.

Section 7.2     **Operation of Business**.

(a)     From the Execution Date until the Closing, except (i) as described on Schedule 4.10 or Schedule 7.2, (ii) as ordered by the Bankruptcy Court or limited by restrictions or limitations under the Bankruptcy Code on any Seller, or (iii) as otherwise approved by Purchaser in writing, the Sellers shall:

(i)     conduct the ownership and operation of the Assets in the ordinary course of business in substantially the same manner as conducted by the Sellers in the six (6) month period prior to the Execution Date as a reasonably prudent operator, in compliance, in all material respects, with all applicable Laws and permits;

(ii)     not transfer, sell, hypothecate, encumber, abandon, novate or otherwise dispose of any of its Assets, except for (A) sales and dispositions of Hydrocarbons in the ordinary course of business, (B) the Plugging and Abandonment of any Assets to the extent required under any applicable Laws or Contracts, (C) sales or dispositions of equipment and materials included in the Assets unless such are required to be disposed of under applicable Laws, permits, Contracts or the Leases and/or Carbon Leases or are not necessary or reasonably required with respect to the ownership and operation of the Assets (unless otherwise replaced by substantially similar equipment or materials), (D) transfers, sales or dispositions to a Winning Bidder at the Auction or to a Person other than Purchaser in connection with the consummation of a definitive agreement regarding a Highest or Best Proposal for the Assets or (E) filing releases for Leases which expired or terminated, wholly or in part, prior to the Effective Time;

(iii)     not enter into, execute, terminate (other than terminations based on the expiration without any affirmative action by any Seller), novate, materially amend or extend any Material Contracts constituting an Assumed 365 Contract or Required Contract;

(iv)     not commit to, and will notify Purchaser of, any new proposed operation reasonably anticipated by the Sellers to require future capital expenditures with respect to the Assets in excess of One Hundred Thousand Dollars ($100,000) net to Sellers' interest;

(v)     not (i) elect not to participate in any operation or activity proposed with respect to the Assets in excess of One Hundred Thousand Dollars ($100,000) net to Sellers' interest (to the extent permitted pursuant to Section 7.2(a)(iv)); (ii) subject to the other terms and provisions set forth in this Section 7.2, fail to timely make any election as to whether to participate in any such operation or activity proposed with respect to the Assets; and (iii) subject to Section 7.2(a)(ii) and Section 7.2(a)(iv), fail to provide reasonable notice to Purchaser of any payments due with respect to operations or activities proposed with respect to the Assets in which

such Seller has elected, or does elect, to participate, in each case, which would result in any of Sellers' interest in such Assets becoming subject to a penalty for forfeiture (including by deemed non-participation in any operation or activity with respect to the Assets under an applicable operating agreement) as a result of such action or inaction of the types noted in subparts (i), (ii), and (iii) of this Section 7.2(a)(v), *provided* that Purchaser shall have the right, but not the obligation, to elect to make any such payments due under subpart (iii) on behalf of such Seller;

        (vi)    use commercially reasonable efforts to maintain in full force and effect all Leases and Carbon Leases (*provided* that commercially reasonable efforts shall not obligate Sellers to pay any fee or assume any obligation unless Purchaser expressly agrees to pay or assume the same);

        (vii)    not voluntarily relinquish Seller's position as operator with respect to any of the Assets;

        (viii)    not enter into any collective bargaining agreement or other labor agreement with any labor union or similar representative of any Employees; and

        (ix)    not, other than in the ordinary course of business or as required by Law or any Benefit Plan set forth on Schedule 4.18 of the Disclosure Schedules, (A) increase the compensation of any current or former director, Employee, officer, consultant or other individual service provider of the Seller in any material manner (which, for clarity, excludes increases in compensation of non-senior executive employees that do not exceed 3% of the applicable employee's then-current base salary in the ordinary course of business), (B) grant or pay any bonus to any current or former director, Employee, officer, consultant or other individual service provider of the Seller, (C) increase, establish, adopt or terminate the coverage or benefits available under any Benefit Plan, except for increases in a manner that does not materially increase the obligations of Purchaser and its Affiliates, (D) accelerate the vesting or funding of any compensation of any current or former director, Employee, officer, consultant or other individual service provider of the Seller;

        (x)    furnish Purchaser with copies of all material drilling, completion and workover AFEs that the Sellers obtain Knowledge of after the Execution Date, in each case after receipt from any Third Parties or upon issuance by the Sellers or any Affiliates of the Sellers; and

        (xi)    not (A) take any action that would cause, or fail to take any permissible action to prevent, any Existing Tax Partnership to be treated as a corporation for U.S. federal income tax purposes, (B) make, revoke or change, or fail to take any permissible action to prevent any Existing Tax Partnership from making, revoking or changing, any other material Tax election of any Existing Tax Partnership or with respect to any Asset Tax other than making any Tax election consistent with past practices, (C) agree to file, or fail to take any permissible action to prevent any Existing Tax Partnership from filing, any waiver extending the statutory period for assessment or reassessment, or any other waiver of restrictions on assessment or collection, of any income, franchise and similar Taxes of any Existing Tax Partnership, or (D) or file any waiver extending the statutory period for assessment or reassessment, or any other waiver of restrictions on assessment or collection, of any Asset Tax; *provided that*, notwithstanding anything herein to

the contrary, nothing in this <u>Section 7.2(a)</u> or any other provision of this Agreement shall prevent, restrict or limit Sellers or Seller's Representative from liquidating any Existing Tax Partnership for U.S. federal (or applicable state and local) income tax purposes.

(b)     Purchaser's approval of any action restricted by <u>Section 7.2(a)</u> shall not be unreasonably withheld, conditioned or delayed and shall be considered granted within ten (10) days (unless a shorter time is reasonably required by the circumstances and such shorter time is specified in the Sellers' Representative's notice) of the Sellers' Representatives notice to Purchaser requesting such consent unless Purchaser notifies the Sellers' Representative to the contrary during that period. Notwithstanding the foregoing provisions of this <u>Section 7.2</u>, in the event of an emergency or risk of loss, damage or injury to any person, property or the environment, the Sellers may take such action as reasonably necessary and shall notify Purchaser of such action promptly thereafter. Requests for approval of any action restricted by this <u>Section 7.2</u> shall be delivered to each of the following individuals, each of whom shall have full authority to grant or deny such requests for approval on behalf of Purchaser:

> Blake London
> Paul Treadway
> Stephanie Reed
> Jordan Steinberg
> Email: blondon@formenterapartners.com
> ptreadway@formenterapartners.com
> sreed@formenterapartners.com
> jsteinberg@formenterapartners.com

(c)     With respect to Assets for which a Seller is not designated as the operator under applicable Laws or Contracts, the Sellers' obligations under this <u>Section 7.2</u> with respect to the operation of such Assets shall be limited to voting the Sellers' Working Interests or other voting interests in a manner consistent with the requirements set forth in this <u>Section 7.2</u>.

Section 7.3     **<u>Available 365 Contracts</u>**.

(a)     At the Closing, Sellers shall pay the amount of all costs or expenses required to be paid under Sections 365(b)(1)(A), 365(b)(1)(B), and 1123(b)(2) of the Bankruptcy Code, as applicable, to cure any defaults in connection with the assumption and assignment of each such Available 365 Contract (such costs and expenses, the "***Cure Costs***") and neither Purchaser, nor any Affiliate of Purchaser, shall be required to make any payment of Cure Costs for, and neither Purchaser nor any Affiliate of Purchaser shall assume or have any obligation for any liabilities with respect to, any Rejected 365 Contract. <u>Part 1</u> of <u>Schedule 7.3</u> sets forth (i) each Available 365 Contract, (ii) the Sellers' good faith estimate of the amount of Cure Costs payable in respect of each such Available 365 Contract, and (iii) Purchaser's initial election as of the Execution Date as to whether such Available 365 Contract is an Assumed 365 Contract or a Rejected 365 Contract. Each Unavailable 365 Contract shall constitute a Rejected 365 Contract. If no Cure Cost is estimated to be payable with respect to an Available 365 Contract, the amount of such Cure Cost shall be deemed to be Zero Dollars ($0.00). In the event that the Sellers identify (whether before or after the Rejection Date) any additional Available 365 Contracts capable of being assumed or

rejected that were not previously identified as such, the Sellers' Representative shall promptly deliver an update to Part 1 of Schedule 7.3 (or supplement thereto) to Purchaser identifying such Available 365 Contracts and the Sellers' good faith estimate of the amount of the Cure Costs with respect thereto. In addition, the Sellers may amend or supplement Schedule 7.3 from time to time, and shall provide Purchaser written notice thereof, to update the Sellers' estimated Cure Costs with respect to any such Available 365 Contract. Sellers shall have the right, in their sole discretion, to determine whether any such subsequently identified 365 Contract constitutes an Available 365 Contract or an Unavailable 365 Contract.

(b)      Purchaser acknowledges that, prior to the Execution Date, the Sellers delivered written notices (the "***Initial Contract Notices***") of the potential assignments of the Available 365 Contracts then known to the Sellers to all non-debtor parties to such Available 365 Contracts, which notice provided notice to each non-debtor party to such Available 365 Contract of (i) the proposed Cure Cost for such Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost. To the extent Schedule 7.3 is supplemented from time to time to include additional Available 365 Contracts or Unavailable 365 Contracts in accordance with Section 7.3(a) above, the Sellers' Representative shall, as promptly as is practicable, deliver written notice (each, a "***Supplemental Contract Notice***" and, together with the Initial Contract Notice, the "***Contract Notices***") to the counterparties to such Available 365 Contracts of the potential assignment of such Available 365 Contracts and the proposed Cure Costs for such Available 365 Contracts, in substantially the same form as the Initial Contract Notice. To the extent that any objections are received from such non-debtor parties in response to such Contract Notices, the Sellers shall use commercially reasonable efforts to resolve such disputes with the applicable non-debtor party, and all such resolutions with respect to any Assumed 365 Contract shall be acceptable to Purchaser in its sole discretion.

(c)      At any time prior to the Rejection Date, Purchaser shall have the right, which may be exercised in Purchaser's sole discretion, to provide written notice to the Sellers' Representative to supplement or change Purchaser's election in order to (i) designate any Available 365 Contract as an Assumed 365 Contract or Rejected 365 Contract or (ii) to the extent the Sellers have updated or supplemented Schedule 7.3, (x) to designate any additional Available 365 Contract as an Assumed 365 Contract or Rejected 365 Contract or (y) with respect to any Assumed 365 Contract and the Cure Costs with respect to such Assumed 365 Contract has increased from the previous Cure Costs estimate, to designate such Assumed 365 Contract as a Rejected 365 Contract. In the event that Sellers supplement or update Schedule 7.3 on or after the Rejection Date, Purchaser may designate each such additional Available 365 Contract as an Assumed 365 Contract or Rejected 365 Contract notwithstanding the passage of the Rejection Date. If an Available 365 Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available 365 Contract or the Cure Costs with respect thereto that has not been resolved to the mutual satisfaction of Purchaser and the Sellers prior to the Rejection Date, then the Rejection Date shall be extended (but only with respect to such Available 365 Contract) to no later than the earliest of (i) the date on which such dispute has been resolved to the mutual satisfaction of Purchaser and the Sellers, (ii) the date on which such Contract is deemed rejected by operation of Sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable, or (iii) the date required by the Bankruptcy Court and set forth in the Sale Order. If Purchaser exercises its rights under this Section 7.3(c) to designate an Available 365 Contract (including a Contract that was an Assumed 365 Contract immediately before such designation) as a Rejected 365 Contract,

there shall be no change in the Unadjusted Purchase Price as a result of such designation or change in designation.

        (d)    Purchaser shall take any actions as reasonably required to obtain prior to Closing a finding that Purchaser has provided adequate assurance of future performance by Purchaser of the Assumed 365 Contracts, including no later than twenty four hours (24) hours after being declared the Winning Bidder furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

        (e)    Subject to the terms of this <u>Section 7.3</u>, any Available 365 Contracts that are not designated as Assumed 365 Contracts on <u>Part 1</u> of <u>Schedule 7.3</u> (as modified and supplemented hereunder) and all Unavailable 365 Contracts shall be deemed to constitute Rejected 365 Contracts and shall constitute Excluded Assets for all purposes hereof.

        (f)    Notwithstanding anything in this Agreement to the contrary, the Sellers shall not reject any Available 365 Contract without the prior written consent of Purchaser in its sole discretion; *provided*, *however*, that, after the Rejection Date, the Sellers may reject Rejected 365 Contracts without the consent of Purchaser so long as such Available 365 Contracts were identified to Purchaser in writing prior to the Rejection Date.

        Section 7.4    **Consent, Preferential Right and Tag-Along Right Notices**. Unless the Bankruptcy Court has entered an order approving the sale and assignment of an Asset subject to a Consent or Required Consent, Preferential Right or Tag-Along Right without obtaining such Consent, Required Consent or without complying with such Preferential Right or Tag-Along Right, promptly, but in no event later than (5) Business Days after the Execution Date, the Sellers' Representative shall use commercially reasonable efforts to prepare and send, or cause to be prepared and sent, (a) notices to the holders of each of the Required Consents and other Consents (other than Customary Consents) that are set forth on <u>Schedule 4.9</u> requesting consents and approvals to the transactions of the Sellers contemplated by this Agreement and (b) notices to the holders of any applicable Preferential Rights and Tag-Along Rights that are set forth on <u>Schedule 4.9</u> in compliance with the terms of such rights and requesting waivers of such rights. In attempting to identify the names and addresses of such Persons holding such Consents, Preferential Rights or Tag-Along Rights, the Sellers shall not in any event be obligated to go beyond the Sellers' own Records. The Sellers and Purchaser shall cooperate and use commercially reasonable efforts to cause such Consents, to be obtained and delivered prior to Closing and all such Preferential Rights and Tag-Along Rights to be waived, *provided* that neither Party shall be required to make payments or undertake obligations to obtain any such Consents. The Sellers shall not be liable or obligated to Purchaser for any Damages or liabilities related or attributable to Customary Consents that are not obtained before, on, or after Closing. If prior to Closing, Purchaser or the Sellers discover any Consents, Required Consents, Preferential Rights or Tag-Along Rights that are not set forth on <u>Schedule 4.9</u> and are not subject to an order by the Bankruptcy Court excusing or waiving compliance with such Consents, Required Consents, Preferential Rights or Tag-Along Rights in connection with the transaction contemplated hereby, then such Party shall, promptly after discovery, provide written notice to the other Party of such Consents, Required Consents, Preferential Rights or Tag-Along Rights, whereupon the other Party

shall promptly thereafter send the notices and requests as to such Consents, Required Consents, Preferential Rights or Tag-Along Rights required under and in accordance with this <u>Section 7.4</u>, <u>Section 7.5</u>, <u>Section 7.6</u> and <u>Section 7.7</u>, as applicable.

Section 7.5 **Consents to Assignment**. Solely with respect to Required Consents for which the Bankruptcy Court has not entered an order approving the sale and assignment of an Asset subject to such Required Consent without obtaining such Required Consent:

(a) In cases in which the Asset subject to an unobtained Required Consent is an Asset other than a Property, and Purchaser is assigned the Property or Properties to which such Asset relates, but such Asset is not transferred to Purchaser due to the unobtained Required Consent, the Parties shall continue after Closing and up to the Cut-Off Date to use commercially reasonable efforts to obtain the Required Consent so that such Asset can be transferred to Purchaser upon receipt of the Required Consent, and, if permitted pursuant to applicable Law and agreement, such Asset shall be held by the applicable Seller for the benefit of Purchaser until the Cut-Off Date, Purchaser shall assume as part of the Assumed Obligations and bear and pay all amounts due thereunder or with respect thereto, and Purchaser shall be responsible for the performance of any obligations and Damages under or with respect to such Asset to the extent that Purchaser has been transferred the Assets necessary to such performance until the earlier of the expiration of the Cut-Off Date or the applicable Required Consent is obtained.

(b) In cases in which the Asset subject to a Required Consent requirement is a Property and the Required Consent is not obtained by Closing, then Purchaser may elect to exclude the Property subject to such Required Consent (along with any other Assets reasonably necessary or desirable for the ownership or operation of such Property), in which event, (i) the Unadjusted Purchase Price shall be reduced by the Allocated Value of such excluded Property and other Assets, (ii) such excluded Property and other Assets shall be deemed to be deleted from <u>Exhibit A</u> and added to <u>Schedule 1.1(a)</u>, and (iii) such excluded Property and other Assets shall constitute Excluded Assets for all purposes hereunder. If any such Required Consent requirement with respect to which an adjustment to the Unadjusted Purchase Price is made under <u>Section 2.4(b)</u> is subsequently obtained prior to the Cut-Off Date, (A) the Sellers shall, promptly after such Required Consent requirement is satisfied, convey the applicable Property and Assets to Purchaser, (B) the Parties shall deliver all instruments and documents that would have been required under the terms hereof to be delivered at Closing with respect to such Property and Assets, (C) Purchaser shall, simultaneously with the conveyance of the applicable Property and Assets, pay the amount of any previous deduction from the Unadjusted Purchase Price (subject to all other applicable adjustments with respect to such Properties and Assets under <u>Section 2.4</u>) to the Sellers' Representative, and (D) such Property and Assets shall no longer be deemed to be (1) deleted from <u>Exhibit A</u>, (2) added to <u>Schedule 1.1(a)</u>, or (3) Excluded Assets for any purposes hereunder.

Section 7.6 **Preferential Rights**. Solely with respect to Preferential Rights for which the Bankruptcy Court has not entered an order approving the sale and assignment of an Asset subject to such Preferential Right without complying with such Preferential Right:

(a) Any Preferential Rights must be exercised subject to all terms and conditions set forth in this Agreement, including the successful Closing of this Agreement pursuant to <u>Article 9</u> on the terms set forth herein. The consideration payable under this Agreement for any

-65-

particular Asset for purposes of Preferential Rights notices shall be the Allocated Value for such Asset, adjusted as set forth herein.

(b) If any Preferential Right as to any Assets is validly exercised prior to Closing, then (i) the Unadjusted Purchase Price shall be reduced by the Allocated Value of such Asset, (ii) such Assets shall be deemed to be deleted from Exhibit A and added to Schedule 1.1(a), and (iii) such Assets shall constitute Excluded Assets for all purposes hereunder; *provided*, *however*, in the event the holder of any Preferential Right as to any Assets validly exercises such Preferential Right prior to Closing but refuses or fails to consummate the purchase of such Assets on or before the Cut-Off Date, (A) the Sellers shall promptly convey the applicable Assets to Purchaser, (B) the Parties shall deliver all instruments and documents that would have been required under the terms hereof to be delivered at Closing with respect to such Assets, (C) Purchaser shall, simultaneously with the conveyance of the applicable Assets, pay the amount of any previous deduction from the Unadjusted Purchase Price (subject to all other applicable adjustments with respect to such Assets under Section 2.4) to the Sellers' Representative, and (D) such Assets shall no longer be deemed to be (1) deleted from Exhibit A, (2) added to Schedule 1.1(a), or (3) Excluded Assets for any purposes hereunder.

(c) Should a Third Party fail to validly exercise or waive its Preferential Right to purchase as to any portion of the Assets prior to Closing, and the time for exercise or waiver of such Preferential Right has not yet expired, then (i) the Unadjusted Purchase Price shall not be reduced by the Allocated Value of such Assets, (ii) such Assets shall be included in the Assets and conveyed by the Sellers to Purchaser at Closing, (iii) from and after Closing, Purchaser shall be entitled to all amounts payable by such holder in connection with such Preferential Right and (iv) from and after Closing, Purchaser shall comply with, be responsible for and perform all obligations arising with or attributable to such Preferential Right.

(d) Purchaser acknowledges that the Sellers desire to sell all of the Assets and would not have entered into this Agreement but for Purchaser's agreement to purchase all of the Assets as herein provided. Accordingly, it is expressly understood and agreed that the Sellers do not desire to sell to any Person other than Purchaser any Assets subject to any Preferential Right unless the sale of all of the Assets is consummated by the Closing Date in accordance with the terms of this Agreement and the terms of the applicable Preferential Right to purchase. In furtherance of the foregoing, the Sellers' obligation hereunder to sell its Assets subject to any Preferential Right to any Person other than Purchaser is expressly conditioned upon the consummation by the Closing Date of the sale of all of the Assets (other than Excluded Assets) in accordance with the terms of this Agreement, either by conveyance to Purchaser or conveyance pursuant to an applicable Preferential Right; *provided*, that nothing herein is intended or shall operate to extend or apply any Preferential Right to any portion of such Assets which is not otherwise burdened thereby.

Section 7.7 **Tag-Along Rights**. Solely with respect to Tag-Along Rights for which the Bankruptcy Court has not entered an order approving the sale and assignment of an Asset subject to such Tag-Along Right without complying with such Tag-Along Right, Purchaser shall comply with the provisions of any Tag-Along Rights set forth on Schedule 4.9 and execute and deliver all agreements and instruments required to be executed and delivered by Purchaser under the respective terms of such Tag-Along Rights; *provided, however,* notwithstanding the foregoing,

nothing in this Section 7.7 shall require Purchaser to incur any liability or out-of-pocket expenses in connection with its compliance with this Section 7.7. Any Tag-Along Rights must be exercised subject to all terms and conditions set forth in this Agreement, including the successful Closing of this Agreement pursuant to Article 9 on the terms set forth herein.

Section 7.8 **Casualty and Condemnation**. If, after the Execution Date but prior to or on the Closing Date, any portion of the Properties are destroyed by fire, explosion, wild well, hurricane, storm, weather events, earthquake, act of nature, civil unrest, or similar disorder, terrorist acts, war, or any other hostilities or other casualty or is expropriated or taken in condemnation or under right of eminent domain (each a "*Casualty Loss*"), Purchaser and the Sellers shall, subject to the satisfaction (or waiver) of the conditions to Closing set forth in Section 8.1 and Section 8.2, nevertheless be required to proceed with Closing and Seller shall assign, transfer and set over to Purchaser or subrogate Purchaser to all of such Seller's or such Seller's Affiliates' right, title and interest (if any) in insurance claims, unpaid awards, and other rights against Third Parties (excluding any Damages or liabilities, other than insurance claims, of or against any Seller) arising out of such Casualty Loss insofar as with respect to the such Assets.

Section 7.9 **Closing Efforts and Further Assurances**. Subject to the terms and conditions of this Agreement, the Sellers and Purchaser shall use their commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law to consummate the transactions contemplated hereby, including by using commercially reasonable efforts to (i) cause the conditions precedent of the Sellers (in the case of Purchaser) and of Purchaser (in the case of the Sellers) set forth in Article 8 to be satisfied, (ii) obtain all necessary Consents from Governmental Authorities and make all necessary registrations, declarations and filings with Governmental Authorities and take all steps as may be necessary to avoid, or to have terminated, if begun, any action, suit or proceeding by any Governmental Authority by the Target Closing Date, (iii) defend any investigations, actions, suits or proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to avoid the entry of, or to have reversed, terminated, lifted or vacated, any stay, temporary restraining order or other injunctive relief or order entered by any Governmental Authority that could prevent or delay the consummation of the transactions contemplated hereby, (iv) execute and deliver additional instruments and agreements necessary to effectuate and consummate the transactions contemplated hereby, and to fully carry out the purposes of, this Agreement, (v) to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transaction Documents, support and take all steps reasonably necessary and desirable to address any such impediment and (vi) consult and negotiate in good faith with material stakeholders, and their advisors regarding the execution of definitive documents and the implementation of the transaction contemplated hereby. Nothing contained in the foregoing shall give rise to an obligation of Sellers or Purchaser to pay any fees, costs or expenses in undertaking its commercially reasonable efforts pursuant to the foregoing.

Section 7.10 **Notifications**. Purchaser shall notify the Sellers' Representative in writing promptly after Purchaser obtains knowledge that any representation or warranty of any Seller contained in this Agreement is, becomes, or will be untrue in any material respect on or before the Closing Date. The Sellers' Representative shall notify Purchaser in writing promptly after any Seller obtains knowledge that any representation or warranty of Purchaser contained in this

Agreement is, becomes, or will be untrue in any material respect on or before the Closing Date. It is understood and agreed that the delivery of any notice required under this Section 7.10 shall not in any manner constitute a waiver by any Party of any conditions precedent to the Closing hereunder.

Section 7.11  **Liability for Brokers' Fees**. Each Party hereby agrees to indemnify, defend and hold harmless each other Party, any Affiliate of such other Party, and all such other Party's stockholders, members, officers, directors, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants from and against any and all claims, obligations, damages, liabilities, losses, costs and expenses (including court costs and reasonable attorneys' fees) arising as a result of undertakings or agreements of any such indemnifying Party (or any of its Affiliates) prior to Closing, for brokerage fees, finder's fees, agent's commissions or other similar forms of compensation to an intermediary in connection with the negotiation, execution or delivery of this Agreement or any agreement or document contemplated hereunder.

Section 7.12  **Credit Support**. The Parties agree and acknowledge that except as expressly provided in this Section 7.12, none of the Credit Support provided by or on behalf of any member of the Seller Group in support of the obligations of any member of the Seller Group related to the ownership or operation of the Assets shall be included in or constitute any Assets or be transferred to the Purchaser at Closing. At or prior to the expiration of the Closing Date, Purchaser shall either (i) post and provide all Credit Support necessary to consummate the transactions contemplated by this Agreement and to replace the Credit Support set forth in Schedule 4.13 issued or posted by the Seller Group to any Governmental Authority as may be required to own and operate the Assets following Closing or (ii) execute an indemnity agreement with the surety that has posted such Credit Support to permit the Credit Support to remain in place until Purchaser's replacement Credit Support is obtained, at no cost or liability to the Seller Group. Prior to the expiration of the Transition Services Agreement, Purchaser shall cooperate with the Seller Group to obtain the release and return of all Credit Support provided by or on behalf of any member of the Seller Group in support of the obligations of any member of the Seller Group related to the ownership or operation of the Assets, with each such release and replacement in the form and substance satisfactory to the Sellers; *provided* that Purchaser shall not be required to expend any out-of-pocket expenses in connection with such release and replacement other than obtaining and posting the Credit Support set forth in Schedule 4.13 issued or posted by the Seller Group to any Governmental Authority. At the Closing, Purchaser shall cause the return or reimbursement of the Sellers for any cash deposits constituting Credit Support that are provided, funded, or otherwise supported by any member of the Seller Group with respect to the Assets to be assigned hereunder solely to the extent that such cash deposits are paid or reimbursed to Purchaser by the applicable holder of such Credit Support prior to the Cut-Off Date.

Section 7.13  **Employee Matters**.

(a)     Sellers have provided Purchaser with a list of the (i) job title, (ii) job location (iii) base salary or hourly rate of pay, as applicable; (iv) bonus compensation payable or potentially payable for 2022; and (v) hire date and service date (if different) of each individual employed or engaged by a Seller or an Affiliate of any Seller and whose primary work duties involve providing services with respect to the Assets (each, an "***Employee***"). Beginning on the Execution Date, Sellers shall permit Purchaser to meet with the Employees to discuss potential employment with

Purchaser or an Affiliate of Purchaser, and such interviews shall be conducted no later than two (2) Business Days following entry by the Bankruptcy Court of the Sale Order. Purchaser shall provide Seller, in writing, not later than seven (7) calendar days prior to the Closing Date, a list of those Employees to whom Purchaser or one of its Affiliates has made offers of employment (collectively, the "***Designated Employees***"). Such offers shall be conditioned upon the occurrence of the Closing, and the satisfaction of Purchaser's or its applicable Affiliate's applicable, customary and lawful pre-employment screening processes, including any background checks or drug testing it conducts with respect to any Designated Employee and for employment to be effective as of 12:01 A.M. on the date following the expiration and/or termination of the Transition Services Agreement (the "***Employee Transfer Date***"); *provided*, *however*, with respect to any Designated Employee who is on a leave of absence as of the Employee Transfer Date other than a disability leave of absence, such offer shall be for employment effective as of 12:01 A.M. on such date to the extent such individual has returned to work otherwise on the date such occurs. Each Designated Employee on a disability leave of absence as of the Employee Transfer Date shall commence employment with Purchaser at such time as they are released to return to work; provided that no offers of employment to such Designated Employee shall be valid after six (6) months after the Employee Transfer Date or such time as may be required by applicable Law. No later than three (3) days prior to the Closing Date, Purchaser shall inform Seller which Designated Employees have accepted offers as contemplated by this Section 7.13. Each Designated Employee who accepts such an offer and assumes employment with Purchaser or its Affiliate is referred to herein as a "***Transferred Employee***." The date that a Transferred Employee assumes employment with Purchaser or its Affiliate is referred to as his or her "***Hire Date***."

(b)     With respect to each Transferred Employee, Purchaser shall, or shall cause its Affiliate to:

(i)     provide to each Transferred Employee for a period of at least twelve (12) months after his or her Hire Date (A) a rate of base salary or wages, as applicable, and cash bonus opportunities (excluding retention, change in control or transaction bonuses) that are substantially similar in the aggregate to those provided to such Transferred Employee by the Sellers or their Affiliates immediately prior to the Closing Date and listed on Schedule 4.18 with respect to cash bonus opportunities and (B) employee benefits, plans, programs and other arrangements (excluding equity plans and compensation, defined benefit plans, retiree welfare plans and nonqualified deferred compensation plans) that are substantially similar in the aggregate to those provided to such Transferred Employee by the applicable Seller or its Affiliates as of the time immediately prior to the Closing Date and set forth on Schedule 4.18;

(ii)     credit each Transferred Employee with his or her length of service recognized by the applicable Seller and its Affiliates for all purposes (including vesting, eligibility and level of benefits) under all employee benefit plans, bonus plans or agreements, paid time off, vacation and sick leave policies, or other compensatory programs, policies or agreements (other than employee pension plans subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended) maintained by Purchaser or any of its Affiliates and in which such Transferred Employee may participate in or be covered under upon or at any time after his or her Hire Date. Such pre-Hire Date service credit shall also be taken into account for purposes of benefit computation under all severance and unemployment compensation plans or policies that may apply to such Transferred Employee after his or her Hire Date; and

(iii)      Purchaser or its Affiliates shall use commercially reasonable efforts to provide that each Transferred Employee who accepts such offer and who becomes covered under a group health plan (including a "group health plan" as defined in Section 5000(b)(1) of the Code) shall receive credit for those sums paid in the current year under the corresponding plan of the applicable Seller or its Affiliates, as deductibles, coinsurance and co-payments, towards any deductible, coinsurance, co-payments and/or out-of-pocket maximum that may apply under such plan of Purchaser or its Affiliates. Purchaser shall or shall cause its Affiliates to honor, through the end of the calendar year in which the Hire Date occurs.

(c)      Effective as of the Employee Transfer Date, Purchaser shall, or shall cause one of its Affiliates to, have in effect one or more defined contribution plans that include a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (as applicable, the "***Purchaser 401(k) Plan***"). Each Transferred Employee who is eligible to participate in a 401(k) plan maintained by any Seller or an Affiliate of any Seller immediately prior to the commencement of such individual's employment with Purchaser or its Affiliate (a "***Seller 401(k) Plan***") shall be eligible to participate in the Purchaser 401(k) Plan as of his or her Hire Date. Purchaser shall, or shall cause one of its Affiliates to, cause the Purchaser 401(k) Plan to accept, within ninety (90) days following the Hire Date of each individual described in the preceding sentence, a "direct rollover" to the Purchaser 401(k) Plan of the account balances of such individual (which shall be entirely in cash, but may, at such individual's election, include promissory notes evidencing outstanding loans) under the Seller 401(k) Plan, if such direct rollover is elected by such individual.

(d)      The provisions of this <u>Section 7.13</u> are solely for the benefit of the Parties and nothing in this Agreement express or implied shall confer upon any employee, Employee or any legal representative or beneficiary thereof any rights or remedies, including any right to employment, or continued employment for any specified period, of any nature or kind whatsoever. Nothing in this <u>Section 7.13</u>, express or implied, shall be deemed an amendment of any employee benefit plan, bonus plan or arrangement, equity or equity-based compensation plan or arrangement, or any other employee benefit plan, agreement, arrangement, program, practice or understanding that is sponsored maintained, provided or contributed to by the Sellers or any of their Affiliates.

Section 7.14      **Expenses; Filings, Certain Governmental Approvals and Removal of Names**.

(a)      Except as otherwise expressly provided in this Agreement, all expenses incurred by the Sellers in connection with or related to the authorization, preparation or execution of this Agreement, and the Exhibits and Schedules hereto and thereto, and all other matters related to the Closing, including all fees and expenses of counsel, accountants and financial advisers employed by the Seller, shall be borne solely and entirely by the Sellers, and all such expenses incurred by Purchaser shall be borne solely and entirely by Purchaser.

(b)      Promptly after the Closing, Purchaser shall (i) record all assignments of Assets executed at the Closing in the records of the applicable Governmental Authorities and will promptly provide recorded copies to the Sellers' Representative, (ii) if applicable, use commercially reasonable efforts to send notices to vendors supplying goods and services for the Assets and to the operator of such Assets of the assignment of such Assets to Purchaser, (iii) actively pursue the approval of all Customary Consents and applicable Governmental

Authorities of the assignment of the Assets to Purchaser, as applicable and (iv) use commercially reasonable efforts to actively pursue all other consents (other than Customary Consents) and approvals that may be required in connection with the assignment of the Assets to Purchaser and the assumption of the Assumed Obligations, that, in each case, which shall not have been obtained prior to the Closing. Purchaser obligates itself to take any and all action reasonably required by any Governmental Authority in order to obtain such unconditional approval, including the posting of any and all bonds or other security that may be required in excess of its existing lease, pipeline or area-wide bond.

(c)　　Upon the occurrence of Closing, as promptly as practicable, but in any case within sixty (60) days after the Closing Date, Purchaser shall eliminate the names "Rockall," "Rockall Energy," "White Marlin" and "Petro Harvester" and any variants thereof from the Assets acquired pursuant to this Agreement and, except with respect to such grace period for eliminating existing usage, shall have no right to use any logos, trademarks, or trade names belonging to any Seller or any of their Affiliates.

Section 7.15　**Records**.

(a)　　No later than the earlier to occur of (i) thirty (30) days after Closing and (ii) the expiration or termination of the Transition Services Agreement, Sellers' Representative shall make available the Records to Purchaser in original form, as applicable, subject to this Section 7.15.

(b)　　The Sellers may retain, at the Sellers' sole cost and expense, copies of any and all Records. The Sellers may retain the originals of those Records relating to Asset Tax and accounting matters and provide Purchaser with copies of such Records (i) that pertain to Asset Tax matters solely related to the Assets or (ii) if such Records are necessary for Purchaser to adequately prepare Tax Returns or to contest a legal or administrative proceeding pursuant to Article 10.

(c)　　Purchaser shall preserve and keep a copy of all Records in Purchaser's possession for a period of at least seven (7) years after the Closing Date. After such seven (7) year period, before Purchaser shall dispose of any such Records, Purchaser shall give the Sellers' Representative at least ninety (90) days' Notice to such effect, and the Sellers shall be given an opportunity, at the Sellers' cost and expense, to remove and retain all or any part of such Records as the Sellers' Representative may select.

(d)　　From and after Closing, Purchaser shall make available to Sellers, its Representatives, the liquidation trustees and any other successor to any of the Sellers, at no cost or expense to the same and to the extent not requiring expenditures by Purchaser, full access to the Records in Purchaser's possession and control in connection with matters relating to the Excluded Liabilities or any claims or disputes relating to this Agreement or with any Third Parties.

Section 7.16　**Sale Order and Auction**.

(a)　　Notwithstanding anything herein to the contrary, Purchaser and the Sellers acknowledge that this Agreement and the sale of the Assets and assumption and assignment of the Assumed Contracts and Assumed Obligations are subject to Bankruptcy Court approval. The Sellers shall take commercially reasonable efforts to (i) obtain entry of the Sale Order by the

Bankruptcy Court and (ii) consummate the transactions contemplated hereby, in each case, in accordance with this Agreement and the Sale Order.

(b)     Purchaser and each Seller acknowledge that (i) to obtain approval of this Agreement and the Sale Order by the Bankruptcy Court and to satisfy such Seller's fiduciary duties to all applicable stakeholders and creditors in accordance with applicable Law, such Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction, (ii) Purchaser must provide adequate assurance of future performance as may be required under Section 365 of the Bankruptcy Code with respect to the Assumed Contracts and (iii) to the extent such adequate assurance of future performance is not provided with respect to an Assumed Contract, then such Assumed Contract will be excluded from the Assets and included in the Excluded Assets.

(c)     The bidding procedures to be employed with respect to this Agreement and the Auction shall be the Bidding Procedures. Purchaser agrees and acknowledges that the Sellers, including through their representatives, are and may continue soliciting inquiries, proposals or offers from Third Parties for the Assets (and negotiating the terms of such proposals or offers) in connection with any alternative transaction pursuant to the terms of the Bidding Procedures. The Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Assets and perform any and all other acts related thereto that are required under the Bankruptcy Code or other applicable Law or otherwise to fulfill the Sellers' fiduciary duties as a Chapter 11 debtor, including supplying information relating to the business and the assets of the Sellers to prospective buyers;

(d)     Nothing in this Agreement, including this Section 7.16, shall require any director or officer of any Seller to violate their fiduciary duties to such Seller, as applicable. No action or inaction on the part of any director or officer of any Seller that such director or officer reasonably believes is required by their fiduciary duties to such Seller shall be limited or precluded by this Agreement; provided, however, that no such action or inaction shall be deemed to prevent Purchaser from exercising any termination rights it may have hereunder as a result of such action or inaction.

(e)     If an Auction is conducted and the Sellers do not choose Purchaser as the Winning Bidder, but instead choose Purchaser as the Backup Bidder, Purchaser will serve as the Backup Bidder. If Purchaser is chosen as the Backup Bidder, Purchaser will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with Purchaser's written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Assets to the Winning Bidder. If the agreement with the Winning Bidder is terminated prior to such closing, the Sellers may select the Purchaser to be the Winning Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement.

Section 7.17   **Seismic Fees.**   At least five (5) Business Days prior to the Target Closing Date, Purchaser shall provide written notice to Sellers as to which, if any, of the Seismic Agreements that Purchaser wishes to obtain at Closing, and as to such Seismic Agreements,

-72-

Purchaser shall assume all obligations and liability for such Seismic Agreements, and shall pay or cause to be paid all costs, expenses and change of control fees associated with (in each case) such Seismic Agreements as a result of the transaction contemplated by this Agreement (the "*Seismic Fees*"). For the avoidance of doubt and notwithstanding anything to the contrary set forth in this Agreement, all Seismic Fees paid or payable shall not constitute Cure Costs and shall be paid or caused to be paid directly by Purchaser to such Third Party. Any Seismic Agreements that Purchaser does not timely and validly elect to assume hereunder shall be deemed a Rejected 365 Contract and shall be terminated by Sellers. To the extent Purchaser has elected to assume any Seismic Agreement, such Seismic Agreements shall constitute Assets and after Closing Sellers shall have no further obligation or liability with respect to such Seismic Agreement.

## ARTICLE 8

## CONDITIONS TO CLOSING

Section 8.1    <u>**Conditions of Sellers to Closing**</u>. The obligations of the Sellers to consummate the transactions contemplated by this Agreement (except for the obligations of the Sellers to be performed prior to the Closing and obligations that survive termination of this Agreement), including the obligations of the Sellers to consummate the Closing, are subject, at the option of the Sellers, to the satisfaction on or prior to Closing of each of the conditions set forth in this <u>Section 8.1</u>, unless waived in writing by the Sellers' Representative:

(a)    <u>Representations and Warranties</u>. Each representation and warranty of Purchaser set forth in <u>Article 5</u> shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date);

(b)    <u>Performance</u>. Purchaser shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by Purchaser under this Agreement prior to or on the Closing Date;

(c)    <u>No Action</u>. On the Closing Date, no injunction, order or award restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, or granting substantial damages in connection therewith, shall have been issued and remain in force;

(d)    **[Reserved.]**

(e)    <u>Closing Deliverables</u>. Purchaser shall (i) have delivered or be ready, willing, and able to deliver, to the Sellers' Representative the officer's certificate described in <u>Section 9.3(i)</u> and (ii) be ready, willing and able to deliver to the Sellers' Representative at the Closing the other documents and items required to be delivered by Purchaser under <u>Section 9.3</u>; and

(f)    <u>Sale Order</u>. The Sale Order shall have been entered by the Bankruptcy Court.

Section 8.2 **Conditions of Purchaser to Closing**. The obligations of Purchaser to consummate the transactions contemplated by this Agreement (except for the obligations of Purchaser to be performed prior to the Closing and obligations that survive termination of this Agreement), including the obligations of Purchaser to consummate the Closing, are subject, at the option of Purchaser, to the satisfaction on or prior to Closing of each of the conditions set forth in this Section 8.2, unless waived in writing by Purchaser:

(a) Representations and Warranties. Each representation and warranty of each Seller set forth in Article 4 shall be true and correct in all respects (without regard to any Material Adverse Effect or other materiality qualifier) as of the Execution Date and as of the Closing Date as though made on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date) except, in each case, to the extent the failure of any such representation or warranty to be true and correct does not result in a Material Adverse Effect;

(b) Performance. Each Seller shall have performed and observed, in all material respects, each covenant and agreement to be performed or observed by such Seller under this Agreement prior to or on the Closing Date;

(c) No Action. On the Closing Date, no injunction, order or award restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, or granting substantial damages in connection therewith, shall have been issued and remain in force;

(d) **[Reserved.]**

(e) Closing Deliverables. The Sellers' Representative shall (i) have delivered, or be ready, willing, and able to deliver, to Purchaser the officer's certificate described in Section 9.2(h) and (ii) be ready, willing and able to deliver to Purchaser at the Closing the other documents and items required to be delivered by the Sellers' Representative under Section 9.2; and

(f) Sale Order. The Sale Order shall have been entered by the Bankruptcy Court.

## ARTICLE 9

## CLOSING

Section 9.1 **Time and Place of Closing**.

(a) The consummation of the purchase and sale of the Assets contemplated by this Agreement (the "***Closing***") shall, unless otherwise agreed to in writing by Purchaser and the Sellers' Representative, take place at the offices of Vinson & Elkins LLP located at 845 Texas Avenue, Suite 4700, Houston, Texas 77002-6760 at 10:00 a.m. Central Time on June 8, 2022 (the "***Target Closing Date***"), or if all conditions in this Article 9 to be satisfied prior to Closing have not yet been satisfied or waived, no later than two (2) Business Days after such conditions have been satisfied or waived, subject to the provisions of Article 11. The date on which the Closing

occurs is referred to herein as the "***Closing Date***." All actions to be taken and all documents and instruments to be executed and delivered at Closing shall be deemed to have been taken, executed and delivered simultaneously and, except as permitted hereunder, no actions shall be deemed taken nor any document and instruments executed or delivered until all actions have been taken and all documents and instruments have been executed and delivered.

       Section 9.2   **<u>Obligations of Sellers at Closing</u>**. At the Closing, upon the terms and subject to the conditions of this Agreement, and subject to the simultaneous performance by Purchaser of its obligations pursuant to <u>Section 9.3</u>, the Sellers' Representative shall deliver or cause to be delivered to Purchaser, among other things, the following:

       (a)   The Preliminary Settlement Statement, duly executed by each Seller;

       (b)   An executed counterpart of a joint written instruction to the Escrow Agent instructing the Escrow Agent to disburse to the designated Seller(s) the Deposit, duly executed by the Sellers' Representative;

       (c)   Conveyances of the Assets in the forms attached hereto as <u>Exhibit B</u> (the "***Conveyances***"), duly executed by each Seller, in sufficient duplicate originals to allow, with respect to the Conveyances in the form described on <u>Exhibit B</u>, recording in all appropriate jurisdictions and offices;

       (d)   Assignments prepared by Seller and reasonably acceptable to Purchaser in the forms required by any Governmental Authorities for the assignment of any Properties, duly executed by each Seller, in sufficient duplicate originals to allow recording in all appropriate offices;

       (e)   A properly completed and duly executed IRS Form W-9 for each Seller (or, if such Seller is disregarded for U.S. federal income tax purposes, its regarded owner for U.S. federal income tax purposes) dated as of the Closing Date;

       (f)   The Transition Services Agreement substantially in the form of <u>Exhibit F</u>, duly executed by the Sellers;

       (g)   Letters-in-lieu of transfer orders with respect to the Oil and Gas Properties duly executed by the appropriate Seller in the form attached hereto as <u>Exhibit G</u>;

       (h)   A certificate from each Seller substantially in the form of <u>Exhibit C-1</u>, duly executed by an authorized officer of such Seller, certifying on behalf of such Seller that the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u> have been fulfilled;

       (i)   Resignation of operator notices, duly executed by the appropriate Seller in the form attached hereto as <u>Exhibit D</u>;

       (j)   Executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable jurisdictions and offices where the Assets are located) in form reasonably acceptable to Purchaser of any mortgages or security interests that attach to the Assets,

in each case, securing indebtedness for borrowed money of any Seller or any of its respective Affiliates;

(k)     A copy of the Sale Order entered with the Bankruptcy Court;

(l)     The Mineral Deed substantially in the form of <u>Exhibit H</u> (the "***Mineral Deed***"), duly executed by the applicable Sellers; and

(m)     All other documents and instruments reasonably requested by Purchaser from the Sellers' Representative that are necessary to transfer the Assets to Purchaser.

Section 9.3     **<u>Obligations of Purchaser at Closing</u>**. At the Closing, upon the terms and subject to the conditions of this Agreement, and subject to the simultaneous performance by the Sellers of their obligations pursuant to <u>Section 9.2</u>, Purchaser shall deliver or cause to be delivered to the Sellers' Representative, among other things, the following:

(a)     The Preliminary Settlement Statement, duly executed by Purchaser;

(b)     A wire transfer of the Closing Payment in same-day funds to the Persons and accounts designated in the Preliminary Settlement Statement described in <u>Section 2.6(a)</u>;

(c)     If the Defect Escrow Amount is a positive number at Closing, Purchaser shall deliver the Defect Escrow Amount to the Escrow Agent via wire transfer of immediately available funds to the account or accounts designated in the Escrow Agreement;

(d)     An executed counterpart of a joint written instruction to the Escrow Agent instructing the Escrow Agent to disburse to the Sellers' Representative the Deposit, duly executed by Purchaser;

(e)     Conveyances, duly executed by Purchaser, in sufficient duplicate originals to allow recording in all appropriate jurisdictions and offices;

(f)     Assignments prepared by Seller and reasonably acceptable to Purchaser in the forms required by any Governmental Authorities for the assignment of any Properties, duly executed by Purchaser, in sufficient duplicate originals to allow recording in all appropriate offices;

(g)     The Transition Services Agreement substantially in the form of <u>Exhibit F</u>, duly executed by the Purchaser;

(h)     Letters-in-lieu of transfer orders with respect to the Oil and Gas Properties duly executed by Purchaser in the form attached hereto as <u>Exhibit G</u>;

(i)     A certificate from Purchaser substantially in the form of <u>Exhibit C-2</u>, duly executed by an authorized officer of Purchaser, certifying on behalf of Purchaser that the conditions set forth in <u>Section 8.1(a)</u> and <u>Section 8.1(b)</u> have been fulfilled;

(j)     Evidence of replacement of all Credit Support required pursuant to Section 7.12, evidence of the provision all adequate assurance of future performance by Purchaser of the Assumed 365 Contracts (to the extent required) and evidence of the filing by or on behalf of Purchaser of any reports or filing (if any), and the issuance to Purchaser of an operator number by the applicable Governmental Authorities and evidence of such other authorizations and qualifications as may be necessary for Purchaser to own the Assets;

(k)     The Mineral Deed, duly executed by the Purchaser; and

(l)     All other documents and instruments reasonably requested by the Sellers' Representative from Purchaser that are necessary to transfer the Assets to Purchaser.

## ARTICLE 10

## TAX MATTERS

Section 10.1     **Asset Taxes**.

(a)     Solely for purposes of determining the amount of Seller Taxes or the adjustments to be made with respect to Asset Taxes pursuant to Section 2.4 or Section 2.6, the Sellers shall be allocated all Asset Taxes attributable to (i) any Tax period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending immediately prior to the Effective Time, and Purchaser shall be allocated all Asset Taxes attributable to (x) any Tax period beginning at or after the Effective Time and (y) the portion of any Straddle Period beginning at the Effective Time.

(b)     Solely for purposes of determining the amount of Seller Taxes or the allocations described in Section 10.1(a), (i) Asset Taxes that are attributable to the severance or production of Hydrocarbons (other than such Asset Taxes described in clause (iii), below) shall be allocated to the period in which the severance or production giving rise to such Asset Taxes occurred, (ii) Asset Taxes that are based upon or related to sales or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (i) above or (iii) below), shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred and (iii) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending immediately prior to the Effective Time and the portion of such Straddle Period beginning at the Effective Time by prorating each such Asset Tax based on the number of days in the applicable Straddle Period that occur before the date on which the Effective Time occurs, on the one hand, and the number of days in such Straddle Period that occur on or after the date on which the Effective Time occurs, on the other hand. For purposes of clause (iii) of the preceding sentence, the period for such Asset Taxes shall begin on the date on which ownership of the applicable Assets gives rise to liability for the particular Asset Tax and shall end on the day before the next such date.

(c)     To the extent the actual amount of an Asset Tax is not known at the time an adjustment is to be made with respect to such Asset Tax pursuant to Section 2.4 or Section 2.6, as applicable, the Parties shall utilize the most recent estimate information available in determining

the amount of such Asset Tax for purposes of such adjustment, and the amount of such adjustment taken into account in the final settlement statement shall be final and binding.

Section 10.2 **Transfer Taxes and Recording Fees**. To the extent not eliminated through the application of Section 1146(a) of the Bankruptcy Code, Purchaser shall bear and pay (a) any sales, use, transfer, stamp, documentary, registration, motor vehicle, value added, excise, or similar Taxes incurred or imposed with respect to the sale of the Assets to Purchaser pursuant to this Agreement ("**Transfer Taxes**") and (b) all required filing and recording fees and expenses in connection with the filing and recording of the assignments, conveyances, or other instruments required to convey title to the Assets to Purchaser. The Sellers and Purchaser shall reasonably cooperate in good faith to minimize, to the extent permissible under applicable Law (including through application of Section 1146(a) of the Bankruptcy Code), the amount of any such Transfer Taxes and filing and recording fees and expenses. Purchaser shall, at its own expense, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes.

Section 10.3 **Cooperation**. Purchaser, the Sellers' Representative and, prior to the liquidation of such Seller, each Seller shall reasonably cooperate, as and to the extent reasonably requested by the Sellers' Representative or the Purchaser, as applicable, in connection with the filing of Tax Returns and any audit, litigation, or other proceeding with respect to Taxes relating to the Assets. Such cooperation shall include the retention and (upon the Purchaser's or Sellers' Representatives' request) the provision of records and information that are relevant to any such Tax Return or audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided under this Agreement. Purchaser agrees to retain all books and records with respect to Tax matters pertinent to the Assets relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations of the respective taxable periods and to abide by all record retention agreements entered into with any Governmental Authority.

Section 10.4 **Existing Tax Partnerships**.

(a)     With respect to each Existing Tax Partnership, the Sellers' Representative and, prior to the liquidation of such Seller, each Seller shall reasonably cooperate with the Purchaser (i) with respect to allocating all items of income, gain, loss and deduction arising in the taxable period that includes the Closing Date based on an "interim closing" as of the Closing Date under Section 706 of the Code and the Treasury Regulations thereunder and (ii) to cause each Existing Tax Partnership to file an election under Section 754 of the Code for the tax period that includes the Closing Date.

(b)     With respect to each Existing Tax Partnership, the Seller's Representatives shall reasonably cooperate with the Purchaser with respect to making a "push out" election under Code Section 6226 (and any corresponding election under state, local and foreign tax law) with respect to any "imputed underpayment" issued by a taxing authority against any Existing Tax Partnership for any Tax period or portion thereof ending on or before the Closing Date.

Section 10.5 **Tax Returns**. After the Closing Date, Purchaser shall file with the appropriate Governmental Authority any and all Tax Returns required to be filed after the Closing Date with respect to such Asset Taxes relating to any Tax period that ends before or includes the

Effective Time and pay any Asset Taxes shown as due on such Tax Returns; *provided* that, if such Tax Return is due prior to the Cut-Off Date, Purchaser shall (a) submit each such Tax Return to the Sellers' Representative for its review and comment reasonably in advance of the due date therefor, and (b) incorporate any comments received from the Sellers' Representative prior to the due date therefor. The Parties agree that this Section 10.5 is intended to solely address the timing and manner in which certain Tax Returns relating to Asset Taxes are filed and the Asset Taxes shown thereon are paid to the applicable Governmental Authority.

# ARTICLE 11

## TERMINATION

Section 11.1 **Termination**. This Agreement may be terminated at any time prior to Closing (the date of any permitted termination of this Agreement under this Section 11.1, the "***Termination Date***"):

(a) by the mutual prior written consent of the Sellers' Representative and Purchaser; or

(b) by the Sellers' Representative or Purchaser upon written notice to the other Party, if:

(i) Closing has not occurred on or before five (5) Business Days after the Outside Date;

(ii) The Sellers enter into a definitive agreement regarding a Highest or Best Proposal for the Assets with a Person other than Purchaser and Purchaser is not the Backup Bidder at the Auction;

(iii) The Sellers consummate the transactions under a Highest or Best Proposal for the Assets with a Person other than Purchaser;

(iv) the Bankruptcy Court enters an order dismissing, or converting to a case under Chapter 7 of the Bankruptcy Code, the Chapter 11 Case, where such order was not requested, encouraged or supported by the Sellers and Purchaser;

(v) there shall be a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereunder; or

(c) by the Sellers' Representative if:

(i) on or after the Outside Date, (A) Purchaser is in material breach or failure of this Agreement such that any of the conditions set forth in Section 8.1 are not satisfied as a result of such breach or failure and (B) such breach or failure is not cured prior to the date that is three (3) Business Days following written notice from Sellers' Representative to Purchaser specifying the reason such condition is unsatisfied;

(d)        by Purchaser if:

        (i)        on or after the Outside Date, (A) a Seller is in material breach or failure of this Agreement such that any of the conditions set forth in <u>Section 8.2</u> are not satisfied as a result of such breach or failure and (B) such breach or failure is not cured prior to the date that is three (3) Business Days following written notice from Purchaser to Sellers' Representative specifying the reason such condition is unsatisfied;

        (ii)        Purchaser is not the Winning Bidder or the Backup Bidder for the Assets at the Auction and the Sellers do not close the transactions contemplated by this Agreement with Purchaser by the Outside Date;

        (iii)        the Bankruptcy Court has not entered the Sale Order by June 8, 2022;

*provided*, *however*, that no Party shall be entitled to terminate this Agreement under <u>Section 11.1(b)(i)</u>, <u>Section 11.1(c)(i)</u>, or <u>Section 11.1(d)(i)</u> if (1) such Party is in material breach of any of such Party's representations, warranties or covenants hereunder, including, if and when required, such Party's obligations to consummate the transactions contemplated hereunder at Closing, at the time such Party seeks to terminate this Agreement or (2) a Party is entitled to and is enforcing its right to specific performance of this Agreement under <u>Section 11.2(b)</u> or <u>Section 11.2(c)</u> below.

Section 11.2      **<u>Effect of Termination</u>**.

        (a)        If this Agreement is terminated pursuant to <u>Section 11.1</u>, this Agreement shall become void and of no further force or effect (except for the provisions of <u>Article 1</u>, <u>Section 2.3</u>, <u>Section 5.12</u>, <u>Article 6</u>, <u>Section 7.1(b)</u>, <u>Section 7.1(c)</u>, <u>Section 7.1(d)</u>, <u>Section 7.13</u>, this <u>Article 11</u>, and <u>Section 13.1</u> through <u>Section 13.16</u>, all of which shall survive and continue in full force and effect indefinitely. Except as expressly provided in this <u>Section 11.2(a)</u>, from and after the Termination Date, each Seller shall be free to immediately enjoy all rights of ownership of the Assets and to sell, transfer, encumber or otherwise dispose of the Assets to any Person without any restriction under this Agreement. The Confidentiality Agreement shall survive any termination of this Agreement, and, upon such termination, the term thereof shall be deemed automatically extended to run until the date that is six (6) months from the Termination Date.

        (b)        In the event that (i) Purchaser is entitled to terminate this Agreement pursuant to <u>Section 11.1(b)(i)</u> or <u>Section 11.1(d)(i)</u>; (ii) all conditions precedent to the obligations of the Sellers set forth in <u>Section 8.1</u> have been satisfied or waived (to the extent waivable) in writing by the Sellers' Representative (or would have been satisfied except for the breach or failure of a Seller's representations, warranties or covenants hereunder) and (iii) the Closing has not occurred solely as a result of the material breach or material failure of a Seller's representations, warranties or covenants hereunder, including, if and when required, Sellers' obligations to consummate the transactions contemplated hereunder at Closing, then Purchaser shall promptly elect in writing, as the sole and exclusive remedy of the Purchaser Group against any member of the Seller Group for the failure to consummate the transactions contemplated hereunder at Closing, to (A) seek specific performance of this Agreement against the Sellers, or (B) terminate this

Agreement and receive the entirety of the Deposit for the sole account and use of Purchaser in which event Purchaser shall be entitled to seek actual, direct damages up to an aggregate amount not greater than an amount equal to the Deposit; *provided*, *however*, if Purchaser elects to seek specific performance of this Agreement against any Seller under (A) above but Closing fails to occur, Purchaser may elect to exercise its rights under (B) above.

(c)     In the event that (i) the Sellers' Representative is entitled to terminate this Agreement pursuant to Section 11.1(b)(i)or Section 11.1(c)(i); (ii) all conditions precedent to the obligations of Purchaser set forth in Section 8.2 have been satisfied or waived in writing by Purchaser (or would have been satisfied except for the breach or failure of any of Purchaser's representations, warranties or covenants hereunder); and (iii) the Closing has not occurred solely as a result of the breach or failure of any of Purchaser's representations, warranties, or covenants hereunder, including, if and when required, Purchaser's obligations to consummate the transactions contemplated hereunder at Closing, then the Sellers' Representative shall promptly elect in writing, as the sole and exclusive remedy of the Seller Group against any member of the Purchaser Group for the failure to consummate the transactions contemplated hereunder at Closing, to (A) seek specific performance of this Agreement, or (B) terminate this Agreement and retain the entirety of the Deposit for the sole account and use of the Sellers as liquidated damages hereunder; *provided*, *however*, if the Sellers' Representative, on behalf of the Sellers, elects to seek specific performance of this Agreement against Purchaser under (A) above but Closing fails to occur, the Sellers' Representative may elect, on behalf of the Sellers, to exercise the rights under subclause (B) above. The Sellers and Purchaser acknowledge and agree that (1) Sellers' actual damages upon the event of such a termination are difficult to ascertain with any certainty, (2) the Deposit is a fair and reasonable estimate by the Parties of such aggregate actual damages of the Sellers, and (3) such liquidated damages do not constitute a penalty.

(d)     In the event that this Agreement is terminated under Section 11.1 and any Seller is not entitled or required to receive the Deposit under Section 11.2(c), Purchaser shall be entitled to receive the entirety of the Deposit for the account of Purchaser.

(e)     Promptly, but in no event later than three (3) Business Days after the Termination Date, the Purchaser and any Seller shall execute and deliver to the Escrow Agent written instructions instructing the Escrow Agent to disburse via wire transfer of immediately available funds the entirety of the Deposit to the Party entitled to receive the Deposit as provided in this Section 11.2.

(f)     Each Party acknowledges that as express consideration for the Parties entering into this Agreement and such Party's representations, warranties and covenants set forth herein, each Party covenants and agrees that solely with respect to each Parties' rights under Section 11.2(b)(iii)(A) and Section 11.2(c)(iii)(A), (i) each Party would be irreparably harmed by any breaches by another Party of its obligations to consummate the transactions hereunder as and when required by such Party hereunder, (ii) monetary damages would not be a sufficient remedy for any violation of the terms of this Agreement with respect to each Parties' rights under Section 11.2(b)(iii)(A) and Section 11.2(c)(iii)(A), (iii) such injured Party shall be entitled to equitable relief, including injunction (without the posting of any bond and without proof of actual damages) and specific performance, in the event of any breach of the provisions of this Agreement with respect to each Parties' rights under Section 11.2(b)(iii)(A) and Section 11.2(c)(iii)(A), in

addition to all other remedies available at law or in equity, including monetary damages, and (iv) none of the Parties, nor any of their representatives, shall oppose the granting of specific performance or any such relief as a remedy with respect to each Parties' rights under Section 11.2(b)(iii)(A) and Section 11.2(c)(iii)(A).

## ARTICLE 12

## INDEMNIFICATION; LIMITATIONS

Section 12.1 **Assumption**. Subject to Purchaser's rights under Article 3, from and after the Closing Date, Purchaser assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the obligations, liabilities and Damages, known or unknown, to the extent arising out of, based on or related to:

(a)     the ownership, operation or use of the Assets on or after the Closing Date;

(b)     all Property Costs on or after the Effective Time;

(c)     all Royalties, including the payment, non-payment or mis-payment thereof, attributable to Hydrocarbons or other substances produced or attributable to periods on or after the Effective Time;

(d)     any Suspense Funds attributable to Hydrocarbons or other substances produced or attributable to periods on or after the Effective Time;

(e)     any Imbalances, in each case whether arising prior to, on or after the Effective Time;

(f)     all Environmental Liabilities with respect to the Assets, including obligations to clean-up, restore or Remediate the Assets, ground water, surface water or soil in accordance with applicable Contracts and Laws, including any obligations to assess, Remediate, remove and dispose of NORM, asbestos, mercury, drilling fluids and chemicals, produced waters, and Hydrocarbons, in each case whether arising prior to, on or after the Effective Time;

(g)     the Plugging and Abandonment of the Assets or replug thereof and all wells, wellbores, pipelines, facilities or conditions located on or constituting the Assets (including all temporarily or previously Plugged and Abandoned wells, wellbores or pipelines), dismantle or decommission and remove any structures, fixtures or personal property, in each case, arising prior to, on or after the Effective Time;

(h)     the Leases and Assumed Contracts, in each case attributable to periods on or after the Closing Date;

(i)     obligations and covenants that are attached to, run with or otherwise binding on the Properties, Rights of Way and/or the Realty Interests in each case attributable to periods on or after the Closing Date;

(j)        all Asset Taxes that are allocated to Purchaser pursuant to Section 10.1 and Asset Taxes for which a downward adjustment to the Unadjusted Purchase Price has been made pursuant to Section 2.4 or Section 2.6, as applicable; or

(k)        the matters described on Schedule 4.8(b),

excluding, in each case of subparts (a) through (k), any and all Excluded Liabilities, (all of the foregoing obligations and liabilities set forth in this Section 12.1 after giving effect to the exclusion of the Excluded Liabilities, the "*Assumed Obligations*"). The assumption of the Assumed Obligations shall not, in any way, enlarge the rights of any Third Parties relating thereto.

Section 12.2    **Seller Group's Indemnification Rights**. Subject to the terms hereof, from and after the Closing Date, Purchaser shall be responsible for, shall pay, and shall indemnify, defend and hold harmless the Sellers, each Affiliate of the Sellers, and each of such Person's respective shareholders, members, officers, directors, employees, agents, lenders, advisors, representatives, accountants, attorneys and consultants ("*Seller Group*") from and against all obligations, liabilities, claims, causes of action, and Damages caused by, arising out of, attributable to or resulting from:

(a)        the failure or breach of Purchaser's covenants or agreements contained in this Agreement;

(b)        any failure or breach of any representation or warranty made by Purchaser contained in Article 5 of this Agreement; and

(c)        any of the Assumed Obligations (without duplication of Asset Taxes for which an upward adjustment to the Unadjusted Purchase Price has been made pursuant to Section 2.4 or Section 2.6, as applicable).

**EVEN IF ANY SUCH DAMAGES ARE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY INDEMNIFIED PERSON, INVITEES OR THIRD PARTIES, EXCEPT TO THE EXTENT ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE SELLER GROUP.**

Section 12.3    **Survival**.

(a)        All (i) representations and warranties of each Seller set forth in this Agreement and the other Transaction Documents (except for and excluding the Transition Services Agreement) shall terminate and expire at Closing; (ii) the covenants, obligations and agreements of each Seller set forth in this Agreement and the other Transaction Documents to be performed on or prior to Closing shall terminate and expire at Closing; and (iii) the covenants, obligations and agreements of each Seller set forth in this Agreement and the other Transaction Documents (except for and excluding the Transition Services Agreement) to be performed after Closing shall survive the Closing and terminate and expire on the earlier to occur of (i) the Cut-Off Date and (ii) the date such covenant, obligation and/or agreement is fully performed.

(b)     The representations, warranties, obligations and covenants of Purchaser set forth in this Agreement and the other Transaction Documents, including the covenants and obligations set forth in <u>Section 12.1</u> and <u>Section 12.2</u>, shall survive the Closing indefinitely. Subject to <u>Article 11</u>, the liability of Purchaser under this Agreement shall be without limit.

(c)     Representations, warranties, covenants, obligations and agreements shall be of no further force and effect after the date of their termination and expiration (if any) as set forth in <u>Section 12.3(a)</u> and/or <u>Section 12.3(b)</u>; *provided*, that there shall be no termination or expiration of any bona fide claim asserted pursuant to this Agreement with respect to such representations, warranty, covenant, obligation or agreement prior to its termination or expiration date.

Section 12.4    **Exclusive Remedy and Certain Limitations**.

(a)     Notwithstanding anything to the contrary contained in this Agreement, from and after Closing, the sole and exclusive remedy against any member of the Seller Group or Purchaser Group with respect to the negotiation, performance and consummation of the transactions contemplated hereunder, any breach of the representations, warranties, covenants and agreements of any member of the Seller Group or Purchaser Group contained herein, the affirmations of such representations, warranties, covenants and agreements contained in the certificates delivered by any member of the Seller Group or Purchaser Group at Closing pursuant to <u>Section 9.2(h)</u> or <u>Section 9.3(i)</u> contained in any other Transaction Document delivered hereunder by or on behalf of any member of the Seller Group or Purchaser Group shall be (x) with respect to Purchaser Group, such remedies set forth in this <u>Article 12</u> and the right to specific performance for the breach or failure of any Seller to perform any covenants required to be performed after Closing and (y) with respect to Seller Group such remedies set forth in <u>Section 7.1(b)</u>, this <u>Article 12</u> and the right to specific performance for the breach or failure of Purchaser to perform any covenants required to be performed after Closing. Effective as of Closing, Purchaser hereby waives, releases, remises and forever discharges, and shall cause each member of the Purchaser Group to waive, release, remise and forever discharge, each member of the Seller Group from any and all Damages, suits, legal or administrative proceedings, claims, demands, losses, costs, obligations, liabilities, interest, charges or causes of action whatsoever, in law or in equity, known or unknown, which any member of the Purchaser Group might now or subsequently may have, based on, relating to or arising out of (i) all avoidance, fraudulent transfer, preference or similar claims, causes of action, rights or proceedings, including all claims under Chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act enacted by any state, or any other similar state or Federal law, (ii) the negotiation, performance and consummation of this Agreement or the other Transaction Documents or the transactions contemplated hereunder or thereunder, and/or (iii) any member of the Seller Group's ownership, use or operation of the Assets, or the condition, quality, status or nature of the Assets, **INCLUDING RIGHTS TO CONTRIBUTION UNDER CERCLA OR ANY OTHER ENVIRONMENTAL LAW, BREACHES OF STATUTORY AND IMPLIED WARRANTIES, NUISANCE OR OTHER TORT ACTIONS, RIGHTS TO PUNITIVE DAMAGES, COMMON LAW RIGHTS OF CONTRIBUTION, ANY RIGHTS UNDER INSURANCE POLICIES ISSUED OR UNDERWRITTEN BY ANY MEMBER OF THE PURCHASER GROUP, AND ANY RIGHTS UNDER AGREEMENTS AMONG ANY MEMBERS OF THE SELLER GROUP, EVEN IF CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE,**

**OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY RELEASED PERSON, INVITEES OR THIRD PARTIES, EXCEPT TO THE EXTENT ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE SELLER GROUP.**

(b)     Any claim for indemnity under this <u>Article 12</u> by any current or former Affiliate, stockholder, member, officer, director, employee, agent, lender, advisor, representative, accountant, attorney and consultant of any member of the Seller Group must be brought and administered by Sellers. No member of the Seller Group other than any Seller shall have any rights against Purchaser under the terms of this Agreement except as may be exercised on behalf of such members of the Seller Group by any Seller.

(c)     Except for the right to termination of this Agreement prior to Closing as expressly provided in <u>Article 11</u>, Purchaser and the Sellers hereby waive any and all rights to rescind, reform, cancel, terminate, revoke or void this Agreement or any of the transactions contemplated hereby; *provided*, *however*, each Party shall have the non-exclusive right to seek specific performance and other equitable remedies available at law or equity (including injunctive relief) for the breach or failure of the other Parties to perform its obligations hereunder required to be performed after Closing.

(d)     The Parties shall treat, for U.S. federal and applicable state and local income Tax purposes, any amounts paid or received under this <u>Article 12</u> as an adjustment to the Adjusted Purchase Price, unless otherwise required by applicable Laws.

(e)     Purchaser hereby waives for itself and their respective successors and assigns, including any insurers, any rights to subrogation for Damages for which such Party is liable or against which such Party indemnifies any other Person under this Agreement. If required by applicable insurance policies, each Party shall obtain a waiver of such subrogation from its insurers.

Section 12.5     **Indemnification Actions**. All claims for indemnification under this <u>Article 12</u> shall be asserted and resolved as follows:

(a)     To make a claim for indemnification, defense or reimbursement under this <u>Article 12</u>, an Indemnified Person shall notify the Purchaser of its claim, including the specific details (including supporting documentation in such Indemnified Person's possession or control of the alleged Damages and such Indemnified Person's good faith estimate of the applicable claim) of and specific basis under this Agreement for its claim (the "***Claim Notice***").

(b)     In the event that any claim for indemnification set forth in any Claim Notice is based upon a claim by a Third Party against the Indemnified Person (a "***Third Party Claim***"), the Indemnified Person shall provide its Claim Notice promptly after the Indemnified Person has actual knowledge of the Third Party Claim and shall enclose a copy of all papers (if any) served with respect to the Third Party Claim in such Indemnified Person's possession or control; *provided* that the failure of any Indemnified Person to give notice of any Third Party Claim as provided in this <u>Section 12.5</u> shall not relieve the Purchaser of its obligations under this <u>Article 12</u> except to the extent such failure results in insufficient time being available to permit the Purchaser to

effectively defend against the Third Party Claim or otherwise prejudices the Purchaser's ability to defend against the Third Party Claim.

(c)     Subject to <u>Section 12.5(e)</u>, in the case of a claim for indemnification based upon any Third Party Claim, the Purchaser shall have thirty (30) days from its receipt of the Claim Notice to notify the Indemnified Person whether it admits or denies its obligation hereunder to defend the Indemnified Person against such Third Party Claim under this Agreement. The Indemnified Person is authorized, prior to and during such thirty (30) day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests and that is not materially prejudicial to Purchaser's interest. Failure of Purchaser to admit its liability to defend an Indemnified Person within such 30-day period shall be deemed a denial of liability to so defend such Indemnified Person. If the Purchaser fails to notify the Indemnified Person within such thirty (30) day period regarding whether the Purchaser admits or denies its obligation to defend the Indemnified Person against such Third Party Claim under this Agreement, then until such date as the Purchaser admits or it is finally determined by a non-appealable judgment that such right or obligation exists, the Indemnified Person may file any motion, answer or other pleading, settle any Third Party Claim or take any other action that the Indemnified Person deems necessary or appropriate to protect its interest, regardless of whether the Purchaser is prejudiced or adversely impacted by any such actions.

(d)     If Purchaser admits its obligation to defend the Indemnified Person against such Third Party Claim under this Agreement, as applicable, then Purchaser shall have (i) the right and obligation to diligently prosecute and control the defense of such Third Party Claim at the sole cost and expense of Purchaser and (ii) have full control of such defense and proceedings, including any compromise or settlement thereof unless the compromise or settlement includes the payment of any amount by, the performance of any obligation by, or the limitation of any right or benefit of, the Indemnified Person, in which event such settlement or compromise shall not be effective without the consent of the Indemnified Person, which shall not be unreasonably withheld or delayed. If requested by the Purchaser, the Indemnified Person agrees at the cost and expense of the Purchaser to cooperate in contesting any Third Party Claim which the Purchaser elects to contest; *provided*, *however*, that the Indemnified Person shall not be required to bring any counterclaim or cross-complaint against any Person. The Indemnified Person may participate in, but not control, any defense or settlement of any Third Party Claim controlled by the Purchaser pursuant to this <u>Section 12.5(d)</u>, *provided*, that the Indemnified Person may file initial pleadings as described in the last sentence of <u>Section 12.5(c)</u> if required by court or procedural rules to do so within the thirty (30) day period in <u>Section 12.5(c)</u>. A Purchaser shall not, without the written consent of the Indemnified Person, settle any Third Party Claim or consent to the entry of any judgment with respect thereto that (A) does not result in a final resolution of the Indemnified Person's liability with respect to the Third Party Claim (including, in the case of a settlement, an unconditional written release of the Indemnified Person from all further liability in respect of such Third Party Claim) or (B) may materially and adversely affect the Indemnified Person (other than as a result of money damages borne solely by Purchaser hereunder).

(e)     If Purchaser does not admit in writing its obligation to defend the Indemnified Person against such Third Party Claim under this Agreement or admits its obligation but thereafter fails to diligently defend or settle the Third Party Claim, as applicable, then the Indemnified Person shall have the right, but not the obligation, to defend and control the defense

against the Third Party Claim (at the sole cost and expense of Purchaser if the Indemnified Person is entitled to indemnification hereunder), with counsel of the Indemnified Person's choosing, subject to the right of Purchaser to admit in writing its obligation to defend the Indemnified Person against such Third Party Claim under this Agreement, as applicable, at any time prior to settlement or final determination thereof. If Purchaser has not yet admitted its obligation to defend the Indemnified Person against such Third Party Claim under this Agreement, the Indemnified Person shall send written notice to the Purchaser of any proposed settlement and the Purchaser shall have the option for ten (10) days following receipt of such notice to admit in writing its obligation to defend the Indemnified Person against such Third Party Claim under this Article 12, and if such right or obligation is so admitted, assume the defense of the Third Party Claim, including the power to reject the proposed settlement.

(f) In the case of a claim for indemnification not based upon a Third Party Claim (a "*Direct Claim*"), such Direct Claim shall be asserted by giving Purchaser a reasonably prompt Claim Notice. Such Claim Notice by the Indemnified Person shall describe the Direct Claim in reasonable detail, shall include copies of all available material written evidence in such Indemnified Person's possession or control thereof and shall indicate the estimated amount, if reasonably practicable, of Damages that have been or may be sustained by the Indemnified Person. Purchaser shall have sixty (60) days from its receipt of the Claim Notice to (i) cure the Damages complained of, (ii) admit its obligation to defend the Indemnified Person against such Direct Claim under this Agreement, or (iii) dispute the claim for such Damages. If Purchaser does not notify the Indemnified Person within such sixty (60) day period that it has cured the Damages or that it disputes the claim for such Damages, the Purchaser shall be deemed to have disputed its obligation to indemnify, defend and hold harmless the Indemnified Person against such Direct Claim under this Agreement.

Section 12.6 **Express Negligence/Conspicuous Manner**. **WITH RESPECT TO THIS AGREEMENT, ALL PARTIES AGREE THAT THE PROVISIONS SET OUT IN THIS ARTICLE 12 AND ELSEWHERE IN THIS AGREEMENT COMPLY WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS REQUIRING PURCHASER TO BE RESPONSIBLE FOR THE NEGLIGENCE (WHETHER SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF MEMBERS OF THE SELLER GROUP, EXCEPT TO THE EXTENT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE SELLER GROUP. PURCHASER REPRESENTS TO THE SELLER GROUP (A) THAT PURCHASER HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF IT HAS NOT CONSULTED AN ATTORNEY, THAT PURCHASER WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO SO CONSULT, BUT MADE AN INFORMED DECISION NOT TO DO SO AND (B) THAT PURCHASER FULLY UNDERSTANDS ITS OBLIGATIONS UNDER THIS AGREEMENT.**

## ARTICLE 13

## MISCELLANEOUS

Section 13.1 **Notices**. Any notice, request, instruction, correspondence or other document to be given hereunder by any Party to another Party (herein collectively called "*Notice*") shall be in writing and delivered in person by courier service or U.S. mail requiring acknowledgement of receipt or mailed by certified mail, postage prepaid, and return receipt requested, or by e-mail requesting the recipient to confirm receipt, as follows:

To the Sellers' Representative:

Rockall Energy, LLC
Lyndon B Johnson Fwy, Suite 700
Dallas, TX 75244
Attn: David Mirkin, Chief Financial Officer
Email: david.mirkin@rockallenergy.com

with a copy (that shall not constitute Notice) to:

Vinson & Elkins LLP
845 Texas Avenue, Suite 4700
Houston, Texas 77002
Attn: Joclynn Townsend
Email: jtownsend@velaw.com

Vinson & Elkins LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
Attn: David Meyer
Email: dmeyer@velaw.com

To Purchaser:

Formentera Partners Energy Fund I, LP
303 Colorado St., Suite 2050
Austin, TX 78701
Attn: Blake London
        Stephanie Reed
Email: blondon@formenterapartners.com
        sreed@formenterapartners.com

with a copy (that shall not constitute Notice) to:

Kirkland & Ellis LLP
401 Congress Avenue
Austin, TX 78701
Attn: Christopher S.C. Heasley
        John Kaercher, P.C.
        Danny Nappier
Email: christopher.heasley@kirkland.com
        john.kaercher@kirkland.com
        danny.nappier@kirkland.com

-88-

Notice shall be effective upon actual receipt. Any Party may change any address to which Notice is to be given to it by giving Notice as provided above of such change of address.

Section 13.2 **Governing Law**. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and the documents delivered pursuant hereto and the legal relations among the Parties shall be governed by, construed and enforced in accordance with the Laws of the State of Texas, without regard to principles of conflicts of Laws that would direct the application of the Laws of another jurisdiction; *provided*, *however*, (a) in connection with the determination of the existence of any Title Defect, Title Benefit or conveyancing matters, the Laws of the state where the applicable Assets alleged to be subject to such Title Defect or Title Benefit shall govern and control such determination and (b) in connection with any Environmental Defect, the federal Laws of the United States and the Laws of the state where the applicable Assets alleged to be subject to such Environmental Defect shall govern and control such determination.

Section 13.3 **Venue and Waiver of Jury Trial**.

(a) Except as to any dispute, controversy, matters or claim arising out of or in relation to or in connection with the calculation or determination of the Adjusted Purchase Price pursuant to Section 2.4, Section 2.5, Section 2.7, or Section 2.8 (which shall be resolved exclusively in accordance with Section 2.6(b)), or the scope, interpretation, and effect of this Article 13 or the existence, cure, or amount of any Title Benefits, Title Benefit Amounts, Defects, or Defect Amounts (which shall be resolved exclusively in accordance with Section 3.2(i)), any dispute, controversy, matter or claim between or among the Parties (each, subject to such exceptions, a "***Dispute***"), that cannot be resolved among the Parties, will be instituted exclusively in the Bankruptcy Court and each Party hereby irrevocably consents to the exclusive jurisdiction in connection with any Dispute, litigation or proceeding arising out of this Agreement or any of the transactions contemplated thereby. All Disputes between or among the Parties to this Agreement and the transactions contemplated hereby shall have exclusive jurisdiction and venue only in the Bankruptcy Court; *provided*, *however*, if the Chapter 11 Case is closed, then each Dispute will be instituted exclusively in the courts of the State of Texas in and for Dallas County or the United States District Court or the Texas State District Court located in Dallas, Texas and each Party hereby irrevocably consents to the exclusive jurisdiction in connection with any Dispute, litigation or proceeding arising out of this Agreement or any of the transactions contemplated thereby. Each Party waives any objection which it may have pertaining to improper venue or forum non-conveniens to the conduct of any litigation or proceeding in the foregoing courts. Each Party agrees that any and all process directed to it in any such proceeding or litigation may be served upon it outside of the Bankruptcy Court, or, in the event the Chapter 11 Case is closed, outside of Dallas County, Texas with the same force and effect as if such service had been made within the State of Texas in and for Dallas County or the United States District Court or the Texas State District Court located in Dallas, Texas.

(b) To the extent that either Party or any of its Affiliates has or hereafter may acquire immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, such Party (on its own behalf and on behalf of its Affiliates) hereby irrevocably (i) waives such immunity in respect of its obligations with respect to this

-89-

Agreement and (ii) submits to the personal jurisdiction of any court described in <u>Section 13.3(a)</u>. Further, each Party waives any objection which it may have pertaining to improper venue or forum non-conveniens to the conduct of any litigation or proceeding in the foregoing courts. Each Party agrees that any and all process directed to it in any such proceeding or litigation may be served upon it outside of the State of Texas in and for Dallas County or the United States District Court located in Dallas, Texas with the same force and effect as if such service had been made within Dallas County, Texas.

(c)     The Parties agree that a dispute under this Agreement may raise issues that are common with one or more of the other Transaction Documents or other documents executed by the Parties in connection herewith or which are substantially the same or interdependent and interrelated or connected with issues raised in a related dispute, controversy, or claim between or among the Parties and their Affiliates. Accordingly, any Party to a new Dispute under this Agreement may elect in writing within fifteen (15) days after the initiation of a new Dispute to refer such new Dispute for resolution by the applicable court together with any existing Dispute arising under this Agreement, other Transaction Documents or other documents executed by the Parties in connection herewith or which are substantially the same or interdependent and interrelated or connected. If the applicable court does not determine to consolidate such new Dispute with the existing Dispute within thirty (30) days of receipt of written request, then the new Dispute shall not be consolidated, and the resolution of the new Dispute shall proceed separately.

(d)     EACH OF THE PARTIES HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY LITIGATION, ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT.

Section 13.4     **Headings and Construction**. The headings and captions herein are inserted for convenience of reference only and are not intended to govern, limit or aid in the construction of any term or provision hereof. The rights and obligations of each Party shall be determined pursuant to this Agreement. The Sellers and Purchaser have each had the opportunity to exercise business discretion in relation to the negotiation of the details and terms of the transaction contemplated hereby. This Agreement is the result of arm's length negotiations from equal bargaining positions. It is the intention of the Parties that every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting Party) and no consideration shall be given or presumption made, on the basis of who drafted this Agreement or any particular provision thereof, it being understood that the Parties to this Agreement are sophisticated and have had adequate opportunity and means to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby and retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.

Section 13.5     **Waivers**. Any failure by any Party to comply with any of its obligations, agreements or conditions herein contained may be waived by the Party to whom such compliance is owed by the application of the express terms hereof by an instrument signed by the Party to whom compliance is owed and expressly identified as a waiver, but not in any other manner. No course of dealing on the part of any Party or its respective officers, employees, agents, or representatives and no failure by any Party to exercise any of its rights under this Agreement shall,

in each case, operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision. Except as otherwise expressly provided herein, no waiver of, or consent to a change in or modification of, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in or modification of, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided herein. The rights of each Party under this Agreement shall be cumulative and the exercise or partial exercise of any such right shall not preclude the exercise by such Party of any other right.

Section 13.6 **Severability**. It is the intent of the Parties that the provisions contained in this Agreement shall be severable and should any terms or provisions, in whole or in part, be held invalid, illegal or incapable of being enforced as a matter of law, such holding shall not affect the other portions of this Agreement, and such portions that are not invalid shall be given effect without the invalid portion. Upon such determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 13.7 **Assignment**. Except as provided in this Section 13.7, no Party shall assign or otherwise transfer all or any part of this Agreement, nor shall any Party delegate any of its rights or duties hereunder, without the prior written consent of the other Party and any transfer or delegation made without such consent shall be null and void; *provided*, *however*, that Purchaser shall be permitted to assign all or any portion of its rights or obligations under this Agreement to one or more Affiliates without prior written consent of Sellers; *provided further*, *however*, Purchaser shall be joint and severally liable with such Affiliate assignees for all such assigned obligations. Unless expressly agreed to in writing by the Parties, no permitted assignment of any Party's rights or duties that is subject to the consent of the other Party shall relieve or release the assigning Party from the performance of such Party's rights or obligations hereunder and such assigning Party shall be fully liable to the other Party for the performance of all such rights and duties. To the extent Purchaser directly or indirectly assigns, transfers, conveys or otherwise disposes, by operation of law, merger, consolidation, change of control or disposition of equity interests or otherwise, of all or any interests in any of the Assets, each Person receiving such interests shall, and Purchaser shall cause each such Person, to assume in writing and Purchaser and such Person(s) shall be jointly and severally liable hereunder to any Seller with respect to the Assumed Obligations arising out of or attributable to such Assets. If a Liquidating Trust is established, from and after the formation of the Liquidating Trust all rights and obligations of any Seller under this Agreement shall accrue to and be for the benefit of, and shall be exercisable by, the Liquidating Trust, as provided by any order of the Bankruptcy Court, and the Liquidating Trustee shall be entitled to exercise all of the rights of the Sellers under this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns.

Section 13.8 **Entire Agreement**. This Agreement and the other Transaction Documents constitute the entire agreement among the Parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof. IN THE EVENT OF A CONFLICT BETWEEN THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE TERMS

AND PROVISIONS OF ANY SCHEDULE OR EXHIBIT HERETO, THE TERMS AND PROVISIONS OF THIS AGREEMENT SHALL GOVERN AND CONTROL; *PROVIDED*, *HOWEVER* THAT THE INCLUSION IN ANY OF THE SCHEDULES AND EXHIBITS HERETO OF TERMS AND PROVISIONS NOT ADDRESSED IN THIS AGREEMENT SHALL NOT BE DEEMED A CONFLICT, AND ALL SUCH ADDITIONAL PROVISIONS SHALL BE GIVEN FULL FORCE AND EFFECT, SUBJECT TO THE PROVISIONS OF THIS <u>SECTION 13.8</u>.

Section 13.9 **<u>Amendment</u>**. This Agreement may be amended or modified only by an agreement in writing signed by Seller and Purchaser and expressly identified as an amendment or modification.

Section 13.10 **<u>No Third-Person Beneficiaries</u>**. Nothing in this Agreement shall entitle any Person other than Purchaser and any Seller to any claim, cause of action, remedy or right of any kind, except the rights expressly provided to the Persons described in <u>Section 7.1</u>, <u>Section 7.11</u>, <u>Article 12</u>, <u>Section 13.11</u> and <u>Section 13.13</u>, in each case, only to the extent such rights are exercised or pursued, if at all, by any Seller or Purchaser acting on behalf of such Person (which rights may be exercised in the sole discretion of the applicable Party hereunder). Notwithstanding the foregoing: (a) the Parties reserve the right to amend, modify, terminate, supplement, or waive any provision of this Agreement or this entire Agreement without the consent or approval of any other Person (including any Indemnified Person) and (b) no Party hereunder shall have any direct liability to any permitted Third Party beneficiary, nor shall any permitted Third Party beneficiary have any right to exercise any rights hereunder for such Third Party beneficiary's benefit except to the extent such rights are brought, exercised and administered by a Party hereto in accordance with <u>Section 12.4(b)</u>.

Section 13.11 **<u>Non-Recourse Persons</u>**. The Parties acknowledge and agree that no past, present or future director, manager, officer, employee, incorporator, member, partner, stockholder, agent, attorney, representative, Affiliate or financing source (including, with respect to Sellers, without limitation, Petro Harvester Oil & Gas Company, LLC, KERA Holdings, LLC and White Marlin Energy Partners, LLC, any investment fund managed by the foregoing or TPG Harvester, L.P. or any of its Affiliates, other PE minority fund holder or any of their respective Affiliates and, with respect to Purchaser without limitation, Formentera Partners, LP or any of its Affiliates, any investment fund managed by Formentera Partners, LP or any of its Affiliates, or other PE minority fund holder or any of their respective Affiliates), and any of the foregoing Person's respective past, present or future directors, managers, officers, employees, incorporators, members, partners, stockholders, agents, attorneys, representatives, Affiliates (other than any of the Parties) or financing sources of the Sellers or Purchaser (excluding, in each case, the Sellers and Purchaser, and subject to such exclusion, each, a "***Non-Recourse Person***"), in such capacity, shall have any liability or responsibility (in contract, tort, or otherwise) for, and Sellers and Purchaser hereby waive, release, remise and forever discharge, and shall cause each member of the Seller Group and Purchaser Group, as applicable, to waive, release, remise and forever discharge, any liabilities, suits, legal or administrative proceedings, claims, demands, losses, costs, obligations, liabilities, interests, charges or causes of action whatsoever, in law or in equity, known or unknown, against each Non-Recourse Person which are based on, related to or arise out of the ownership or operation of the Assets, the Excluded Assets or negotiation, performance and consummation of the

Transaction Documents or the transactions contemplated thereunder. Each Non-Recourse Person is expressly intended as a third-party beneficiary of this Section 13.11.

Section 13.12 **Limitation on Damages**. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PERSON SHALL BE ENTITLED TO LOST PROFITS, DIMINUTION IN VALUE, LOSS OF BUSINESS OPPORTUNITY, INDIRECT, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND EACH OF PURCHASER AND ANY SELLER, FOR ITSELF AND ON BEHALF OF THEIR RESPECTIVE MEMBERS OF THE PURCHASER GROUP AND THE SELLER GROUP, RESPECTIVELY, HEREBY EXPRESSLY WAIVES ANY RIGHT TO LOST PROFITS, INDIRECT, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, OTHER THAN LOST PROFITS, DIMINUTION IN VALUE, LOSS OF BUSINESS OPPORTUNITY, INDIRECT, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES SUFFERED BY ANY THIRD PARTY FOR WHICH RESPONSIBILITY IS ALLOCATED AMONG THE PARTIES UNDER THE TERMS HEREOF.**

Section 13.13 **Deceptive Trade Practices Act**. Purchaser certifies that it is not a "consumer" within the meaning of the Texas Deceptive Trade Practices Consumer Protection Act, Subchapter E of Chapter 17, Sections 17.41, *et seq.*, of the Texas Business and Commerce Code, (as amended, the "*DTPA*"). Purchaser covenants, for itself and for and on behalf of any successor or assignee, that if the DTPA is applicable to this Agreement, (a) Purchaser is a "business consumer" as that term is defined in the DTPA, **(b) AFTER CONSULTATION WITH ATTORNEYS OF PURCHASER'S OWN SELECTION, PURCHASER HEREBY VOLUNTARILY WAIVES AND RELEASES ALL OF PURCHASER'S RIGHTS AND REMEDIES UNDER THE DTPA AS APPLICABLE TO EACH SELLER AND SUCH SELLER'S SUCCESSORS AND ASSIGNS AND (c) PURCHASER SHALL DEFEND AND INDEMNIFY THE SELLER GROUP FROM AND AGAINST ANY AND ALL CLAIMS OF OR BY ANY MEMBER OF THE PURCHASER GROUP OR ANY OF THEIR SUCCESSORS AND ASSIGNS OR ANY OF ITS OR THEIR AFFILIATES BASED IN WHOLE OR IN PART ON THE DTPA ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT**.

Section 13.14 **Time of the Essence; Calculation of Time**. Time is of the essence in this Agreement. If the date specified in this Agreement for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date that is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day that is a Business Day.

Section 13.15 **Sellers' Representative**.

(a) Each Seller other than Sellers' Representative, by executing this Agreement, irrevocably constitutes and appoints Sellers' Representative and its successors as such appointing Person's attorney-in-fact to act on behalf of such Person in connection with the

authority granted to the Sellers' Representative pursuant to this <u>Section 13.15</u>, and acknowledges that such appointment is coupled with an interest.

(b)     Each Seller other than Sellers' Representative, by the appointment described in <u>Section 13.15(a)</u>, (i) authorizes the Sellers' Representative subsequent to the Execution Date (A) to give and receive written consents, reports, notices and communications to or from Purchaser relating to this Agreement, the transactions contemplated by this Agreement and the other Transaction Documents, (B) to act on such appointing Person's behalf with respect to any and all matters affecting such appointing Person in this Agreement, including giving and receiving all notices and communications to be given or received with respect to any such matters, and (C) to negotiate, compromise and resolve any dispute that may arise under this Agreement; *provided*, *however*, that in each of <u>clauses (A)</u> through <u>(C)</u> preceding, the Sellers' Representative will not have the authority to execute any agreements or documents (other than consents, reports, notices and communications) on behalf of any other Seller, and (ii) agrees to be bound by all agreements and determinations made by and documents executed and delivered by the Sellers' Representative pursuant to the authority granted to the Sellers' Representative hereunder.

(c)     Each Seller other than Sellers' Representative, by the execution of this Agreement, expressly acknowledges and agrees that (i) the Sellers' Representative is authorized to act on its behalf with respect to this Agreement, notwithstanding any dispute or disagreement between such appointing Person and the Sellers' Representative, and (ii) Purchaser will be entitled to solely interact with, and rely on any and all actions taken by, the Sellers' Representative under this Agreement without any liability to, or obligation to inquire of, such appointing Person. Any notice or communication given or received by, and any decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of, the Sellers' Representative that is within the scope of the Sellers' Representative's authority under this <u>Section 13.15</u> will constitute a notice or communication to or by, or a decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction of the Sellers and will be final, binding and conclusive upon such appointing Person. Purchaser will be entitled to rely upon any such notice, communication, decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or instruction as being a notice or communication to or by, or a decision, action, failure to act within a designated period of time, agreement, consent, settlement, resolution or interaction of, such appointing Person and the Sellers.

(d)     Each Seller and each Sellers' Representative is, and hereby agrees to be, jointly and severally liable to Purchaser with respect to the representations, warranties and covenants of each Seller set forth herein and/or in each Transaction Document.

Section 13.16 **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, .pdf or other electronic transmission of copies of signatures shall constitute original signatures for all purposes of this Agreement and any enforcement hereof.

[*Remainder of Page Intentionally Left Blank. Signature Pages Follow.*]

IN WITNESS WHEREOF, this Agreement has been signed by each of the Parties as of the Execution Date.

**SELLERS**:

**ROCKALL ND, LLC**

Name:_____

By:      David Mirkin

Title:   SVP & CFO

**ROCKALL MIDSTREAM, LLC**

Name:_____

By:      David Mirkin

Title:   SVP & CFO

**ROCKALL AGENT CORP.**

Name:_____

By:      David Mirkin

Title:   SVP & CFO

**ROCKALL MS, LLC**

Name:_____

By:      David Mirkin

Title:   SVP & CFO

**ROCKALL LAUREL, LLC**

Name:_____

By:      David Mirkin

Title:   SVP & CFO

**ROCKALL EOR, LLC**

Name:_____

By:      David Mirkin

Title:   SVP & CFO

**ROCKALL LA, LLC**

Name: _____

By:    David Mirkin
Title:  SVP & CFO

**ROCKALL PINE PRAIRIE, LLC**

Name: _____

By:    David Mirkin
Title:  SVP & CFO

**WHITE MARLIN MIDSTREAM, LLC**

Name: _____

By:    David Mirkin
Title:  SVP & CFO

**PETRO HARVESTER OPERATING CO., LLC**

Name: _____

By:    David Mirkin
Title:  SVP & CFO

**ROCKALL ENERGY LLC**

Name: _____

By:    David Mirkin
Title:  SVP & CFO

**PURCHASER:**

**FORMENTERA PARTNERS FUND I, LP**

Name: _____

By:    Blake London

Title: Vice President

**EXHIBITS**:

| | |
|---|---|
| Exhibit A | Assets |
|    Exhibit A-1 | Leases |
|    Exhibit A-2 | Wells |
|    Exhibit A-3 | Future Wells |
|    Exhibit A-4 | Rights of Way |
|    Exhibit A-5 | Realty Interests |
|    Exhibit A-6 | Inventory and Equipment |
|    Exhibit A-7 | Vehicles |
|    Exhibit A-8-A | O&G Contracts |
|    Exhibit A-8-B | Carbon Contracts |
| Exhibit B | Form of Recordable Conveyances |
| Exhibit C | Form of Closing Certificates |
|    Exhibit C-1 | Form of Seller Closing Certificate |
|    Exhibit C-2 | Form of Purchaser Closing Certificate |
| Exhibit D | Form of Resignation of Operator |
| Exhibit E | Form of Sale Order |
| Exhibit F | Form of Transition Services Agreement |
| Exhibit G | Form of Letter in Lieu |
| Exhibit H | Form of Mineral Deed |

**<u>Exhibit C</u>**

**Proposed Confirmation Order Notice**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 22-90000 (MXM)** |
| | § | |
| **ROCKALL ENERGY HOLDINGS, LLC,** | § | **(Chapter 11)** |
| *et al.*, | § | |
| | § | **(Jointly Administered)** |
| | § | |
| **Debtors.**[1] | § | |

### NOTICE OF (I) ENTRY OF ORDER CONFIRMING THE
### DEBTORS' AMENDED JOINT CHAPTER 11 PLAN, (II) OCCURRENCE OF THE
### EFFECTIVE DATE, AND (III) ADMINISTRATIVE EXPENSE CLAIMS BAR DATE

**PLEASE TAKE NOTICE** that on June [1], 2022, the Honorable Mark X. Mullin, United States Bankruptcy Judge for the United States Bankruptcy Court for the Northern District of Texas (the "***Bankruptcy Court***"), entered the order [Dkt. No. [●]] (the "***Confirmation Order***") confirming the *Debtors' Amended Joint Chapter 11 Plan* [Dkt. No. 548] (as amended, modified, or supplemented, the "***Plan***").[2]

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on **June [8], 2022**.

**PLEASE TAKE FURTHER NOTICE** that copies of Confirmation Order and the Plan, as well as other documents filed in these chapter 11 cases can be found on the docket of these chapter 11 cases and can also be downloaded free of charge from the website of the Debtors' noticing and claims agent, Stretto, at https://cases.stretto.com/Rockall.

**PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has approved certain release, exculpation, injunction, and related provisions in Article VIII of the Plan.

**PLEASE TAKE FURTHER NOTICE** that the Plan and Confirmation Order, and the provisions thereof, are binding on the Debtors, the Liquidation Trust, the GUC Trust, any Holder of a Claim against or Interest in the Debtors and such Holder's respective successors, assigns, and

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Arrow Rock Energy, LLC (7549), Petro Harvester Operating Company, LLC (2136), Rockall Agent Corp. (1653), Rockall Energy Holdings, LLC (5784), Rockall Energy, LLC (6340), Rockall EOR, LLC (4136), Rockall Exploration Company, LLC (0547), Rockall Intermediate, Inc. (9759), Rockall LA, LLC (4270), Rockall Laurel, LLC (1178), Rockall Midstream, LLC (0917), Rockall MS, LLC (0740), Rockall ND, LLC (9311), Rockall Pine Prairie, LLC (5799), White Marlin Investment Company, LLC (9987), and White Marlin Midstream, LLC (1466). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 5005 LBJ Freeway, Suite 700, Dallas, TX 75244.

[2] Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order.

US 8836385

designees, whether or not the Claim or Interest of such Holder is Impaired under the Plan and whether or not such Holder or entity voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Plan and the Confirmation Order, the deadline for filing requests for payment of Administrative Expense Claims shall be [June 30], 2022, and the deadline for filing requests for payment of Professional Fee Claims shall be [July 30], 2022.[3]

**PLEASE TAKE FURTHER NOTICE** that the Bar Date for filing claims based on the rejection of Executory Contracts or Unexpired Leases is the later of: (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) 5:00 p.m. (prevailing Central Time) on the date that is 21 days following service of an order (including the Confirmation Order) approving the rejection of any executory contract or unexpired lease of the Debtors. To the extent any executory contract or unexpired lease is rejected pursuant to the terms of the Plan, the Rejection Damages Bar Date shall be 21 days after service of this *Notice of (I) Entry of Order Confirming the Debtors' Amended Joint Chapter 11 Plan, (II) Occurrence of the Effective Date, and (III) Administrative Expense Claims Bar Date*.

**PLEASE TAKE FURTHER NOTICE** that from and after this date, if you wish to receive notice of filings in this case, you must request such notice with the clerk of the Bankruptcy Court and serve a copy of such request for notice on counsel to the Liquidation Trust. You must do this even if you filed such a notice prior to the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review the Plan and the Confirmation Order in their entirety.

---

[3]    The deadline for filing requests for payment of Administrative Expense Claims shall be: (a) for Administrative Expense Claims that are not Professional Fee Claims, 30 days after the Effective Date; and (b) for Administrative Expense Claims that are Professional Fee Claims, 60 days after the Effective Date.

US 8836385

Dated: June [●], 2022
Dallas, Texas

/s/ *[Draft]*

**VINSON & ELKINS LLP**

Michael A. Garza (Texas Bar No. 24126797)
Matthew J. Pyeatt (Texas Bar No. 24086609)
Trevor G. Spears (Texas Bar No. 24106681)
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Tel: 214.220.7700
Fax: 214.999.7787
mgarza@velaw.com; mpyeatt@velaw.com;
tspears@velaw.com

- and -

David S. Meyer (admitted *pro hac vice*)
George R. Howard (admitted *pro hac vice*)
Lauren R. Kanzer (admitted *pro hac vice*)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel: 212.237.0000
Fax: 212.237.0100
dmeyer@velaw.com; ghoward@velaw.com;
lkanzer@velaw.com

**ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

US 8836385